Jason A. Richardson (Utah SBN #14543)
Email:  jason.richardson@mhllp.com
David T. McDowell* (TX SBN #00791222)
Email: david.mcdowell@mhllp.com
Kendall J. Burr* (TX SBN #24067533)
Email: kendall.burr@mhllp.com
McDowell Hetherington LLP
1001 Fannin St., Suite 2700
Houston, Texas 77002
Telephone:  (713) 337-5580
Facsimile:  (713) 337-8850
*admitted pro hac vice

Attorneys for Defendant American General
Life Insurance Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| **Molly Farrand,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | Case Number: 1:16-cv-00134-DB |
| **American General Life Insurance** | § | |
| **Company,** | § | |
| | § | |
| *Defendant.* | § | |

## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   Introduction and Relief Sought ................................................................. 1

II.  Background ............................................................................................... 2

III. Statement of Undisputed Material Facts .................................................. 4

IV.  Standard ................................................................................................... 8

V.   Argument .................................................................................................. 9

    A.   American General did not breach the Policy contract. ................................. 9

        a)   Mr. Farrand's death was not accidental under Utah law. .............................. 10

        b)   Coverage was unavailable due to applicable Policy exclusions ................... 13

            i.    Mr. Farrand was committing a felony ....................................... 13

            ii.   Mr. Farrand was engaged in illegal activity ............................. 14

            iii.  Mr. Farrand was intoxicated .................................................... 15

            iv.   Mr. Farrand intended to cause his own death. .......................... 16

    B.   American General denied the claim in good faith because it had a reasonable basis for denial, and its decision was, at a minimum, fairly debatable. .................................. 16

    C.   American General did not intentionally inflict emotional distress, as the claim denial was not outrageous and intolerable .......................................................................... 20

    D.   Plaintiff's fourth cause of action is an improper attempt to assert violations of the insurance code as a bad faith tort, and Utah courts reject such claims as lacking a private right of action .......................................................................................... 22

    E.   Mrs. Farrand asserts improper extra-contractual damages premised on her husband's death, not on American General's alleged conduct. .................................................. 23

VI.  Conclusion .............................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Alf v. State Farm Fire & Cas. Co.*,
  850 P.2d 1272 (UT 1993) .......................................................................... 10

*Ankers v. Rodman*,
  995 F.Supp. 1329 (D. Utah 1997) ............................................................ 21

*Annett v. Univ. of Kan.*,
  371 F.3d 1233 (10th Cir. 2004) .................................................................. 9

*Bair v. Axiom Design, L.L.C.*,
  2001 UT 20, 20 P.3d 388 (2001) ............................................................. 10

*Beck v. Farmers Ins. Exch.*,
  701 P.2d 795 (UT 1985) ............................................................................ 24

*Bennett v. Jones, Waldo, Holbrook & McDonough*,
  2003 UT 9, 70 P.3d 17 (2003) ................................................................. 21

*Billings v. Union Bankers Ins. Co.*,
  918 P.2d 461 (UT 1996) ............................................................................ 24

*Bones v. Honeywell Int'l, Inc.*,
  366 F.3d 869 (10th Cir. 2004) .................................................................... 9

*Brown v. State Farm Mut. Auto. Ins. Co.*,
  302 So.2d 445 (Fla. 1st DCA 1974) ........................................................ 15

*Callioux v. Progressive Ins. Co.*,
  745 P.2d 838 (Utah Ct.App. 1987) ..................................................... 17, 19

*Campbell v. State Farm Mut. Auto. Ins. Co.*,
  840 P.2d 130 (Utah Ct.App. 1992) .......................................................... 24

*Candelaria v. CB Richard Ellis*,
  319 P.3d 708 (Utah Ct.App. 2014) .......................................................... 22

*Castillo v. Atlanta Cas. Co.*,
  939 P.2d 1204 (Utah Ct.App. 1997) ........................................................ 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) .............................. 8

*Crabb v. State Farm Fire & Cas. Co.*,
  Civil No. 2:04-CV-00454-PGC (D. Utah October 5, 2004) (ECF No. 15) ........................... 22

*Eldredge v. State Farm Mut. Auto. Ins. Co.*,
  No. 2:12CV900 DAK, 2014 WL 1875663 (D. Utah May 9, 2014) ...................................... 17

*Hoffman v. Life Ins. Co. of N. Am.*,
  669 P.2d 410 (UT 1983) ................................................................................... 10, 12

*Holman v. New York Life Ins. Co.*,
  No. 2:10-CV-490 TS, 2012 WL 253202 (D. Utah Jan. 26, 2012)........................................ 22

*Isoard v. Mut. Life Ins. Co. of New York*,
  22 F.2d 956 (8th Cir. 1927) .............................................................................. 11

*J.C. Penney Life Ins. Co. v. Moser*,
  490 So.2d 1275 (Fla. 5th DCA 1986) ................................................................... 12

*King v. Cigna Corp.*,
  No. 06-CV-6203T, 2008 WL 795823 (W.D.N.Y. Mar. 24, 2008) ........................................ 12

*Matthews v. Kennecott Utah Copper Corp.*,
  54 F.Supp.2d 1067 (D. Utah 1999)....................................................................... 21

*Morris v. Health Net of Calif., Inc.*,
  1999 UT 95, 988 P.2d 940 (1999) ...................................................................... 17

*Murdock v. Monumental Life Ins. Co.*,
  2 P.3d 963 (Utah Ct.App. 2000) ....................................................................... 12

*N.M. on behalf of Caleb v. Daniel E.*,
  2008 UT 1, 175 P.3d 566 (2008) ..................................................................... 10, 11

*Phillips v. Calhoun*,
  956 F.2d 949 (10th Cir. 1992) ........................................................................... 9

*Prince v. Bear River Mut. Ins. Co.*,
  2002 UT 68, 56 P.3d 524 (2002) ............................................................. 16, 17, 19, 20

*Retherford v. AT&T Comm'n of Mountain States, Inc.*,
  844 P.2d 949 (UT 1992) .................................................................................. 21

*S.S. by & through Shaffer v. IHC Health Servs., Inc.*,
  2018 UT 13, 417 P.3d 603 (2018) ........................................................................ 21

*Scott v. Harris*,
    550 U.S. 372, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007)........................................................ 8

*Sigmon v. CommunityCare HMO, Inc.*,
    234 F.3d 1121 (10th Cir. 2000) ................................................................................................ 8

