# APPENDIX B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH


MOLLY FARRAND,               )

                             )   Videotaped deposition of:

     Plaintiff,              )

                             )   MOLLY FARRAND

vs.                          )

                             )

AMERICAN GENERAL LIFE        )   Case No. 1:16-cv-00134-DB

INSURANCE COMPANY,           )

                             )

     Defendant.              )




August 24, 2017 * 9:58 a.m.


Location:  Office of Jon D. Williams

9 Exchange Place, Suite 600

Salt Lake City, Utah


Reporter:  Dawn M. Perry, CSR

Notary Public in and for the State of Utah

Videographer:  Erik Largent

1     A P P E A R A N C E S
2

3     FOR THE PLAINTIFF:

4     Robert B. Cummings
    Attorney at Law
    The Salt Lake Lawyers
5     10 Exchange Place
    Suite 622
6     Salt Lake City, Utah 84111
    (801) 590-7555
7     (801) 384-0825 (fax)
    Robert@thesaltlakelawyers.com
8

9     FOR THE DEFENDANT:

9     Kendall J. Burr
10     Attorney at Law
    Edison, McDowell & Hetherington, LLP
11     1001 Fannin Street
    Suite 2700
12     Houston, Texas 77002-6707
    (713) 337-8875
13     (713) 337-8851 (fax)
    kendall.burr@emhllp.com
14
15
16
17
18
19
20
21
22
23
24
25

---

1         I N D E X

2   MOLLY FARRAND           PAGE
3   Examination by Mr. Burr      4
4   Examination by Mr. Cummings    84
5          * * *
6      E X H I B I T S
7   NO.       DESCRIPTION       PAGE
8

9    1   Photograph          27

   2   Photograph          39
10

   3   Plaintiff's Initial Disclosures Pursuant   60
11      to Fed. R. Civ.P. 26(a)(1)
12    4   Plaintiff's Responses and Objections to   60
      Defendant's First Set of Interrogatories
13
14          * * *
15
16
17
18
19
20
21
22
23
24
25

---

1     P R O C E E D I N G S
2

3     THE VIDEOGRAPHER: We are on the record.
4 The time is 9:58 a.m. This is the video deposition
5 of Molly Farrand in the matter of Farrand versus
6 American General Life Insurance.
7     This deposition is held at Mitchell,
8 Barlow & Mansfield in Salt Lake City, Utah. Today's
9 date is August 24th, 2017.
10     My name is Erik Largent, the videographer.
11 Will the court reporter please swear in
12 the witness?
13     MOLLY FARRAND,
14     called as a witness, being first sworn,
15     was examined and testified as follows:
16     EXAMINATION
17 BY MR. BURR:
18     Q. Could you state your name for the record?
19     A. Molly Marie Farrand.
20     Q. And where do you reside?
21     A. Centerville, Utah.
22     Q. And what's your address?
23     A. I'm currently with my sister. 383 East
24 London Road, Centerville, Utah 84014.
25     Q. How long have you been staying there?

---

1     A. I sold my house in May, and I had been in
2 the Centerville home for 18 years.
3     Q. So the home that you sold in May, what was
4 the address of that home?
5     A. 550 South 300 East, Centerville, Utah.
6     Q. And you sold it in May of 2017?
7     A. Yes.
8     Q. Okay. Have you been in a deposition
9 before?
10     A. No.
11     Q. Okay. Your attorney has probably
12 explained the process to you, but just briefly, this
13 is taken by video and also by transcript.
14     Do you understand that?
15     A. Yes.
16     Q. And we may use the video, but we may just
17 use the transcript without the video.
18     Do you understand that?
19     A. Sure.
20     Q. And because of that, there's going to be
21 questions and answers in the transcript, and so
22 it's -- it's helpful for me to wait until you finish
23 your answer until I start my next question, and vice
24 versa, for you wait until I finish my question until
25 you start your answer, just so that there is a clean

1 record.
2 A. Okay.
3 Q. Thank you.
4 Have you ever testified in court before?
5 A. No.
6 Q. Okay. So you've never been in a
7 deposition or testified in court?
8 A. No.
9 Q. Have you ever testified in any other
10 proceeding, arbitration, anything like that?
11 A. No.
12 Q. Did you -- did you meet with your attorney
13 to -- to prepare for this deposition?
14 A. We met yesterday.
15 Q. Okay. And I don't want you to disclose
16 anything you talked about with him. Just wanted to
17 confirm that you did meet with him.
18 A. Just a briefing of what would happen
19 today, yeah.
20 Q. Did you review any documents?
21 A. Just -- he sent me some, just lightly
22 briefed over.
23 Q. Okay. Are these documents that were filed
24 in the case or were they, you know, other -- other
25 documents?

1 A. No, they were the ones that were filed.
2 Q. You understand that you are a plaintiff in
3 a lawsuit?
4 A. Correct.
5 Q. And you are suing my client, American
6 General Life Insurance Company; is that right?
7 A. Correct.
8 Q. Have you spoken with anyone at American
9 General directly before?
10 A. Yes. When I first -- after my husband was
11 killed and I turned in the paperwork for the claim, I
12 spoke to someone on the phone there about it.
13 Q. Okay. Approximately when was that?
14 A. Within a couple weeks of -- of his passing
15 in April of 2014.
16 Q. Okay. Did you speak more than one time,
17 or just one time?
18 A. I called on a follow-up because I hadn't
19 heard from anything, but that was it. They never
20 contacted me directly, other than by mail.
21 Q. Did you speak to someone in, like, a call
22 center or the claims department?
23 A. It was the person that was assigned to our
24 claim.
25 Q. Do you recall the name?

1 A. I don't.
2 Q. Do you recall what you said on that call?
3 A. I just asked him if they had any update on
4 it, if they knew when they were going to pay out the
5 claim.
6 Q. And do you recall what you were told in
7 response?
8 A. He said they were still in -- doing their
9 investigation on that side.
10 Q. Okay. Just to back up. Where -- where
11 did you grow up?
12 A. I grew up in Salt Lake City, Utah. I
13 lived in Denver for two years through preschool and
14 kindergarten, and then back to Salt Lake.
15 Q. Okay.
16 A. I was born in Brigham City, Utah.
17 Q. And did you graduate from high school in
18 Salt Lake City?
19 A. Yes.
20 Q. Did you go to any college?
21 A. I went to -- I had a scholarship to Salt
22 Lake Community College. And then I went to Utah
23 College of Massage Therapy. I also have two
24 certificates for real estate agent and a real estate
25 broker here in Utah.

1 Q. So during the 2014 time frame, were you
2 employed at the time?
3 A. Yes.
4 Q. What did you do?
5 A. I worked for a software company, handling
6 accounting and contracts.
7 Q. Okay. You mentioned that you had some
8 real estate licenses; is that right?
9 A. Uh-huh (affirmative).
10 Q. What -- during what years did you act as a
11 real estate broker or agent?
12 A. So for the last 12 years. The last seven
13 I've been with the software company. And prior to
14 that I worked for Rainey Homes for five years, a
15 builder and developer in Davis County and along the
16 Wasatch Front. And then two years before that with a
17 real estate brokerage out of Bountiful.
18 Q. Okay. So for the past seven years with
19 the software company, what kind of work did you do?
20 A. Mostly billing, contractual billing and
21 contracts. They work for -- they do a lot of
22 software for nonprofits, government agencies and
23 social service organizations. So I handle that, and
24 operations side.
25 Q. And during that time frame were you --

1   that you've worked at that company, have you also
2   done any real estate work on the side?
3      A.   Yes.
4      Q.   Continuously or at times?
5      A.   Mostly just for friends and family.  A
6   couple a year.  Not full-time.
7      Q.   Do you maintain your license today?
8      A.   I put it on hold in May, when I sold my
9   house.
10      Q.   Now, you mentioned your husband.  His name
11   is Vincent; is that right?
12      A.   Uh-huh (affirmative).
13      Q.   Do you call him Vincent or Vince?
14      A.   Vince.
15      Q.   Did Vince -- was he employed at the time?
16      A.   He's been self-employed for almost our
17   whole 20 years together, mostly doing flooring.  He
18   was working on getting our house ready to sell.  And
19   then we were looking at purchasing and flipping
20   cabins in Monticello, Utah, as soon as our son
21   graduated from high school, which happened -- just
22   after he passed, our son graduated.  So he had been
23   employed our whole 20 years, and then less so, doing
24   less jobs there at the end because he was working on
25   our projects in-house.

1      Q.   So you mentioned that he was
2   self-employed.  Did he have a company or was he just
3   on his own?
4      A.   On his own.  He worked a lot mostly from a
5   place there in Bountiful; he contracted for them and
6   did most all -- most of the jobs through them for the
7   last five years.
8      Q.   And how many children do you have?
9      A.   Just one.
10      Q.   And you mentioned that he graduated high
11   school just recently?
12      A.   Right after Vince passed in 2014.  He
13   passed about three months before -- or two months
14   before his graduation.
15      Q.   So he passed away on April 13th, 2014; is
16   that right?
17      A.   Correct.
18      Q.   Okay.  What day of the week was that, do
19   you recall?
20      A.   A Sunday.
21      Q.   And did he work on Sundays?
22      A.   No.
23      Q.   Did he work during the week?
24      A.   Usually always during the week.
25      Q.   Okay.  And I have to go through some

1   questions.  If you need a break at any point, just
2   let me know.
3      A.   No worries.
4      Q.   So do you recall anything the week prior
5   to that -- that Sunday regarding, you know, whether
6   he was working full-time or not?
7      A.   No.  He was actually -- we had done some
8   hikes that week and he spent some time working on an
9   old '72 Chevy truck project with our son, and then
10   working on the house, getting it ready to sell.
11      Q.   Did you have any -- did you have the home
12   listed for sale yet?
13      A.   We had put it up the October before,
14   thinking about, you know, selling it, and then pulled
15   it off the market about a week because we
16   wanted to wait until after our son finished school.
17   We thought he might stay with my grand -- his
18   grandparents that are just in Kaysville if it did
19   sell early, but then decided to wait until spring,
20   which is usually a better time to sell.
21      Q.   Okay.  That Sunday, what -- what were you
22   and Vince doing throughout the morning of that day?
23      A.   Well, we had actually had friends over the
24   night before, one of my good friends.  Met her
25   boyfriend for the first time.  So that morning we

1   were talking about that, talking about friends and
2   how sometimes friends, you know, disappear when they
3   get into relationships and weird stuff like that.
4      And that brought up another friend of
5   Vince's named Brett who he was angry with and
6   quarrelsome with, and that's kind of where it went
7   that morning.
8      Q.   What's Brett's last name?
9      A.   Clyde.
10      Q.   So how long had Vince known Brett Clyde?
11      A.   Oh, probably ten years.
12      Q.   Do you know how they met?
13      A.   They met through a mutual friend named
14   Max Nelson, who they hunted together, and Vince went
15   to high school with Max.
16      Q.   And how close were Vince and Matt -- Vince
17   and -- sorry --
18      A.   Brett?
19      Q.   Brett.
20      A.   You know, there had been periods where we
21   didn't see him for a couple years, and then he would
22   show back up and we would go camping or, you know,
23   the guys would go hunting together, stuff like that.
24   So I wouldn't say really close, but, you know,
25   someone we hung out with, barbecued with, went on

1   trips with on occasion, camping trips.
2   Q.   Did he have a -- a wife or girlfriend?
3   A.   He had a girlfriend, Courtney.
4   Q.   Do you know --
5   A.   They lived together in Bountiful.
6   Q.   Do you know how long -- well, strike that.
7        How long have you known Brett?
8   A.   Probably as long as Vince.
9   Q.   About ten years?
10  A.   Yeah.
11  Q.   Ten years dating back from 2014?
12  A.   Yeah.
13  Q.   And then Courtney, how long have you known
14  Courtney?
15  A.   I think it was about two or three years
16  before that they met, and we ran into them and
17  realized that they were living in Bountiful, right
18  near us, and that's when we kind of reconnected and
19  became friends again.
20  Q.   Okay.
21  A.   So I think they'd only been together, at
22  that point, three or four years.
23  Q.   Okay.  So this time when you reconnected
24  with Brett and...
25  A.   Courtney.

