# APPENDIX G

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

MOLLY FARRAND,            )
                          ) Videotaped deposition of:
    Plaintiff,            )
                          ) OFFICER PRESTON CASEY
vs.                       )
                          )
AMERICAN GENERAL LIFE     ) Case No. 1:16-cv-00134-DB
INSURANCE COMPANY,        )
                          )
    Defendant.            )

August 18, 2017 * 10:06 a.m.

Location: Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
Salt Lake City, Utah

Reporter: Dawn M. Perry, CSR
Notary Public in and for the State of Utah
Videographer: Gavin Bohne

## Page 2

```
 1         A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3       Jon D. Williams
         Attorney at Law
 4       Jon D. Williams, P.C.
         9 Exchange Place
 5       Suite 600
         Salt Lake City, Utah 84111
 6       (801) 746-1460
 7  FOR THE DEFENDANT:
 8       Diane Wizig
         Attorney at Law
 9       Edison, McDowell & Hetherington, LLP
         1001 Fannin Street
10       Suite 2700
         Houston, Texas  77002-6707
11       (713) 333-5889
         (713) 337-8850 (fax)
12       diane.wizig@emhllp.com
13  FOR THE WITNESS:
14       Heather White
         Attorney at Law
15       Snow, Christensen & Martineau
         10 Exchange Place
16       Suite 1100
         Salt Lake City, Utah  84111
17       (801) 521-9000
         (801) 363-0400 (fax)
18       hsw@scmlaw.com
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2  OFFICER PRESTON CASEY              PAGE
 3    Examination by Ms. Wizig          5
 4    Examination by Mr. Williams      64
 5              * * *
 6           E X H I B I T S
 7  NO.       DESCRIPTION              PAGE
 8
    6         Photograph                45
 9
10              * * *
```

## Page 4

```
 1              P R O C E E D I N G S
 2
 3       THE VIDEOGRAPHER:  We are on the record at
 4  10:06 a.m.  This is the videotaped deposition of
 5  Officer Preston Casey in the matter of Farrand versus
 6  American General Life Insurance Company in the United
 7  States District Court for the District of Utah.
 8       This deposition is being held at Snow,
 9  Christensen and Martineau in Salt Lake City, Utah, on
10  August 18th, 2017.
11       My name is Gavin Bohne and I am the
12  videographer.  I am present on behalf of Stratos
13  Legal.  The court reporter is Dawn Perry, also
14  present on behalf of Stratos Legal.
15       Counsel will now state their appearances
16  and firm affiliation for the record.
17       MR. WILLIAMS:  Jon Williams on behalf of
18  the plaintiff, Molly Farrand.  And my practice is
19  Jon D. Williams, PC.
20       MS. VIZIG:  Diane Wizig from Edison,
21  McDowell and Hetherington, on behalf of the
22  defendant, American General Life Insurance Company.
23       MS. WHITE:  Heather White of Snow,
24  Christensen and Martineau on behalf of Officer Casey.
25       THE VIDEOGRAPHER:  Will the court reporter
```

Page 5

1  please swear in the witness?
2
3            OFFICER PRESTON CASEY,
4       called as a witness, being first sworn,
5         was examined and testified as follows:
6                    EXAMINATION
7  BY MS. WIZIG:
8      Q.  Mr. Casey -- or Officer Casey, excuse me,
9  we met just a few moments ago. I'm Diane Wizig. I
10 represent American General Life Insurance Company
11 with respect to this litigation which was filed by
12 plaintiff Molly Farrand in September 2016.
13          Can you state your name for the record?
14     A.  Preston Casey.
15     Q.  Where do you live?
16         MS. WHITE: We don't give officers' home
17 addresses. You can have his work address or you can
18 contact him through me.
19         MS. VIZIG: Okay. Very good.
20     Q.  Have you ever had your deposition taken
21 previously?
22     A.  For this?
23     Q.  For anything.
24     A.  Once.
25     Q.  Okay. And what was that in regards to?

Page 6

1      A.  It's in regards to an inmate and -- two
2  inmates and a canteen worker having sex in a
3  refrigerator.
4      Q.  Okay. And that was a lawsuit filed by
5  whom?
6      A.  That would have been by -- I don't know
7  his name.
8      Q.  Okay.
9      A.  Or their names. Sorry.
10     Q.  That's okay.
11     A.  Both names.
12         I wasn't really involved with it. I was
13 listed as somebody that was, and they had the wrong
14 name, but seeing that they did, they kept me --
15     Q.  Okay.
16     A.  -- throughout the whole time.
17     Q.  And you -- were you a named party?
18     A.  Yeah.
19     Q.  Go on. Sorry.
20     A.  I was a named party, as far as I worked at
21 the jail and I was supposedly the officer that let
22 the two inmates go over to the kitchen. But it was a
23 different officer, but I was named in it.
24     Q.  Okay. And when was that?
25     A.  '08 or -- '08-ish, '07.

Page 7

1      Q.  Do you know what happened in that --
2      A.  I have no idea.
3      Q.  Have you been involved in any other
4  litigation?
5      A.  Nope. Sorry. No.
6      Q.  And as I said, I represent American
7  General Life Insurance Company. Have you ever heard
8  of American General before?
9      A.  No.
10     Q.  Have you ever spoken to anyone with
11 American General? It's safe to say no, since you
12 haven't heard of it?
13     A.  No.
14     Q.  Were you aware of a lawsuit involving the
15 city prior to this litigation?
16     A.  Was I -- sorry. Was I what?
17     Q.  Aware of a lawsuit involving the city in
18 this same incident prior to this lawsuit.
19     A.  Like -- I -- I was aware that they were
20 going to come back and sue, yes.
21     Q.  So you were aware that Molly Farrand sued
22 the city in regards to this same incident?
23     A.  Yes.
24     Q.  Okay. Do you know the outcome of that
25 lawsuit?

Page 8

1      A.  No.
2      Q.  Were you involved at all in that lawsuit?
3      A.  We are referring to this lawsuit, right?
4      Q.  This same incident but not this lawsuit.
5      A.  Yes, I was involved in that incident.
6      Q.  Were you involved in the lawsuit by
7  Molly Farrand against the city?
8      A.  Yes.
9      Q.  Okay. And do you understand that that
10 lawsuit was separate from the current lawsuit by --
11 against my client?
12     A.  Now I do, yes.
13     Q.  Okay. What was your involvement in the
14 prior lawsuit with the city?
15     A.  I was a backup officer. Actually -- yeah,
16 I was a backup officer the day that this happened.
17 It was, like, 10 or 15 minutes, I think, before I was
18 going home.
19         Do you want -- do you want the story or --
20     Q.  No, I'm -- I'm referring more to what your
21 involvement was in that prior lawsuit when
22 Molly Farrand sued the city. Did you give a
23 deposition like this?
24     A.  No.
25     Q.  Did you give any statements in regards to

Page 9

1  that lawsuit besides your communications with your
2  attorney?
3     A.  Just to the detectives afterward.
4     Q.  Okay.  Have you given any testimony in
5  court before?
6     A.  Yeah.  Yes.
7     Q.  And how many times?
8     A.  A couple.  A few.
9     Q.  Sorry.  I don't meet to cut you off.
10    A.  Okay.  A few.
11    Q.  And were those in your professional
12 capacity?
13    A.  Yes.
14    Q.  And you understand that this deposition,
15 you're sworn in just as if you were testifying in
16 court and under oath?
17    A.  Yes.
18    Q.  Okay.  So just to go over some ground
19 rules.  I'm guilty of them already, obviously.  But
20 let's just try not to talk over each other.  I know
21 it's hard.  And when you're responding to me, it
22 doesn't seem like you're inclined to do this, but
23 respond verbally instead of nods of the head.  And
24 it's hard for our court reporter to take down uh-huhs
25 and huh-uhs, so yes or no would be better for her.

Page 10

1        Is there any reason you can't testify
2  honestly today?
3     A.  No.
4     Q.  Are you on any medication that may affect
5  your testimony?
6     A.  No.
7     Q.  Okay.  What did you do to prepare for this
8  lawsuit -- or for this deposition?  Excuse me.
9     A.  Nothing.  I came in and met with my
10 attorney.
11    Q.  Did you talk to anyone besides your
12 attorney?
13    A.  No.
14    Q.  Did you review any documents?
15    A.  No.
16    Q.  How did you get into police work?
17    A.  I -- I started back in 2006.  I wanted to
18 be -- I wanted to work out on patrol, but I was told
19 that the sheriff's office was hiring for corrections.
20 I went and applied, went through their POST academy
21 and started in the jail, and worked in the jail,
22 so -- starting in October of 2006.
23    Q.  And what did you have to do to train for
24 that position?
25    A.  Just we -- SFO and BCO at that time.  So

Page 11

1  special functions officer and basic corrections
2  officer.  And then lots of scenarios and PT tests,
3  physical -- physical tests.
4     Q.  How long did that training last?  It
5  sounded like maybe there is two steps to it?  You
6  said SFO?
7     A.  Yeah, and I can't -- sorry.  Yes, I
8  can't -- I can't remember how long the -- I think it
9  was six months for those two.
10    Q.  And then after you were an officer in the
11 jails, what was your next step in your career?
12    A.  I got hired four and a half years ago with
13 Centerville, and I stayed on part-time at the jail,
14 but I did -- I was on the jail CERT team.  They sent
15 me through the patrol part of the police academy,
16 which is LAO.
17        And then a year after getting that
18 certification I went out on the road with Centerville
19 and remained part-time with the county up until two
20 years ago.  So I spent nine years at the jail and
21 I've roughly been about four years, four and a half
22 years with Centerville.
23    Q.  So at the time of this incident in April
24 of 2014, you were still part-time with the jail?
25    A.  I can't remember if I was exact -- if I