*State v. Casey*,
    2001 UT App 205, 29 P.3d 25 (2001) .................................................................................... 13

*State v. Casey*,
    2003 UT 55, 82 P.3d 1106 (2003) .......................................................................................... 13

*Utah Farm Bureau Ins. Co. v. Crook*,
    1999 UT 47, 980 P.2d 685 (1999) .......................................................................................... 10

*Vasquez v. Trinity Mission Health*,
    No. 2:11-CV-01002-EJF, 2013 WL 4095157 (D. Utah Aug. 13, 2013) ............................... 21

*Western Cas. & Sur. Co. v. Marchant*,
    615 P.2d 423 (UT 1980) ......................................................................................................... 18

*Young v. Fire Ins. Exchange*,
    2008 UT App 114, 182 P.3d 911 (2008) ............................................................................... 17

**Statutes**

Utah Admin. Code r. R590-191 ....................................................................................................... 22

Utah Code § 41-6a-502 .................................................................................................................... 15

Utah Code § 76-10-506 .................................................................................................................... 14

Utah Code § 76-10-507 .................................................................................................................... 14

Utah Code § 76-10-528 .................................................................................................................... 15

Utah Code § 76-5-102(1)(a) ............................................................................................................ 13

Utah Code § 76-5-102(1)(b) ............................................................................................................ 13

Utah Code § 76-5-102.4(4) .............................................................................................................. 13

Utah Code § 76-5-103(1) ................................................................................................................. 13

Utah Code § 76-5-107 ...................................................................................................................... 14

Utah Code § 76-5-107(3) .......................................................................................... 14

Utah Code § 76-5-107(4) .......................................................................................... 14

Utah Code § 76-8-305 ............................................................................................... 15

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 8

Fed. R. Civ. P. 56(c) .................................................................................................. 9

Local Rule 56-1(b)(2) ................................................................................................ 2

**Other Authorities**

14 Lee. R. Russ & Thomas F. Segalla, *Couch on Insurance* 3d § 207:53 (1999) ....................... 16

Defendant American General Life Insurance Company, pursuant to Federal Rule of Civil Procedure 56, moves for summary judgment on all claims asserted by Plaintiff Molly Farrand.

## I.   INTRODUCTION AND RELIEF SOUGHT

American General requests summary judgment on all claims.  Plaintiff alleges that her husband, Vincent Farrand, died as the result of an "accidental injury" covered by an American General insurance policy.  But the undisputed facts show that Mr. Farrand's death was the result of his own criminal and intentional conduct when he exited his home, gun in hand, intoxicated, and confronted police officers.  Mrs. Farrand told 9-1-1 that her husband was suicidal and wanted to be shot.  Mr. Farrand defied repeated commands to "drop the gun," and instead tapped the trigger and told the officer repeatedly to just "do it."  Finally, he raised his gun towards the officer, who then shot him.  Mr. Farrand's death is certainly a tragedy, but it is not a covered "accident."

American General seeks summary judgment on Plaintiff's breach of contract claim.  The shooting was not an accident under Utah law, and regardless, the policy excludes recovery where the insured is engaged in illegal conduct, such as assault and disobeying police commands.

Summary judgment is also undeniably warranted on Plaintiff's claim alleging breach of the duty of good faith and fair dealing.  Utah law rejects such claims where the insurer's position is "fairly debatable."  American General's position easily meets that standard, as it is amply supported by witness statements, transcripts, and detailed forensic analyses from the Davis County Police Department's investigation, and was confirmed in discovery by audio and video recordings, as well as corroborative deposition testimony.  American General acted in good faith, and its position is not just fairly debatable; it is correct.

Mrs. Farrand's claim for intentional infliction of emotional distress likewise fails, as Utah

1

courts apply the same "fairly debatable" standard to such claims.

Mrs. Farrand's tortious interference with public policy claim is also improper under Utah law, which rejects such claims as lacking a private right of action.

Finally, in the unlikely event that any claims survive summary judgment, they should be limited to the policy's stated benefit; Plaintiff's non-contractual damage theories are groundless.

## II.   BACKGROUND

Pursuant to Local Rule 56-1(b)(2), citations for the facts described below are set forth in the following Statement of Undisputed Facts (*infra* Section III).

On Sunday, April 13, 2014, Vincent Farrand grabbed a firearm and left his house.  He had been arguing with his wife about a friend, Brett Clyde, who had supposedly made an unsolicited sexual advance towards her a few weeks earlier.  Mr. Farrand had also been drinking heavily throughout the day, and had struggled with depression most of his life, including a prior suicide attempt.  After he left with the gun, Mrs. Farrand called 9-1-1, concerned about her husband's mental health and what he might do.  She told the dispatcher, "He wants to go kill him.  I'm afraid he is either going to kill himself or this other person."

Minutes later, Mr. Farrand came back into the house, still upset.  Mrs. Farrand was still on the line with 9-1-1.  Three police officers arrived within minutes, and parked out front.  Mr. Farrand sent his son a text message stating "Hey Logan I love you . . ," and retrieved a .22 pistol.  Mrs. Farrand told him that the police wanted him to come out, then she saw the pistol and exclaimed to the 9-1-1- dispatcher, "He has the .22 handgun and another gun.  And I think he wants the police to shoot him . . . He's been suicidal for a long time . . . Suicide by cops."  She repeated this sentiment later on the same call:  "He's suicidal, and I'm afraid he wants suicide by cops."  She

exited the house through a side door to meet the arriving officers, one of whom, Officer Preston Casey, led her away from the scene.

Mr. Farrand exited his front door, intoxicated, holding the pistol by his side.  He was met by Officer Jason Read, who repeatedly pleaded with Mr. Farrand to drop the gun.  Officer Gary Thomas approached from behind and witnessed the standoff between Mr. Farrand and Officer Read.  Officer Thomas's dash camera also caught a partial view of the confrontation, and he also had a microphone on him that captured their dialogue.  Officer Read kept pleading with Mr. Farrand, ordering him to "Drop the gun" at least nine times and adding, "Don't put your finger on that trigger, man.  Don't put your finger on that trigger."  But Mr. Farrand would not comply; instead, he rubbed and tapped the trigger repeatedly and responded to Officer Read three times, "Do it."  Mr. Farrand then abruptly moved towards a gate positioned between the house and the detached garage, opened the gate, began to pass through the opening in a sideways "bladed" position, and lifted his gun towards Officer Read.  Officer Read fired four shots, two of which hit and killed Mr. Farrand.