1   Q.   -- Courtney, at that point, about what
2   year was that?
3   A.   Probably 2011, 2010, along there.
4   Q.   And you mentioned that something came up
5   regarding Brett during your conversation that
6   morning.  What was it that came up?
7   A.   He had actually propositioned me about a
8   month or so earlier and -- very inappropriately, and
9   my husband was furious still about it.  And so when
10  it came back up and we were talking about it, he was
11  very angry -- still angry over it, and that's what
12  led to the -- all the events that happened that day.
13  Q.   You mentioned that it had been about --
14  you said it was a month earlier?
15  A.   Uh-huh (affirmative).
16  Q.   So you believe this happened in March
17  of 2014, at some point?
18  A.   Yes, it would have been end of March.
19  Q.   Okay.  And do you know -- did you -- did
20  you tell Vince immediately about -- about the
21  incident, or when -- how did Vince find out?
22  A.   So he was out of town at the time, and so
23  I waited until he got back.  And he mentioned wanting
24  to do a weekend trip with Brett and Court --
25  Courtney, and I told him that I wasn't comfortable

1   with that, and what had happened, and -- and he was
2   very angry, as you can imagine.
3   Q.   And so this was just a few days after it
4   happened in March of 2014, still?
5   A.   Uh-huh (affirmative).
6   Q.   Okay.  This was all about a month before
7   the incident on April 13th?
8   A.   Maybe two to three weeks, yeah.
9   Q.   Okay.  And do you know if Vince ever met
10  with Brett at any point after that?
11  A.   I know he talked to him on the phone about
12  it, messaged him, you know, told him off, "How dare
13  you, you know, approach my wife like that," that kind
14  of thing.  I know he was just angry.  You know, they
15  were friends.  They had been hunting together.  They
16  went camping together.  And so we trusted him that
17  way and we told him off.
18  Q.   Right.
19       So you -- you mentioned he called him and
20  texted with him?
21  A.   I believe so.
22  Q.   Do you recall how many times,
23  approximately?
24  A.   Maybe two or three.
25  Q.   Two or three calls, two or three --

1   A.   Texts, phone calls.  Total, maybe one
2   call, two -- two texts.
3   Q.   Do you recall reading those texts?
4   A.   Not until after.  After, when we got the
5   phone back, I saw them and, you know, it basically
6   told him that he was a piece of shit and -- you know.
7   Q.   Did they contain any threats in them?
8        MR. CUMMINGS:  Objection.  Vague as to
9   "threats."
10       Go ahead and answer to the extent you
11  understand.
12       THE WITNESS:  I think it could be
13  construed that way, you know, "If you ever come near
14  us again," kind of thing.
15       MR. BURR:  Understood.
16  Q.   Did you ever speak with Courtney about
17  that incident with -- involving Brett?
18  A.   I did.
19       MR. CUMMINGS:  Objection as to "that
20  incident."  Are we talking about the text messages or the
21  March incident?
22  Q.   (BY MR. BURR)  The incident between Brett
23  and yourself.
24  A.   Yes, I did talk to her about it.  I felt
25  that she should know that her boyfriend is a -- what

1    kind of person he is.

2       Q.   Understood.

3           Have you interacted at all with Brett

4    since your husband passed away?

5       A.   They called and left me a voice message

6    after, with their condolences, which I never

7    returned.

8       Q.   Have you communicated with Courtney since

9    that incident?

10      A.   No.

11       MR. CUMMINGS:  Can I just have one quick

12    moment?

13       THE WITNESS:  Sorry.

14       THE VIDEOGRAPHER:  Going off the record.

15       (A break was taken from 10:13 a.m. to

16       10:14 a.m.)

17       THE VIDEOGRAPHER:  We're on the record.

18    It's 10:15.

19       Counsel may proceed.

20       Q.   (BY MR. BURR)  So on the morning of

21    April 13th, 2014, you mentioned that the name Brett

22    came up and this incident came up.  Do you recall

23    about what time of day that was?

24      A.   Oh, it was probably about 11:00 a.m.-ish.

25    Yeah.

1       Q.   And do you know what happened over the

2    next few hours?

3       A.   We kind of --

4       MR. CUMMINGS:  Objection.  Vague as to --

5    can you just be a little more specific?

6       MR. BURR:  Sure.

7       Q.   What did Vince do over the next couple of

8    hours after that?

9      A.   I'm not exactly sure.  I know he was in

10    the garden room, which is like a family room.  And I

11    went up, took a bath, was reading book.  Just kind of

12    a lazy Sunday.  I think we had breakfast.  I -- I

13    didn't realize he was still fuming.  I think he was

14    still angry over it.  Yeah.

15      Q.   When the topic first came up, was he

16    angry -- was he angry with you at any point?

17      A.   No, I don't think so.

18      Q.   What -- how long was the discussion about

19    Brett initially, around 11:00 a.m.?

20      A.   I'd say about an hour from where we first

21    started talking about, you know, my friend that had

22    been over the night before, that led to Max, who

23    would disappear every time he had a girlfriend.  Then

24    it went to Brett again and then that whole situation

25    came up again.

1       Q.   Was he asking for details about what

2    happened, or was he just venting, or what was he

3    saying?

4       A.   No, I think he was just angry -- still

5    angry at Brett.  I think he wanted, you know, to

6    confront him.  He was angry that he would do that to

7    him.

8       Q.   Did he say anything during that 11:00 a.m.

9    conversation, or thereabouts, about -- about going to

10    see Brett?

11      A.   Not until later in the afternoon, after I

12    had taken a bath and read my book and stuff.

13      Q.   About what time was it when you next spoke

14    with him?

15      A.   I can't be sure.  Probably around 2:00 --

16    1:30, 2:00, somewhere in there.

17      Q.   Did he bring up Brett?

18      A.   Yeah, he was -- when I came down, you

19    know, he was still just angry.  And that's when, you

20    know, he talked about going over there and

21    confronting him and -- and then he was leaving to go

22    over there.  And that's when I was afraid he was

23    going to do something stupid, and so I called the

24    police for -- to see if they could go over and stop

25    him from, you know, beating him up or threatening him

1    or whatever.  That was my mistake that day, is

2    calling the police for help.  I should have just let

3    him go.

4       Q.   So before you called the police, he

5    mentioned he was going to go confront Brett?

6      A.   Uh-huh (affirmative).

7      Q.   And just for the record, just to make it

8    clearer, could you say yes or no?

9      A.   Oh, yes.  Sorry.

10      Q.   Thank you.

11          The time of day was about 2:00 in the

12    afternoon or so, your best memory --

13      A.   It was -- yeah, mid-afternoon.

14      Q.   And did he actually get in the car and

15    leave?

16      A.   He got -- he went out to get in the car.

17    I don't think he -- I don't know if he actually left.

18    I think he just sat -- he might have sat in there

19    just thinking and fuming.  But I had assumed he left,

20    and that's when I called the police.  But then when I

21    went out to check, he was -- he was coming back in.

22    I tried to calm him down.  And then the police showed

23    up.

24      Q.   Do you know if when he went to the -- when

25    he went and got in the car, did he have a gun with

1    him?
2         A.   Yes, and that is why I called the police,
3    because I was -- that worried me.
4         Q.   Do you know what kind of gun it was?
5         A.   I think it was his .22 pistol.
6         Q.   How many guns did he have?
7         A.   Probably ten or so.  Some he received from
8    his dad.  A lot from -- for hunting.
9         Q.   Where were they stored in the home?
10        A.   In a gun safe in our bedroom closet.
11        Q.   What floor of your home?
12        A.   So it's a California tri.  So you walk in
13   one level and then it splits up to the bedrooms, and
14   the bedroom is up a half a level.
15        Q.   And you mentioned your son.  Was he home
16   at the time?
17        A.   He wasn't.  He was working.
18        Q.   Where -- what did he do for work?
19        A.   While he was in high school he worked for
20   a hotel there in Bountiful, doing maintenance.
21        Q.   Okay.  Do you recall what his shift was
22   that day?
23        A.   I think he worked until 6:00 or so.
24        Q.   The -- so you mentioned the gun was
25   probably his .22?

1         A.   His .22 handgun.
2         Q.   And do you recall him going to get it from
3    the safe?
4         A.   I don't.  I recall him coming through the
5    kitchen with it, and that's when I got concerned and
6    thought I would call for help to talk him down from
7    threatening someone.
8         Q.   You mentioned he came through the kitchen
9    with it.  Was this before or after your second
10   conversation with him about Brett?
11        A.   After.
12        Q.   Okay.  So just to recap the sequence,
13   there was a conversation around 11:00 a.m. or so, and
14   then a few hours of a break, and then you spoke again
15   with him about Brett?
16        A.   Yeah.  So I kind of thought the
17   conversation was over, went up, took a bath.  You
18   know, just a chill Sunday.  But when I came back down
19   I realized he had been fuming over it the whole time,
20   still getting worked up over it, so...
21        Q.   Then after the second conversation about
22   Brett he mentioned something about going to confront
23   him?
24        A.   Uh-huh.  Yeah.
25        Q.   And then was it after that you -- he left

1    and must have gone to get the gun, because he came
2    back through the kitchen with it?
3              MR. CUMMINGS:  Objection.  Calls for
4    speculation.
5              But answer to the extent you can.
6              THE WITNESS:  We always go out the kitchen
7    door.  It's a side door on the house.  And so I don't
8    recall if he went up to get it or whatnot, but just
9    passing by me in the kitchen, going out the door.
10        Q.   (BY MR. BURR)  Did you see it at any point
11   earlier that day?
12        A.   No.
13        Q.   Do you know what vehicle he went to go sit
14   in?
15        A.   His white Chevy four-door Silverado, long
16   bed.
17        Q.   Do you know if he -- and you're not sure
18   if he ever left the property in the car?
19        A.   I don't -- no, I think he -- I don't think
20   he left.  I think he was sitting in there, you know,
21   trying to calm himself down or come to his senses.
22        Q.   Do you know approximately how long before
23   you saw him next?
24        A.   It went by so fast.  It was before I even
25   got off the call with the police.  So it was all in

1    that duration of the call.
2         Q.   Okay.  Do you recall approximately how
3    long that call was?
4         A.   It seemed like forever, but maybe four
5    minutes, three minutes.  I don't...
6         Q.   Okay.  So you called 911.  And why did you
7    call 911?
8         A.   Because I thought Vince was going to go
9    over and threaten or hurt or beat up or who knows
10   what with Brett.  So I -- I thought the police would
11   help and get over there and, you know, separate the
12   two and whatever, but that's not what happened.
13        Q.   The next time you saw Vince --
14        A.   Uh-huh (affirmative).
15        Q.   -- was it inside the house?
16        A.   Uh-huh (affirmative).
17        Q.   Did he come back into the home?
18        A.   He came back in while I was still on the
19   phone with the 911 operator.
20        Q.   Okay.  Did he have the gun with him at
21   that time?
22        A.   Uh-huh (affirmative).
23              MR. CUMMINGS:  Yes or no?
24              THE WITNESS:  I'm sorry.  Yes.
25        Q.   (BY MR. BURR)  And did you have any