Page 12

1  was part-time or not at the jail on that date or not.
2  I think I was.
3     Q.  Okay.  And if you were, about what percent
4  of your time would have been with the jail versus
5  with Centerville?
6     A.  A hundred percent of my time was with
7  Centerville and possibly 5 to -- 5 percent of the
8  time was with the sheriff department.
9     Q.  Okay.  So at the time of the incident in
10 2014, how many shifts per week would you be working
11 for Centerville?
12    A.  Just my normal four tens.
13    Q.  That's four shifts, ten hours each?
14    A.  Yes.
15    Q.  Okay.  And I think you said you're still
16 currently employed with Centerville?
17    A.  Yes.
18    Q.  Has your role changed at all since you
19 were hired by Centerville?
20    A.  Can you clarify my role?
21    Q.  Sure.  You said that when you started you
22 were working towards a patrol certification, and I
23 assume after that you were certified as a patrol
24 officer.  Have you gained any further certifications?
25    A.  I've gained my -- so Centerville has --

Page 13

1  or -- when you go out on patrol, it's different than
2  corrections. You start at a PO1 and then -- that's
3  where I started with Centerville. And during this
4  incident I was a PO1. I believe I was nine months
5  on -- or off of FTO at that time, which was three
6  months.
7      Q.  What is FTO?
8      A.  Field training. It's for new -- the new
9  guys that have to be trained for three months with
10 multiple officers and sergeants.
11     Q.  Okay. And what all is involved in FTO,
12 field training?
13     A.  Just riding around, understanding the
14 legal system out on the streets, and just learning
15 how to talk to people and handle calls that we would
16 go on.
17     Q.  Okay.
18     A.  So...
19     Q.  And you said you were nine months out at
20 the time of the incident. Was that nine months you
21 had been with Centerville or nine months out from
22 your training?
23     A.  It was -- it was -- so I was hired
24 July 14th with Centerville, and this happened in --
25 what month?

Page 14

1      Q.  I believe it was April 2014.
2      A.  So I would have been nine months, total,
3  with Centerville.
4      Q.  But the first three months of that, it
5  sounds like, were training?
6      A.  Yes. And currently -- you asked what my
7  position -- my title or position was, right?
8      Q.  Yes.
9      A.  I am currently a PO3 now. So I've gone
10 from PO1, PO2, and now I'm PO3.
11     Q.  Could you just walk me through that
12 progression, what the difference is between PO1, 2
13 and 3?
14     A.  PO1s are basically right out of the
15 academy or right out of corrections, but like a
16 brand-new officer. PO2s have some time on. There's
17 just -- there is a policy -- I'm not sure what it is,
18 like -- exactly what it is, but you have to have
19 certain -- you have to have certain, like, defense
20 tactics, that kind of stuff, to become -- to advance,
21 to step up. And I'm currently going through the
22 defense tactics instructor development stuff, and
23 that's what bumped me up to a PO3. So you have to
24 have a specialty to become a P03. A PO2 is basically
25 time and if your supervisors think that you are

Page 15

1  capable of handling calls without assistance.
2      Q.  How long would you say -- or do you recall
3  how long it was before you became a PO2?
4      A.  My PO1 to PO2 took a little bit. I think
5  it was, like, two -- two years or two and a half
6  years. And then just recently, within the last few
7  months, I've got my PO3.
8      Q.  And correct me if I'm wrong; I just want
9  to make sure I understand. The progression from PO1
10 to PO2 is based on a judgment call from your
11 supervisors that you're ready; is that correct?
12     A.  Yeah, you still have to -- you still have
13 to be able to, like -- I'm sorry, I'm trying to throw
14 this out without using our lingo, I guess, and it's
15 kind of difficult. But, anyway, PO1 is your new
16 officers, PO2 is basically -- like, when you -- when
17 your supervisors feel that it's -- ready to go. It's
18 just basically a pay bump and more -- like, a PO3 you
19 can be -- kind of like an officer in charge, an OIC.
20         Does that make sense?
21     Q.  It does.
22     A.  So -- so a PO3 you're capable of handling
23 people -- your crew, and kind of being like a
24 supervisor when there isn't an active supervisor.
25     Q.  Do you recall -- strike that.

Page 16

1         Are officers aware of their colleagues'
2  status, PO1 versus 2 versus 3?
3      A.  Yes.
4      Q.  Do you recall what Officer Read was at the
5  time of the incident?
6      A.  Officer Read I believe has been a PO3
7  since I've been working with Centerville. So PO3.
8      Q.  Okay. And do you recall what
9  Officer Thomas was categorized as at the time?
10     A.  He was a PO3 as well.
11     Q.  Okay. And you said at the time of the
12 incident you were on -- what you called a four ten.
13 How were your shifts assigned? Did you know them in
14 advance? Did they change week to week?
15     A.  No, we know them three months in advance,
16 what we're going to be working.
17     Q.  Okay. So you knew far in advance that you
18 would be working on the day of the incident?
19     A.  Yep. Yes.
20     Q.  And were you typically on four consecutive
21 days?
22     A.  Yes.
23     Q.  Do you have a recollection of the incident
24 we've been referring to?
25     A.  Yes.

Page 17

1  Q. And, you know, just so we know -- or just
2  you know -- excuse me -- you know, we're not here to
3  test your memory or elicit every single detail of the
4  incident. I only want your best recollection of what
5  you remember.
6       This incident involved a Mr. Vincent
7  Farrand. Did you know Mr. Farrand prior to this day?
8  A. No.
9  Q. Had you ever heard his name before?
10 A. No.
11 Q. Did you know his wife, Molly?
12 A. No.
13 Q. Had you ever heard her name before?
14 A. No.
15 Q. I understand there was a shooting on that
16 day. Is that right?
17 A. Yes.
18 Q. Can you walk me through the events of that
19 day as you remember them?
20 A. Yes. So I was -- me and Gary Thomas -- he
21 was involved with this case. But we were parked at
22 Wendy's. We had just cleared juveniles on the
23 railroad tracks call, and we had -- it was kind of a
24 little bit of a -- like, a new call for me. I've --
25 I remember that call coming in as these kids, like,

Page 18

1  came pretty close to getting hit. So we were trying
2  to actively find them. We just barely -- when we
3  found them, they were at Wendy's. And I was getting
4  ready to do shift change with Gary so that he could
5  let Officer Read know what was going on, who was just
6  signing on --
7  Q. Okay.
8  A. -- when that came out.
9  Q. Sorry to interrupt you.
10 A. You're okay.
11 Q. So you were with Officer Thomas prior to
12 getting the call to go to Mr. Farrand's house?
13 A. Yes.
14 Q. Okay. And it sounds like you were working
15 another call at the time involving kids you were
16 trying to locate?
17 A. We had just barely located the kids,
18 advised them not to do it anymore, got their name and
19 cleared the call, so...
20 Q. And you were trying do a shift change.
21 Could you explain what that means?
22 A. Shift change is basically when we meet up
23 with one or more officers so we can -- we do shift
24 change by sitting in our car, windowing up. Parking
25 next to each other talking through windows is what I

Page 19

1  mean by that.
2       Also, we sit down at gas stations and talk
3  about some of the -- you know, the lower-key stuff
4  that we've dealt with during the day and stuff that
5  needed to be passed on for extra patrol stuff.
6       We -- I can't remember if we were in our
7  cars or if we were standing next to our cars. Jason
8  had not got there yet, but I could hear him signing
9  on. I think that's how it went down, is that we were
10 talking next to one of our cars and I was getting
11 ready to go home when Jason signed on, so...
12 Q. So it sounds like your shift was ending
13 and Officer Read's was beginning?
14 A. Right, and he was -- he was picking --
15 that wasn't a normal shift for him. He -- I didn't
16 work with him, normally. So that was -- I think he
17 was picking up a shift that day.
18 Q. But he wasn't present at the Wendy's, you
19 just heard him through your radio?
20 A. Yeah. Yes.
21 Q. So tell me about when the call came
22 through. What did they tell you? What do you
23 remember about that?
24 A. I remember them saying we -- I think there
25 was a possibility as far as a suicidal male with a

Page 20

1  gun going to Bountiful to possibly shoot somebody. I
2  don't -- I'm not recalling if that was all of the
3  information given or the radio or what I heard
4  afterward, but there was a male with a gun going to
5  Bountiful to shoot somebody, is what I believe I
6  heard on the radio.
7       I was close to the Bountiful area. I
8  don't know the exact address that they were reporting
9  where he was going. So I started driving south. I
10 was actually at the Chevron on Parrish. I started
11 driving south on the frontage road, hoping to go meet
12 up with a Bountiful officer before -- before he got
13 that location -- before the suspect at that time got
14 to the location.
15      As I got to Porter Lane, I think it was,
16 they had advised us that the male had returned
17 home -- this is dispatch, meaning "they." Dispatch
18 had advised us that the male had returned home and I
19 believe he had put his guns away, and they didn't
20 want us to come over anymore.
21 Q. Okay. So backing up, let me make sure I
22 understood all of that.
23      It sounds like at the be -- right after
24 you got the call you were heading to Bountiful. Is
25 that right?