Two weeks later, Mrs. Farrand submitted a claim to American General seeking $500,000 in benefits under an accidental injury policy insuring her husband.  American General retained third party Curry & Associates to acquire the detailed reports from the Davis County Police Department's official investigation of the incident, which included numerous witness statements from the officers and other eye-witnesses, transcripts of interviews, a detailed ballistics analysis, a medical examiner's report, a toxicology report, an analysis of Mr. Farrand's computer and cell phone, and numerous other materials.

American General reviewed this evidence and made its claims decision in good faith.  The

Policy only covered "accidental" injuries that were "unforeseen and suddenly sustained without the design or intent of [the] Insured Person."  The Policy also listed exclusions where the claim involved a felony or illegal activity (such as disobeying police instructions and raising a gun towards the officer), suicide, and intoxication.  After reviewing the investigative materials, American General determined that it had sufficient information to make a claims decision, concluding that the Policy benefits were not payable, and properly denied the claim.

## III.  STATEMENT OF UNDISPUTED MATERIAL FACTS

The following undisputed facts are evidenced in the attached Appendix:

1.  American General issued an AccidentCare Direct limited benefit policy (Policy No. YMC0171575) (the "Policy") for accidental injury coverage to Vincent Farrand effective September 28, 2011. (Appx. A., Policy at AGLIC-FARRAND 000013-26.)

2.  The Policy provided a $500,000 benefit should Mr. Farrand die as the result of an accidental injury. (*Id.*, Policy at AGLIC-FARRAND 000018.)

3.  The Policy defines "accidental injury" as an "accidental bodily injury, which is unforeseen and suddenly sustained without the design or intent of [the] Insured Person." (*Id.*, Policy at AGLIC-FARRAND 000016.)

4.  The Policy excludes coverage for any accidental injury or any loss "caused or resulting in whole or in part by," *inter alia*:

   a.  The Insured's suicide or attempt at suicide, or intentional self-inflicted injury, or any attempt at intentional self-inflicted injury while sane or insane; or

   b.  The Insured's being under the influence of an excitant, depressant, hallucinogen, narcotic, or any other drug or intoxicant including those prescribed by a physician that are misused by the Insured Person; or

   c.  The Insured's commission of or attempt to commit an assault or felony; or

>   d.   The Insured's engaging in an illegal activity or occupation.

(*Id.*, Policy at AGLIC-FARRAND 000019.)

5.       Molly Farrand called 9-1-1 on April 13, 2014 because her husband had taken a firearm from his gun safe and was traveling to confront Brett Clyde, who had allegedly made an unsolicited sexual advance towards her weeks earlier.  (Appx. B., M. Farrand dep. at 20:15-22:5.)

6.       Mr. Farrand had been drinking throughout the day on April 13, 2014, and arguing with his wife about Mr. Clyde.  (*Id.*, M. Farrand dep. at 45:25-46:7.)

7.       On the 9-1-1 call, Mrs. Farrand told dispatch, "I'm afraid he is either going to kill himself or this other person." (Appx. C., 9-1-1 call at 3:12-13; Appx. D., Audio of 9-1-1 call.)

8.       Mr. Farrand had a history of depression and had previously attempted suicide. (Appx. B., M. Farrand dep. at 56:13-20.)

9.       Mr. Farrand came back into the house and retrieved a .22 pistol.  Mrs. Farrand then exclaimed on the 9-1-1 call, "He has the .22 handgun and another gun.  And I think he wants the police to shoot him . . . He's been suicidal for a long time . . . Suicide by cops." (Appx. E., 9-1-1 call portion #2 at 11:16-12:3; Appx. F., Audio of 9-1-1 call portion #2.)  Moments later, she reiterated, "He's suicidal, and I'm afraid he wants suicide by cops."  (Appx. E., 9-1-1 call portion #2 at 12:16-17; Appx. F., Audio of call portion #2.)

10.      At some point in this sequence, about two minutes before his death, Mr. Farrand sent a text message to his son stating, "Hey Logan I love you…" (*Compare* Appx. N., Text Message at FARRAND_000546 *with* Appx. L., G. Thomas Dash recording.).

11.      Mrs. Farrand exited the home through a side door to meet the officers who arrived on scene.  (Appx. B., M. Farrand dep. at 26:10-14.)  Officer Preston Casey led Mrs. Farrand away

from the scene and out of view.  (Appx. G., P. Casey dep. at 43:3-25; Appx. B., M. Farrand dep. at 35:4-36:5; Appx. H., J. & M. Layton witness statements at AGLIC-FARRAND 000096-97.)

14. 12. Mr. Farrand exited his front door with a .22 pistol in his hand.  (Appx.  I., Officer J. Read Statement at AGLIC-FARRAND 119; Appx. J., G. Thomas dep. at 50:8-14.)

13. During the ensuing confrontation, Officer Read pointed his handgun at Mr. Farrand, and ordered Mr. Farrand to "drop the gun" at least nine times. (Appx. K., G. Thomas Dash at 2:6-25; Appx. L., G. Thomas Dash recording; Appx. I., Officer J. Read Statement at AGLIC-FARRAND 119.)

14. Officer Read feared for his life during the confrontation.  (Appx. I., Officer J. Read Statement at AGLIC-FARRAND 000129.)

15. Two neighbors saw and heard the confrontation in the Farrands' front yard, and confirmed that Officer Read repeatedly told Mr. Farrand to drop the gun.  (Appx. H., J. & M. Layton witness statements at AGLIC-FARRAND 000096-97.)

16. Instead of obeying Officer Read, Mr. Farrand kept rubbing and tapping the trigger of his pistol. (Appx. I., Officer J. Read Statement at AGLIC-FARRAND 000128; Appx. J., G. Thomas dep. at 47:6-48:16, 51:1-19.)

17. Officer Read commanded Mr. Farrand, "Don't put your finger on that trigger, man. Don't put your finger on that trigger."  (Appx. K., G. Thomas Dash at 2:6-25; Appx. L., G. Thomas Dash recording.)

18. In response to Officer Read's commands, Mr. Farrand sighed, smirked, and responded three times, "Do it." (Appx. K., G. Thomas Dash at 2:6-25; Appx. L., G. Thomas Dash recording; Appx. I., Officer J. Read Statement at AGLIG FARRAND 000131.)