1 conversation with Vincent at that time?
2    A.   I couldn't really.  I was still on the
3 phone with the 911 operator.  I told her that he had
4 come back in, that everybody was okay, they didn't
5 need to send the police.
6         She told me that they still had to send
7 them, that they were on their way, just to make sure
8 that I wasn't being threatened or that everything was
9 fine there.
10        And I was up on the phone with her until
11 the police actually pulled up to the house, and then
12 I got off the phone with her to meet them.  So I
13 walked through the kitchen door to meet Officer Read,
14 is who first approached me.
15    Q.   Did you hear the police arrive?
16    A.   I could see -- I went out -- there's a --
17 one step on our kitchen that you can see over the
18 gate there, and so I could see him approaching.  So I
19 told her that, you know, he was approaching, I was
20 going to hang up.  And then that's when he started
21 calling for Brett.  He was confused and thought Brett
22 was at the house.  He didn't understand the
23 situation.
24    Q.   I will show you a few documents which will
25 hopefully help to re-create where everybody was that

1 day.
2    A.   Okay.
3         (EXHIBIT 1 WAS MARKED.)
4    Q.   I'll hand you what I'm marking as
5 Exhibit 1.  Do you recognize this photograph?
6    A.   It's the house I lived in for 18 years,
7 raised my child in.
8    Q.   And in your last answer you mentioned a
9 gate.  Do you see that gate in the middle?
10    A.   Yep, that blue gate.
11    Q.   And that's between the gara -- the
12 detached garage and the main home?
13    A.   Uh-huh.  Yes.
14    Q.   And you mentioned a kitchen door.  Is that
15 a kitchen door on the side yard, behind the gate?
16    A.   Yes.
17    Q.   And when the police arrived, did you see
18 them through a window?
19    A.   So there's -- this is the kitchen here.
20 And the door's on this side.  So I looked this way,
21 but stepped out and looked over this fence here to
22 see the police officer walking up right here, to meet
23 him.
24    Q.   So just for the transcript, the home has
25 two windows facing the front on the south side --

1 south end of the -- of the --
2    A.   Of the east side?
3    Q.   Yes.  So it's the east side of the home
4 that faces the street, right?
5    A.   Yes.  And the south end of that east side.
6    Q.   Yes.
7    A.   Correct.
8    Q.   There are two windows.  You saw the police
9 arrive through one of those windows?
10    A.   She told me they were arriving right then,
11 the 911 operator.  I didn't necessarily see him;
12 that's why I stepped out onto that step, to look
13 over, and I could see his head coming over the gate
14 right then.
15    Q.   Okay.  Did you -- how many officers did
16 you see initially?
17    A.   Just one.
18    Q.   Okay.  And you saw his head over the gate?
19    A.   Uh-huh (affirmative).  So I told the 911
20 operator that they were there and I was going to go
21 out and meet with them.  That's when I hung up with
22 her and went out to talk to him.
23    Q.   Okay.  Did you or he open the gate?
24    A.   I don't recall which one of us did, but we
25 were both right there, close proximity to it.

1    Q.   Did you end the call at that point?
2    A.   Yes.
3    Q.   Before you exited?
4    A.   Before I engaged with him, yes.
5    Q.   So after you looked and you saw his head
6 over the gate --
7    A.   Yeah.
8    Q.   -- then you hung up?
9    A.   Then I told her that he was there and I
10 was going out to meet her -- him, and hung up with
11 her.
12    Q.   Did you ever go into the front yard?
13    A.   Well, immediately he started calling for
14 Brett.  And I told him that there -- Brett wasn't
15 here, that Vince was here, and that, you know, I had
16 just gotten off the phone and -- and he was very
17 confused as to who was there and what the situation
18 was.
19         And he immediately grabbed me and put my
20 arm -- my hands behind my back.  And I said, "No, I'm
21 the one that called.  I'm here to tell" -- you know,
22 to explain the situation.  And he started marching me
23 forward, towards his cop car.
24    Q.   So this was right -- just -- where did
25 this happen, where he grabbed you?

```
 1      A.   Right -- right at the gate, this -- right
 2  in between the space here.
 3      Q.   Okay.  And then he -- do you recall where
 4  his car was parked?
 5      A.   It -- it was over -- right over here in
 6  the -- in front of the neighbor's house, to the
 7  south.
 8      Q.   Okay.  So you recall -- do you recall
 9  which officer that was?
10      A.   Officer Read.
11      Q.   Do you recall whether it was his car that
12  was to the south?
13          MR. CUMMINGS:  Objection.  Calls for
14  speculation.
15          THE WITNESS:  I don't know whose cars were
16  whose.  There was also another one parked over here
17  that's --
18      Q.   (BY MR. BURR)  To the north -- to the
19  north?
20      A.   Uh-huh (affirmative).
21      Q.   So he started going with you south.  Do
22  you recall seeing --
23      A.   East up the driveway.
24      Q.   East up the driveway?
25      A.   Yeah.
```

```
 1      Q.   And then did he go around the truck, to
 2  the south?
 3      A.   No.  Then he passed me off to another
 4  officer.
 5      Q.   Was that near the rear of the truck?
 6      A.   Yes.
 7      Q.   Okay.  And so this is -- this white truck
 8  here, is that the truck that you -- that Vince went
 9  and sat in previously that we discussed earlier?
10      A.   Yeah, that's what he was going to drive
11  over to Brett's.  That's his -- his main vehicle, his
12  work truck.
13      Q.   Okay.  There was another officer you
14  mentioned that he handed you off to?
15      A.   Uh-huh (affirmative).
16      Q.   Do you recall the name of that officer?
17      A.   I don't.
18      Q.   Okay.  Do you recall seeing Vince at any
19  point during that interaction with Officer Read?
20      A.   Not until after, when Vince came out to
21  meet with him -- came out the front door to meet him.
22      Q.   Did Vince come out the front door before
23  or after Officer Read handed you off to the other
24  officer?
25      A.   After.  And that's when Officer Read went
```

```
 1  to meet with Vince, who was coming out to talk to
 2  him.
 3      Q.   Okay.  Do you recall seeing Vince come out
 4  the front door?
 5      A.   Yes.
 6      Q.   Did he have a gun in his hand?
 7      A.   No, he did not.  He had one -- the police
 8  officer -- Officer Read asked him if he had a gun,
 9  and it was in his waist band.
10          And he said, "Yes," and he took it out --
11  actually, with his left hand -- and he took it out
12  and went to put it on the ground.  He did not have it
13  in his hand when he came out the front door.
14      Q.   Did you recall him putting it on the
15  ground?
16      A.   I recall him lifting it -- setting it
17  down.  And at that point the other officer was trying
18  to move me away to another location, so from that
19  point on I didn't really see anything.
20      Q.   Did you see the gun actually being placed
21  on the ground or just him reaching towards --
22      A.   Within an inch of the ground.  It may have
23  been on the ground, it may have been an inch within
24  the ground, but it was a whole motion down.
25      Q.   And then the other officer led you out of
```

```
 1  view of Vince?
 2      A.   Well, I kept asking, "Well" -- I was
 3  trying to talk to him and explain, you know, and --
 4  and it all happened so fast.
 5          Then my neighbor -- I have an elderly
 6  neighbor to the north who came out.  She was
 7  wandering towards the front yard.  And, you know, I
 8  was, like, "Margean," you know, "step back."  So I
 9  was trying to motion to my neighbor, who was in her
10  90s, coming across the front yard.  And, you know, I
11  was asking him what was happening and, you know, if I
12  can go talk to the other officer.  But he didn't put
13  me into his car or anything yet, until shortly after
14  that.
15      Q.   Okay.  So during this time frame when you
16  were motioning to the neighbor who was coming from
17  the north, was she actually in your yard or was she
18  further north?
19      A.   Right in between.  So her yard steps down
20  a step onto our yard, and there's a little driveway
21  between the two that goes to her backyard.  She was
22  right in that area.
23      Q.   Okay.  So if you look at this -- this
24  image in Exhibit 1, is there -- this white garage to
25  the right, is that the drive -- is there a driveway
```

1  to that garage?
2      A.  There is a small driveway that goes down
3  to that.  So she was just above our flowerbed here on
4  that -- right in between the two yards.
5          MR. CUMMINGS:  To the north?
6          MR. BURR:  Right.
7          THE WITNESS:  Yes, to the north.
8      Q.  (BY MR. BURR)  Okay.  And so perhaps -- do
9  you see this tree in the right -- in the right
10 corner?
11     A.  The silver maple, uh-huh.
12     Q.  Yes.  Was she near the trunk of that tree,
13 for example?
14     A.  Just behind it.  That's still in the
15 flowerbed.  She was right on the line between our two
16 houses.
17     Q.  Do you recall her turning around?
18     A.  No.  I mean, it was happening so fast and
19 then -- and then there was another neighbor pulled up
20 across the street.  One of the Bake daughters was
21 coming home.  So there was lots of things happening,
22 plus, the officer kept, you know, "Stand back, move
23 over here," you know, "Come over this way."  So I was
24 trying to follow his directions as well.  And it was
25 only a few minutes and then we heard gunshots.  And

1  then I started yelling, "Who is shooting?  Why is
2  there shooting?"
3          Sorry.
4      Q.  So you mentioned there was a few minutes
5  during which there was commotion going on, and
6  this -- you are talking a couple minutes?
7      A.  Like, maybe two minutes between when I was
8  at the top of the driveway with the one officer and
9  he was talking to Vince, and the time that he started
10 shooting.  Minutes.
11     Q.  Do you remember the trajectory you walked
12 during those two minutes or --
13     A.  That I did?
14     Q.  -- where were you?  Yes.
15     A.  I stayed right around this area right
16 here.  He wouldn't let me move much further than
17 between the two house -- the -- up by the mailbox on
18 the sidewalk between my house and the house to the
19 south.
20     Q.  Okay.  So you were probably a little bit
21 south from your driveway?
22     A.  Yes.
23     Q.  Okay.  And during that time frame did you
24 have a view of Vince?
25     A.  No.

1      Q.  Was the truck in the way?
2      A.  Yeah.  Yes.  Well, 'cause -- he had --
3  there is a big bush you can't see here -- it's, like,
4  a type of honeysuckle bush that's big -- that he kind
5  of put me behind.
6      Q.  And, again, you don't remember this
7  officer's name?
8      A.  I don't.  I know that he was very new.  He
9  was the same one that put me in the cop car.  And I
10 kept asking questions too.  And he said he didn't
11 know how long I would be in there.  I had to wait.
12 This was all new to him too.  Not really reassuring.
13     Q.  Do you -- does your family have a dog?
14     A.  Yes.
15     Q.  Do you remember where the dog was during
16 that time period?
17     A.  So the -- the dog was in the house when I
18 was.  When we came -- when Officer Read brought --
19 took me through the gate and up the driveway, he left
20 the gate open.  And I had seen video before of the
21 dash cam from the car that was parked over here, and
22 in that you can see the dog coming -- running out
23 through the gate to meet Vince in the front, about
24 the -- just before -- I didn't see the dog come out
25 when I was here, but I could see it from the dash cam

1  video that I had seen previously with Jon Williams.
2      Q.  So other than what you saw on the footage
3  from the dash cam, do you have any other independent
4  memories of the dog and where the dog was?
5      A.  No.  I -- I recall when I was talking to
6  the 911 officer, telling her, when they said they
7  were sending policemen, I was concerned.  I -- you
8  know, you hear stories about them -- we have a big --
9  he's big.  He is, like, a 130-pound American
10 Rottweiller.  Very sweet, but sometimes people can be
11 scared of him just because he's so big.  So I warned
12 her, you know, "We have a dog.  Please make sure they
13 know we have a dog.  He's friendly."  You know, so
14 that they didn't do anything when they encountered
15 the dog.
16         And that was the last that I really
17 mentioned it until after -- after the shooting when
18 he put me in the cop car and I asked -- you know, I
19 said, "Where is our dog," you know.
20     Q.  When you heard the gunshots, were you
21 outside?
22     A.  Uh-huh, I was still right up there by the
23 mailbox.
24     Q.  And then you mentioned it was after that
25 that he put you in the car?