Page 21

1  A. Yeah, to the address that -- where the
2  suspect was supposedly going.
3  Q. Okay. And then the dispatch told you the
4  suspect was actually going back home; is that right?
5  A. He had returned back home.
6  Q. Returned back home.
7     And at that point you headed towards the
8  home?
9  A. I knew that Officer Thomas was driving up
10 to meet with the victim, which was -- I thought at
11 the time, was the male's wife. So I was, like,
12 "That's not good. He's going to be up there alone."
13 Because Jason had signed on, but I think he was on
14 Legacy when he signed on, or I-15, but -- so I
15 started driving toward Gary, because I heard that
16 information. And it was directly east of where I was
17 at, except maybe I had to jog up a couple streets,
18 meaning take a couple roads to get there that -- it
19 wasn't a straight shot for me.
20    So I drove up to 300 East, the road that
21 they live on, and missed the turn, trying to look at
22 notes on my computer. And as I was turning around,
23 just right after I had passed 300 East, like 15 feet,
24 I was turning around and Jason had turned right. So
25 we basically all got there at the same time.

Page 22

1  Q. So you heard that Gary, meaning
2  Officer Thomas --
3  A. Right.
4  Q. -- was heading towards the victim. And by
5  "the victim," who were you referring to?
6  A. The wife of the suspect.
7  Q. And did you understand at the time that
8  she was at their home?
9  A. Did I what?
10 Q. Did you understand at the time that she
11 was at their home, meaning she and her -- her and her
12 husband's home?
13 A. Did I understand that?
14 Q. Did you know that that is where
15 Officer Thomas was heading?
16 A. Yes, I knew that Officer Thomas was
17 heading to the victim's house.
18 Q. And you said that you saw on your --
19 something on your computer that distracted you.
20 Could you describe to me what that computer system is
21 like?
22 A. It's my laptop in my car. It's not what I
23 saw. It was I was trying to read the notes on the
24 computer to get more -- like, there was so much radio
25 traffic; we had Bountiful radioing this out, which

Page 23

1  was at Bountiful dispatch, Davis dispatch is
2  radioing -- or trying to transmit all this traffic.
3  And we scan both channels. And I flipped over to
4  Bountiful to get more information on the Bountiful
5  call, and then I had had to flip back to Davis. So
6  it was kind of a -- a clutter, you know, going, so I
7  was trying -- because it's all in the notes on our
8  computer. So I was trying to read it and missed the
9  street, like -- I was trying to read the little notes
10 at the bottom of the computer, which are teeny, and
11 get more -- the updated information to make sure that
12 he was really back at the house, and that's when I
13 missed the turn and had to turn around, so...
14 Q. So it sounds like you could only listen to
15 one dispatch at a time. Is that right?
16 A. No, you can listen to both dispatches.
17 They -- they patch through both, like, one radio
18 channel, but one of them is our home -- home channel,
19 which is Davis County. But the call I think
20 originated in Bountiful.
21 Q. Got it. And you said it's your laptop?
22 A. Yes.
23 Q. What does that -- can you sort of explain
24 to me what information comes through on that laptop?
25 A. Everything that dispatch says comes

Page 24

1  through that.
2  Q. So anything dispatch is saying verbally
3  gets -- comes to you in written form?
4  A. Yes.
5  Q. Okay. Do you remember what written notes
6  were coming up at that time?
7  A. No. The only thing I remember is what I
8  heard. I don't even recall what I saw.
9  Q. What do you recall hearing?
10 A. The information I told you earlier.
11 Q. Okay. So the suspect had returned home,
12 and Officer Thomas was heading there. Those are the
13 things you were hearing?
14 A. Yes.
15 Q. Okay. So on the drive to the house you
16 were listening to the radio, at some point trying to
17 read your notes. Were you doing anything else?
18 A. Just driving.
19 Q. How long would you say your car ride over
20 there was? And let's break that down. How long were
21 you headed towards Bountiful once you left the
22 Chevron?
23 A. When I left the Chevron, like, until I got
24 to the house?
25 Q. How long from when you left the Chevron

Page 25

1  until you decided to turn around and go to the house
2  instead of Bountiful?
3     A.  About one minute.
4     Q.  Okay.  And then how long between when you
5  decided to head to the house until you got there?
6     A.  About one minute.
7     Q.  Okay.  When you got there, was anyone else
8  there?
9     A.  Yes.  Me -- Gary was already there, and me
10 and Jason pulled up at the same time.  So all three
11 of us.
12    Q.  Where did you pull up to?
13    A.  I was trying to pull up a couple doors
14 down from domestics and walk in, but Gary was
15 already, I think, one house away, like on the same
16 side of the street as Molly's house, and I pulled up
17 behind Gary, and Jason pulled up in front of the
18 house.
19    Q.  I'm going to show you what's previously
20 been marked as Exhibit 1.  Do you recognize this
21 picture?
22    A.  Yep.  Yes.
23    Q.  What do you recognize it from?
24    A.  That day.  The day of the shooting.
25    Q.  What's in the picture?

Page 26

1     A.  What's in it?
2     Q.  Yes.
3     A.  A memory.
4     Q.  Okay.  What house is that?
5     A.  Molly's.
6     Q.  Okay.  And could you point on the picture
7  where you pulled up to?  Is it in the picture?
8     A.  No.
9     Q.  Okay.  Would it have been to the right or
10 the left of the picture?
11    A.  The right.
12    Q.  Okay.  And what direction is that, if you
13 know?
14    A.  That would have been north.
15    Q.  Okay.  So you pulled up north of the house
16 in that -- in Exhibit 1?
17    A.  Yes.
18    Q.  And were you in the front of the three
19 cars, meaning yours, Officer Read and Officer Thomas?
20    A.  No, I was the back.
21    Q.  Okay.  And who was immediately in front of
22 you?
23    A.  Officer Thomas.
24    Q.  Okay.  And then Officer Read was in front
25 of him?

Page 27

1     A.  Yes.
2     Q.  Okay.  How far back from the house were
3  you parked?  Or north of the house, excuse me.
4     A.  A couple -- 200 feet, I'd say, or less.
5     Q.  Okay.  What did you know about the
6  situation when you pulled up?
7     A.  What I said I heard on the way over.
8     Q.  Okay.  So you hadn't learned anything more
9  than what we've already talked about?
10    A.  Not at that point, no.
11    Q.  Okay.  What did you do when you got there?
12    A.  I got out of my car.  I met up with Gary
13 and Jason at the north corner of this house.
14    Q.  And then what happened?
15    A.  And then we made an approach from this
16 tree to the front door.  We crossed the lawn for some
17 reason, but we walked in front of the house.  And I
18 remember walking through the -- that area.
19    Q.  While you were walking across the lawn,
20 were you learning any more information about the
21 situation?
22    A.  When we got to the doorstep I had learned
23 some new information.
24    Q.  What did you learn?
25    A.  That he was -- dispatch was advising that

Page 28

1  he had his guns out again as I was about to knock.
2     Q.  Did you knock?
3     A.  I can't remember.
4     Q.  Once you learned that he had his guns out,
5  what did you do next?
6     A.  We immediately went over to -- me and
7  Jason went to this side of the garage so we had some
8  kind of cover, which wasn't much, because there was
9  windows everywhere on the house.  And Gary went
10 around to this side of the house.
11    Q.  So it looks like you and Officer Read went
12 south?
13    A.  Yes.
14    Q.  And Officer Thomas went north, behind the
15 house?
16    A.  Yes.
17    Q.  Backing up a little bit; do you recall
18 seeing that white truck in the driveway when you got
19 there?
20    A.  Not when I got there, no.
21    Q.  Okay.  Do you know when it arrived?
22    A.  It was there when -- when -- it was there
23 when I was over here by the garage.
24    Q.  Okay.
25    A.  That's when I -- so I didn't notice it

Page 29

1  when I was walking to the house, because I was more
2  focused on the front door and I had tunnel vision.
3  It was new to me. But when I got over to the garage,
4  the truck was there.
5      Q.  It's not that it wasn't there, you just
6  may not have noticed it when you arrived?
7      A.  Right.
8      Q.  And did the truck being in the driveway
9  tell you anything?
10     A.  No. Just that he was home.
11     Q.  Okay. So it told you that Mr. Farrand had
12 come home?
13     A.  Yep.
14     Q.  Or confirmed it for you, because you had
15 heard it over dispatch?
16     A.  (Witness nods head.)
17     Q.  And what did -- what happened next after
18 you and Officer Read walked south?
19     A.  We actually -- you know what, let me back
20 up.
21         I pointed out that there was a female,
22 Molly, standing behind this gate as I was walk -- as
23 we were walking toward the garage, which is not
24 normal on a domestic. Domestics, usually they're
25 inside talking to each other and trying to calm each