19.     Within seconds, Mr. Farrand approached a gate positioned between his house and the adjoining garage, stood in a "bladed" sideways position, opened the gate to his backyard with one hand and, with the other, began to lift his pistol towards Officer Read as he passed through the gate, prompting Officer Read to shoot and kill Mr. Farrand.  (Appx. I., Officer J. Read Statement at AGLIC-FARRAND 000131-133; Appx. M., J. Read Dep. at 44:7-18; Appx. K., G. Thomas Dash at 2:24-3:3; Appx. J., G. Thomas dep. at 73:11-12.)

20.     A toxicology report later confirmed that Vincent Farrand's blood alcohol level was 0.22.  (Appx. O., Medical Examiner's Report at FARRAND_000667-673.)

21.     On April 28, 2014, Mrs. Farrand submitted a proof of death claimant's statement and a copy of Mr. Farrand's death certificate to American General, seeking payment of the $500,000 policy benefit.  (Appx. P., Claimant's Statement at AGLIC-FARRAND 000007-12.)

22.     On June 18, 2014, Curry & Associates submitted a report to American General including internet research of news articles related to Mr. Farrand's shooting, an update on the status of FOIA requests for investigative materials related to the shooting sent to Clearfield Policy Department, call notes for a discussion with Neal Geddes, Davis County Attorney regarding acquisition of the investigative file, and notice that the Utah Medical Examiner would provide a copy of Mr. Farrand's autopsy upon the receipt of a notarized authorization from next of kin. (Appx. Q., Curry Report 1 at AGLIC-FARRAND 000027-31.)

23.     On June 27, 2014, Curry & Associates submitted a second report to American General including a notarized authorization from Mrs. Farrand to obtain Mr. Farrand's autopsy report from the Utah Medical Examiner, and a copy of the Davis County Critical Incident Investigation Report.  (Appx. R., Curry Report 2 at AGLIC-FARRAND 000035-38.)  The Davis

County Critical Incident Investigation Report included, among other things, (1) a summary of Davis County's findings and conclusions, (2) interview transcripts of Officer Jason Read, Officer Gary Thomas, Officer Preston Casey, Officer Mike Sheldon, (3) interview summaries of Mrs. Farrand, Officer Jason Read, Officer Gary Thomas, Officer Preston Casey, Officer Mike Sheldon, Brett Clyde, Courtnee Parks, John Plowman, (4) Mr. Farrand's autopsy report, (5) summaries of data retrieved from Mr. Farrand's cellphone and laptop computer, and (6) summaries of the crime scene investigation.  (*See id.*)

24.     On July 15, 2014, Curry & Associates submitted a third report to American General including a copy of the Utah Medical Examiner's autopsy and toxicology report for Vincent Farrand. (Appx. S., Curry Report 3 at AGLIC-FARRAND 0000169-184.)

25.     On August 5, 2014, American General's Life Claim Review Committee determined that the claim was not payable. (Appx. T., Life Claim Review Form at AGLIC-FARRAND 000232.)

26.     On August 18, 2014, American General sent a letter advising Mrs. Farrand of its claims decision.  (Appx. U., Denial Letter at AGLIC-FARRAND 000242-43.)

**IV.**   <u>S</u>ᴛᴀɴᴅᴀʀᴅ

Summary judgment is appropriate when the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fᴇᴅ. R. Cɪᴠ. P. 56).  The moving party can meet its burden by "point[ing] to an absence of evidence to support the non-movant's claim." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007) (*quoting Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (citation omitted). "To defeat a motion for summary judgment, evidence . . . must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992); *see also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004) ("[U]nsupported conclusory allegations . . . do not create a genuine issue of fact.").

V.   **ARGUMENT**

The Farrand claim is not payable as a matter of law, thus Plaintiff's breach of contract claim fails. Further, Plaintiff's bad faith and intentional infliction of emotional distress claims fail as a matter of law because coverage was, at a minimum, fairly debatable. Finally, Plaintiff has no private right of action for her fourth claim.

### A. American General did not breach the Policy contract.

Mrs. Farrand's first claim asserts that American General breached the Policy by not paying the claimed benefit. (ECF No. 2, Compl. at ¶ 56.) But American General acted properly; given Utah law as applied to the undisputed facts, the shooting was not a covered event.

The Policy is a contract that provides accidental death and dismemberment coverage. (Appx. A., Policy.) "An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." *Alf v. State Farm Fire*

& *Cas. Co.*, 850 P.2d 1272, 1274 (UT 1993); *see Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, 980 P.2d 685, 686 (1999).   The elements of breach of contract are: (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages. *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, 20 P.3d 388, 392 (2001). Given the undisputed facts, American General's claim decision was proper.   Mr. Farrand did not die as a result of an accidental injury under Utah law, and coverage was also properly denied under applicable Policy exclusions.

a) *Mr. Farrand's death was not accidental under Utah law.*

Under the Policy, the threshold question—before addressing enumerated exclusions—is to determine whether Mr. Farrand's death met the definition of a covered loss.   That is, was his death an "accidental injury"?   The policy defines the term in this manner: "accidental bodily injury, which is unforeseen and suddenly sustained without the design or intent of an insured person." (Appx. A., Policy at AGLIC-FARRAND 000016.)   The Utah Supreme Court has expressly interpreted such terms in accidental injury insurance policies:

> There are thus two independent methods by which bodily injury or property damage may be deemed nonaccidental.  First, harm or damage is not accidental if it is the result of actual design or intended by the insured.  Second, harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured.  The first category presents a factual question as to what the insured intended.  The second category generally presents a legal question as to what the average individual would expect to happen under the circumstances.

*N.M. on behalf of Caleb v. Daniel E.*, 2008 UT 1, ¶¶ 6–7, 175 P.3d 566, 569–70 (2008) (*citing Hoffman v. Life Ins. Co. of N. Am.*, 669 P.2d 410, 416–17 (Utah 1983)).   The Utah Supreme Court clarified that "the specific type of injury suffered need not be intended or expected by the insured." *N.M. on behalf of Caleb*, 2008 UT ¶ 12. "Only where the injury suffered is completely

disproportionate to the injury intended or reasonably expected would the actual injury be considered accidental in nature." *Id.*

While an analysis under both tests will support the same result, American General will address the objective standard first. The objective "natural and probable consequence" standard involves a "legal question as to what the average individual would expect to happen under the circumstances." *N.M. on behalf of Caleb*, 2008 UT ¶ 7.  Here, an average individual would expect that a natural and probable consequence of Mr. Farrand's conduct would include a response of deadly force. Mr. Farrand exited his home with a handgun to confront police (Appx. I., Officer J. Read Statement at AGLIC-FARRAND 119); when Officer Read told him to "put down the gun" nine times and twice instructed him not to put his finger on the trigger, Mr. Farrand would not comply and instead escalated the situation, defiantly tapping the trigger and telling Officer Read three times to "Do it."  (Appx. K., G. Thomas Dash at 2:6-25; Appx. I., Officer J. Read Statement at AGLIC-FARRAND 119 and 131.); finally, Mr. Farrand began to raise the firearm up towards Officer Read (*Id.*, Officer J. Read Statement at AGLIC-FARRAND 000131-133; Appx. M., J. Read Dep. at 44:7-18), an action that was certain to invite deadly force.  Any one of these actions would cause a reasonable person to expect a deadly consequence; the three taken together leaves little doubt that it was reasonable to expect this unfortunate outcome.