1     A.   Well, he immediately rushed over to the --
2  right next to the truck area.
3     Q.   Yes.
4     A.   And -- and then I saw the Bake daughter
5  across the street, and she was staring at me and I
6  was staring at her.  And I said -- you know, I
7  said -- this was after the shots, and I said, "I
8  think -- I think they just shot Vince."  Because they
9  wouldn't answer me, they wouldn't tell me who was
10 shot, you know.
11        And then she came over and put her arms
12 around me and kind of held onto me for a minute.
13        And then he -- the officer came back and
14 took me over to the car and locked me in the back of
15 his cop car for almost two hours.
16    Q.   Do you recall how many gunshots you heard?
17    A.   It was, like, a quick, maybe, five that
18 was, like, really fast, in a row.  Definitely more
19 than three.
20    Q.   And did you ever see Vincent alive after
21 the image of him putting the gun towards the ground?
22    A.   I didn't get to see him for three days.  I
23 mean, they took him.  They wouldn't let me see him
24 while I was there.  They left me locked in the cop
25 car until they took him down to meet the helicopter,

1  which they didn't take him in; I guess he had passed
2  in that time frame.
3     Q.   Sorry.
4     A.   And then he had -- we donated his -- some
5  of his -- his eyes and some other things that they
6  could save.  So that took a couple days, so I didn't
7  get to see him until three days after he passed.
8     MR. BURR:  Let's take a break.
9     THE WITNESS:  Thanks.
10    THE VIDEOGRAPHER:  Go off the record.
11 It's 10:38.
12        (A break was taken from 10:38 a.m. to
13        10:48 a.m.)
14    THE VIDEOGRAPHER:  We're on the record.
15 The time is 10:48.
16        Counsel, you may proceed.
17        (EXHIBIT 2 WAS MARKED.)
18    Q.   (BY MR. BURR) I'm handing you another
19 document, Exhibit 2.  And is this another view of
20 your home?
21    A.   Yes.
22    Q.   And you mentioned earlier that you went to
23 kind of the rear of the truck, and that's where
24 Officer Read handed you off to the other officer?
25    A.   Correct.

1     Q.   And is that kind of in the driveway behind
2  the truck or --
3     A.   Yeah, right about here.
4     Q.   Okay.  So directly behind the truck or a
5  little bit to the right of the truck, rear right?
6     A.   As you are getting closer to that garden
7  bed right there, between the sidewalk and the
8  driveway, right in front of here.
9     Q.   Okay.
10    A.   Yeah.
11    Q.   And then you walked kind of towards the
12 camera with the other officer; is that right?
13    A.   Yes.  So this is that big bush that was
14 the honeysuckle-type bush that -- he had us just on
15 the other side of it, right here.  And this is the
16 line between my house and the neighbor's house.  And
17 we were right over here for a good portion, and
18 that's where the Bake daughter came over to meet me.
19    Q.   So just to recap for the transcript, so
20 there is a bush to the right -- sorry -- to the left
21 of this -- of this image?
22    A.   (Witness nods head.)
23    Q.   And that's a bush that kind of separates
24 the southern neighbor from your -- yours?
25    A.   Correct.

1     Q.   And you came with the officer around this
2  bush and kind of behind that bush?
3     A.   Yes.
4     Q.   And this was kind of a south -- southeast
5  of the home?
6     A.   Yes.
7     Q.   Okay.  Were you on the sidewalk or in the
8  neighbor's yard?
9     A.   On the sidewalk.
10    Q.   And your view is obstructed so that you
11 couldn't see Vincent at that time?
12    A.   Yes.
13    Q.   Could you see any of the police officers?
14    A.   No.  Not there, no.
15    Q.   Okay.
16    A.   Margean, my elderly neighbor who lived
17 next door, she was right up here.  So I could see
18 her, and that's why I was concerned that she was kind
19 of wandering over.  She was just in this spot between
20 the two houses there.
21    Q.   Okay.  Was she on the sidewalk?
22    A.   No.  She was --
23    Q.   On the grass?
24    A.   On the grass.
25    Q.   Okay.  In a spot between your home and

1 the --
2     A.   And her house.
3     Q.   And her house was just directly north of
4 your home?
5     A.   Yes.
6     Q.   From your angle, how much of the front --
7 of your own front yard could you see?
8     A.   Once we got up onto the sidewalk, I could
9 kind of see straight over.  So the half of it -- the
10 front half.
11     Q.   Okay.  Could you see any of that curved
12 walkway leading from the front door to the driveway?
13     A.   I don't think so.  I don't recall.
14     Q.   Okay.
15     A.   But when we were lower on the driveway,
16 before he moved us up into this area, that's when
17 I -- that's where Vince came out and met him, and
18 I -- that's where -- he was on that curved circle
19 part when he took out the gun and set it down.
20     Q.   As you were moving from that location to
21 behind the bush, were you walking backwards, still
22 facing the scene, or were you -- was your gaze
23 directed southward or southeastward?
24     A.   I don't honestly recall.  I think he was
25 walking me towards the street.  So we would have been

1 walking east.  But at a couple different points we
2 were stopping.  He kept watching back, and I would
3 like look and -- you know, and that's when I saw
4 Margean next door.
5     Q.   Okay.
6     A.   So...
7     Q.   Do you recall looking at -- over your
8 shoulder or turning around at any point during your
9 walk from that point to behind the bush, when you saw
10 any of your front yard where any of the officers or
11 Vince were?
12     A.   I don't know.  I don't recall any specific
13 movements between the two.  It happened really quick,
14 and he kept talking -- I was trying to talk to him,
15 he was trying to, you know, lead me over.
16     Q.   Okay.
17     A.   So quite distracted by the officer I was
18 with.
19     Q.   You mentioned Officer Read and this
20 officer who you were handed off to.
21     A.   Uh-huh (affirmative).
22     Q.   Do you recall a third officer being on the
23 scene prior to -- prior to Vince being shot?
24     A.   As soon as -- not prior.  As soon as there
25 were shots --

1     Q.   Okay.
2     A.   -- two other officers came running across
3 the yard after that point.
4     Q.   Do you recall from what direction?
5     A.   I believe it was from the north, heading
6 south.
7     Q.   Okay.
8     A.   I think that was that other cop car that
9 was parked up here.
10     Q.   To the...
11     A.   To the north of my house.
12     Q.   Okay.  Do you -- okay.
13        Do you believe that Vince was depressed
14 that day?
15     A.   Well, Vince had had bouts of depression
16 for most of his adult life.  He had issues from when
17 his parents got divorced when he was in high school.
18 It was a rough divorce.  And he had been on and off
19 with depression for his whole -- his whole life,
20 but -- well, adult life, but it was typically
21 seasonal.  Like, in the winters, when it would get
22 really gray, he would get more depressed.  So we had,
23 like, a sunlamp that we would use to give him Vitamin
24 D that would typically help with the depression.
25     Q.   Did he take medications?

1     A.   He did.
2     Q.   During what time frame?
3     A.   Most of -- over 20 years, on and off, for
4 different ones.  A lot of them caused different side
5 effects, and so they would try new ones throughout
6 the period we were together.
7     Q.   Do you know if he was prescribed
8 medications as of that day?
9     A.   As of that day?
10        MR. CUMMINGS:  Objection.  Vague.
11        But go ahead and answer to the extent you
12 understand the question.
13        THE WITNESS:  Yes, we saw a new doctor
14 that was referred to about a month or so before, and
15 he -- they had a -- a different type of drug that
16 worked differently than these chemical ones that
17 seemed to be working really well for the last month
18 that I was excited about, actually.
19     Q.   (BY MR. BURR)  Do you recall the name of
20 it?
21     A.   I think it was called Brintellix.
22     Q.   Was Vince consistent in taking it?
23     A.   Uh-huh.  Yeah.  I don't think he ever
24 missed any, that I'm aware of.
25     Q.   Okay.  Did -- do you know if Vincent drank

1  that day?
2      A.   We drank quite a bit the night before with
3  our friends, and then I -- I believe that he was --
4  when I was up in the tub and he was sitting in there
5  kind of fuming, I think he was drinking in that -- in
6  the garden room where -- our living room, while I was
7  up in the tub.
8      Q.   When you interacted with him, did he seem
9  intoxicated in his interactions with you?
10     A.   Not so much.  He's hard to tell.  Like, he
11 used to joke and call me a cheap date because one or
12 two glasses of wine and I could feel it.  And I joked
13 with him that he was an expensive date because he
14 could drink a whole bottle of wine and not feel
15 anything.  I don't know if it's the Irish background
16 or what it was, but it was very hard for him to feel
17 alcohol, and so it -- and it was hard for me to tell.
18     So I think maybe if I look back, he
19 might -- you know, maybe a little bit, but very hard
20 to tell with him because he didn't really feel
21 alcohol.
22     Q.   Do you -- do you know how many drinks he
23 had?
24     A.   No idea.
25     Q.   Did you ever speak with -- well, strike

1  that.
2      Do you know if there were any other people
3  at the scene besides the police officers who actually
4  saw the shooting itself?
5      A.   I don't know.  I don't recall Margean or
6  the -- the Bake daughter.  I don't -- I don't
7  believe -- I don't know if they saw it.  I know that
8  they were close to or around that, but I don't -- I
9  don't know if they -- I never talked to them about if
10 they saw it.
11     Q.   Besides those two neighbors and the police
12 officers and yourself, do you remember anybody else
13 being out there on the street or in any of the yards?
14     A.   No, not until after.  Then there was lots
15 of people, because they blocked off the street and
16 all the neighbors were coming up and -- yeah.  And
17 Margean Lowell, who was my neighbor next door, has
18 since passed away.  She -- they were in their late
19 90s, her and her husband.  She went Christmas right
20 after, and her husband followed.  I think he was 94.
21 So they have both passed since.
22     Q.   All right.  Had Vincent ever been involved
23 in any interactions with police prior to this day?
24     A.   The only one I'm aware of was when -- back
25 when he was in high school, when his parents were

1  getting divorced, he -- he got caught doing something
2  stupid.  I don't know exactly.  Shoplifting or
3  something.  I think it was more of an attention thing
4  because of the situation.
5      And then -- and then I think a couple
6  years after that he was out with friends at a club
7  and a bunch of the guys got into kind of a bar fight
8  kind of thing.  And those are the only two incidents
9  I know of, but they were about 20 years prior.
10     Q.   During those 20 years, do you recall any
11 incidents involving violence involving Vince?
12     A.   No.
13     Q.   Did he ever, prior to this day, leave the
14 home with a gun to confront anybody?
15     A.   No.
16     Q.   Was this out of the ordinary for -- for
17 you to see him, you know, having a gun and indicating
18 he was going to confront Brett?
19     A.   Somewhat.  That's why I called the police,
20 because I was concerned.  I didn't want my husband
21 going to jail or something stupid.  You know, he's a
22 reasonable person.  I thought the police would be
23 able to talk to him and say, you know, "It's not
24 worth it," you know, whatever.
25     Q.   Yeah.  Have there ever been any other

1  incidents prior to that day where you had concerns
2  that he might become violent?
3      A.   Violent, no.
4      Q.   Towards anyone?
5      A.   No.
6      Q.   You mentioned that you had a call with
7  someone in my client's claims department.  Do you
8  recall any other interactions, whether via e-mail or
9  in writing or -- with anybody else from my client?
10     A.   They sent me paperwork, which I assumed
11 was the standard paperwork release forms, so that
12 they could get copies of his medical and the police
13 reports and that kind of thing.
14     Q.   Right.
15     A.   So I got those.  I signed them.  I sent --
16 faxed them back to them.  That was really it.  I
17 never -- they never called, like, interviewed with
18 me, spoke with me, other than that initial setting --
19 you know, when I sent the claim in and then called to
20 follow up on it.
21     Q.   Okay.  After the shooting you mentioned
22 that you were in the car for about two hours; is that
23 right?
24     A.   (Witness nods head.)
25     Q.   Yes?