Page 30

1  other down or screaming at each other. But she was
2  by this gate -- behind it.
3      Q.  I'm sorry. Please keep going.
4      A.  Okay. Jason and I started talking to her,
5  and she was giving out information. And, again, I
6  had tunnel vision and could only think, Why is she
7  outside?
8          Jason opened the gate -- or she swung the
9  gate open and we -- or back -- and we escorted her
10 out of that area, and then got behind the garage,
11 that little pillar there.
12     Q.  Okay. So backing up. You said that it's
13 not normal for a victim or someone in a domestic
14 situation to be outside; is that right?
15     A.  Like, they are usually -- domestics that
16 I've seen -- I can't speak for every officer, but
17 domestics that I've seen, they're always in the
18 house. When I say "always," I've been on quite a bit
19 of domestics, and they're always in the house either
20 split up in rooms or -- or still arguing or trying
21 to -- you know, if it's suicidal, they are trying to
22 talk the people down, trying to get them help. She
23 was outside.
24         Now, other calls that I've heard on the
25 radio, there has been a few where they've been

Page 31

1  outside or they've gone to neighbors' houses and
2  stuff like that. But me, personally, I haven't been
3  to a domestic where they've split up.
4      Q.  What did you think when you saw her
5  outside?
6      A.  Well, like what I just said. I was
7  trying to tran -- I didn't understand what -- it had
8  to have been bad if she's outside, because, like I
9  said, I haven't been to a domestic where they have
10 been split like that.
11     Q.  And by "bad," you mean dangerous?
12     A.  I -- well --
13         MR. WILLIAMS: Object to the form.
14     Q.  (BY MS. VIZIG) You can answer.
15     A.  As far as dangerous -- I can't say exactly
16 "dangerous," but intense, I guess. It must have been
17 intense if she's out here. I don't know, like, what
18 was happening in the house at that point.
19     Q.  Okay. Backing up a little bit. Are there
20 rules for who is in charge at a scene?
21     A.  Usually the PO3 or the person that -- so
22 what happens is we're dispatched to the call, and the
23 lead officer is in charge of the call, whoever was
24 dispatched to it, like, initially. So they'll -- I'm
25 Victor 12 now, and if they send me to a domestic with

Page 32

1  Victor 6 or 7, it's still my call. But if something
2  goes bad or something, like, go -- becomes, like,
3  bigger and needs to have, like, a supervisor or an
4  OSE making decisions, the PO3 will take over.
5      Q.  Okay.
6      A.  So -- is that what you mean?
7      Q.  Yes.
8      A.  Okay.
9      Q.  Before you said that both Officers Read
10 and Thomas are PO3s; is that right?
11     A.  Yes.
12     Q.  So who took charge at the scene?
13     A.  It seemed like -- I -- so I believe it was
14 Officer Thomas's call, but Officer Read -- it ended
15 up becoming, like -- it became, to me, that
16 Officer -- it was going to be Officer Read's for the
17 fact that he was the one making, you know, contact.
18         Our calls are basically given out and
19 disbursed certain ways. It's not who is a PO3, who
20 is a PO2. It's just who gets the call. And it's
21 still their call. However, Officer Read was
22 basically -- we just change roles sometimes, and
23 that's what happened that day, is I think it was
24 Officer -- or, sorry, Gary's call, and it turned into
25 Officer Read's call because he's the initiating

Page 33

1 officer; he's making contact now.
2 And this, at the time, was so big, like,
3 as far as a domestic with a gun -- I had never been
4 to one -- that it became -- like, I was just more
5 focused on -- we got to -- we got to figure out
6 what's going on, but I'm with Officer Read, so it's
7 going to be his.
8  Q.  Okay.  Have you been to any domestics with
9 guns since this incident?
10  A.  The guns are, like, involved like this?
11  Q.  Yes.
12  A.  No.
13  Q.  Have you been to any domestics where guns
14 are at all since this incident?
15  A.  When you say "guns have been involved,"
16 meaning, like, we get -- we get sent to domestics all
17 the time where there are guns in the house, so -- but
18 as far as waving them around or threatening them,
19 stuff like that, I think maybe one.
20  Q.  You said that this was your first
21 incident -- or domestic incident with a gun involved.
22 So what do you mean by "gun involved"?
23  A.  Meaning somebody is walking around with a
24 gun in their hand.
25  Q.  Okay.  And you said you've been to one

Page 34

1 incident -- domestic incident with a gun involved
2 since this one?
3  A.  Yeah, but before -- before I actually got
4 there, he had -- like, they had put the gun away and
5 they -- he was actually standing outside.
6  Q.  When was that incident?
7  A.  I can't remember the date.
8  Q.  Okay.  But it was after this one?
9  A.  Yes.
10  Q.  I'm going to show you what's previously
11 been marked as Exhibit 2.
12  A.  Can I clarify on that last statement real
13 quick?
14  Q.  Absolutely.
15  A.  He didn't -- like, the one that I'm
16 referring to was not threatening her, so -- like
17 the -- the other person involved, so...
18  Q.  Okay.  I've put in front of you what's
19 been marked as Exhibit 2.  Do you recognize this
20 picture?
21  A.  Yes.
22  Q.  Okay.  Before you were pointing to a gate
23 in Exhibit 1.  Is that gate in Exhibit 2 as well?
24  A.  Yes.
25  Q.  Can you point it out for me?

Page 35

1  A.  (Indicating.)
2  Q.  And you said that you and Officer Read
3 walked up to that gate and began engaging with Molly
4 Farrand; is that right?
5  A.  Yes.
6  Q.  Can you describe what that engagement was
7 like?
8  A.  She was still on the phone with dispatch,
9 and we we're trying to get more information from her,
10 and were telling her to hang up the phone so we could
11 talk to her and find out what we had inside.
12  Q.  Were you still receiving information at
13 this point?
14  A.  I don't recall.  At that point, Molly was
15 our biggest -- like, we needed to get Molly away from
16 the house but yet still get information from her.
17  Q.  Do you recall what she was saying?
18  A.  I can't remember.
19  Q.  But she was talking to dispatch?
20  A.  Yep.
21  Q.  Was she talking to you and Officer Read as
22 well?
23  A.  Yes.
24  Q.  Do you recall anything she said to you?
25  A.  I don't want to even -- she was talking to

Page 36

1 us, but I can't say exactly, so I'm not going to try
2 and remember -- or try and say what she was saying,
3 because I don't really recall.
4  Q.  Okay.  Did you have your gun drawn at this
5 point?
6  A.  At that -- at this moment, yes, I had my
7 gun out.
8  Q.  When did you draw your gun?
9  A.  When we found out that he had his gun
10 again, I was on the porch, and me and Jason drew our
11 gun and started making our way toward Molly.
12  Q.  Okay.  So you got your gun out once you
13 left the porch and approached Molly?
14  A.  Yes.
15  Q.  Okay.  Did you have a body camera at the
16 time?
17  A.  No.  Our department did not have body
18 cameras at that time.
19  Q.  Do they have them now?
20  A.  Yes.
21  Q.  Okay.  Do you wear one all the time?
22  A.  All the time that I'm working, yes.  As
23 far as, like, I would -- I left it in my car now.
24 But, yes.
25  Q.  But if you were on shift, you would be

Page 37

1  wearing it?
2     A.  I -- yes. I'm on shift right now, so --
3  but, yeah -- so I don't have it on me right now, but
4  it's in my car. But when I'm patrolling, yes, I have
5  it on me.
6         MR. WILLIAMS: You didn't want to film
7  this exciting event?
8         THE WITNESS: I didn't think I could have
9  it in here, so I left it in the car.
10        MS. VIZIG: It's already being filmed.
11        MR. WILLIAMS: (Indistinguishable.)
12        MS. WHITE: Gavin is very grateful to you.
13        THE WITNESS: Right.
14    Q.  (BY MS. VIZIG) When you approached and
15 saw Molly at the gate, do you recall if the gate was
16 opened or closed?
17    A.  The gate was closed.
18    Q.  And which side of the gate was Molly on?
19    A.  The backyard.
20    Q.  So she was on the other side from you and
21 Officer Read?
22    A.  Yes.
23    Q.  And when did she come to your side of the
24 gate?
25    A.  When Jason or Molly opened the gate is

Page 38

1  when she came out. I don't recall who opened the
2  gate. I was still looking at her and making -- like,
3  worried about what was happening in the house because
4  of him -- the radio traffic being him with a gun,
5  so...
6     Q.  Okay. Were you behind Officer Read?
7     A.  We were side -- side by side. I -- side
8  by side.
9     Q.  So you recall that you didn't open the
10 gate, did you?
11    A.  I didn't. I can't even tell you if I
12 opened the gate. I believe it was either Molly or
13 Jason.
14    Q.  Okay. Did you say anything to Molly at
15 that point?
16    A.  Yes.
17    Q.  What were you saying?
18    A.  I don't remember.
19    Q.  Was Officer Read saying anything to her?
20    A.  Yes.
21    Q.  Do you recall what he was saying?
22    A.  No.
23    Q.  What happened next?
24    A.  We pulled Molly out to this -- in front of
25 the garage door so that we could figure out what was

Page 39

1  going on, and talked to her a little bit more about
2  what was happening inside the house.
3        She was very emotional. We finally got
4  her to stop talking to dispatch and start talking to
5  us, because that took a minute, it seemed like. I
6  mean, it was probably seconds, but she -- she finally
7  came out. She gave us the story about what was going
8  on.
9        And Jason thought he knew who he was
10 working with at this point. It was -- instead, Jason
11 thought -- so Jason thought that a guy from -- that
12 was in this house was actually the possible victim
13 that he was going over to his house.
14       Is that clear?
15    Q.  (Nods head.)
16    A.  Okay. So Jason yelled out that guy's
17 name -- the guy that lives in Bountiful, yelled out
18 his name to this house.
19       And she screamed and started freaking out.
20 "You -- you just pissed him off," or "You just -- you
21 just said the wrong name. That's the guy that he
22 wants" -- I think -- I don't want to say this,
23 because I can't remember, but that's the guy that he
24 wants to injure. I don't recall the exact word.
25       Jason, at that point -- me and Jason

Page 40

1  looked at each other, like, "Oh, shit, this isn't
2  good," because now Jason -- Jason is really good with
3  words and he's really good with talking to people.
4  But we got to this point where it was, like, this
5  isn't the guy that Jason knows and this is extremely
6  serious, so...
7     Q.  Before she started screaming that
8  Officer Read had said the wrong name, did you know
9  Officer Read thought he knew the suspect?
10    A.  The way that Officer Read was talking
11 about -- like, the conversation back and forth with
12 Molly, I had a feeling that Officer Read knew the
13 suspect, but I -- I only got that because he thought
14 he was talking about the victim. So -- because Jason
15 was thinking that he was talk -- she was talking
16 about the other -- the possible victim, I thought
17 that Jason knew who was in that house. But when they
18 flip-flopped the names, I realized that Jason didn't
19 know who was in the house.
20    Q.  Do you recall that other person's name?
21    A.  I don't recall either of the two names --
22 either of the males' names. I don't recall.
23    Q.  So at that point when you realized
24 Officer Read didn't know the suspect, what was going
25 through your head?