Courts in this jurisdiction and elsewhere, when examining cases involving shootings and claims for accidental benefits, agree that accidental insurance coverage does not apply in similar circumstances.  *See Isoard v. Mut. Life Ins. Co. of New York*, 22 F.2d 956, 957 (8th Cir. 1927) (applying Utah law, affirming trial court's directed verdict for insurer determining that death was not accidental where insured was shot and killed by his wife's alleged paramour after insured

raised his gun toward the paramour during a confrontation about the affair); *Hoffman*, 669 P.2d at 418 (where insured's conduct and use of weapon threatens another, insured should expect or anticipate the use of deadly force); *Murdock v. Monumental Life Ins. Co.*, 2 P.3d 963 (Utah Ct.App. 2000) (robber fleeing from scene should have expected deadly force, and finding death non-accidental even though the threatened person had accidentally hit him with his van while chasing him); *J.C. Penney Life Ins. Co. v. Moser*, 490 So.2d 1275, 1277 (Fla. 5th DCA 1986) (insurance coverage for accidental injury not available to insured who pointed a loaded pistol at his brother-in-law while intoxicated); *King v. Cigna Corp.*, No. 06-CV-6203T, 2008 WL 795823, at *4 (W.D.N.Y. Mar. 24, 2008) (finding shooting nonaccidental under both the objective and subjective tests where insured confronted police officers with a gun).

Given the above, Mr. Farrand's death was the natural and probable consequence of his own actions, and a reasonable person would anticipate that his conduct would result in the use of deadly force against him.  Under the objective standard, this was no "accidental" injury.

The subjective standard requires the same result.  During the confrontation, Mr. Farrand clearly told an armed officer three times, as memorialized on recorded audio, "Do it."  (Appx. K., G. Thomas Dash at 2:6-25.)  Plaintiff cannot credibly testify that her husband had alternative intentions, because her contemporaneous thoughts about his mental state are also memorialized on recorded audio—she told the 9-1-1 dispatcher, "I think he wants the police to shoot him . . . He's suicidal, and I'm afraid he wants suicide by cops."  Trial is unnecessary; the evidence already makes plain that Mr. Farrand knew his actions would result in his death.

Under either test, this was no accidental injury.  Whether viewing the evidence from the perspective of Mr. Farrand's own subjective intent or that of a reasonably objective average person,

this shooting is not covered by the Policy language.

> ### b)   *Coverage was unavailable due to applicable Policy exclusions*

The claim is also barred by four applicable Policy exclusions.  (Appx. A., Policy at AGLIC-FARRAND 000019.)

> ### i.   *Mr. Farrand was committing a felony.*

The Policy excludes coverage for injuries caused or resulting in whole or in part by "the Insured Person's commission of or attempt to commit an assault or felony."  (*Id*.)  Mr. Farrand's conduct constituted multiple felonies and attempted felonies under Utah law.  Assault with a dangerous weapon (i.e. aggravated assault) is a third-degree felony.  Utah Code § 76-5-103(1).  Aggravated assault against a law enforcement officer is also a second-degree felony. *Id.* § 76-5-102.4(4).  An assault is "an attempt, with unlawful force or violence, to do bodily injury to another." *Id*. § 76-5-102(1)(a).  Assault can also be shown by an act that "creates a substantial risk of bodily injury to another."  Utah Code § 76-5-102(1)(b).  Pointing a gun at someone is unquestionably aggravated assault.  *E.g. State v. Casey*, 2001 UT App 205, 29 P.3d 25 (2001), *aff'd*, 2003 UT 55, 82 P.3d 1106 (conviction of aggravated assault for pointing gun at victim).

The record shows that Mr. Farrand assaulted Officer Read, thus instigating the shooting.  Again, Mr. Farrand confronted Officer Read with a gun; this aggressively dangerous action was alone sufficient to invite a deadly response.  (*See* Appx. J., G. Thomas dep. at 99:25-100:10.)  Officer Read reasonably feared for his life.  (Appx. I., Officer J. Read Statement at AGLIC-FARRAND 129.)  Mr. Farrand also disobeyed repeated instructions to drop his weapon, and instead escalated the situation by his responsive words and actions.  (Appx. K., G. Thomas Dash at 2:6-25; Appx. I., Officer J. Read Statement at AGLIC-FARRAND 119.)  And in the final

moment, he raised the gun towards Officer Read.  (*Id.*, Officer J. Read Statement at AGLIC-FARRAND 000131-133; Appx. M., J. Read Dep. at 44:7-18; Appx. K., G. Thomas Dash at 2:24-3:3; Appx. J., G. Thomas dep. at 73:11-12.)  These actions constitute felony assault, which was certainly a cause of Mr. Farrand's death.

> ### ii.   *Mr. Farrand was engaged in illegal activity.*

The Policy also excludes coverage for injury caused or resulting in whole or in part by "the Insured Person's engaging in an illegal activity or occupation."  (Appx. A., Policy at AGLIC-FARRAND 000019.)  Mr. Farrand's conduct violated, among others, at least five criminal code provisions that constitute "illegal activity" triggering the Policy exclusion:

1.      Threat of violence (class B misdemeanor), Utah Code § 76-5-107.  The Code explains that such a threat "may be express or implied," and that this provision may be violated even if the person did not actually "attempt to or was incapable of carrying out" such a threat.  *Id.* at § 76-5-107(3) and (4).  Here, exiting his home with a deadly weapon, tapping the trigger despite police instructions to drop the gun, and then raising the gun towards the officer each constituted actions that threatened violence.