1    A.   Oh, I'm sorry.  Yes.
2    Q.   Did you -- after that did you give a
3 statement at some point?
4        MR. CUMMINGS:  Objection.  Vague.  To who?
5    Q.   (BY MR. BURR)  Did you give any interview
6 or recounting of the incident to anyone?
7    A.   Yes.  So as soon as the chief -- or the
8 head of the police got there, he said to the officer,
9 you know, "Why is she in the car?"  And I had been
10 asking to be let out.  And he said, "Let her out,"
11 you know, and that's when he let me out and told me
12 that my husband had died.
13    Q.   Prior to being let out of the car?
14    A.   Let me out of the car and kind of, you
15 know, was standing next to me and -- and I could see
16 my family while I was in the car, stuck on that kind
17 of road where they blocked off the road about a house
18 and a half down the street.  And I could see --
19 because I had called them from inside of the police
20 car.  And so I could see my dad.  And then I could
21 see my son.  And I said, "Can I go see them," and
22 they let me walk over to them.  And that's when
23 they -- he told me that my husband had been shot and
24 was killed.
25    Q.   Did your dad live nearby?

1    A.   Yeah, he lived about a mile away, which is
2 that -- my sister's house.  That's the address in
3 Centerville that I'm currently at.
4    Q.   Did you call him or anyone during the --
5 the couple hours you were in the car?
6    A.   Yes.
7    Q.   Who did you call?
8    A.   First I called the 911 operator to ask why
9 I was stuck in the car, if they could let me out,
10 that I would like to see my husband, because I was
11 afraid I wouldn't be able to see him.  It didn't
12 help.  They didn't let me out.
13        I called my dad and told him that I think
14 Vince had been shot, that I was stuck in a police
15 car.  He came over.
16        I called Vince's mother.  I told her that
17 I know that, I -- that I thought Vince had been shot
18 and that -- what was happening.
19        So I called all three of -- and then I
20 think after that I called my mom.  And all of them
21 came over but were behind the police line until after
22 they let me out.
23        After they let me out and told me that my
24 husband was dead, he said, "Can we" -- you know,
25 we're in the middle of the street surrounded by all

1 the neighbors.  He said, "Why don't we go somewhere
2 and talk."
3        And my sister's house was only a mile
4 away, so we all drove over there where they asked me
5 a whole bunch of questions.
6    Q.   Do you know if that was recorded?
7    A.   I believe it was.  Not video, but audio,
8 at least.
9    Q.   Okay.  Do you recall ever seeing a
10 transcript of it?
11    A.   I don't think so.  I mean -- I don't -- I
12 don't know if there was or not.  I -- it wasn't put
13 in front of me anyway.
14    Q.   Did you ever, at any point, give any other
15 interview to anybody at the police department?
16    A.   They had taken my work computer that day,
17 and a couple days later I went to the Farmington
18 Police Department so I could pick up my computer --
19 they had to look through it and make sure there was
20 nothing -- so that I could have it back for work.  I
21 think they might have recorded just the conversation
22 of that.
23    Q.   Was that a conversation, again, about the
24 incident and the going through what happened?
25    A.   A little bit of it.  It was somewhat

1 casual.  Some of it was about the computer.  They
2 were asking me, you know, "Did Vince have any access
3 to this computer," blah, blah, blah.
4        He didn't.  It was locked.  It was a work
5 computer.
6    Q.   But the first interview at your sister's
7 house --
8    A.   Uh-huh (affirmative).
9    Q.   -- that was a lengthier interview?
10    A.   Yes.
11    Q.   Was that one where you went through all of
12 your memory of the events of that day?
13    A.   Yes.
14    Q.   Okay.  Other than that interview at your
15 sister's house and then a couple days later when you
16 returned the computer, did you ever have any other
17 times when you discussed the incident with members of
18 the police department?
19    A.   Not that I can recall.  We did -- I met
20 with Jon Williams and the district attorney in
21 Farmington at some point about the case.  But Jon and
22 them discussed most of it.  I was actually in the
23 hallway for a lot of it.  I didn't want to -- they
24 were reviewing videos and some other things that were
25 not something that I wanted to view in my head over

1    and over, so I was in the hallway for a long time.

2        Q.   Was this related to a separate lawsuit

3    against the city?

4        A.   Yes.

5        Q.   Do you recall what happened in that

6    lawsuit, how it -- how it was resolved?

7        A.   They settled with us.

8        Q.   Okay.  Do you recall the amount?

9        A.   127,000.

10       Q.   Do you recall approximately when that

11   settlement was reached?

12       A.   About a year ago.

13       Q.   Did you, prior to that settlement, ever

14   give any testimony in that case?

15       A.   Testimony, like -- never sworn in or

16   anything like that, just when they interviewed me at

17   these different points.  But never, like, as a sworn

18   witness or anything.

19       Q.   Do you recall signing any documents in

20   that case recounting any of the events of that day?

21       A.   I did the -- the suit that we actually

22   filed, and there were some paperwork that I signed,

23   yes.

24       Q.   Do you know if any other witnesses in that

25   case were asked to give testimony in a deposition or

1    otherwise?

2        A.   I -- I believe that the officers who were

3    involved gave their depositions in the last week for

4    this.

5        Q.   Okay.  In this case, right?

6        A.   Yes.

7        Q.   But I'm asking -- just to clarify -- in

8    the other case against the city --

9        A.   Yes.

10       Q.   -- do you remember if any of the officers

11   testified in that case?

12       A.   As far as testified, I know that they, you

13   know, interviewed them.  I don't -- I'm not sure if

14   testified means, like, in a court, but they did

15   interview them separately, yes.

16       Q.   Understood.

17          Do you recall if there were any -- strike

18   that.

19          Okay.  I've seen the phrase "suicide by

20   cop" used in this case.  Do you know where that came

21   from and who said it?

22        MR. CUMMINGS:  Objection.  Calls for

23   speculation.

24          Go ahead and answer to the extent you

25   understand the question.

1        THE WITNESS:  She asked me -- the 911

2    operator, when I was on the phone -- if he was -- I

3    think she asked me if he was suicidal.

4          And in my mind I thought, you know, he's

5    had depression, he's been suicidal in the past.  You

6    know, even though it might not have been that day, I

7    felt like I had to answer honestly that he had been

8    before.

9        Q.   (BY MR. BURR)  Yeah.

10       A.   And I said yes.  So I don't recall

11   specific to those words, but I do remember her asking

12   me about depression or suicide on the 911 call.

13       Q.   You mentioned he'd been suicidal in the

14   past.  Had he ever actually attempted suicide in the

15   past?

16       A.   I think he -- when -- when he was, like,

17   19 -- 18, maybe 17, in high school, when his parents

18   were getting divorced, I think he kind of took pills

19   once, but I wasn't there for it.  I just -- you know,

20   we had kind of talked about it before.

21       Q.   How old was he when you met him?

22       A.   He had just turned 19.

23       Q.   So this was after you had met but --

24       A.   They were -- they were just finished

25   separating when we met.

1        Q.   Okay.  Was this incident when he took the

2    pills after you met him?

3        A.   Before.  And it was actually at his friend

4    Max's house that we talked about earlier.

5        Q.   Okay.  Did he ever express suicidal

6    thoughts during the 20 years that you were together?

7        A.   They were along the lines of depression

8    to -- I don't know if I would say strictly suicidal.

9    Yes, maybe at some points, but it was the depression.

10    It's hard to explain.  Like, they feel overwhelmed,

11   like, hard to be happy when they know they should be

12   happy kind of a thing that he would explain.

13       Q.   Do you recall the phrase "suicide by cop"

14   being uttered by anyone that day?

15       A.   When I was in the police car...

16       Q.   Yes.

17       A.   I could hear over the radio -- the radio

18   was still going, and they mentioned -- a couple times

19   they said, "Is it a suicide?  Was it a suicide?  Did

20   we shoot?  Did they shoot?"  There was some

21   communication over that radio that they weren't sure

22   if it was a suicide or -- or what.  That -- I heard

23   that over the radio.

24       Q.   Okay.

25       A.   There was -- one of the officers that ran

1     up after the scene, there is audio that I've heard
2     from his body camera, when I was reviewing it with
3     Jon Williams, in which he -- he came up to the scene
4     and he asked the police officer that was there if it
5     was -- if it was suicide or if he shot, and they
6     said -- in that audio he says, "No, he put down the
7     gun and we shot him."
8     Q.  Do you -- well, strike that.
9         So in this litigation you're suing for a
10    disability policy; is that right?
11     A.  Disability?
12     Q.  Or what -- what kind of life insurance
13    product is it?
14     A.  We have a life insurance policy.  It was a
15    $500,000 policy that I purchased in 2011.  In 2011,
16    my boss, who was our president and CFO, died
17    unexpectedly at the age of 57.  And I watched his
18    wife have to sell their home.  And she moved back
19    with family in Oregon.  And so right after that I
20    decided to -- we decided to purchase an insurance
21    policy, and that's the American General policy that
22    we purchased.
23     Q.  Okay.  And do you -- do you know what
24    damages you're seeking in this litigation besides the
25    amount of the policy?

1     A.  I know we would like interest for the
2    amount of time they didn't pay, when they should have
3    been paid out.  Having -- you know, I sold my home.
4    If I would have had the policy, I would have been
5    able to keep the house.  It was just too much work
6    for me by myself, so I sold the house.
7         I -- we have another property, 70 acres,
8    outside of Monticello, Utah, that Vince -- you know,
9    the elk run through the barbwire fence in the winter,
10    and firewood and stuff like that, that -- things that
11    I have to pay or have somebody do haven't -- I've
12    been lucky enough to find family and friends to help
13    me with it in the last little while, but you know,
14    things that I could have taken care of should I have
15    had the money, I think that's the -- what we're
16    seeking the damages on.
17     Q.  Okay.  And we have some documents that
18    you've served in this case, and we'll go through
19    them.  I believe you mentioned earlier that there may
20    have been some corrections that can you make on the
21    record, so as we go through them, you can explain.
22     A.  Okay.  They were small.  It was, like,
23    "Clearfield" instead of "Centerville," little things
24    like that.
25     Q.  Understood.  We can isolate those

1    incidents --
2     A.  Okay.
3     Q.  -- and make sure they are clear on the
4    record.
5        (EXHIBIT 3 WAS MARKED.)
6        I am handing you Exhibit 3, which, for the
7    record, is plaintiff's initial disclosures.
8     A.  Okay.
9     Q.  Do you recall seeing this document before?
10     A.  I believe so, yes.
11     Q.  And, actually, I'll just mark the second
12    one as well.
13        (EXHIBIT 4 WAS MARKED.)
14     A.  This is the list of, like, witnesses that
15    will be in this?
16     Q.  We can go through it.
17     A.  Okay.
18     Q.  We can -- we'll ask a few questions about
19    them.  I just want to get them marked first, and then
20    we can go through them and figure out what you
21    remember.
22     A.  Okay.
23     Q.  I'm also handing you Exhibit 4.
24     A.  Oh.  On this one is the one that it says
25    "Clearfield," page 7, number six.  It says, "Real

1    estate documents related to Vallecito, Monticello and
2    Clearfield," but that "Clearfield" should be
3    Centerville.
4     Q.  Sorry.  Could you say the page number
5    again?
6        MR. CUMMINGS:  Page 7, item six at the
7    top.
8        THE WITNESS:  Yes.
9     Q.  (BY MR. BURR)  Okay.  Clearfield should be
10    Centerville?
11     A.  Correct.
12     Q.  In Section II.A.6?
13     A.  Yeah.
14     Q.  Thank you.
15        MR. CUMMINGS:  And those errors are the
16    scrivener's errors, meaning me, not Molly.
17        MR. BURR:  No problem.
18     Q.  And this, again, is Exhibit 3, which is
19    labeled Plaintiff's Initial Disclosures Pursuant to
20    Federal Rule of Civil Procedure 26(a)(1).
21        If you'll turn to -- and, for the record,
22    we also marked Exhibit 4, which is Plaintiff's
23    Responses and Objections to Defendant's First Set of
24    Interrogatories.  And we'll go through a few of
25    these -- a few pages from these.  We don't need to go

1  through all of them, but...
2      In Exhibit 3, the initial disclosures, on
3  page 6 -- or, sorry, page 7, there is a Section 3 at
4  the bottom.
5      A.  Okay.
6      Q.  And it states, near the bottom, "Plaintiff
7  calculates that her damages are as follows," and then
8  continuing onto the next page there is a list of a
9  few different kinds of damages, and I would like to
10  go through those.
11     A.  Okay.
12     Q.  So the first one is the value of the
13  policy at issue, which is 500,000, plus prejudgment
14  interest.  And we've covered that already, right?
15     A.  Correct.
16     Q.  The next one is a reference to a -- to a
17  flatbed 16-foot utility trailer.  You indicate here
18  that you were forced to sell that.  Can you explain
19  when and to whom you sold that?
20     A.  So short -- within a month after Vince
21  passed I needed some money to take care of funeral
22  expenses and some of the other things that we had
23  done.  I contacted Allied Home Furnishings, which is
24  who Vince did -- contracted through a lot there in
25  Bountiful.