Page 41

1     A.  That was a gut-wrenching time. That was
2 that gut-wrenching feeling that -- my stomach sunk.
3 That -- that ball-in-the-throat feeling, like, this
4 isn't going to be good.
5         So usually when you go to a call, like --
6 and an officer knows somebody, it deescalates things.
7 So I was kind of de -- like, I was starting to calm
8 down from the initial call, and then the -- this male
9 has his gun out again. I was calming down because I
10 thought Officer Read knew who was in the house, and
11 usually it works better that way, they have a
12 rapport. But then when I heard that it wasn't the
13 right person and he had just said the wrong name,
14 I -- I had that gut-wrenching feeling like, this
15 isn't good, so...
16     Q.  Do you recall, once you got Molly to the
17 garage, what -- if you said anything to her?
18     A.  Yeah. I was asking -- I was asking Molly
19 what kind of guns she -- the individual in the house
20 had. I think I asked her if he had made comments
21 about shooting us, and if he knew we were there at
22 the house.
23         And I can't -- I don't remember her
24 answers. I remember her getting very hysterical,
25 upset. I did not know what exactly was going on,

Page 42

1 because it was so much screaming and arguing and
2 bickering about, like -- because we needed to move
3 her out of that area in case he came out. There
4 was -- it happened so fast, but yet felt like it took
5 forever to get her out of the -- out of the area so
6 that if he came out, there wouldn't be a gunfight and
7 we were sitting in a corner with, you know, her
8 standing there with us and, you know, possibly all
9 three of us being shot.
10     Q.  Were you fearing for her life at that
11 time?
12     A.  I was fearing for my life, I was fearing
13 for her life, I was fearing for Jason's life.
14     Q.  How long would you say you were out in
15 front of the garage talking?
16     A.  Like I said, it felt like a month that we
17 were trying to talk her into going up and giving us
18 information, but it was possibly a minute to two
19 minutes, maybe, at the most.
20     Q.  Do you remember if she gave you any
21 information besides that Officer Read said the wrong
22 name?
23     A.  She gave us information about what was
24 going on. I just don't recall exactly the
25 information.

Page 43

1     Q.  Do you recall anything about it?
2     A.  No.
3     Q.  Describe to me what happened when you took
4 her away.
5     A.  We -- she was talking and wanting to,
6 like, go, up until we hit this car -- not hit, but
7 walked past -- maybe the back side of the car.
8 Because we were walking past this car, and that's
9 when she, like, went out of control and was
10 hysterical, because she wanted to talk him down and
11 she wanted to be the one that, like, made sure that
12 he wasn't going to do anything stupid, and we -- we
13 don't allow that. That's not okay, because in just
14 trainings and everything we've been through,
15 that's -- you don't let the victim go back, so...
16     Q.  And, in your experience, why is it a bad
17 idea for the victim to go back?
18     A.  Because they called us there for a reason
19 and they're amped up for a reason, and now they're
20 not going to help the situation by confronting the
21 person that -- now the cops are at the scene and they
22 are not going to help the situation that way.
23     Q.  So based on your experience and training,
24 you take the victim away for their own safety?
25     A.  Right. Yes.

Page 44

1     Q.  Did you stay behind the car or did you
2 move again?
3     A.  No, we moved. We -- we were trying to
4 move quickly because we didn't know how much time we
5 had before he eventually -- like, if he were to have
6 come out or been looking out these windows, we
7 were -- I -- I would have felt very vulnerable in the
8 position that I was at. And I knew -- like, I said
9 earlier, I knew we had to get her out. But when you
10 feel, like, that -- I don't know how many feet --
11 ten-feet stretch of am I going to be shot, am I dead
12 right now or am I alive, and moving her on. Because
13 we've gone to calls where, you know, they barricade
14 themselves in a house and you don't see them for
15 hours until SWAT gets there and, you know, handles
16 the situation. So -- but that ten-foot stretch
17 there, that was extremely scary.
18         I had to secure my gun because she started
19 flailing her arms. And when we told her she couldn't
20 go back, she got upset. She was really mad and
21 started flailing her arms and fighting us -- not like
22 punching or slapping or anything like that, just more
23 like resisting. But she wasn't under arrest, but
24 more like a resisting kind of move.
25         And that's when I had to secure my gun for

Page 45

my safety as well as hers, to get her out of the driveway from that ten-foot range from the back of the car where we had a little bit of cover, to a sidewalk where we could get her up the street, so...
 Q. So you secured your gun while standing behind the car in Exhibit 2?
 A. I secured my gun as soon as I had to go hands on with her because she was going to try and go back to the house.
 MS. WIZIG: I'm going to ask the court reporter to mark this as Exhibit 6.
 MR. WILLIAMS: Can I see what your exhibits are? Do you have copies or -- just before you show it to him.
 MS. WHITE: Thank you.
 (EXHIBIT 6 WAS MARKED.)
 Q. (BY MS. VIZIG) This has been marked as Exhibit 6, and I believe that that vantage point is south of the house. Is that right?
 A. Yeah.
 Q. Is that the direction you walked with Molly?
 A. Yep. Yes.
 Q. Were you -- when you walked her away from the driveway, was where you were standing reflected

Page 46

in Exhibit 6?
 A. Yes.
 Q. Could you point out where you were?
 A. (Indicating.)
 Q. Okay. So you were on the sidewalk, still on the side of the street of the house?
 A. Yes.
 Q. Okay. And how long were you standing there with Molly?
 A. Felt like a year. I have no idea what the time was.
 Q. Okay. Do you think it was seconds, minutes or really no idea?
 A. I really don't know. I had too much going on in my head at that point.
 MS. WIZIG: Should we take a break?
 MS. WHITE: Do you want to take a break or do you want to just take a breath?
 THE WITNESS: Just a breath.
 MS. WHITE: Okay.
 THE WITNESS: At that point it was seconds before he came running out of the house while we're walking. Jason was behind the white truck. And I thought I was going to get shot at that point, because me -- well, sorry. Let me back up.

Page 47

Jason assisted me up the driveway with her after she wouldn't go. And we were making her leave now. She didn't have a choice. There was no going back. There was no sweet talking to get up the drive -- or to go back to the house. At this point we were walking her to the driveway -- up to the sidewalk, I mean. Jason assisted me with her right arm, I think I had her left. Jason, I think, had his gun out still.
 As soon as we got up here we asked her for a few more de -- like, detailed questions. I can't remember what they were. It was basically more -- more or less, "What kind of guns does he have?"
 Jason went back to the truck. He came out. I pushed her over and then sat right behind this bush while trying to -- while trying to keep her pushed down the street and telling her to get back.
 I -- I didn't know at that time if I needed to stay with my partner or stay with the victim. So I figured that I needed to stay with the victim and keep an eye on my partner instead of going down behind the truck with Jason. Jason -- he started walking out. It was weird. The door opened when he walked out, and I noticed immediately that he had his gun, and it was a handgun. And he walked out

Page 48

here. And I don't know if Jason made contact with him first, but for some reason he went back and I thought, Oh, thank God, he's going to barricade himself. He didn't see us. He ran out of that door the first time like he was going to kill somebody. He had this evil look on his face. He -- I don't know if he knew we were there. I don't think he knew we were on scene. And if he did -- I mean, I -- it would surprise me. But he ran out of that house with the gun down to his side, not on the ground, in his hand still, and he looked like he was looking for somebody to kill.
 Within seconds Jason confronts him. He had walked back to the door, and I was thinking, Oh, good, he's going to go barricade himself and we can let SWAT handle this. We don't need to worry about it. We're going to set up containment and just go home fairly early today.
 He -- he shut the door after he had, like, come out. Then he went back. But when he shut the door, I was thinking, He's -- he's still outside. This is -- this isn't good.
 I don't know why he shut the door. I don't know what was going on, why he felt like he needed to shut the door after he ran out like he did.