2.      Threatening with or using a dangerous weapon in a fight or quarrel (class A misdemeanor), Utah Code § 76-10-506.  Again, during their verbal confrontation, Mr. Farrand disobeyed the officer's instructions and took steps to escalate the situation.

3.      Possession of a deadly weapon with criminal intent (class A misdemeanor), Utah Code § 76-10-507. Mrs. Farrand's own statements show that this situation began with Mr. Farrand leaving his home to confront Mr. Clyde with a gun.  (Appx. B., M. Farrand dep. at 20:15-22:5; Appx. C., 9-1-1 call at 3:12-13.)  His criminal intentions are also manifested by actions throughout

his confrontation with Officer Read.

4.      Carrying a dangerous weapon while under the influence of alcohol or drugs (class B misdemeanor), Utah Code § 76-10-528.  Mr. Farrand was undeniably under the influence, given his blood alcohol content and his wife's testimony.  (Appx. B., M. Farrand dep. at 45:25-46:7; Appx. O., Medical Examiner's Report at FARRAND_000667-673.)  The provision specifies that "under the influence" is defined using the same limit as driving under the influence (Utah Code § 76-10-528), and his 0.22 concentration far exceeded that limit (*see* Utah Code § 41-6a-502).

5.      Interference with peace officer (class B misdemeanor), Utah Code § 76-8-305.  This provision bars any action or inaction, including refusing to obey officer instructions (such as the repeated orders to "Drop the gun") or refusing to refrain from performing instructions (such as continuing to tap and rub the trigger after being told, "Don't put your finger on that trigger"), where an officer is seeking to lawfully detain the person.  *Id*.

Each of these violations constitute illegal activity under Utah law, and caused or partially contributed to the use of deadly force resulting in Mr. Farrand's death.

### iii.    Mr. Farrand was intoxicated

The policy also excludes coverage for injury caused or resulting in whole or in part by "the Insured Person's being under the influence of an excitant, depressant, hallucinogen, narcotic; or any other drug or intoxicant including those prescribed by a physician that are misused by the Insured Person." (Appx. A., Policy at AGLIC-FARRAND 000019.)  Again, Mr. Farrand's blood alcohol level far exceeded the legal limit.   (Appx. O., Medical Examiner's Report at FARRAND_000667-673.) *See, e.g.*, *Brown v. State Farm Mut. Auto. Ins. Co.*, 302 So.2d 445 (Fla. 1st DCA 1974) (accidental injury coverage unavailable where insured pointed a loaded pistol at

his brother-in-law while intoxicated). Again, under the Policy, his intoxication need not be the *sole* cause of his injury; the exclusion applies merely if the injury resulted "in part" from his intoxication. (Appx. A., Policy at AGLIC-FARRAND 000019.) That standard is met here.

### iv. *Mr. Farrand intended to cause his own death.*

Finally, the Policy excludes coverage for injury caused or resulting in whole or in part by "the Insured Person's suicide or attempt at suicide, or intentional self-inflicted injury or sickness, or any attempt at intentional self-inflicted injury or sickness while sane or insane." (*Id.* Policy at AGLIC-FARRAND 000019.) Mr. Farrand's recorded voice asked Officer Read repeatedly to "Do it." (Appx. K., G. Thomas Dash at 2:6-25.) And Plaintiff herself has already revealed her own contemporaneous impression of his state of mind, telling the 9-1-1 dispatcher that he was suicidal and twice specifically explaining that she believed he wanted "suicide by cops." (Appx. E., 9-1-1 call #2 at 11:16-12:17.) She cannot now credibly claim that he intended a different outcome. Mr. Farrand's clear intention, based on the evidentiary record, was to put police officers in the position where they would have to end his life.

In sum, American General did not breach the contract by denying coverage. This was not an accidental injury, and regardless, applicable exclusions bar coverage here.

### B. American General denied the claim in good faith because it had a reasonable basis for denial, and its decision was, at a minimum, fairly debatable.

American General is also entitled to summary judgment on Plaintiff's bad faith claim. Under Utah law, an insurer does not violate the implied covenant of good faith and fair dealing as long as it "acts reasonably in denying a claim." *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 524, 533 (2002) (citing 14 Lee. R. Russ & Thomas F. Segalla, *Couch on Insurance* 3d § 207:53 (1999)). The standard for such reasonableness in Utah examines whether coverage is

"fairly debatable."  As the Utah Supreme Court explains,

> The denial of a claim is reasonable if the insured's claim is fairly debatable. Under Utah law, if an insurer denies an insured's claim that is fairly debatable, then the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so.

*Prince*, 2002 UT 68 at ¶ 28 (internal punctuation omitted) (quoting *Morris v. Health Net of Calif., Inc.*, 1999 UT 95, ¶ 7, 988 P.2d 940 (1999).  This determination is a question of law.  *Prince*, 2002 UT 68 at ¶ 33. "If the evidence presented creates a factual issue as to the claim's validity, there exists a debatable reason for denial . . . eliminating the bad faith claim." *Id.* ¶ 34 (quoting *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct.App. 1987).

The evidence cited above shows that, at a minimum, there was a fair debate as to whether coverage applied.  Thus, in the unlikely event that the Court identifies fact issues needing clarification at trial, the existence of such fact issues would necessarily underscore American General's entitlement to summary judgment on the bad faith claim (*Prince*, 2002 UT 68 at ¶ 34 (equating "factual issues" with "debatable reason for denial"); *see also Eldredge v. State Farm Mut. Auto. Ins. Co.*, No. 2:12CV900 DAK, 2014 WL 1875663, at *6-7 (D. Utah May 9, 2014) (evidence supporting denial of coverage, even if opposed by expert opinion, renders the decision "fairly debatable."); *Young v. Fire Ins. Exchange*, 2008 UT App 114, 182 P.3d 911, 917 (2008) (same).  Plaintiff may endeavor to identify fact issues hoping to defeat this Motion; however, given the ample evidence above, Plaintiff cannot demonstrate that *every* fact issue about the shooting is so easily resolved in her favor that the merits of her claim are absolute, patently obvious, and undebatable.  Thus, American General is entitled to seek redress from this Court and pursue its assertion that this claim was not payable. *Prince*, 2002 UT 68 at ¶ 28 (insurer is "entitled to debate" a reasonable position).  As the Utah Supreme Court explained,

> It would not comport with our ideas of either law or justice to prevent any party who entertains bona fide questions about his legal obligations from seeking adjudication thereon in the courts.