1      Q.  Yes.
2      A.  And I asked Shelly and Brad, who are the
3  owners, if they had any interest in purchasing
4  Vince's tools and the trailer.  They purchased all
5  the tools from me.  I think it was actually 2,000, is
6  what they paid for it.  It says 2,500 here, but I
7  think it was 2,000 that just lump -- they came and
8  picked up all of the flooring tools and all of his
9  work tools, and -- and paid me 2,000 for all -- a big
10  group of them.
11     Q.  Okay.
12     A.  The trailer was the work trailer that he
13  used for moving flooring and stuff to and from the
14  jobs.  I sold it to a friend that I work with, for
15  $500.
16         So those are those two things that I sold
17  initially.
18     Q.  Where was the trailer normally stored?
19     A.  Right next to the garage.  There's the --
20  it's up the -- I don't know if you can see it in
21  these pictures.  There's this gate right here next to
22  the garage.  It was either behind the gate or next to
23  the Acura TL right there usually.
24     Q.  Okay.  So the -- again, for the record,
25  it's on the south side of the garage, so the opposite

1  side of the garage where the shooting took place?
2      A.  Opposite side, yes.
3      Q.  And the flatbed was normally stored there
4  in a driveway that was just south of the garage?
5      A.  Yeah.  There's a gate -- yes, there's a
6  gate that's like an RV kind of parking right there.
7      Q.  Okay.  And you mentioned in this paragraph
8  that the prices that you sold the trailer and the
9  tools for were less than their market value.  Do you
10  have any appraisals or documents or another way to
11  estimate how much they were actually worth?
12     A.  My son was really bummed that I sold the
13  trailer afterwards, because he needed a flatbed
14  trailer to purchase a vehicle that he was going to
15  restore and rebuild.  And so he started pricing them
16  out to move this -- this car, and the trailer -- most
17  of them were between 1,500 up to 2,000 for the
18  flatbeds.  He ended up just renting one, but -- yeah,
19  he priced those out.
20     Q.  And did -- do you know if there are any
21  records showing, you know, the date -- or the year of
22  the trailer, I don't know, when it was made?
23     A.  I would have it in our records.  I mean,
24  we had to have it licensed every year, so it would be
25  on those.  I'm not exactly sure of the date, but I

1  would have that in our files.
2      Q.  Okay.  What about the tools; was there a
3  list of the tools, pictures, any records showing what
4  the tools were?
5      A.  I don't have any specific list or
6  pictures.  I can recall them.  I could probably call
7  Shelly and Brad and ask them if they could list all
8  of them that they remembered.  I mean, I know the
9  basic -- the big tools, you know, the steam irons and
10  carpet movers and all different kinds of tools like
11  that.  But I could -- they would be able to verify
12  the majority of that list and -- and what the
13  replacement value is.
14     Q.  Did you attempt to sell the trailer or the
15  tools to any persons other than the ones that you
16  sold them to?
17     A.  No.  I didn't, like, list them on KSL or
18  anything.
19     Q.  The -- the market value of at least $1,400
20  that's listed here for the utility trailer...
21     A.  Uh-huh (affirmative).
22     Q.  Do you know if that estimate was based on,
23  for example, some kind of web-based trailer?
24     A.  The replacement cost from what we had --
25  to try to buy another one for my son.  So that was a

1  low estimate of the cost of one that you could get
2  that was similar.
3      Q.  Okay.
4      A.  Just buying one off of KSL or something
5  like that.
6      Q.  Okay.
7      A.  I had -- I hadn't put them on KSL or
8  anything like that.  Shelly and Brad -- Vince worked
9  with them for a long time.  They were good
10 people.  They had offered to pay for the cost of the
11 funeral or the -- and I didn't want to take their
12 charity, and so I asked them to buy the tools,
13 because I needed the money, but I knew that they
14 would -- that way they would get something for it
15 instead of just giving me straight money.  I'm kind
16 of a proud person.  I didn't want to just take the
17 charity.  So that way I knew they could use the tools
18 and then that would be a better way, in my mind,
19 to -- to receive that money I needed.
20     Does that make sense?
21     Q.  Yes.
22     MR. CUMMINGS:  Just by way of
23 clarification, KSL is an online -- it's a web media
24 news site, but it also has a classifieds segment, and
25 so it's a -- it's an online classifieds- type --

1      MR. BURR:  Okay.  Thank you.
2      MR. CUMMINGS:  -- website.
3      THE WITNESS:  They sell everything from
4  cars to tools to homes on there.
5      MR. BURR:  Thank you.
6      Q.  Kind of like a local Craigslist?
7      A.  Yes, exactly.
8      Q.  Thank you.
9          The next section refers to three pieces of
10 real estate.
11     A.  Yes.
12     Q.  The first one refers to cabins in --
13 Vallecito?
14     A.  Vallecito.
15     Q.  Vallecito.
16     A.  It's just above Durango in Colorado.
17     Q.  It indicates that you and Vince were going
18 to purchase those cabins?
19     A.  We had -- we had been down there a couple
20 of times.  We were working with a real estate agent
21 in Durango.  We -- it was a resort, seven cabins on
22 Vallecito Lake.  It was two hours from our other
23 property at Monticello.  We were just waiting for
24 Logan to graduate from high school, and then we were
25 planning to sell our house and buy -- fix up these

1  seven cabins and rent them out as rental properties.
2      Q.  Okay.  So you were planning to buy all
3  seven cabins?
4      A.  A resort and seven cabins.  They were all
5  one property.
6      Q.  And do you recall the address or any more
7  detail about where they were located?
8      A.  Vallecito Lake is a small lake above
9  Durango, Colorado.  It's about a mile across and five
10 miles up.  They were listed -- there's real estate
11 listings for them.  And I think we provided -- you
12 have all of those in some of the e-mails back and
13 forth.
14     My parents had flown down there with us
15 also to view them all and kind of do the inspection
16 with us.  My dad was a -- a property inspector,
17 licensed at one point, and so that's why I asked him
18 to come up and -- to look at those.  So we were
19 planning on purchasing these and renting them out,
20 and then I would also do real estate down there
21 around the lake.
22     Q.  Did you -- so you mentioned that you were
23 working with a real estate agent?
24     A.  Uh-huh (affirmative).
25     Q.  Do you recall whether you were negotiating

1  actual prices for these cabins or this resort?
2      A.  We had been talking back and forth.  She
3  had given me the -- the kind of cost analysis of what
4  they -- you know, what their rentals had been in the
5  past, what they anticipated the costs of, like, snow
6  removal and that kind of things on the property.  The
7  pricing was good.  They had been on the market for a
8  while.  They needed a lot of work, which my husband
9  was able to do.  And so we were pretty close to being
10 able to do that.  We just had to sell our home and
11 then put that money into that.
12     Q.  Do you recall a range of what price range
13 you were discussing?
14     A.  It was about 300,000.
15     Q.  Okay.  For all seven cabins?
16     A.  Yeah.  Two of them were, like, wooden,
17 small log cabins that had water and, you know, power.
18 They were all -- I think it was a little over an acre
19 piece of property that these were all on, and they
20 were very small.  It was kind of like a -- they
21 weren't, like, home-style cabins, they were small
22 like that you would rent out on Airbnb for, like, two
23 people.  And they all sat right on the lake.
24     Q.  And do you recall who the owner was at the
25 time?

1    A.   I don't.  I worked through the real estate
2  agent.  I never actually met them -- the owners.
3  When we viewed the property on two occasions, they
4  weren't there.  It has since been sold.  It sold
5  about six, seven months after Vince passed.
6    Q.   Okay.  Do you recall if these cabins have,
7  like, a name, if there's a -- any other way to
8  reference them?
9    A.   Vallecito Resort.  I -- I think you can
10  probably -- you have the documents that I provided
11  that had, like, the real estate listing and those.
12  So we should be able to give you the names or that.
13    Q.   Were you planning to purchase them
14  outright or to finance them with a mortgage?
15    A.   Finance them.  The main -- the resort was
16  like the main house.  That's where we would have
17  lived.  And then it had an office on the front part
18  of it that you -- I would use as my real estate
19  office and the office to check people in and out.
20      There's a couple other little communities
21  like this on the lake.  They are seasonal; it's only,
22  really, half the year.  And then around the holidays
23  they rent them out.
24    Q.   So was your plan to keep the home in
25  Centerville and live there, or to move completely

1  to --
2    A.   No, we were planning on selling the home.
3  Vince was getting it ready for us to sell as soon as
4  Logan graduated.  And he graduated in May of 2014,
5  just after -- two months after Vince passed.
6    Q.   Okay.  You mentioned that through this
7  broker you were discussing prices.  Do you know if
8  you ever placed an actual offer?
9    A.   Not yet.  I needed to get our house at
10  least listed before we put our offer in, because it
11  would be contingent upon the sale of our home.
12    Q.   Had you looked into, you know, getting
13  preapproval for a mortgage loan or anything like that
14  for that property?
15    A.   I mean, I have been in real estate for 12
16  years.  I have excellent credit, over 800.  So did
17  Vince.  We had money that we would put down from our
18  house.  So I didn't actually, like, get a loan or
19  apply for it, but I knew that we would have no issue
20  with it.
21    Q.   Okay.  Was your expectation that you would
22  have enough equity in the home that you would sell in
23  Centerville to help get the down payment?
24    A.   Yeah.  Part of -- a little bit of the down
25  payment, but more into fixing it up.  Some of the

1  cabins were dated and we would want them, you know,
2  all repainted and cleaned up, change out a few things
3  before renting them so you could get the best value
4  of the rentals.
5    Q.   Had you ever rented out property before?
6  Would this be the first time you had been a landlord?
7    A.   First time as a landlord that way.  My
8  father owned a company that I worked for when I was
9  in high school that rented out executive suites to
10  people on business for short-term -- short- and
11  long-term rentals, anywhere from a month to a year.
12  Had weekly maid service.  So I did everything from --
13  in high school -- the maid service part of it, to the
14  purchasing of all the housewares for them.  So a
15  little bit different, but somewhat similar.
16    Q.   Okay.  There is a calculation here of
17  1,768,000 in rental income.
18    A.   Uh-huh (affirmative).
19    Q.   Do you know how that amount is calculated?
20    A.   So they had an independent -- our lawyers
21  hired an independent firm.
22      Do you know what it's called?
23      MR. CUMMINGS:  I don't offhand.
24      THE WITNESS:  But they are the ones that
25  did all the calculations.  We gave them all the

1  information that we had, the information we got from
2  the real estate agent about approximate rentals, how
3  much, what the season was, you know, what you could
4  expect to rent it out.  And they are the ones that
5  came up with that total number over, I don't know,
6  20, 30 years, however long it is.  So it was an
7  independent professional that the lawyers hired to
8  figure out that number, but we had given them all the
9  information from the real estate agent that we were
10  working with.
11    Q.   (BY MR. BURR)  Okay.  The next category is
12  an inability to properly maintain property owned by
13  her and her husband in Monticello, Utah.
14    A.   Monticello, uh-huh.
15    Q.   Monticello.  And you mentioned Monticello
16  was about a couple hours from Vallecito?
17    A.   Two hours.  It's five hours from here; a
18  lot longer.
19    Q.   So this is property that you and Vincent
20  owned?
21    A.   Uh-huh.  we purchased it about ten years
22  ago.
23    Q.   Were you the sole owners?
24    A.   Yes.
25    Q.   Was it financed?