Page 49

1  Jason stepped out from this side of the
2  truck and I was still trying to keep eyes on Molly
3  and yet have my partner's back if something happened,
4  because now Jason has got a gun on him. And I don't
5  know where Gary is at this point.
6  Yeah. It's just that it was a scary look
7  when he came out of the house, and I don't think that
8  he was -- I don't think he was coming out to shoot
9  us. I think she was going to die that day.
10  Q. Did you ever draw your gun again at any
11  point?
12  A. No. I had her to deal with, and I can't
13  risk her running back into the scene with me having a
14  gun out and not being able to secure it quick enough
15  and tackle her.
16  Q. Did you ever take her any further from
17  behind the bush in Exhibit 6 that you pointed out?
18  A. Yeah. It didn't feel like it, but I had
19  pushed her about -- to the next driveway. I don't
20  know how many feet it is, but I pushed her to the
21  next driveway.
22  Q. On the same side of the street as --
23  A. Yes.
24  Q. -- the house?
25  A. We didn't leave that sidewalk. The same

Page 50

1  side.
2  I was thinking about taking her to my
3  police car, because the police cars were parked on
4  this side of the house, but there was no way I was
5  going to cross that -- the front of that house,
6  knowing he had his guns out again.
7  So I was, like, I'm in a shitty situation
8  and I just got to make the best of what I can. And
9  so I took her the opposite way and was hoping that,
10  you know, nothing would happen, so...
11  Q. When he walked out of the door you were
12  facing him and saw him, being Mr. Farrand, walk out
13  of the door?
14  A. I watched him walk out of the door. It
15  was more of a -- it was a quick -- I don't know how
16  to describe it. It was like you're not running but
17  you're moving fast, like you've got -- you're going
18  to take care of a problem, is what it looked like.
19  Q. And you said he had the gun in his hand.
20  Could you see the gun?
21  A. Oh, yeah, clearly.
22  Q. Do you remember what it looked like?
23  A. Just black.
24  Q. Did he raise the gun at any point?
25  A. I can't remember.

Page 51

1  Q. And you said he walked out, not completely
2  a run but also not a slow walk. How far did he go?
3  A. I think he got to about the point where it
4  starts to turn, the curb.
5  Q. By "it," you mean the sidewalk?
6  A. Sorry. Yes, the sidewalk.
7  Q. That's okay.
8  And where was Officer Read at this point?
9  A. Behind the truck, at the right passenger
10  light.
11  Q. Okay. And did Officer Read leave from
12  behind the truck at any point?
13  A. No. For some reason -- he -- he poked,
14  like we're trained to do, but instead of staying
15  behind cover, I don't know why -- and this is what
16  worried me that he was going to get shot, is that he
17  gave up his entire body stepping outside of the
18  truck.
19  Q. So he did leave from his cover behind the
20  truck?
21  A. Yep.
22  Q. And where did he walk to?
23  A. Just a couple feet to the right.
24  Q. Would that be towards the sidewalk?
25  A. That -- I don't know if he went backwards.

Page 52

1  It seemed like the truck was -- it -- like, from my
2  viewpoint, it seemed like the truck was longer.
3  Not -- I know that it -- not longer, but it seemed
4  like it was deeper, that -- like, more toward the
5  street. It didn't move. Like, nobody got in it
6  after that, you know.
7  But from what I observed, it felt like
8  Jason had more time at a better angle behind the
9  truck. But this picture looks like the sidewalk
10  walks right back out into the -- like, that area.
11  So -- and I didn't recall that. Jason just stepped
12  outside, like, right here.
13  Q. Okay. And what happened once he got out
14  of cover?
15  A. That's when -- that's when the suspect was
16  given orders by Jason to put the gun down, and to
17  talk -- and then started -- they started their
18  communication. I don't know exactly what words came
19  when, but he was ordered to put the gun down. And
20  then I could hear Jason, like, communicating with,
21  "Please don't make me do this," those kinds of
22  things, so -- those kinds of comments.
23  Q. Did you hear Mr. Farrand, the suspect, say
24  anything?
25  A. I could hear a voice. I couldn't make out

Page 53

1  what he was saying.  I don't know if I was too far
2  away or at this point I'm just tunnel vision.  I
3  didn't hear -- I didn't hear sirens.  We had called
4  for backup -- and 1039 means now, get here now -- or
5  1033, sorry, means get here now.  We had called for
6  that.  I didn't hear sirens.  I didn't hear, like,
7  people -- I didn't hear officers coming into the area
8  responding.  All I could hear was Jason, Gary and
9  dispatch.  That was all I could hear.  I don't know
10 why.  It's weird, but those are the only people I
11 could hear during that time, in my ear.
12     Q.  When did you all make that 1033 call?
13     A.  I can't remember.  Actually, yeah, I think
14 it was right when we found out that he had his gun
15 out again and we were at the front porch, moving
16 toward the garage.
17     Q.  Was that before or after you made contact
18 with Molly?
19     A.  Same time.  Like, right -- probably right
20 before or right after.
21     Q.  Okay.  So from what I understand, the
22 suspect walked out of the front door that you can see
23 in Exhibit 6.  Officer Read walked out from behind
24 the truck that's also visible in Exhibit 6, and they
25 had some sort of verbal exchange; is that right?

Page 54

1     A.  Right.  Yes.
2     Q.  Do you remember anything else that
3  Officer Read said?
4     A.  No.
5     Q.  And then what happened after that?
6     A.  It was a back and -- I'll explain it
7  better, but it was back and forth for me.  It was
8  check my partner, check the victim, check my partner,
9  check the victim.
10        And in the process of everything going on
11 up front, I did notice that this male started walk --
12 the suspect started walking out -- out in front of
13 the house, like, centered up, like, between the
14 sidewalk and the truck and -- while they were
15 communicating.
16        I lost visual of the suspect when he put
17 his gun down to his side.  Like, he had it in his
18 hand still, but it was down to his side as he was
19 walking toward the gate.
20     Q.  All right.  And how many seconds or
21 minutes have elapsed between when Officer Read left
22 cover and the suspect started walking towards the
23 gate?
24     A.  I -- like I said, everything felt for,
25 like -- everything felt so long, but it was maybe a

Page 55

1  minute or less.
2     Q.  Okay.  When you lost sight of Mr. Farrand,
3  the suspect, could you still see Officer Read?
4     A.  Yes.
5     Q.  Okay.  And where was he?
6     A.  He was trying to get a better angle.  He
7  is still out here, but now he's kind of getting a
8  better angle as far as if he has to do something, but
9  yet not let him run directly in front of the truck
10 and lose what we already had set up.
11     Q.  And then what do you recall happening
12 next?
13     A.  I turned my head.  I saw Jason.  I heard
14 the rounds go off, the shots.  I immediately turned
15 back after I saw Jason was still standing.  I turned
16 and noticed that Molly had two people standing with
17 her now, and they were later identified, I think, as
18 the neighbors -- her next-door neighbors to the
19 south.  They were assisting her.  She starts
20 screaming that -- I don't remember the exact words,
21 but it was, "Did they shoot my husband?"
22        I -- I immediately thought, I need to
23 check on Jason.  I have to check on Jason.  I --
24 like, for some reason, I don't know why, but I could
25 see Jason standing, but it -- for -- like, I didn't

Page 56

1  know if he had been shot.
2        And things aren't like the movies, where
3  if you got shot you blow back five or ten feet; it's
4  not like that.  I didn't know if he had been shot, so
5  I took off running toward the house and I -- there
6  was a couple side things that I'll tell you about
7  after that -- after this.  This is just the main
8  focus, what I saw.  So I took off running towards
9  Jason to make sure he was okay.
10        When I -- when I got to the gate I noticed
11 the suspect was down behind the gate, and he had been
12 shot.  Gary Thomas had also been -- gone in the
13 backyard.  I didn't watch him run into the backyard.
14 I don't recall him running into the backyard, but --
15 yeah.  There was a couple times I saw Gary that I
16 wanted to talk to you about on this picture.
17        So when -- when this suspect was walking
18 toward Jason -- or, like, in the same area as Jason
19 and not stopping and doing what he was asked to do, I
20 did see Gary Thomas.  It was bizarre.  It felt like a
21 movie.  But he came from this corner and it felt
22 like -- to me, it looked like he was hovering, and I
23 don't -- it was just weird.  It looked like he was
24 hovering.  He had his gun out, and I could see his
25 gun and realized that me and -- like, me and Molly

Page 57

1  would have been in that area where if he shot, that
2  wouldn't have been a good area for us.
3      So he didn't shoot at that point. And
4  then I don't know where he went, but -- or I'm
5  getting the times mixed up. But he was also over
6  here and he was looking over the fence, trying to get
7  a better view, too, at one point. And he, like, ate
8  it coming across the -- like, when -- I think it was
9  when Jason said, "Shots fired," on the radio, he came
10 running and he tripped and skid across the -- the
11 driveway, breaking, like, his tool belt and stuff
12 like that.
13     Q.  So he fell?
14     A.  Yeah, his duty belt, so... I think that's
15 when he entered the backyard, is when he ran that
16 way.
17     Q.  Okay. So when the shots were fired, do
18 you recall how many shots were fired?
19     A.  Not -- not now. Right when I give my
20 interview to the detectives, I -- I gave them what I
21 heard, as far as the amount, but now I don't
22 remember.
23     Q.  When was that interview given?
24     A.  Directly after -- like, right after the
25 shooting.