*Western Cas. & Sur. Co. v. Marchant*, 615 P.2d 423, 427 (UT 1980).

Plaintiff will likely try to dispute some of the officers' testimony, but she admits that she did not have a vantage point from which to view the confrontation; once she left the scene, the only witnesses with knowledge of what happened next were the officers and two neighbors who gave corroborative statements. (*See* Appx. G., P. Casey dep. at 43:3-25; Appx. B., M. Farrand dep. at 35:4-36:5; Appx. H., J. & M. Layton witness statements at AGLIC-FARRAND 000096-97.)  Nor can Plaintiff dispute her own words on the 9-1-1 call stating that her husband was suicidal, and predicting the very outcome that ultimately played out.  Plaintiff may also attempt to offer lay opinions contending that the officer's (and neighbors') recollections are incorrect, but she offers no forensics expert capable of identifying analytical errors, and no eyewitness provides a credible alternative explanation of what else prompted the shooting.

Plaintiff also claims that American General should have investigated further and obtained additional evidence.  But the materials that American General reviewed in 2014 were quite robust.  Curry & Associates secured extensive materials between June 18, 2014 and July 15, 2014 from Davis County's investigation of the incident, including summaries of Davis County's findings and conclusions; interview transcripts of Officer Jason Read, Officer Gary Thomas, Officer Preston Casey, and Officer Mike Sheldon; summaries of interviews with Mrs. Farrand, Officer Jason Read, Officer Gary Thomas, Officer Preston Casey, Officer Mike Sheldon, Brett Clyde, Courtnee Parks (Brett's girlfriend), and John Plowman (Mrs. Farrand's father), among others; witness statements from the Laytons and other neighbors; Mr. Farrand's autopsy report and toxicology analysis;

summaries of data retrieved from Mr. Farrand's cellphone and laptop computer; and summaries of the ballistics analysis, the holes in the gate, and other aspects of the forensics investigations. (Appx. Q., Curry Report 1 at AGLIC-FARRAND 000027-31; Appx. R., Curry Report 2 at AGLIC-FARRAND 000035-38; Appx. S., Curry Report 3 at AGLIC-FARRAND 0000169-184.)  These materials provided more than enough information for American General to understand the circumstances well enough to determine that the claim was not payable.  (Appx. T., Life Claim Review Form at AGLIC-FARRAND 000232.)

Moreover, one cannot prove bad faith simply by criticizing the thoroughness of a claims review; a plaintiff must identify material facts that could or should have been discovered from additional investigation, *and* show that those facts would have foreclosed any assertion that the claim was "fairly debatable."   *Prince*, 2002 UT 68 at ¶ 28; *Callioux*, 745 P.2d at 842.  Plaintiff cannot plausibly make such a showing here.  Even with the benefit of four years of hindsight and this Court's subpoena power, no such contradictory facts have been unearthed; rather, discovery has corroborated and reaffirmed the conclusions previously reached in 2014.  For example, the three officers corroborated their 2014 interviews when they testified at depositions in 2017.  (*Compare generally* Appx. V., Summary Report at AGLIC-FARRAND 000049-50, *with* Appx's. M., J., and G.)  And on February 24, 2017, American General received more evidence from Davis County that it had sought for years,[1] including the audio recording of Plaintiff's 9-1-1 call, as well

---

[1] American General's counsel submitted various requests under the Utah Government Records and Management Act ("GRAMA") to the Davis County Attorney's Office, which would not provide such materials until after Plaintiff had filed this lawsuit and after American General had obtained a protective order and an additional order specifically referencing the requested materials.  (*See* Appx. W., February 24, 2017 letter; *see also* ECF Nos. 25 (Protective Order) and 28 (Order granting disclosure request relating to materials requested under GRAMA).

as the dash camera video with dialogue between Officer Read and Mr. Farrand.  It makes no sense to fault American General for being unable in 2014 to obtain materials that Davis County would not turn over until 2017; and regardless, those materials corroborated the 2014 reports and bolstered American General's prior conclusions, thus rendering this line of criticism moot.

Overall, American General had sufficient evidence in 2014 to dispute the claim, and that information has been corroborated during this lawsuit.  Plaintiff may critique discrete aspects of the Davis County detectives' investigation, or suggest that American General should have tried to interview the witnesses again—but American General had no reason to believe that any witness might tell it something different than what he or she had told the police, and in any event, no witness has since come forward to contradict what was reported to police.  At the end of the day, Plaintiff falls far short of her burden of showing that the evidence is so one-sided that the claim is not even "fairly debatable."  *Prince*, 2002 UT 68 at ¶ 28.  Plaintiff's bad faith claim must be denied.

### C.  American General did not intentionally inflict emotional distress, as the claim denial was not outrageous and intolerable.

In Utah, a plaintiff cannot recover against an insurer for intentional infliction of emotional distress (IIED) when the insurer's grounds for denying benefits were fairly debatable.  *Prince*, 2002 UT ¶ 39.  Thus, this claim fails for the same reason as the bad faith claim.

Nor can Plaintiff prove the elements of her IIED claim, including that: (i) American General's conduct was outrageous and intolerable in that it offended the generally accepted standards of decency and morality; (ii) American General intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress; (iii) Plaintiff suffered severe emotional distress; and (iv) American General proximately caused Plaintiff's emotional distress. *Retherford*

*v. AT&T Comm'n of Mountain States, Inc.*, 844 P.2d 949, 970–71 (UT 1992).  "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, 32, 70 P.3d 17 (2003) (citations omitted).  Indeed, "for a plaintiff to prevail on this claim, the case must be one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Ankers v. Rodman*, 995 F.Supp. 1329, 1335 (D. Utah 1997) (citations omitted).

Notably, "[w]hether the conduct is outrageous enough is a legal question for the court to resolve." *Matthews v. Kennecott Utah Copper Corp.*, 54 F.Supp.2d 1067, 1075 (D. Utah 1999).  And, "[l]iability exists only where the conduct is atrocious, and utterly intolerable in a civilized community."  *Id*. (*citing Retherford*, 844 P.2d at 977-78).  A denial of a fairly debatable claim simply cannot meet this high standard.  *Prince*, 2002 UT ¶ 39.