1       A.    No.  We paid cash.

2       Q.    Do you recall how much you paid cash?

3       A.    About -- it was just over a thousand

4    dollars an acre, so about $70,000, a little more.

5       Q.    Were there any improvements on the

6    property?

7       A.    Yeah.  We fully fenced the 70 acres, Vince

8    did, spent a whole summer.  That's a lot to fence.

9    To keep the running horses and cattle out there -- so

10   to keep them out of our side of the property.

11          We built a bunkhouse down there.  There is

12   some mountain lions and bears and stuff.  At first we

13   camped on it until a mountain lion killed a deer 30

14   feet away from our tent one night, and then Vince

15   just built me a bunkhouse to sleep in with six inches

16   slated wall so I didn't have to worry.  So -- so,

17   yes, we built those.

18      Q.    Okay.  Were there any other buildings on

19   the property?

20      A.    There is two outhouses, uh-huh.

21      Q.    The paragraph here references a basis at

22   the time of Vincent's death of $190,000.

23      A.    Is this on the Monticello?

24      Q.    Yes.

25      A.    Yes.  Like I said, the elk run through the

1    fence if the snow is too deep in the winter, so I

2    have to hire somebody -- Vince used to fix it.  I

3    have to hire somebody to maintain the fence for me,

4    fix it.

5          All of our firewood would come from there.

6    I was lucky enough to have a friend this last year

7    come and spend about eight hours chain-sawing for me.

8          There is a lot of wood on the property

9    that needs to be -- or the bunkhouse itself that

10   needs to be restained and -- and just general

11   maintenance-type stuff that I haven't been able to

12   get to or do myself.  So the things that Vince would

13   have normally done, I think those are the costs they

14   figured that it would be to do all those things that

15   he used to do.

16      Q.    So you mentioned that it's probably about

17   five hours away?

18      A.    It is.

19      Q.    How often would Vincent go out there?

20      A.    Once a month, at least.  It was -- it was,

21   like, a family recreation.  Our closest neighbor was,

22   like, seven miles away, so it was nice and quiet.

23          We would often shoot.  We had a small gun

24   range set up down there so that we could target

25   practice and stuff like that.

1    Lots of hiking and climbing, mountain

2    biking, that kind of thing down there.  It's not far

3    from Moab.

4       Q.    And you state here that there is an

5    estimated appreciated value of $504,127 over a

6    20-year period.  Is that --

7       A.    It's probably on the land mostly.

8       Q.    Okay.  Is that an appraised value of the

9    land if it were to be sold today?

10      A.    I'm not sure how they calculated it

11   exactly.  But I think it would be if -- or where --

12   the appreciated value when they sell it in 20 years.

13   I think it mentions over a 20-year period.

14          MR. CUMMINGS:  I am just going to insert a

15   standing objection on the -- the real estate damages.

16   They will be the subject of expert testimony.  She

17   can, of course, testify to her understanding at this

18   point, but this is all derived from preliminary

19   expert reports.

20          MR. BURR:  Okay.

21      Q.    Do you know if this 20-year period is

22   talking retroactively or what it may be worth down

23   the road in the future, in 20 years?

24      A.    I'm not sure.

25      Q.    Okay.  Do you know what the property is

1    worth today?

2       A.    I would list it, knowing the market down

3    there, right now at about 150.

4       Q.    Have you ever listed that property?

5       A.    No.  I would like to keep it in the family

6    as long as I can, pass it to my son, if possible.

7       Q.    Can you remind me -- I don't remember if

8    you testified to this already, but when did you

9    purchase it?

10      A.    About ten years ago.

11      Q.    Okay.

12      A.    2009, 2010, I think.

13      Q.    Okay.  And --

14      A.    Maybe it was even 2008.  It's been about

15   ten years.

16      Q.    Okay.  And during the time frame that you

17   owned it for those -- you know, while Vince was alive

18   or since, you've never listed it for sale?

19      A.    No.

20      Q.    Okay.

21      A.    We had planned on building a retirement

22   home on there.  And being where it was only two hours

23   from Vallecito, you could go overnight, not needing,

24   like, a three-day weekend that you feel like you need

25   to from driving up here.  But that it was planned to

1  have a retirement house on it.
2      Q.  Do you know if an appraisal has been done
3  on that property at any point?
4      A.  Not by us.  I don't know if the rancher
5  that sold it -- he subdivided it into three.  He may
6  have had an appraisal done at the time that he had it
7  subdivided, but I'm not sure.
8      Q.  And this was prior to selling it to you?
9      A.  Yes.  I have watched other properties come
10  and go that have been sold in the time frame near
11  there as we've been living there.  As I mentioned, I
12  have been a real estate broker, and so I have access
13  to the listings on the MLS; I can see things as
14  they've come up and sold near us.
15      Q.  If you will turn to Exhibit 4.  These are
16  your responses to interrogatories.  Do you recognize
17  that?
18      A.  I briefly reviewed this.
19      Q.  Okay.  If you'll turn to page -- sorry,
20  there aren't page numbers, but there's an
21  interrogatory number.
22      A.  Okay.
23      Q.  Probably about two-thirds, three-fourths
24  of the way back there is an Interrogatory Number 8.
25      A.  Okay.

1      Q.  And this refers to the lost ability to
2  maintain that property in Monticello?
3      A.  Uh-huh (affirmative).
4      Q.  Turn to the following page.  In that
5  second paragraph of your answer it refers to the --
6  the labor to maintain the property.
7      A.  Uh-huh (affirmative).
8      Q.  And it states, "She is unable to
9  physically complete the labor herself, and because
10  she does not have any money to hire assistance, the
11  property will depreciate in value."
12      A.  It has been -- like I said, I was lucky to
13  have a friend who came and helped me out this year.
14  I would have liked to hire a couple of the ranch
15  hands down there in Monticello to come take care of
16  the fence and some other things, but it is -- it
17  needs a lot of work right now.
18      Q.  Okay.  Do you know if there are any
19  documents or appraisals or anything that would show
20  whether it has already depreciated in value?
21      A.  Well, my dad came down.  He's a -- he was
22  an inspector.  He didn't give me a -- like, an actual
23  appraisal or anything, but he said, you know, "Mugs,
24  it's really going downhill."  He said, "We've got a
25  lot of work we got" -- you know, "you need to do down

1  here.  You don't want to see all of Vince's work go
2  to waste."  I know it does need stuff.
3      Q.  Okay.  And then there was one other piece
4  of real estate mentioned in your disclosure, and
5  that's the home you lived in for 18 years; is that
6  right?
7      A.  Correct.
8      Q.  And you sold that home in May of 2017; is
9  that right?
10      A.  I did.
11      Q.  Okay.  During the time frame that you
12  owned it, were both you and Vince, when he was alive,
13  listed as the owners on the property?
14      A.  Yes.
15      Q.  Okay.  Were there any other cosigners or
16  anything like that?
17      A.  No.
18      Q.  Okay.  And was there a mortgage on the
19  property?
20      A.  Yes.
21      Q.  Okay.  Do you recall what the balance of
22  the mortgage was when you sold?
23      A.  About 200 -- 230,000.
24      Q.  Okay.  And what was the price that you
25  sold it for?

1      A.  Three fifty.  I had put some money into
2  it, having the hardwood floors refinished and a few
3  other things, the back porch repoured, the siding
4  repainted, just prior to selling it to make sure that
5  I could get the best value out of it, but -- so that
6  came out of the money that I made up with the sale.
7      Q.  Okay.  If you'll turn back to Exhibit 4,
8  the interrogatory responses.
9      A.  Okay.
10      Q.  If you'll look at Interrogatory Number 9.
11      A.  Okay.
12      Q.  I just wanted to clarify, because it
13  states here in the -- at the top of the second page
14  of this answer -- it says that you sold the
15  Centerville home for 375,000.  Was it 375 or 350?
16      A.  Well, 370 -- minus commissions and stuff.
17  So, yes, 375 was the listing price.
18      Q.  Okay.
19      A.  Not necessarily what the takehome was.
20      Q.  Did you act as the agent for --
21      A.  Selling agent.
22      Q.  The selling agent?
23      A.  Uh-huh (affirmative).
24      Q.  And what were your commissions on that?
25      A.  None for me.  It was three percent to the

1 other side.
2     Q.  Okay.
3     A.  And then closing costs.
4     Q.  Right.
5     A.  I actually had to pay my brokerage 500 --
6 $599, I think, just as -- you know, so -- not
7 commissions, but that went to the brokerage fees to
8 my brokerage.
9     Q.  Okay.  I believe in the production I saw
10 an appraisal for the property that was done, like, a
11 year prior.  Do you recall that?
12     A.  I think the only appraisal that I had was
13 back in, like, 2008, when we refinanced the house.
14     Q.  Okay.
15     A.  So it's been a while.
16     Q.  Okay.
17     A.  That one was at 350,000.  That was -- you
18 know, kind of dropped after that little bubble, and
19 then it took a little bit to come back up to it.
20     Q.  Yeah.  Okay.  If you would turn to
21 Exhibit 3, page 8.
22     A.  Yes.
23     Q.  It refers to this home in Centerville.
24     A.  Okay.
25     Q.  And it states at the bottom of page 8, and

1 continuing onto page 9, current value is estimated at
2 350.  And this was prior to you selling it, right?
3     A.  Yes.
4     Q.  So this -- just for the record, this was
5 signed in February of 2017 and you sold it a couple
6 months later, right?
7     A.  Yes.
8     Q.  Okay.  And then it states after that,
9 "with an estimated appreciated value of 928,654 over
10 a 20-year period."
11     Do you know what that refers to, the
12 928,654?
13     MR. CUMMINGS:  Same standing objection.
14     THE WITNESS:  It was the professional that
15 they hired to calculate all of it.
16     Q.  (BY MR. BURR)  Okay.
17     A.  We just gave him all the information on
18 it.
19     Q.  Okay.
20     A.  I'm not exactly sure how they calculated
21 that.
22     Q.  Okay.  Do you know if this 20-year period
23 is prospective, for the future, 20 years down the
24 road?
25     A.  I would assume, but I don't know.