Page 58

1      Q.  The same day?
2      A.  Yes.
3      Q.  Did you give any other interviews about
4  this incident?
5      A.  No. Just with my attorney.
6      Q.  Okay. When the shots were fired, did you
7  know who had shot them?
8      A.  At the time?
9      Q.  Yes.
10     A.  No.
11     Q.  When did you learn who had shot them?
12     A.  When I ran down to the gate to find out if
13 Jason was okay.
14     Q.  Did any of the actions you observed of
15 Mr. Farrand indicate to you that he was intoxicated?
16     A.  I didn't see him that closely.
17     Q.  Okay. When you saw the suspect walking
18 towards the gate, what was going through your mind at
19 that point?
20     A.  I need to keep Molly away from him, and I
21 hope to God he doesn't run in front of the truck,
22 because that's going to limit our, you know,
23 containment on him if he takes off in front of the --
24 like, the garage, so...
25     Q.  Did it seem to you him walking towards the

Page 59

1  gate was deescalating the situation?
2      A.  No. I didn't -- I didn't know what was
3  happening at the time when he was walking to the
4  gate. I just knew that this was still very, very
5  serious when we have our guns out.
6      Q.  But yours was away, right?
7      A.  Mine was put away, but when I say "we,"
8  meaning Gary and Jason had their guns out.
9      Q.  So you had no idea where he was going --
10 "he" being Mr. Farrand -- when he walked towards the
11 gate?
12     A.  No, I lost him after he got to a certain
13 point.
14     Q.  Okay.
15     A.  "Lost him," meaning I lost sight of him as
16 he walked around that corner by the truck.
17     Q.  When did you learn he passed away?
18     A.  When I had to -- this was the -- this was
19 pretty hard. I didn't know that he was dead at the
20 moment, but she -- when I finally was able to contain
21 her and the scene was kind of coming together, as far
22 as, like, people -- like, getting there to back us, I
23 was able to find an officer where I could -- I
24 don't -- again, I didn't want to walk her up to my
25 car, so I took the first officer that I could find,

Page 60

1  which I believe was a Farmington or a Bountiful
2  officer. I asked the Bountiful corporal to help me,
3  because I didn't know what to do. Because I kind of
4  figured that he was going to die by the looks of him
5  on the back patio, because I did see him when I was
6  standing up by Jason. I did see him. I had a
7  feeling he was going to die. I didn't think we could
8  do anything to save him.
9      And I immediately went back up to get
10 Molly, and that's when some of the questions like,
11 "Did you just kill my husband" came out. And I
12 really didn't know how to answer. I -- I had no idea
13 how to answer that. That was something I never
14 prepared for in law enforcement, so never -- I never,
15 in a million years, would have thought that I would
16 have to answer that question, so...
17     Q.  Sorry.
18     A.  I put her in the back of a Farmington
19 police car and offered her water, asked if I could --
20 I got her Kleenex, because she was crying. She was
21 emotional. I tried to do what I did -- I guess like
22 what I would do if, you know, somebody just had a
23 loved one pass, and try and comfort them in a way.
24 But I was still emotionally tied up in the incident
25 to where I did my best trying to help her without --

Page 61

 1  without giving her too much information.
 2      Q.  Did you answer her questions at all?
 3      A.  No, I did not.
 4      Q.  Okay.
 5      A.  I would -- I would basically scoot around
 6  the question and talk about something else.
 7      Q.  How long after the shots were fired did
 8  you put her in someone else's car?
 9      A.  It felt like -- like I said, it felt like
10  hours, but it was a minute or two.
11      Q.  Okay.  So she was standing with her
12  neighbors, and how did you get her from that point to
13  the car?
14      A.  I just went back and got her.  She stayed
15  with them and, like, she never ran up to the back --
16  like, to see what was going on.  She stayed with the
17  neighbors.  I had told her to stay with the neighbors
18  and not to move while I went back and checked on
19  Jason.  And then when I found out Jason was okay, I
20  walked back up to her.
21      Q.  Was she cooperative when you took her to
22  the car?
23      A.  She -- yes, but no.  She didn't want to
24  go, and I completely understand.  I wouldn't want to
25  go sit in the back of a car at that moment.  I mean,

Page 62

 1  if -- if I was involved in something like that, I
 2  wouldn't want to be in the back of the car.  But we
 3  had so much stuff going on that we had to kind of
 4  just -- I didn't handcuff her or anything.  I just
 5  wanted to get her out of the heat.  It was hot.  I
 6  didn't -- it felt hot that day, like after that
 7  moment.  I don't know the temperature, but it was
 8  hot.  I just wanted to make sure that she was in an
 9  air-conditioned car where she could cool off and, you
10  know, we could get tissues and water and not have,
11  like, members of the neighborhood and all that coming
12  to just sit there and gr -- you know, hound her about
13  questions as far as regarding what had just happened.
14      Q.  What were you doing while she was in the
15  back of the car?
16      A.  Standing by the back -- back of the
17  window -- or the back door of the car.
18      Q.  Besides Molly, were you talking to anyone
19  else?
20      A.  Yeah, I was talking to some officers.  I
21  actually went -- at one point after I think she was
22  secured and the corporal from Bountiful and the
23  Farmington officer were there, I went to see what I
24  could help with.  I -- I -- I like to go and help
25  people, and I didn't know, like, if I needed to stay

Page 63

 1  with her now that there were two officers there or if
 2  I needed to be handing out witness statements.
 3          So I went up to the front of the house
 4  over here and started talking to my lieutenant who
 5  had -- who had arrived on scene, and asking him what
 6  he wanted me do.  And that's when I got the
 7  confirmation to stay with the victim.
 8      Q.  Did any neighbors come up and talk to you?
 9      A.  There -- yeah.  I -- I wasn't talking to
10  them, though.  I can't remember how many or who or
11  what they said.  I just -- it was -- I had tunnel
12  vision still and I was not talking to anybody except
13  the officers or Molly.
14      Q.  Have you ever had to tell someone to drop
15  their gun?
16      A.  What?
17      Q.  Have you ever had to tell someone to drop
18  their gun?
19      A.  No.
20      Q.  Have you watched any other officers tell
21  someone to drop their gun besides this day?
22      A.  Actually, yes.  Sorry.  No, I have not.
23  We -- I had an individual with a knife that was --
24  that was saying he was going to kill people, and he
25  was -- he actually had his knife in his hand.  So by

Page 64

 1  that question do you mean any deadly weapon or just a
 2  gun?
 3      Q.  Any deadly weapon.
 4      A.  Yeah, I have, so...
 5      Q.  Did they comply?
 6      A.  After SWAT arrived and we had a negotiator
 7  and everybody take -- you know, take control, after
 8  we cleared the scene -- well, cleared the area of the
 9  house in case he popped out of the car with the
10  knife, because he had it up to his chin.
11          MS. VIZIG:  I'll pass the witness.
12          MR. WILLIAMS:  Thank you.  No one wants me
13  yelling.
14              EXAMINATION
15  BY MR. WILLIAMS:
16      Q.  Officer Casey, earlier I had a chance to
17  introduce myself to you.  My name is Jon Williams.
18  I'll formally do that again.
19          Understandably, this is an emotional time
20  to recall all of these events, so I'll try to be
21  quick so that we can just be done with this.
22          A couple of times through this deposition
23  you gave some statements about what Jason thought
24  and -- so that was just your speculation, right?  You
25  don't know what Jason was thinking?

Page 65

1  A. When I was telling her that, I was
2  assuming that's what he thought, so...
3  Q. Okay.
4  A. But, like, if I were in his shoes, that's
5  kind of what I would be thinking. I guess
6  I shouldn't have said what I -- what I thought of him
7  doing is meaning, like, if I were there, that's what
8  I would be thinking, if I were Jason.
9  Q. Okay. So it was more about what you --
10 how you would react in that situation?
11 A. Right.
12 Q. Okay. You've described where you were as
13 you witnessed these events unfold and the position
14 you had, which is away from the back of the truck
15 where Officer Read was --
16 A. Yes.
17 Q. -- correct?
18    And you were on the sidewalk or were you
19 on the strip of grass between the street and the
20 sidewalk?
21 A. I don't recall. I believe I was on the
22 sidewalk.
23 Q. Okay. But right in that general vicinity?
24 A. Yes.
25 Q. Okay. When -- we've referred to him as

Page 66

1  the suspect, Mr. Farrand. When he went toward the
2  fence, did you lose line of sight with him?
3  A. Yes.
4  Q. Okay. So the only vantage point -- or the
5  only line of sight you would have had on Mr. Farrand
6  is when he left the front door and then between that
7  time and heading towards the fence? That's the only
8  time you would have had line of sight on him?
9  A. Are you saying that, like, when he -- when
10 he walked around -- like, I watched him walk
11 around -- watched him walk out, go back, shut the
12 door, come back out, and then the communication. And
13 then as soon as he got past that truck area, the --
14 like, where you can see that brake light, I could
15 only see his head.
16 Q. Okay.
17 A. Then as it got a little bit deeper I
18 couldn't see anything on him.
19 Q. Okay. During any of that time that you
20 just described where you had line of sight on him,
21 did you ever see Mr. Farrand lift the gun up from his
22 side?
23 A. I don't recall.
24 Q. Okay.
25 A. When -- when you say "lift" -- "lift the