The evidence here does not support these IIED claim elements.  American General's basis for denial was wholly justified, or, at a minimum, fairly debatable.  American General's conduct was not outrageous or intolerable, and it certainly was not intended to cause Mrs. Farrand emotional distress.  Indeed, merely asserting a contractual right does not give rise to an IIED claim. *S.S. by & through Shaffer v. IHC Health Servs., Inc.*, 2018 UT 13, 417 P.3d 603, ¶ 10 (2018). Moreover, Mrs. Farrand offers no evidence that she suffered severe emotional distress (*see Vasquez v. Trinity Mission Health*, No. 2:11-CV-01002-EJF, 2013 WL 4095157, at *23 (D. Utah Aug. 13, 2013) (allegations of "headaches due to stress" unaccompanied by evidence of medical attention sought were insufficient to prove "severe emotional distress" element), or that any such distress was caused by the claim decision rather than by her husband's tragic death.  *See*

*Candelaria v. CB Richard Ellis*, 319 P.3d 708, 711 (Utah Ct.App. 2014) (claimant must provide evidence that emotional distress caused damages, as opposed to damage that caused emotional distress).  Plaintiff never submitted any corroborating medical records in discovery, nor did she serve an expert report asserting such injuries.  Therefore, Mrs. Farrand's IIED claim has no merit.

> **D.  Plaintiff's fourth cause of action is an improper attempt to assert violations of the insurance code as a bad faith tort, and Utah courts reject such claims as lacking a private right of action.**

Plaintiff's claim for "tortious violation of public policy" effectively alleges violations of Utah's Insurance Code but recasts them as a tort.  No support for such a claim exists in the law.  A bad faith action brought pursuant to Utah's Insurance Code can only be adjudicated through an administrative proceeding, exposing insurers to civil penalties only, not monetary damages. *See* Utah Admin. Code r. R590-191. No corresponding private right of action exists under Utah law. *Holman v. New York Life Ins. Co.*, No. 2:10-CV-490 TS, 2012 WL 253202, at *8 (D. Utah Jan. 26, 2012) (granting summary judgment against insured's claim against insurer for violation of Utah Admin. Code r. R590-191 as no private right of action exists thereunder).  Other litigants in this District have attempted the same back-door approach that Plaintiff attempts here, seeking to assert tortious violations of the Insurance Code.  *See* Order Granting Defendant's Motion to Dismiss Plaintiffs' Fourth and Fifth Causes of Action at 1-2, *Crabb v. State Farm Fire & Cas. Co.*, Civil No. 2:04-CV-00454-PGC (D. Utah October 5, 2004) (ECF No. 15). Utah does not recognize a private right of action for bad faith, and Plaintiff's attempt to recast that claim as one for tortious breach of public policy has no recognized basis in Utah law.

**E.  Mrs. Farrand asserts improper extra-contractual damages premised on her husband's death, not on American General's alleged conduct.**

If this Court allows any of Plaintiff's claims to proceed to trial, American General respectfully requests that its order on this Motion strike Plaintiff's exorbitant and frivolous extra-contractual damages claims.  In addition to the policy benefit of $500,000, Mrs. Farrand improperly seeks three additional categories of non-contractual economic damages:

(1) lost income for her husband's death;

(2) lost anticipated rental income for a property she and her husband allegedly intended to purchase, but could not due to his death; and

(3) lost anticipated appreciation on an owned property because her husband could no longer maintain it due to his death.

(Appx. X., Plt.'s Initial Disclosures at 8-9.)  According to her damages expert, she seeks $2,006,000 to $2,252,000 in such extra-contractual damages, in addition to the stated policy benefit.  Mrs. Farrand's damages expert, which American General has moved to exclude (ECF No. 43), admitted that these damages were actually caused by Mr. Farrand's death, not by American General's claims decision.  (Appx. Y., T. Pastore dep. at 15:25-16:19 and 17:25-21:10; Appx. Z., T. Pastore Report at Ex. D, pg. 9. ("I utilized a damage period commencing on April 13, 2014, the date of the death of Mr. Vincent Farrand…").)  Obviously, American General did not pull the trigger, and it should not have to waste further time and expense defending against frivolous damages theories baselessly trying to hold it liable for the economic consequences of Mr. Farrand's death.

In a breach of contract case, there are generally two types of recoverable damages: "general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was

23

entered into." *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct.App. 1997) (*citing Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (UT 1985)).   For breach of an express term in an insurance contract, only general damages are available.   *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 466-67 (UT 1996).   General damages under an insurance contract are defined in the contract itself—i.e., the stated benefit, here $500,000.   *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 840 P.2d 130, 140 (Utah Ct.App. 1992).   Consequential damages may also be available for breach of the implied covenant of good faith and fair dealing, but to recover such damages, a claimant must still prove that they were actually caused by the contract breach.   *Castillo*, 939 P.2d at 1209 (citations omitted).

For reasons set forth above, American General seeks summary judgment on all claims.   But in the event this Court determines that certain facts need to be addressed at trial, American General respectfully requests a ruling protecting it from Plaintiff's baseless damages theories, and holding that her claims survive only to the extent that they seek the stated Policy benefit.

## VI.   CONCLUSION

For the foregoing reasons, American General respectfully requests that the Court grant this motion for summary judgment and dismiss all of Plaintiff's claims with prejudice.   Alternatively, should the Court decline to dismiss any of Mrs. Farrand's claims, American General requests an order limiting the damages at trial to the stated policy benefit of $500,000, the general damages available under the insurance contract.

Dated: June 22, 2018                    Respectfully submitted,

By:  /s/ Kendall J. Burr
    Jason A. Richardson, Utah Bar No. 14543
    David T. McDowell*
    Kendall J. Burr*

    MCDOWELL HETHERINGTON LLP
    1001 Fannin St., Suite 2700
    Houston, Texas 77002
    Telephone:  (713) 337-5580
    Facsimile:  (713) 337-8850
    Email:  jason.richardson@mhllp.com
           david.mcdowell@mhllp.com
           kendall.burr@mhllp.com
    *admitted pro hac vice

    **ATTORNEYS FOR DEFENDANT
    AMERICAN GENERAL LIFE
    INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served on June 22, 2018, on all counsel of record through the Court's electronic filing system:

MARK J. GERAGOS (Cal. SBN #108325)
DAVID W. GAMMILL (Cal. SBN #258286)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
E: david@geragos.com

JON D. WILLIAMS (#8318)
JON D. WILLIAMS, P.C.
The Boston Building
9 Exchange Place, Ste. 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
E-mail: jwilliam@lawyer.com

ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

*Attorneys for Plaintiff Molly Farrand*

_____/s/ Nick Lawson_____

26