1     Q.  Okay.
2     A.  It is classified as horse property, and
3 there were fruit trees on it.  That was the hard part
4 for me to maintain.  But there's very little horse
5 property in east Centerville, so it -- it's kept its
6 value and goes up over time.
7     MR. BURR:  Okay.  Let's take a break.  I'm
8 just about done.
9     MR. CUMMINGS:  Okay.
10     THE VIDEOGRAPHER:  Off the record.  It's
11 11:46.
12     (A break was taken from 11:46 a.m. to
13     11:53 a.m.)
14     THE VIDEOGRAPHER:  We're on the record.
15 The time is 11:53.
16     Counsel may proceed.
17     MR. BURR:  I'll pass the witness.
18     EXAMINATION
19 BY MR. CUMMINGS:
20     Q.  Your dog -- what is your dog's name?
21     A.  Brutus or Brutus Bear.
22     Q.  And do you have a dog door on your house?
23     A.  Yes.
24     Q.  And where is that dog door?
25     A.  It's in the very back of the house that

1 comes out of the basement.
2     Q.  Okay.  So how can Brutus get out of the
3 house if he is inside?
4     A.  Through that door.
5     Q.  Okay.  And then if -- obviously, if
6 another people door is open, then, right?
7     A.  Only -- yeah, if somebody opened a door
8 and let him out.
9     Q.  So on April 13th of 2014, where -- what is
10 your best understanding or belief as to where dog --
11 or where Brutus exited the house?
12     A.  My understanding is when Vince came out
13 the front door, Brutus then would -- knowing what his
14 usual path was, he went around the back to come out
15 his dog door and around.  And that's when he found
16 the gate that was left open.  When Officer Read and I
17 went through it, the gate was left open.  And he came
18 around there and met Vince in the front yard.
19     In the police car that was off to the
20 north, parked on the road, on their dash cam you can
21 see when Brutus runs through the gate and to the
22 front door.
23     Q.  Okay.  And so based upon your best
24 recollection, Brutus was at or near Vince during
25 the -- the altercation and those few minutes leading

1  up to the shooting?
2     A.  Right at the end I think Brutus ran out --
3  it was after Vince had put the gun down.  The dog ran
4  out.  And then you can see Vince go with the dog --
5  go back to the backyard to put him away.  And it was
6  right as he was going back through the gate to put
7  the dog away that he was shot.
8     Q.  Shelly and Brad at Home Furnishings, what
9  is their last name?
10     A.  Let's see.  Shelly got remarried.  Do you
11  mind if I look at my phone?
12     Q.  It's just fine.  We -- I was -- we'll
13  provide Kendall and -- his crew with supplemental
14  disclosures.  That's the --
15     A.  They're brother and sister --
16     Q.  I just want to get them on the record
17  here.
18     A.  Yeah.  Allied Home Furnishings.
19     Q.  Okay.
20     A.  And the owners.
21     Q.  Now, the -- the Monticello property, you
22  still own that, correct?
23     A.  I do.
24     Q.  If you had to sell it, though, you would,
25  correct?

1     A.  I really hope I don't ever have to sell
2  it.  I would like to pass it to my son.
3     Q.  But if the repairs get too costly for you,
4  and the upkeep and maintenance?
5     A.  You have to do what you have to do.
6     Q.  And if American General would have paid
7  the $500,000 policy, would that have assisted you in
8  making those repairs and maintenance?
9     A.  Yeah.  I would have hired the ranchers
10  down there -- a couple of the ranch hands to come
11  help out with a lot of the maintenance.
12     Q.  Would it have relieved any of your -- your
13  stress and anxiety over that maintenance and repair?
14     A.  Absolutely.
15     Q.  And the Centerville home, you said that
16  you listed it in the October before the shooting?
17     A.  We were getting ready to list it to sell
18  [sic] that other house.  We put it on briefly before
19  it was quite ready, and took it off about a week
20  later, deciding to wait until Logan was completely
21  finished with school.  I didn't want to have him move
22  in with grandparents for only two months.  So we took
23  it off and were waiting for him to graduate.
24     Q.  And the hope was to sell that home and
25  invest it in the --

1     A.  The Vallecito --
2     Q.  -- Vallecito property, correct?
3     A.  Correct.
4     Q.  And then you sold that house in May of
5  this year, 2017 --
6     A.  I did.
7     Q.  -- correct?
8     And what precipitated or necessitated that
9  -- that sale?
10     A.  I couldn't keep up with the yard.  The
11  trees needed pruning.  Some needed to be taken out.
12  The -- the garden had just gone to hell in the back.
13  Fruit trees needed pruning.  It just -- there was
14  more than I could handle.  I had to replace the sewer
15  main.  There was just a lot of things that, you know,
16  Vince normally took care of that I couldn't do.
17     Q.  And if American General would have paid
18  out the insurance proceeds on the claim, would that
19  have assisted you in making those maintenance and
20  repairs?
21     A.  I would have hired somebody to come take
22  care of it weekly, you know.
23     Q.  And if American General would have paid
24  out the insurance proceeds in this case, would that
25  have relieved you of some of the anxiety and stress

1  associated with the Centerville property?
2     A.  Yeah, absolutely.
3     Q.  Relatedly, why -- why did you purchase
4  the -- the policy in question?
5     A.  As I mentioned before, my boss, the
6  president and CEO of the software company I worked
7  for, passed away in 2011 suddenly.  He was only 57.
8  And it was a wake-up call.  It was the first person,
9  you know, that had really passed that I was close to,
10  that I would spend time with every day.  And I
11  watched his wife, you know, sell their home, move
12  back to Oregon and have to deal with all of this.
13  And I realized that was the responsible thing.  You
14  know, we had -- we still had a child in school and
15  that, you know -- and so we purchased it for that
16  reason, if something happened to us.  I didn't think
17  I would ever have to use it.  I assumed, you know, if
18  something happened to us, then, you know, my parents
19  or my sister or somebody would be able to help Logan
20  sell the house and deal with it, and that would keep
21  him taken care of if something happened.
22     Q.  And so is it fair to say that you
23  purchased the policy just in case something like what
24  happened on April 13th, 2014 -- if that happened, you
25  would be taken care of?

1    MR. BURR: Objection. Form. Speculation.
2    THE WITNESS: I never would have foreseen
3  what happened that day ever happening. I -- it was
4  like a movie -- a bad movie to live through. I never
5  foresaw anything like that ever happening.
6    But in the case that one of us died, which
7  did happen, then, you know, that would -- Vince being
8  the one who made more through most of our whole
9  marriage, that it would help us or -- or Logan, our
10  son, if -- be taken care of.
11    Q.   (BY MR. CUMMINGS) When American General
12  denied the claim, how did that make you feel?
13    A.   You know, I kind of felt -- I kind of
14  heard stories, you know, that they just automatically
15  deny it and you have to sue them for it. It made me
16  feel sad for all of the other widows and, like,
17  little old ladies who get these claims that they
18  deny, and they don't know that you have to get a
19  lawyer and go after it. So it -- you know, I paid
20  every premium and I paid them all on time and I felt
21  like it was their, you know -- I didn't get what I
22  paid for.
23    Q.   Prior to American General denying the
24  claim, did they ask you to sign any release related
25  to getting documents from Davis County?

1    A.   They did. They sent me some paperwork to
2  sign to release medical and police stuff, and that I
3  signed right -- I think I signed it before I even
4  talked to Jon.
5    Q.   Do you recall signing a release within the
6  past six months?
7    A.   I think there might have been another one
8  they asked for more documents that -- but it went
9  through the lawyers. There might have been one more.
10    Q.   Now --
11    A.   And I signed everything that they've ever
12  asked me to or given me.
13    Q.   But you -- there was a release that you
14  signed after this lawsuit was filed; is that correct?
15    A.   I believe so.
16    Q.   But you had signed every other thing that
17  American General had provided to you?
18    A.   Yes. Part of the paperwork of, you know,
19  paying the claim, I just figured you needed to in
20  order for them to do their job.
21    Q.   Do you remember sending an e-mail to
22  American General with pictures of detectives' cards?
23    A.   I sent them -- yeah, they -- a copy of the
24  policy, the death certificate. I think the
25  detective's card so they could get ahold of them to

1  get the police report, whatever they needed. I mean,
2  it's been a lot -- it's been over three years. I
3  don't recall exact dates or -- but I -- I do recall
4  sending them all the information that I had on it.
5    Q.   So were you trying to do everything that
6  you could to assist American General in their
7  investigation of this claim?
8    A.   Yes.
9    Q.   After you submitted the initial policy
10  claim, did anybody from American General call you and
11  ask you what happened on April 13th, 2014?
12    A.   No.
13    Q.   Did anybody from American General call you
14  and interview you about the incident?
15    A.   No.
16    Q.   Did anybody -- do you know of an
17  organization called Curry & Associates?
18    A.   No.
19    Q.   So is it fair to say that anybody from --
20  that nobody from Curry & Associates called you and
21  interviewed you?
22    A.   Not that -- no.
23    Q.   Did anybody from American General call
24  you, e-mail you, or otherwise ask you about any
25  potential witnesses from April 13th, 2014?

1    A.   No.
2    Q.   To the best of your knowledge, did anybody
3  at American General talk to your elderly neighbor,
4  Margean?
5    MR. BURR: Objection. Calls for
6  speculation.
7    THE WITNESS: I'm not --
8    Q.   (BY MR. CUMMINGS) To the best of your
9  knowledge.
10    A.   I'm not aware of them contacting anyone.
11    Q.   To the best of your knowledge, did anybody
12  from American General contact the Bake's daughter
13  about the incident?
14    A.   Again, I'm not aware of them contacting
15  anyone.
16    MR. CUMMINGS: I think that's it.
17    THE VIDEOGRAPHER: This concludes this
18  deposition. We'll go off the record. It's 12:03.
19    (Deposition concluded at 12:03 p.m.)
20    * * *
21
22
23
24
25

1    REPORTER'S CERTIFICATE
2    STATE OF UTAH        )
                          ) ss.
3    COUNTY OF SALT LAKE    )
4
          I, Dawn M. Perry, Certified Shorthand
5    Reporter and Notary Public in and for the State of
     Utah, do hereby certify:
6
          That prior to being examined, the witness,
7    Molly Farrand, was by me duly sworn to tell the
     truth, the whole truth, and nothing but the truth;
8
          That said deposition was taken down by me
9    in stenotype on August 24, 2017, at the place therein
     named, and was thereafter transcribed and that a true
10   and correct transcription of said testimony is set
     forth in the preceding pages.
11
          I further certify that, in accordance with
12   Rule 30(e), a request having been made to review the
     transcript, a reading copy was sent to Robert B.
13   Cummings, Attorney at Law, for the witness to read
     and sign under penalty of perjury and then return to
14   me for filing with Kendall J. Burr, Attorney at Law.
15        I further certify that I am not kin or
     otherwise associated with any of the parties to said
16   cause of action and that I am not interested in the
     outcome thereof.
17
          WITNESS MY HAND this 31st day of August,
18   2017.
19
20
21
22        Dawn M. Perry, CSR
23
24
25

1    Case:  MOLLY FARRAND vs. AMERICAN GENERAL LIFE
     INSURANCE COMPANY
2    Case No.:  1:16-cv-00134-DB
     Reporter:  Dawn M. Perry, CSR
3    Date taken:  August 24, 2017
4         WITNESS CERTIFICATE
5         I, MOLLY FARRAND, HEREBY DECLARE:
          That I am the witness in the foregoing
6    transcript; that I have read the transcript and know
     the contents thereof; that with these corrections I
7    have noted this transcript truly and accurately
     reflects my testimony.
8
     PAGE-LINE      CHANGE/CORRECTION        REASON
9    _____    _____    _____
     _____    _____    _____
10   _____    _____    _____
     _____    _____    _____
11   _____    _____    _____
     _____    _____    _____
12   _____    _____    _____
     _____    _____    _____
13   _____    _____    _____
     _____    _____    _____
14   _____    _____    _____
15   _____    No corrections were made.
16
          I, MOLLY FARRAND, HEREBY DECLARE UNDER THE
17   PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
     OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE
18   FOREGOING IS TRUE AND CORRECT.
19
          MOLLY FARRAND
20
          Date: _____
21
22
23
24
25