Page 67

1  gun up," I -- like, with him walking, I would say
2  yes, arms above six inches. But as far as if he
3  pointed it ever at one of us, I don't recall. But as
4  far as moving his arms and stuff like that, yes, he
5  brought the gun up.
6  Q. Okay.
7  A. Does that make sense to you?
8  Q. It does. It sounds like what you are
9  describing is a normal stride --
10 A. Yes.
11 Q. -- of arms. When you're walking, your
12 arms tend to move back and forth?
13 A. Yes.
14 Q. Okay. You also described that after the
15 shooting you were speaking to a corporal and a
16 Farmington police officer?
17 A. Yes.
18 Q. And this was taking place outside one of
19 their vehicles?
20 A. The Farmington officer's vehicle.
21 Q. Farmington, okay. Do you recall his name?
22 A. Yeah, it was Heslop.
23 Q. Heslop?
24 A. Officer Heslop.
25 Q. Okay. And are you aware today that

Page 68

1  Officer Heslop was wearing a body cam?
2  A. Yeah. Yes, I am, after I had been talked
3  to about the comment that I made.
4  Q. Okay. And I never want to ask a question
5  that would interfere with any communications you had
6  with your lawyer, so if it comes across that way,
7  that's not my intention, and she'll let me know if it
8  sounds that way.
9  A. Okay.
10 Q. Who did you speak to, other than your
11 lawyer, about the comment you made to Officer Heslop?
12 A. After -- there was a comment made in our
13 debrief about an officer that had misspoke, and they
14 were explaining, like, to, you know, keep your mouth
15 closed until the investigations are all done. They
16 didn't know it was me, meaning the chief. He had no
17 idea it was me that had said it.
18    So I walked up -- and this was after the
19 criminal case -- or the -- after it had been ruled
20 justified -- and I said, "Hey, that was me that said
21 that, and I learned my lesson," because I had spoke
22 with my attorney regarding that comment that I made.
23 Q. Okay. And I don't want to know anything
24 about what you said to your lawyer at all.
25    Did anybody ever play that -- other than

Page 69

1  your lawyer, did anybody ever play Heslop's body cam
2  for you?
3      A.  No, I haven't seen any -- I haven't read
4  any reports on this case.  I haven't watched any dash
5  cam.  I haven't been talked to about it directly.
6  When that comment came out about somebody had
7  misspoke and, "Don't do this, don't -- just keep your
8  mouth closed, you know, until you meet with your
9  attorney and stuff like that where you can talk" --
10     Q.  Uh-huh.
11     A.  -- I didn't know and I was just trying
12 to -- trying to get information.  Because I was
13 young, I was new, and I didn't know what to do at
14 that -- at that moment, you know.  So when I was over
15 at the car, I was just trying to get some advice.
16 And Cannon was new too.  But there was -- a corporal
17 was there from Bountiful, and that's who I was trying
18 to get the advice from.  What do I need to do?  How
19 do I -- how do I go about this and making sure Molly
20 is okay, you know, and taking care of her.  I was
21 hoping, like, he had had some feedback for me.
22         So in this time, you know, need and help,
23 I had somebody, but I don't recall any information
24 besides get, "Get her in the back of a car," so...
25     Q.  As you reflect back on that day, do you

Page 70

1  feel like you were in shock a little bit during the
2  time you're talking to Officer Heslop?
3         MS. WHITE:  Objection.  Calls for expert
4  opinion.
5         Go ahead.
6         THE WITNESS:  Okay.  "Shock," meaning --
7  like, describe -- like -- I don't know if I was in
8  shock.  Looking back, I would say yes, but I remember
9  somebody asking me -- actually, Gary asked me, "Are
10 you okay?"
11        And I told him "Yeah."  I told him "Yes,"
12 because I was okay.  I wasn't hurt.  I didn't have
13 any bullet holes in me.  Besides, you know, thinking
14 I was going to die up here, yeah, I was -- like,
15 looking back, I was in shock.  I was, like, tunnel
16 vision for way too long.  Yeah.
17     Q.  (BY MR. WILLIAMS)  You've used that term a
18 lot today, of having tunnel vision.  Do you feel like
19 at the time you were speaking with Officer Heslop,
20 that you still maintained this tunnel vision?
21     A.  I -- at the time that I was talking to
22 Heslop, I remember talking to Heslop very well, and I
23 remember what was going on around me, my, like
24 surroundings and stuff.  So I don't think that the
25 tunnel vision was when I was talking to.

Page 71

1  Officer Heslop.
2      Q.  Okay.  So you were asked a couple of times
3  if you have given any other formal statements to
4  anybody, and I believe your answer was that other
5  than the detectives that day, no other formal
6  statements.
7      A.  No.
8      Q.  Okay.  So no one from -- and we sort of
9  addressed this -- no one representing American
10 General ever contacted you?
11     A.  No.
12     Q.  Okay.  No investigators from American
13 General, anyone like that?
14     A.  No.
15     Q.  Okay.  And we've established that you did
16 speak with Officer Heslop.  Did you speak with any
17 other officers that day about the events?
18     A.  Well, Corporal, I think it's Kunz or
19 Combs, was there.  That was the other officer that I
20 was asking for advice on what to do with Molly.
21     Q.  Okay.
22     A.  But as far as the incident, I don't
23 think -- I don't know if he was there when I said he
24 was walking around with the gun, and he had put the
25 gun down to his side.

Page 72

1      Q.  Okay.  Just so we're clear, you never --
2  other than the normal stride that you described, you
3  never saw Mr. Farrand raise the gun nor -- other than
4  a normal stride, correct?
5      A.  Well, normal is -- normal, to me, is like
6  what -- I walk with my hands down.  And I would say
7  normal, upset stride.  If we're going to stay
8  "normal," I would say a normal upset stride, meaning,
9  there was -- it wasn't just a normal walk, like --
10 I'm -- I meant yes, it's like a walk -- like he was
11 walking, but he was walking with a purpose.  There
12 was no -- it wasn't just a casual walk in the park or
13 walk down the beach with your wife or husband, you
14 know.  It was a -- it was -- his arms were -- I'm not
15 saying flailing either, because that's too much, but
16 it was, you know, here and there.  Like, it was his
17 right hand and it was moving up, but it wasn't -- I
18 don't recall it being pointed at me at the time, or
19 Jason.
20     Q.  Okay.  And then once he turns towards the
21 fence, you could only see the top of his head?
22     A.  Yeah.  And that was only for a split
23 second too, because as it gets deeper into the
24 truck -- the cab of the truck, you -- he goes back
25 into that -- that -- what is -- breezeway?  And then

Page 73

1 **I don't see him.**
2    Q.  Okay. So you never saw him raise the gun
3 toward Officer Read?
4    **A.  I couldn't see -- I couldn't see him doing**
5 **anything at that point.**
6       MR. WILLIAMS: Okay. Well, thank you,
7 Officer. I don't have any other questions.
8       THE WITNESS: You're welcome.
9       MR. BURR: I don't have any questions.
10 We'll read and sign. If you'll get the
11 transcript to me, I'll get it to Officer Casey.
12       THE VIDEOGRAPHER: Off the record. The
13 time is 11:27.
14      (Deposition concluded at 11:28 p.m.)
15         * * *

Page 74

1      REPORTER'S CERTIFICATE
2 STATE OF UTAH    )
            ) ss.
3 COUNTY OF SALT LAKE  )
4
     I, Dawn M. Perry, Certified Shorthand
5 Reporter and Notary Public in and for the State of
Utah, do hereby certify:
6
     That prior to being examined, the witness,
7 OFFICER PRESTON CASEY, was by me duly sworn to tell
the truth, the whole truth, and nothing but the
8 truth;
9      That said deposition was taken down by me
in stenotype on August 18, 2017, at the place therein
10 named, and was thereafter transcribed and that a true
and correct transcription of said testimony is set
11 forth in the preceding pages.
12      I further certify that, in accordance with
Rule 30(e), a request having been made to review the
13 transcript, a reading copy was sent to Heather White,
Attorney at Law, for the witness to read and sign
14 under penalty of perjury and then return to me for
filing with Diane Wizig, Attorney at Law.
15
     I further certify that I am not kin or
16 otherwise associated with any of the parties to said
cause of action and that I am not interested in the
17 outcome thereof.
18      WITNESS MY HAND this 24th day of August,
2017.
19
20
21
22
       Dawn M. Perry, CSR
23
24
25

Page 75

1 Case: MOLLY FARRAND vs. AMERICAN GENERAL LIFE
   INSURANCE COMPANY
2 Case No.: 1:16-cv-00134-DB
   Reporter: Dawn M. Perry, CSR
3 Date taken: August 18, 2017
4      WITNESS CERTIFICATE
5    I, OFFICER PRESTON CASEY, HEREBY DECLARE:
   That I am the witness in the foregoing
6 transcript; that I have read the transcript and know
   the contents thereof; that with these corrections I
7 have noted this transcript truly and accurately
   reflects my testimony.
8
   PAGE-LINE    CHANGE/CORRECTION    REASON
9 _____ _____ _____
   _____ _____ _____
10 _____ _____ _____
   _____ _____ _____
11 _____ _____ _____
   _____ _____ _____
12 _____ _____ _____
   _____ _____ _____
13 _____ _____ _____
   _____ _____ _____
14 _____ _____ _____
15 _____ No corrections were made.
16
     I, OFFICER PRESTON CASEY, HEREBY DECLARE
17 UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE
   UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF
18 UTAH THAT THE FOREGOING IS TRUE AND CORRECT.
19
        OFFICER PRESTON CASEY
20
     Date: _____
21
22
23
24
25