# APPENDIX J

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

MOLLY FARRAND,              )
                           ) Videotaped deposition of:
        Plaintiff,          )
                           ) OFFICER GARY THOMAS
vs.                         )
                           )
AMERICAN GENERAL LIFE       )
INSURANCE COMPANY,          ) Case No. 1:16-cv-00134-DB
                           )
        Defendant.          )

August 14, 2017 * 9:06 a.m.

Location:  Snow, Christensen & Martineau

10 Exchange Place, Eleventh Floor

Salt Lake City, Utah

Reporter:  Dawn M. Perry, CSR

Notary Public in and for the State of Utah

Videographer:  Gavin Bohne

## Page 2

1         A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3         Robert B. Cummings
          Danielle Hawkes
4         Attorneys at Law
          The Salt Lake Lawyers
5         10 Exchange Place
          Suite 622
6         Salt Lake City, Utah  84111
          (801) 590-7555
7         (801) 384-0825 (fax)
          Robert@thesaltlakelawyers.com
8         Danielle@thesaltlakelawyers.com
9  FOR THE DEFENDANT:
10        Kendall J. Burr
          Attorney at Law
11        Edison, McDowell & Hetherington, LLP
          1001 Fannin Street
12        Suite 2700
          Houston, Texas  77002-6707
13        (713) 337-8875
          (713) 337-8851 (fax)
14        kendall.burr@emhllp.com
15  FOR THE WITNESS:
16        Heather White
          Attorney at Law
17        Snow, Christensen & Martineau
          10 Exchange Place
18        Suite 1100
          Salt Lake City, Utah  84111
19        (801) 521-9000
          (801) 363-0400 (fax)
20        hsw@scmlaw.com

## Page 3

             I N D E X
OFFICER GARY THOMAS                    PAGE
     Examination by Mr. Burr          5
     Examination by Mr. Cummings      100
             * * *
          E X H I B I T S
NO.        DESCRIPTION            PAGE

1   Photograph                   39

2   Photograph                   56

3   Photograph                   71

4   Photograph                   78

             * * *

## Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record at
9:06 a.m.  This is the videotaped deposition of
Officer Gary Thomas in the matter of Molly Farrand
versus American General Life Insurance Company,
United States District Court for the District of
Utah.

This deposition is being held at Snow,
Christensen & Martineau on August 14th, 2017.

My name is Gavin Bohne, and I am the
videographer.  I am present on behalf of Stratos
Legal.  The court reporter is Dawn Perry, also
present on behalf of Stratos Legal.

Counsel will now state their appearances
and firm affiliation for the record.

MR. BURR:  Kendall Burr of Edison,
McDowell and Hetherington, for the defendant.

MR. CUMMINGS:  Robert Cummings of the Salt
Lake Lawyers, on behalf of the plaintiff.

MS. WHITE:  Heather White for
Officer Thomas.

THE VIDEOGRAPHER:  Will the court reporter
please swear in the witness?

Page 5

1          OFFICER GARY THOMAS,
2    called as a witness, being first sworn,
3    was examined and testified as follows:
4                EXAMINATION
5    BY MR. BURR:
6        Q.   All right.  Good morning.
7        A.   Good morning.
8        Q.   What is your name, for the record?
9        A.   It's Gary Thomas.
10       Q.   And what's your address, your residence?
11       A.   I live in Bountiful, Utah.
12       Q.   Okay.  What is your profession?
13       A.   I used to be a police officer.  I'm now
14   retired.  And then I work for the LDS church.
15       Q.   When did you retire?
16       A.   I retired June 3rd, two years ago, so this
17   past June 3rd.
18       Q.   June 3rd of 2015?
19       A.   Yeah, 2015.
20       Q.   You understand we're here to talk about an
21   event that took place on April 13th, 2014?
22       A.   Correct.
23       Q.   And so this is a little more than a year
24   before you retired; is that correct?
25       A.   Correct.

Page 6

1        Q.   How long were you a police officer?
2        A.   Up to that point, almost 24 years
3    full-time.
4        Q.   Okay.
5        A.   I had worked as a reserve officer prior to
6    this for a couple years.
7        Q.   Did you have any other professions prior
8    to being a reserve officer?
9        A.   Like in law-enforcement-type thing?
10       Q.   Right.
11       A.   I did not.  I -- I just worked odd jobs
12   here and there, so...
13       Q.   Okay.  You understand that this event that
14   took place on April 13th, 2014, involved a gentleman
15   who was shot and passed away?
16       A.   Correct.
17       Q.   Okay.  And you were present on the scene?
18       A.   I was.
19       Q.   And do you remember some of the events of
20   that, today?
21       A.   I do.
22       Q.   Okay.  You didn't witness the entirety of
23   the scene but you witnessed your perspective of it,
24   right?
25       A.   Correct.

Page 7

1        Q.   Okay.  And that's what we are here today
2    to talk about, is to just gather your recollection of
3    the events as you saw them, okay?
4            Do you know the company, American General
5    Life Insurance Company?
6        A.   I do not.
7        Q.   Have you ever heard of American General
8    Life Insurance?
9        A.   I may have, but I don't have any
10   affiliation or I've never worked with them or
11   anything, so no.
12       Q.   Okay.  So that's my client.  I represent a
13   life insurance company, and we're here in relation to
14   a civil litigation.
15           Do you understand that?
16       A.   I do.
17       Q.   Okay.
18           MS. WHITE:  Make sure you answer out loud.
19           THE WITNESS:  Oh.  Yes.
20           MR. BURR:  Thank you.
21       Q.   Because it's being videotaped, but it's
22   also being transcribed, so we may use the transcript
23   separately than the video.
24       A.   Okay.
25       Q.   So we want to have question, answer.  And

Page 8

1    so I'll try to let you finish your answers before I
2    start my next question.  If you could do the same,
3    that would be helpful.
4        A.   Very good.
5        Q.   So do you understand that this litigation
6    involves a life insurance policy?  Have you heard
7    that before?
8        A.   That's what I've been told it was for,
9    yes.
10       Q.   Do you know about that policy?
11       A.   I don't know anything about it.
12       Q.   Okay.  Do you understand that the events
13   of that day, April 13th, 2014, may have some
14   relationship to this litigation today?
15       A.   I would assume, yes, but I don't know.
16       Q.   But you don't know how, right?
17       A.   (Witness shakes head.)
18       Q.   Okay.  And that's fine.  I just want to
19   make sure that you understand that you are here
20   solely to provide your memory of the events of that
21   day, okay?
22       A.   Okay.
23       Q.   Have you been in a deposition before?
24       A.   Have I done a deposition before?
25       Q.   Yes.

Page 9

1    A.   I have not.
2    Q.   Have you ever testified in court before?
3    A.   I have.
4    Q.   How many times, approximately?
5    A.   A hundred, maybe.
6    Q.   Right.
7    A.   Or more.
8    Q.   And that's a common thing that police
9    officers have to do, right?
10   A.   Correct.
11   Q.   So you understand the concept of -- of
12   giving testimony under oath?
13   A.   Yes.
14   Q.   And you understand that you need to be as
15   honest as you can in your answers?
16   A.   Correct.
17   Q.   By the same token, you are not required to
18   speculate or fill in gaps in your knowledge.  Do you
19   understand that?
20   A.   That's right.
21   Q.   So you just testify to what you remember?
22   A.   Yes.
23   Q.   And if I ask a question and you think you
24   remember it, but you're not certain, could you
25   explain that on the record?  Can we try to just make

Page 10

1    that clear, that your best memory is this, but you're
2    not positive of the details, that kind of thing?
3    A.   Sure.
4    Q.   Can do you that?
5    A.   Yes.
6    Q.   Thank you.
7         I understand that this event that took
8    place led to another litigation against the city.  Is
9    that right?
10   A.   That's what I understand, yes.
11   Q.   Do you recall being involved at all in
12   that litigation?  Were you asked to testify, for
13   example?
14   A.   The -- only time, to the best of my
15   recollection, that I've ever told the story of the
16   events of what had happened on that date are on two
17   occasions; one was the evening after the event, and
18   with Miss White here in this office.
19   Q.   Okay.  And this -- that was a privileged
20   discussion with your counsel in connection with the
21   civil litigation?
22   A.   Correct.
23   Q.   Okay.  And other than the initial
24   interview that night, the night of the event --
25   A.   Uh-huh (affirmative).

Page 11

1    Q.   -- did you ever recount any of the events
2    that you witnessed in any other format to your
3    superiors or to anyone in the department?
4    A.   There was -- from time to time, you know,
5    people would ask, "Hey, what happened?"  Generally, I
6    was very brief or very vague.
7    Q.   Right.
8    A.   But to tell the story from start to
9    finish, those were the only two times that I have --
10   I recall ever telling it.
11   Q.   Do you know if the initial interview that
12   you gave that evening was recorded?
13   A.   I -- I don't know.  I'm assuming it was,
14   due to the fact that the room that we were in had
15   video cameras.  So I'm assuming that it was, yes.
16   Q.   Do you know if there was a written
17   transcript of it?
18   A.   I don't know.
19   Q.   Okay.
20   A.   I have not ever seen one, so I don't know.
21   Q.   Do you remember at any point going back
22   and listening to or looking at what you had testified
23   to -- or what you had shared during that interview
24   that evening?
25   A.   There was a time where we did -- we kind

Page 12

1    of had a department meeting, I don't know, probably
2    maybe six weeks after, and the detective -- one of
3    the detectives that was over the investigation played
4    different segments of -- video segments to -- he kind
5    of did a synopsis of what had happened in a -- like a
6    PowerPoint presentation.
7    Q.   Okay.  These video segments, did they
8    consist of dash cam, body cam footage?  What kind of
9    videos?
10   A.   I -- I do remember that there was a
11   segment played during that time where I could hear
12   myself calling out to dispatch that shots had been
13   fired, that he had played that, and had indicated
14   that that helped them tag an exact time of when it
15   had happened, that kind of thing.
16   Q.   Okay.
17   A.   But I -- I have not seen it from start to
18   finish kind of a thing.
19   Q.   Okay.  So you mentioned you had been a
20   police officer for approximately 20 years; is that
21   right?
22   A.   About 24 years.
23   Q.   Twenty-four years, okay.
24        What was your typical -- did your job
25   responsibilities change during that time frame?

Page 13

1     A.  It did, many times.

2     Q.  Okay.  So during the 2014 -- spring 2014

3 time frame, what was your primary role?

4     A.  I was a patrol officer.

5     Q.  What does a patrol officer do?

6     A.  I handle any calls of service or calls

7 that are in-progress-type calls, to citizen assists,

8 you know, unlocking car doors to handling traffic

9 accidents.  Centerville City has experienced some

10 growth, but over the years our -- our duties have

11 pretty much kind of stayed the same and -- so it's a

12 variety of stuff.  We pretty much handle anything

13 that comes in.

14        We don't have many specialized areas.  I

15 know some agencies have just traffic divisions, for

16 instance, but we don't, and so we have to handle

17 everything that comes across, whether it's a traffic

18 accident or a shoplifter or a family fight or

19 whatever the case may be.  Patrol generally handles

20 those calls that are immediately pending.

21     Q.  Okay.  So how big is the Centerville

22 Police Department -- or how big was it at the time,

23 how many officers?

24     A.  At the time, I believe there were 17

25 officers.  That included our -- our -- like, the

Page 14

1 chief, assistant chief, sergeants, all of that.

2     Q.  And would you classify most police

3 officers as patrol officers?

4     A.  Say that one more time.

5     Q.  Would you classify most of the officers

6 within the department as patrol officers, or were

7 there other functions?

8     A.  The majority of them were patrol.  We had

9 three detectives; one of those was a supervisor, and

10 then he had two detectives that worked under him.

11 And then you had a sergeant -- or, I mean --

12 correction, a chief, an assistant chief, and then

13 there were two patrol sergeants.

14     Q.  Do you recall the names of any other

15 officers who were on the scene besides yourself?

16     A.  Officer Casey and Officer Read.

17     Q.  Okay.  What are their first names, just

18 for the record?

19     A.  Preston Casey and Jason Read.

20     Q.  Were any other officers on the

21 scene before the shooting took place?

22     A.  Not that I recall.  It was just the three

23 of us.

24     Q.  Did you all arrive together?

25     A.  I actually arrived first.  And because of

Page 15

1 the call that had come in, I waited momentarily,

2 maybe only 15 seconds, when Officer Read pulled up.

3 He actually pulled up in front of my car.

4     Q.  Was Officer Casey with Officer Read or

5 separate?

6     A.  I -- I didn't immediately see him, but

7 then after I had gotten out of my car I saw him

8 walking, yes, so -- and I believe he parked behind

9 me, but I would be speculating.  I don't know.

10     Q.  Okay.  Where did you grow up?

11     A.  I grew up in Bountiful, Utah.

12     Q.  Did you work in Centerville City

13 Department for your entire career as a police officer

14 or for another --

15     A.  For about 22 years of that.

16     Q.  You did the first two years somewhere

17 else?

18     A.  And two years before that I worked for

19 West Bountiful City, which is a neighboring city to

20 that area.  And then that's where I also worked as a

21 reserve officer.

22     Q.  And your profession today -- you said you

23 work for the LDS church?

24     A.  I worked for the LDS church.  I actually

25 worked at the Bountiful Temple, in their grounds

Page 16

1 department, so...

2     Q.  Do you recall during April 2014 what your

3 typical schedule was like, what shifts you worked?

4     A.  I actually remember the day well, only

5 because there was different highlights that also --

6 that I can correspond with it.  And on that date it

7 happened to be a Sunday, so -- most Sundays in

8 Centerville are fairly uneventful.  It's kind of a

9 sleepy community and not a whole lot going on other

10 than just basic calls.

11     Q.  Okay.  And throughout the prior week had

12 you been working days, mornings, afternoons?

13     A.  I had been on a day shift.

14     Q.  Okay.  Did you ever have to work night

15 shifts?

16     A.  I -- in my earlier days I worked a lot of

17 graveyards.

18     Q.  But during the 2014 time frame you were

19 working day shifts?

20     A.  Correct.  Yeah.  Either a day shift or

21 early -- kind of an early swing shift.  On this

22 particular day, I believe I was working from 10:00 in

23 the morning until 8:00 in the evening.

24     Q.  Approximately how many days per week would

25 you work?

Page 17

1    A.  Four days a week.  We worked ten-hour
2  shifts.
3    Q.  And then it would fluctuate?  Would you
4  have the same schedule every week, or would you
5  sometimes get a Sunday shift, sometimes not?
6    A.  We usually stayed on the same days of the
7  week for about 60 days or -- well, I'm trying to
8  remember the -- how the -- the schedule is.  I
9  believe it was a -- like, a 12-week period, and then
10  we would rotate to a different shift.
11    Q.  Okay.  How would a typical -- how would
12  you spend the time on a typical shift?  You mentioned
13  that as a patrol officer, you would take calls.
14    A.  Handle calls.  We would run radar -- sit
15  on the side of the road, run some radar, watch for
16  traffic violations.  It -- it also depends on just
17  kind of how boring the day is.  You know, you'd have
18  a break or a lunch break periodically.  On this day,
19  I don't recall it being anything really different
20  prior.
21    Q.  Do you recall what activities you did that
22  day prior?  Like, were there any particular things
23  you had to do?
24    A.  Nothing special that -- I -- I remember
25  the call just prior to the call that we're here to

Page 18

1  talk about was a call where some kids were down on
2  the railroad tracks that had been called in, but we
3  had not ever located them.
4    Q.  Okay.  Would you patrol typically by
5  yourself?
6    A.  I'm the -- I'm the only person in my car.
7  Is that what you are asking?
8    Q.  Right.
9    A.  Yes, I'm the only person in my car.
10    Q.  Do others in the department usually go off
11  solo, or do they pair up?
12    A.  Yeah, we are all single units, with the
13  exception of if -- if we were field training a new
14  officer, for instance, then normally the field
15  training officer is doubled up with the new recruit.
16  But on this case, that -- we didn't have that at the
17  time.
18    Q.  Okay.  And so this event on April 13th,
19  2014, all three of you arrived in separate vehicles?
20    A.  Correct.
21    Q.  You believe you arrived first, then
22  Officer Read, then Officer Casey?
23    A.  Yes.
24    Q.  And we'll get into the sequence in a bit.
25  I'm just trying to get some background first.

Page 19

1    You mentioned that -- that you've spoken
2  with your -- your counsel about this -- this lawsuit.
3  I don't want you to reveal any of the substance of
4  what you talked to counsel in connection with the
5  civil litigation.  How long ago was that?
6    A.  I wouldn't know exactly, but probably --
7  it was before I retired, but many months after -- if
8  I remember right, after the event.
9    Q.  And in connection with preparing for your
10  deposition today, did you, like, run through a -- you
11  know, all the facts again or you just --
12    A.  I did not.
13    Q.  -- just coming in and providing your best
14  memory?
15    A.  No.
16    Q.  Okay.  Understood.
17    So this event that took place on
18  April 13th, 2014, involved a death.  About how often
19  in your career has -- have you been involved in or
20  witnessed incidents that led to someone having -- you
21  know, someone dying?
22    A.  As in at the hands of a police officer
23  having used deadly force?  Is that that you are
24  asking?
25    Q.  No, just any incident that led to -- to a

Page 20

1  death.
2    A.  I've been on suicide scenes or someone who
3  has passed away overnight, you know, or something to
4  that effect --
5    Q.  Right.
6    A.  -- many times.  Thirty or more.
7    Q.  Okay.  How many times have you been at a
8  scene where someone died during the event that you
9  witnessed?
10    A.  I would say less than a half a dozen.
11  Usually because of, like, medical-type issues.
12    Q.  Okay.  And can you recall any other
13  instances where someone died from an event that you
14  were at the scene of where the police officer had to
15  use deadly force?
16    A.  This is the only time.
17    Q.  How often during your career would you
18  have to deal with tense situations where there was --
19  where a police officer had a gun and a suspect had a
20  gun, and there were instructions to drop the weapon,
21  for example?
22    A.  Maybe four or five times in my career --
23  where they both were armed --
24    Q.  Right.
25    A.  -- with something?  Yeah.

Page 21

1      Q.   And in each of those instances, other than
2  this one we're talking about today, the -- did the
3  suspect, you know, comply with the police
4  instructions?
5      A.   He did not.
6      Q.   Okay.  No, I'm taking about the other
7  incidents.
8      A.   Oh, the other incidences?
9      Q.   Yes.
10     A.   Quite often after some persuasion or
11 verbal dialogue they would come into compliance, yes.
12     Q.   How many times have you dealt with a
13 situation where -- where someone -- strike that.
14          Let's just run through the events of that
15 day and we can kind of get through some of these
16 details.
17     A.   Okay.
18     Q.   So you mentioned that you were on your own
19 in your vehicle doing patrol and you got a call?
20     A.   Correct.
21     Q.   Was that the first thing you heard, was a
22 call?
23     A.   For this event, yes.  That Davis County
24 dispatch had contacted us via the radio and indicated
25 that they needed us to respond to a specific address.

Page 22

1      Q.   Okay.  And in your vehicle you have a
2  radio that transmits --
3      A.   Correct.
4      Q.   -- calls directly from dispatch?
5      A.   Uh-huh (affirmative).
6      Q.   Okay.  And do you have any other means of
7  communication within the vehicle to get information
8  about the incident prior to arriving?
9      A.   We -- we also have computers in our cars.
10 Generally, the computers, by the time they update,
11 dispatch is usually a little quicker.  So we -- we
12 usually get our initial information from our
13 dispatch.
14     Q.   Okay.  So the dispatch usually shares some
15 information orally?
16     A.   Uh-huh (affirmative).
17     Q.   And then as the computer loads, you get
18 additional information on a screen?
19     A.   Correct.
20     Q.   What's the computer called?
21     A.   The computer program that we use is a
22 program called FATPOT.  It's a dispatch program
23 incorporated with -- how do you describe it?  It's --
24 it basically does almost everything we need it to do.
25 Like, we can run drivers' licenses, we can run

Page 23

1  registrations on vehicles through this program.  You
2  keep track of our officers' log on that program
3  that -- the daily log.  So from such and such a time
4  to another time, this is what I did, and the address.
5  And it kind of time stamps it kind of a thing.
6          You would mark that on your -- on your log
7  noting a -- using a code that would signify the call
8  or the event.  You know, a traffic stop, you would
9  use a code for that.  Some of that's used for
10 statistical purposes, is my understanding.
11         The dispatch screen -- you are able to go
12 to the dispatch screen and bring up the specific call
13 that you are looking at.  It also will show other
14 calls that are on there from other agencies --
15 Farmington, Bountiful, West Bountiful, including
16 Centerville calls -- but they are all -- the computer
17 will -- designates which agency is responsible for
18 that call.  And then when it's assigned to a specific
19 officer, it will actually put our call sign next to
20 the call number that -- or your officer number next
21 to the incident that you're involved in.  So it's a
22 way of dispatch keeping track of the officers who are
23 out and what officers are on each call.
24     Q.   How big is the screen?
25     A.   It's probably the same size as that

Page 24

1  laptop, so maybe a 12- or 14-inch screen, something
2  to that effect.
3      Q.   Okay.  And is this like a touch screen or
4  does it have buttons that you -- key pad?
5      A.   They are all different.  At the time, the
6  patrol car that I was using actually had a
7  tablet-type computer device.  So the tablet itself
8  sat separate, and then the keyboard sat down below.
9  And when you put the tablet in, it would actually
10 plug into the keyboard.  And it was a
11 touch-screen-type tablet.
12     Q.   And when you got calls for events where
13 there was some urgency, you know, what kind of
14 information would be populated on the screen and how
15 quickly would you be able to digest it before you had
16 to leave?
17     A.   Normally, as -- as you are responding and
18 information is coming up, it's hard to drive and hard
19 to read what's coming up.  And normally any new
20 information, especially if it's very pertinent to the
21 call, our dispatch would relay that information to
22 ensure that we knew what was happening and what was
23 being updated.
24     Q.   So on the day that this event took place,
25 do you remember in any detail what you heard via

Page 25

1    dispatch and what you may have seen on the screen?
2    We'll go through them separately.
3        A.    Dispatch had asked us to respond to a call
4    where a male individual and his wife had been in an
5    argument, and they asked us to respond to a specific
6    address.  They indicated moments later that the male
7    had left the residence and was going to another
8    residence in Bountiful, and that he had a gun and he
9    was going to go kill somebody.
10           (Discussion off the record.)
11        He said -- he said -- dispatch indicated
12   that the male suspect had left the residence, he had
13   a gun and he was going to another residence to kill
14   somebody.
15        Q.    In Bountiful?
16        A.    Uh-huh (affirmative).
17        Q.    Did you get any names of the suspects --
18   or the suspect at that point?
19        A.    I know they -- they told us some names,
20   but I don't recall them.  Like, the -- the suspect,
21   Frand, or Frandland, the one who died, I remember his
22   name, and that the person that he was going to, they
23   told us his name, but I don't remember that.
24        Q.    Okay.  Did you know either of the
25   individuals?

Page 26

1        A.    I don't either one of them.
2        Q.    Now, you mentioned that you heard that
3    kind of information on dispatch.  Did you also look
4    at your screen?  Do you remember seeing any
5    information on your screen?
6        A.    I remember looking at the screen to verify
7    the address.  What I typically do is -- it's a lot
8    nicer when you see it.  Then I can -- what works for
9    me is then I try to picture where I'm going.  This is
10   where the location of this address is.  After working
11   in the city for, at that point, over 20 years, I
12   became to where I could visualize landmarks and
13   visualize an area, you know, because I had driven up
14   many of these streets hundreds of times, literally.
15       Q.    Right.
16       A.    And I can think of the fastest route to
17   get me from point A to point B the easiest, the
18   quickest, tactically correct kind of a thing.  And so
19   as I would look at the address and look at, okay, how
20   am I going to approach this and get there as quickly
21   as I can, I would -- I would visualize that, as well
22   as look at my screen to find, you know, what the
23   address was.
24       Q.    Do you know approximately how long it took
25   after you first got the call until you arrived on the

Page 27

1    scene?
2        A.    I would guess three to four minutes.
3        Q.    When you got the information on dispatch,
4    you first got an address for the Farrands' home; is
5    that right?
6        A.    Uh-huh (affirmative).
7        Q.    Did you ever veer from that -- and I know
8    you mentioned that someone had also mentioned on
9    dispatch that he was going to Bountiful with a gun.
10   Was anybody going to Bountiful?  Were you going to
11   Bountiful or were you just heading straight for the
12   home?
13       A.    I was -- I was originally going to the
14   address.  And Officer Read had just signed on duty.
15   He had only been on duty maybe five minutes, at the
16   most.  I mean, he had just barely come on.  In fact,
17   I remember that it was an extra shift for him to
18   work, because we were shorthanded that day and he had
19   volunteered to work that day.  And I don't even think
20   that he had -- I think he was really close to the
21   city, but I would be speculating.
22       Q.    Okay.
23       A.    But normally, most of our officers don't
24   sign on duty in their patrol cars until they're
25   actually in the city limits.  That way they -- as --

Page 28

1    when they sign on duty, dispatch can give them any
2    calls and know that they are available.  It wouldn't
3    do any good to sign on duty and still be in Kaysville
4    or something, coming to work.
5        And so he had signed on duty, but I think
6    was still trying to get off the freeway, because he
7    normally takes the freeway.  And so he was a little
8    bit behind me.
9        As we had talked about the call and the
10   events, I remember Officer Read saying, "You go to
11   the house and I'll try going to this other address in
12   Bountiful."  And he had also -- I recall one of them
13   had said let -- to dispatch -- they had said to call
14   Bountiful PD and let them know that this guy is going
15   to a Bountiful address and to see if they can get
16   officers to respond there.
17       Q.    As far as you knew, was everyone -- well,
18   strike that.
19       Did you get a sense, during your drive to
20   the home, who else was coming to the home?  Were you
21   able to tell that Officer Read was also heading
22   there?
23       A.    I believe Officer Casey was also going to
24   come to the home.
25       Q.    And did you hear on dispatch that both of

Page 29

1   them were heading to the same location?
2   **A.  Yeah.**
3   Q.  So when you arrived, you knew that there
4   would be three of you on scene; is that right?
5   **A.  At least two, uh-huh.**
6   MS. WHITE:  I'm just going to remind you,
7   sometimes you are saying "uh-huh."  Make sure you say
8   yes or no so it's easier for the court reporter.
9   THE WITNESS:  Sorry.
10  MS. WHITE:  That's okay.
11  THE WITNESS:  Sorry.  I've had a scratchy
12  throat all weekend.
13  So as we were responding the events
14  changed and -- so as I got within a minute or so of
15  respond -- starting to respond to the home, then
16  dispatch had contacted us back, updating us with
17  information, indicating that the suspect had returned
18  to the home and his wife was on the phone and had
19  indicated that he had come back, that he had put the
20  gun away and that we were no longer needed at the
21  house.
22  Q.  (BY MR. BURR)  So these were all comments
23  that were conveyed to you by someone at dispatch?
24  **A.  Correct.**
25  Q.  Do you know who that was?

Page 30

1   **A.  I have no idea.**
2   Q.  Okay.
3   **A.  I don't know.**
4   Q.  Is there a dispatch person for the
5   department, or is it something broader?
6   **A.  We -- we are dispatched through Davis**
7   **County dispatch, generally speaking.  I have seen and**
8   **heard where there are anywhere from two to five or**
9   **six, depending on the day, that would be working.**
10  **Most days, if I stop by dispatch -- you**
11  **know, hypothetically, when I've been up there, been**
12  **to the jail, stopped by to get something from**
13  **dispatch, there is typically three or four men or**
14  **women that work in dispatch at the same time.**
15  Q.  Okay.
16  **A.  But how many are always there, I don't**
17  **know.  I don't know what their schedules are.**
18  Q.  How many people are linked to the same
19  channel and hearing the same information?
20  **A.  Ooh.  A lot.  In -- in Davis County,**
21  **Bountiful City -- at the time -- and it's changed**
22  **over the years from time to time.  But at the time,**
23  **there is Bountiful City dispatch, and they would --**
24  **they can listen in.  I don't know if they routinely**
25  **do or not.  A lot of officers will scan Davis County,**

Page 31

1   **as well as their own department's channels, so that**
2   **if calls are happening on borders -- or their**
3   **borders, or if they are close to something, they**
4   **could respond.  But officers who would actually have**
5   **it -- you could have 30 or 40, even, that would --**
6   **could listen in from -- you know, Bountiful City**
7   **dispatch dispatches for Bountiful City, North Salt**
8   **Lake, Woods Cross and West Bountiful.**
9   **And then Centerville goes from Davis**
10  **County, but so does Farmington, Davis County**
11  **themselves, Kaysville.**
12  **And then you have Layton, and Layton has**
13  **their own dispatch unit.  And we normally don't**
14  **interact or listen to them because they are so far**
15  **north from us.**
16  **Clearfield also has their own dispatch**
17  **center.  But then cities further north, Sunset,**
18  **Clinton, for instance, they still go through Davis**
19  **County dispatch.**
20  Q.  So all these -- all these different, you
21  know, persons had access to and could listen in.  Was
22  there a smaller pool of people who would
23  automatically hear everything that came through on
24  the radio, just because it's in their car and it
25  comes through or --

Page 32

1   **A.  I think the majority of them -- like,**
2   **Layton I can't imagine was -- Layton officers**
3   **themselves would have been listening in, but**
4   **Farmington, Bountiful, Centerville, West Bountiful, I**
5   **would imagine all of them would have heard it.**
6   Q.  And in terms of how it's decided who goes
7   to the scene, is it basically a decision by each
8   officer who is in the location, they say, "Oh, I'm
9   going there," and you just go, or are there
10  instructions from somebody saying, "Hey, we need an
11  additional person there"?  How does that usually
12  work?
13  **A.  It's -- it's nicknamed self-dispatching,**
14  **that -- that some officers hear an event come across**
15  **and so they just -- and because of the event being**
16  **critical, they just start going that way.  Not always**
17  **do they maybe respond on scene, but might sit down**
18  **the street a block so that in the event it goes bad,**
19  **that they would be close.**
20  **Other times officers respond all the way**
21  **in and have never been invited or asked to go.**
22  Q.  When you got information through your
23  radio from dispatch, did they convey to you what
24  vehicle Mr. Farrand was driving?
25  **A.  If I recall right, it was a white pickup**

Page 33

1  truck, but I don't know the make or model at this
2  point.
3      Q.   Okay.  And during the three or four
4  minutes that it took for you to arrive at the home,
5  what were you doing other than getting there and
6  listening to the information?  Were you trying to do
7  anything else?
8      A.   No, I was just driving there.
9      Q.   Okay.
10     A.   I mean, we're communicating and kind of --
11  I guess coming up with somewhat of a game plan.  You
12  know, that's why, you know, I'm going to the home,
13  somebody else is going to try intercepting going to
14  where we think he's going, kind of a thing.
15     Q.   Do you recall any discussions with
16  Officer Read or Officer Casey?
17     A.   I remember Officer Read and I, as we
18  talked on the radio, that -- that I was going to go
19  to the home and he was going to try intercepting
20  where the suspect was heading to in Bountiful.
21         And then we learned that the suspect was
22  now back.  And I remember Officer Read asking on the
23  radio, "Hey, did you hear that?  The guy is back at
24  the house."
25         And I was very close to the home at that

Page 34

1  point, probably less than a block away.
2      Q.   When you arrived at the home, was the
3  white pickup truck there?
4      A.   It was.
5      Q.   Okay.  Was it parked in the driveway?
6      A.   It was parked in the driveway.
7      Q.   Okay.  And you were the first one to
8  arrive?
9      A.   I was.
10     Q.   Did you park right in front of the house?
11     A.   As -- as I came down the road, I then
12  realized that I had almost pulled up in front of the
13  house, and so I actually backed up a little bit.
14     Q.   Okay.  Is that typical practice, to park a
15  little ways away?
16     A.   Well, I -- yeah, you don't want to be
17  right in front of the house.  That's not a safe place
18  to be for this particular call.  You know, other
19  calls, you'd pull right up in front, yes.
20     Q.   But for a call where someone has a weapon,
21  you wanted to be a little away from danger?
22     A.   Yeah, come in a little more discreet.
23     Q.   Do you recall how long you were there
24  before anyone else arrived?
25     A.   I would have only been there a few

Page 35

1  seconds, maybe 15 seconds, when Officer Read pulled
2  up in front of me.  He actually came around me and --
3  from behind and pulled up in front.
4      Q.   So you had backed up, so he parked a
5  little bit more in front of the home?
6      A.   Correct.
7      Q.   Okay.  Was it directly in front of the
8  home or was it --
9      A.   No, no, we were still --
10     Q.   -- still a ways back?
11     A.   We have been north of the home maybe 60
12  feet, 70 feet from the middle of their home.  We
13  were -- the home to the -- to the north, we were
14  probably parked almost right in the middle to
15  slightly the north half of that home.
16     Q.   Okay.  So just to orient, because the jury
17  is going to want to try to visualize everything --
18     A.   Okay.
19     Q.   -- which way does the home face?  As you
20  are looking out the front door, which way does the
21  home face?
22     A.   So the home -- the home faces to the east.
23  And there is 300 East that passes in front of the
24  home running north and south.
25     Q.   Okay.  So the home faces to the east, and

Page 36

1  you were parking on the right side of the street, if
2  you look at a map?
3      A.   So we were -- I -- I came in approaching
4  the home heading southbound.  So from the north,
5  going south on 300 East.  And as I approached the
6  home, if you were looking at the front door, I would
7  have been coming from the right.
8      Q.   Right.
9      A.   Going towards -- south, towards the house.
10     Q.   When you arrived, did you have sirens on
11  or anything like that?
12     A.   I did not, no.
13     Q.   And was that deliberate, to not have
14  sirens on --
15     A.   Correct.
16     Q.   -- to alert anyone?
17     A.   Right.
18     Q.   What about the others who arrived, did
19  either of them have sirens on or anything like that?
20     A.   I did not hear any, no.
21     Q.   Do you have the capacity to flash your
22  lights but not play the sirens?
23     A.   Uh-huh (affirmative).
24     Q.   Do you -- were anybody -- were you
25  displaying your lights and not your sirens?

Page 37

1    A.   I don't believe I ever did.
2    Q.   Do you know if either of the other two
3  did?
4    A.   No, I don't.
5    Q.   So this home -- I understand it has a
6  separate garage, it's a separate structure.  Is that
7  right?
8    A.   It's a detached garage, yes.  It sits on
9  the south, southeast corner of the home.  The
10  garage -- if -- if you were looking at the front of
11  the home -- and, again, as it faces east -- and the
12  home -- the front of the home would run north and
13  south.  The garage is to the south of the home
14  probably ten feet -- ten to 12 feet, and then the
15  garage sits slightly forward.  So the front of the
16  garage and the front of the home are offset probably
17  by eight to ten feet.
18    Q.   And the front of the garage is closer to
19  the street?
20    A.   And -- yeah, the front of the garage would
21  be closer to the street.
22    Q.   But there was still room in the driveway
23  for the pickup truck?
24    A.   Correct.
25    Q.   Were there any other vehicles in the

Page 38

1  driveway, that you can recall?
2    A.   There -- I -- the best I can recall, there
3  was another vehicle parked to the south of the white
4  pickup truck.
5    Q.   Okay.  You mentioned that it was all
6  pretty quick from the time that you got the call
7  until you arrived on scene, about three or four
8  minutes, and somewhere in that time frame you heard
9  that he had -- he was going to Bountiful but then
10  that he had returned to the home?
11    A.   Right.
12    Q.   So did you see any signs, when you first
13  got to the home, that he had recently arrived?
14    A.   Other than the white truck was in the
15  driveway.  But I saw no movement or no people out in
16  the front or in the driveway or in the front of the
17  house or anything like that, no.
18    Q.   Could you hear voices at all?
19    A.   I did not.
20    Q.   When you arrived, you said you waited
21  about 15 seconds before Officer Read came?
22    A.   Correct.
23    Q.   Did you stay in your vehicle?
24    A.   I did.
25    Q.   Okay.  Were you looking at your screen or

Page 39

1  what were you doing?
2    A.   I actually -- because the type of call it
3  was, I thought I needed to make sure my video was
4  functioning correctly and that our in-car cameras, as
5  such -- they are permanently mounted.  My camera
6  actually hangs from the windshield -- from a bracket
7  that glues to the windshield, and it looks straight
8  forward, so to speak.  To get it to look another
9  direction with it, you actually manually would have
10  to grab onto it and reach up and turn it, as such.
11    Q.   Did you do that?
12    A.   I did.
13    Q.   And which way did you turn it?
14    A.   I -- I faced it so it was facing more of
15  the front of the home, so that you would be looking
16  more towards the house and the yard versus -- it's
17  designed that it would maybe -- it would be ideal for
18  a traffic stop situation where you pull up behind
19  someone and it videotapes what's directly in front of
20  your car, whereas in this case, my car is facing
21  straight south but yet the home and the front of the
22  home and the yard is not directly south of me, it's
23  kind of a south, southwest direction slightly.
24    Q.   Okay.
25        (EXHIBIT 1 WAS MARKED.)

Page 40

1    Q.   I'll mark this document as Exhibit 1.  Do
2  you recognize this?
3    A.   I do.
4    Q.   And what is it?
5    A.   This is the house in which we responded to
6  on the call on April 13th, 2014.
7    Q.   Do you know who took the picture?
8    A.   I have no idea.
9    Q.   Do you know when it was taken?
10    A.   I don't know.
11    Q.   Would your car have been parked anywhere
12  on this shot, or was it even further to the right?
13    A.   I -- I was further to the right or north
14  of this location.
15    Q.   Okay.  So this white pickup truck, is that
16  the truck that you saw --
17    A.   Correct.
18    Q.   -- sitting in the driveway?
19        Okay.  And do you see that there's a front
20  door and then there's kind of a walkway that wraps
21  around to the driveway?  Do you see that?
22    A.   The arcing sidewalk?
23    Q.   Yes.
24    A.   Correct.
25    Q.   And then there's -- the driveway looks

Page 41

1 like it has a little passageway to the -- to a gate
2 to the side --
3     **A.**   **Yes.**
4     Q.   -- like, kind of a middle area between the
5 garage and the house; is that right?
6     **A.**   **Uh-huh (affirmative).**
7     Q.   Okay. All right. When you exited the
8 vehicle -- well, strike that.
9     You arrived. Officer Read got out of his
10 vehicle immediately; is that right?
11     **A.**   **Correct.**
12     Q.   And then you exited right after or did you
13 wait a little bit?
14     **A.**   **Right after he...**
15     Q.   Okay. And then how quickly did you notice
16 Officer Casey on the scene as well?
17     **A.**   **As -- as Officer Read was walking, he was**
18 **actually ahead of me, because he had parked in front**
19 **of me and had immediately exited. And as he started**
20 **walking towards the home, I felt as though I wanted**
21 **to get further west to use kind of concealment of**
22 **trees, bushes, houses, whatever was there, so that**
23 **the front of the home I wasn't completely visible**
24 **from directly just looking out in front.**
25     **Officer Read, when he exited his car, had**

Page 42

1 **gone more -- was more out in front. And as I started**
2 **to go across, that's when I -- that's the first time**
3 **I remember seeing Officer Casey as he was catching up**
4 **with Officer Read.**
5     Q.   Were the three of you running, jogging, a
6 combination?
7     **A.**   **I recall we were just walking quickly.**
8     Q.   And if you look at this picture, about
9 what trajectory did Officer Read take when he was
10 walking towards the house? Did he go cut across the
11 lawn?
12     **A.**   **I don't -- I don't remember where he**
13 **walked, because when I saw the two of them going**
14 **towards the front and that the suspect was now inside**
15 **the home, I thought it best that I would make my way**
16 **around the back side of the home so that we could**
17 **somewhat surround the house to try getting eyes on**
18 **it, to see what we could see.**
19     Q.   So if you look at this picture here, you
20 see to the right of the home --
21     **A.**   **Uh-huh (affirmative).**
22     Q.   -- you see there is some tape right there,
23 but there is not a clear shot of what exactly is
24 between that home and the next-door neighbor.
25     **A.**   **Correct.**

Page 43

1     Q.   Did you go through that area?
2     **A.**   **So -- yes. In -- in -- so as I started**
3 **across the front yard of the home to the north, there**
4 **is a separation in the two homes. And there's a**
5 **garage that I believe belongs to the home to the**
6 **north, but there's no access to that garage for**
7 **vehicles, because it's all grass. It's kind of an**
8 **odd garage. It's -- it's not like it's a driveway**
9 **entrance there, but it's open.**
10     **And so as I went to that corner -- or**
11 **between those two homes, I noted that there's a**
12 **wooden fence that blocks the backyard to the home**
13 **that we were responding to. And between the fence**
14 **and the garage there's -- there's a space, maybe two**
15 **to three feet. And I remember the thought that came**
16 **to my mind, as I was going to cut down there -- and**
17 **then I remember thinking, "There's too much crap in**
18 **the way," that I couldn't walk between the fence and**
19 **the garage. So then I was forced to go around that**
20 **garage. The fence is six feet, at least, and I**
21 **wanted to be able to see into the backyard.**
22     **And so as I went around behind that**
23 **garage, the wooden fence is -- there's not any. The**
24 **wooden fence only goes back probably to the back of**
25 **that neighboring garage. And so I could clearly see**

Page 44

1 **into the backyard at that point. It's, like, a**
2 **chain-link-type fence that's only -- short, and I**
3 **could clearly see into the backyard at that point.**
4     MR. CUMMINGS: Why don't -- if we could
5 take a quick break.
6     MR. BURR: Sure.
7     THE VIDEOGRAPHER: Off the record. The
8 time is 9:53.
9     (A break was taken from 9:53 a.m. to
10     10:14 a.m.)
11     THE VIDEOGRAPHER: Returning on the
12 record. The time is 10:14.
13     Q.   (BY MR. BURR) Okay. So you were
14 testifying about how you went around to the
15 neighbor's -- to the neighbor's yard and kind of
16 around the garage to the neighbor to the north,
17 right?
18     **A.**   **Yes.**
19     Q.   Were you able to get from that location
20 into the Farrand's neighborhood -- their backyard?
21     **A.**   **I didn't actually go into their backyard.**
22 **I made it around behind the neighbor's garage.**
23     Q.   Yeah.
24     **A.**   **And I could then have more of a clear**
25 **picture of the backyard.**

Page 45

1     Q.   Okay.
2     A.   But there were still, like, a chain-link
3  fence separating the two yards --
4     Q.   Okay.
5     A.   -- but I could see.
6     Q.   At that point you were at kind of the --
7  the northwest corner --
8     A.   Correct.
9     Q.   -- of -- looking into the north -- from
10 the angle of the northwest corner of the backyard?
11    A.   Right.
12    Q.   And were you able to see the -- the garage
13 and kind of the walkway between them at all from that
14 angle, or not?
15    A.   No.
16    Q.   Okay.  After you went to that point and
17 you got to the chain-link fence, what do you do next?
18    A.   So I was there.  I didn't hear anything
19 for a couple of minutes.  And then I heard over the
20 radio Officer Read indicated that the suspect had
21 come out the front door and had a gun.
22    Q.   Okay.
23    A.   So at that point I then ran from where I
24 was at, back around that neighboring garage to the
25 front yard, and when I came out, I was right on the

Page 46

1  corner of the northeast corner of the suspect's home.
2         And as I peeked around the corner, I
3  anticipated seeing him -- the suspect, like, standing
4  on the front porch or something, is kind of what I
5  had envisioned he would be, and instead I found that
6  he was standing -- referring to the picture --
7  that -- that arced sidewalk -- he was probably
8  halfway out on that sidewalk, going towards --
9  looking towards the truck.
10        And I could see that Officer Read was
11 standing at the back of the truck, on the rear, right
12 corner of the pickup truck.  And Officer Read had his
13 gun out and was pointing it at him.  And where I was
14 standing, where the suspect was standing and where
15 Officer Read was standing, we were almost perfectly
16 in line with one another, that if you were to just --
17 I remember thinking, "If he were to use deadly force,
18 I'm the backdrop; I need to move."  And so I moved
19 straight east.
20        And you could see that -- in the picture
21 that -- you can just see part of the big -- there is,
22 like, a big -- I'm going to call it an oak tree -- a
23 great big tree out in front of the home.  And there
24 is, like, a rock wall that wraps around that.  And I
25 moved across the front of that rock wall so that from

Page 47

1  where Officer Read was, where I was at and where the
2  suspect was, was more of a rectangle points versus a
3  straight line from one another.  That way I could see
4  Officer Read, I could see him, but we didn't have the
5  crossfire situation, as such.
6     Q.   Okay.  So initially, when you first came
7  around the corner and you saw the two of them, were
8  they in motion, were they walking?
9     A.   They --
10    Q.   Were they standing still?
11    A.   They were both standing.  And I could tell
12 there was some dialogue going on between the two of
13 them.
14    Q.   Could you hear what they were saying at
15 that point?
16    A.   Not at that point, no.
17    Q.   Then you moved eastward and approached
18 that rock wall, sort of that tree --
19    A.   Right.  I kind of -- I -- I actually kind
20 of walked around it but stayed more tight against the
21 wall, to where once I got about maybe three-quarters
22 of the way around that wall, that's where I had
23 stopped.
24    Q.   Okay.  During this whole time were you
25 watching Mr. Farrand's head direction, where he was

Page 48

1  looking?
2     A.   Yes.  He was looking towards Officer Read.
3     Q.   Did he ever break gaze from Officer Read,
4  that you could tell from that angle?
5     A.   Not -- not that I would know.  I was -- it
6  was more of the back of his head, but maybe the left
7  back side of his head that I was more looking at.
8     Q.   Okay.  As you were moving from the -- from
9  that -- near the house towards the street, did they
10 stay in that standing position?
11    A.   They -- they stayed there for -- I -- I
12 remember thinking it lasted forever, but several
13 minutes they were in that position.
14    Q.   Okay.
15    A.   And there was some communication between
16 the two of them.
17    Q.   At some point during those several minutes
18 were you able to start hearing what they were saying?
19    A.   I heard a couple of things.  I couldn't
20 ever hear what he was -- what the suspect was saying,
21 Mr. Frandland -- I'm sorry -- I apologize, I'm
22 slaughtering his name.  I couldn't hear what he was
23 saying, but I remember Officer Read at one point
24 said, "Don't do -- don't make me do this; I have a
25 wife and kids."

Page 49

1    Q.   Okay.  During that conversation, other
2    than the statement, "Don't do this; I have a wife and
3    kids," did you hear anything else that Officer Read
4    said?
5    A.   I heard him say -- so as we're standing
6    there and -- a lot of things are going through my
7    mind at the same time.  I'm trying to think, "Okay,
8    what can I do," because I remember thinking, "He
9    doesn't know I'm here, so I have kind of the element
10   of surprise."  And obviously your thoughts -- you
11   can -- you can think things a lot faster than you can
12   convey them.  So the thought is -- is well, I
13   could -- I could try moving in closer and try
14   Tasering him, because I could see that he had a gun,
15   and the gun was down at his side, pointing towards
16   the ground.  I could try to Taser him, but if one of
17   the barbs misses, all that's going to do is -- and I
18   remember thinking, "That's just going to piss him
19   off," which then he's going to turn and it's going to
20   escalate.  And I've got to move closer to be able to
21   do this, because I knew I was too far away that my
22   barbs wouldn't get to him.  I knew I would have to
23   move in even closer to him.
24        And then the thought came to my mind, "You
25   don't bring a Taser to a gunfight," that he's -- he's

Page 50

1    got a gun and he's not complying with already what's
2    going on.  I don't believe, in my opinion, that
3    anyone is going to step out of a home, knowing police
4    are there, and bring a gun with them and confront the
5    law enforcement if they weren't aggressive towards
6    us.
7    Q.   Have -- strike that.
8        You mentioned bringing a gun with him.
9    When you first saw him when he came out from the
10   neighbor's yard, did you see the gun immediately or
11   did it take a little bit of time?
12   A.   When I came around the corner I could see
13   that he had gun in his right hand, and it was pointed
14   down at the ground.
15   Q.   Okay.  And was his arm completely vertical
16   facing down or was it --
17   A.   At that point it was straight down.
18   Q.   Okay.
19   A.   And then that's when I moved around so
20   that we were more on a triangular basis to one
21   another.
22        I heard Officer Read make the comment, you
23   know, "Don't make -- don't make me do this."  And
24   then I -- I remember him saying, "Keep your finger
25   off the trigger.  Keep your finger off the trigger."

Page 51

1        And I remember looking at his hand, and I
2    could see his -- his gun down there.  And I remember
3    his hand was -- his -- his hand was more open with
4    the gun, but I could remember him tapping his finger
5    on the side of the gun trigger area when Officer Read
6    said that.  He had sat there.
7        And I remember the thought going through
8    my mind, as he was doing this, as I looked back up at
9    him -- and I have my gun out and I'm -- I'm right in
10   the center of his back.  And I'm thinking, "If he
11   starts to raise that, I'm going to have to shoot this
12   guy in the back," which everybody knows you don't
13   shoot somebody in the back.  But I -- I am not going
14   to allow him to do anything to hurt Officer Read.
15   That's my job.  And so I -- but I was fearful that he
16   might do that, especially when that antagonizing
17   movement of tapping his finger said to me,
18   personally, that, "Yeah, what are you going to do
19   about it?"
20   Q.   So did you see the color, the type of the
21   gun?
22   A.   I remember it was a black gun.  And I
23   remember thinking it looked like -- this is going to
24   sound weird -- kind of like a Russian,
25   German-looking, square, old gun, is what I thought.

Page 52

1        But I also remember that it had a gold
2    trigger.  I don't know how I remember that.  But I
3    remember thinking, "It's got a gold trigger."  And I
4    don't know if -- if -- if I became somewhat fixated
5    on it.  I've heard that happens.  I -- I -- you know,
6    don't become fixated on the gun, you know, keep --
7    keep your thoughts clear, keep -- don't get tunnel
8    vision; open up.  Because I've experienced that
9    before, that tunnel vision, where all you can see
10   is -- is, you know, what's in this little, teeny
11   scope.
12        And so I was -- I was going through my
13   mind, "Don't get tunnel vision, don't get fixated on
14   the gun, watch what is happening, watch the whole
15   totality."
16        And that's why I think that time -- time,
17   in itself, seemed to slow down, that it seemed to
18   last forever, like we had been there for an hour, we
19   stood there, and in actual reality I know it was only
20   maybe moments to a few minutes, at the most --
21   Q.   Yeah.
22   A.   -- before then things started to move
23   again.
24   Q.   You mentioned that you were moving
25   eastward towards the street, right?

Page 53

1     A.   Uh-huh (affirmative).
2     Q.   As you were moving eastward, did your
3  angle, your view of his arm holding the gun -- did
4  that change?
5     A.   Where I was standing I could still see his
6  back and I could see him down -- see the gun clearly
7  at his side.
8     Q.   Right.  Were you kind of looking at kind
9  of a 45-degree angle towards his back -- about that
10  or more --
11     A.   Yeah, a slight angle to his -- like, I
12  wasn't square, looking straight onto his back, I'm
13  still off to a side angle, but --
14     Q.   But you could see still his right arm?
15     A.   -- I'm back 30 feet from him.
16     Q.   Okay.
17     A.   So it's -- there's still a lot of opening
18  there to -- to be able to see from one side of him to
19  the other side of him very clearly.  If -- if I were
20  standing a foot away from him, I wouldn't be able to
21  see what I could see 30 feet back.
22     Q.   And approximately how far were you from
23  Mr. Farrand?
24     A.   Probably 30 feet.
25     Q.   Thirty feet.  And you mentioned that he

Page 54

1  was about halfway down this curbed walkway from the
2  front door to the driveway.
3     A.   Uh-huh (affirmative).
4     Q.   And Officer Read was --
5         MS. WHITE:  Is that yes?
6         THE WITNESS:  Yes.  Sorry.
7     Q.   (BY MR. BURR)  And Officer Read was
8  standing at kind of this intersection with the
9  driveway and the walkway near the --
10     A.   Yes, he --
11     Q.   -- rear right corner of the truck?
12     A.   -- had been at the rear right corner of
13  the vehicle.  And I remember that he had moved
14  forward for some reason while he was talking with
15  him, just a few feet.  Not, like, drastically, but
16  had -- had kind of moved -- closed the distance maybe
17  a couple of feet from him.
18     Q.   About how far apart were they from each
19  other?
20     A.   Maybe 15 feet.
21     Q.   And Mr. Farrand, when he was facing
22  Officer Read and holding the gun, were his feet
23  square?  Was one in front of the other?  Was he just
24  standing, you know?
25     A.   I -- I wouldn't -- I wouldn't know.  I

Page 55

1  don't remember that part, what his feet were looking
2  like.  I remember he was facing that way.
3     Q.   Yeah.
4     A.   So it might be safe to assume that his --
5  I mean, his -- he wasn't, like, in a running position
6  or running stance or something, but he was just
7  standing there.
8     Q.   Okay.
9     A.   It seemed fairly normal, fairly square to
10  Officer Read.
11     Q.   What was his other arm doing?  Was it
12  motioning at all?
13     A.   The best I can remember is they were both
14  just down.  They were -- he was just standing there.
15  I think he used some -- you know, I remember his body
16  language, you know, his head movement a little bit.
17  But, you know, he wasn't doing something like that
18  either.
19     Q.   And, again, you were looking at him from
20  the northeast corner of the yard at that point?
21     A.   Right.
22     Q.   And you said they talked for about a --
23  possibly a couple minutes?
24     A.   Yeah.  Yes.
25     Q.   Without moving much, except that

Page 56

1  Officer Read closed the distance by a couple of feet?
2     A.   Yes.
3     Q.   Did -- when did things change after that
4  point?
5     A.   I don't know why it changed, other than
6  Mr. Farrand then started to walk towards that gate at
7  an angle.  And as he moved across towards that gate,
8  I -- the thought even -- I remember thinking, "Where
9  is he going?  He can't just leave us."  You know, "He
10  can't do this," you know, "we're talking to him."
11  And he started walking towards the gate.
12         And Officer Read was saying something.  I
13  don't remember what he said.  But Officer Read then
14  started moving down the passenger side of that truck
15  as the suspect started towards the gate.
16         So I moved from where I was to come around
17  kind of halfway between the front door and where he
18  had been standing out there on that island.  There
19  is, like, a -- a flower thing in the grass.  And so I
20  was going to cut through there at an angle and still
21  stay at an angle with him as I kind of started to
22  follow him until he got to the gate.
23     Q.   I'm going to mark another document as
24  Exhibit 2.  It's another photo of the house.
25         (EXHIBIT 2 WAS MARKED.)

Page 57

1     Q.  Do you recognize this as another angle of
2 the house?
3     **A.  Yes.**
4     Q.  And you see that -- do you see that
5 walkway leading from the front door towards the
6 driveway?
7     **A.  Correct.**
8     Q.  And at the beginning of when you entered
9 the front yard and you first see them facing each
10 other, Mr. Farrand was about near the right edge of
11 this picture; is that right?
12     **A.  That would be accurate, yes.**
13     Q.  Okay.  And then Officer Read was kind of
14 right behind where the tree is?
15     **A.  Correct.**
16     Q.  And then did Mr. Farrand start going at an
17 angle across kind of that -- I guess it's dirt and
18 some bushes there?
19     **A.  There's -- there's a couple of flowerbeds**
20 **in the dirt -- or in -- in the front lawn area, kind**
21 **of a -- roundish-looking flowerbed.  So you would**
22 **have, like, a flowerbed, a little bit of grass,**
23 **flowerbed, a little bit of grass, kind of a thing.**
24     Q.  And he took an angle towards the gate?
25     **A.  Right.**

Page 58

1     Q.  What direction was his body facing?  Was
2 he facing the direction he was walking or was he
3 angled towards the --
4     **A.  He was facing the direction he was**
5 **walking.**
6     Q.  Okay.  And, meanwhile, his arm was still
7 holding the gun in his right hand?
8     **A.  Correct.**
9     Q.  And were -- was his head facing towards
10 the gate, or was he still looking at Officer Read?
11     **A.  From my perspective, it seemed as though**
12 **he was now ignoring us and he was -- had his own --**
13 **he -- he had his own idea of what he was going to do.**
14 **He was going another direction.**
15     Q.  Okay.  Did he go straight towards the
16 gate, or did he go partway and then stop, or...
17     **A.  He went -- he went straight towards the**
18 **gate.**
19     Q.  When he got to the gate, what did he do
20 next?
21     **A.  The best I remember is the gate was**
22 **already open.  And so as he got -- I remember when he**
23 **got to the gate I was only partway to where -- I was**
24 **just walking.  He was walking, I was walking.  And as**
25 **he got to the gate, just as he was going to go into**

Page 59

1 **the gate is when I remember looking over at**
2 **Officer Read to see where he was at, because I was**
3 **going to move that direction to his vantage point now**
4 **so that we could link up.**
5     Q.  Meaning that you were heading towards the
6 truck?
7     **A.  So -- so at one point I was walking across**
8 **at a slight angle from where I was at to where the**
9 **gate was at.  So I'm starting to move at an angle,**
10 **and then I started to move towards Officer Read.**
11     Q.  You mentioned that the gate was open.  Am
12 I right that the gate opens with the handle on the
13 right and the hinge on the left?
14     **A.  I -- yes.**
15     Q.  So the gate was open, with the gate
16 turning in or out?
17     **A.  It -- it -- so the gate hinges are on the**
18 **left, if you were looking at it, and the latch would**
19 **be on the right.  Or I'm assuming there is a latch.**
20 **I don't remember what kind of latch assembly is on**
21 **the gate.**
22     Q.  Okay.
23     **A.  But it -- it opens so that the gate, when**
24 **it opened, would open against the garage door -- or**
25 **the side of the garage.**

Page 60

1     Q.  Towards -- going backwards?
2     **A.  Right.  Into the backyard.**
3     Q.  Okay.  So that gate was already opened.
4 Was it all the way open or partway?
5     **A.  That, I don't remember.**
6     Q.  Okay.  But there was an opening there and
7 he -- did he go straight into that space in the
8 opening?
9     **A.  Yes.**
10     Q.  Did his body turn?
11     **A.  I don't know.**
12     Q.  Okay.  Did -- okay.  You mentioned earlier
13 that Officer Read was originally standing -- you
14 know, during the couple minutes when he was talking
15 with Mr. Farrand, he was standing at the rear right
16 corner of the truck; is that right?
17     **A.  Correct.**
18     Q.  And then he inched forward towards the
19 suspect by a couple of feet?
20     **A.  Yes.**
21     Q.  Did he back up later or did he move to a
22 different position later?
23     **A.  I don't -- I don't recall.  Because**
24 **once -- once the suspect started to move, I was kind**
25 **of watching him.  But as he got to the gate, I**

Page 61

1    remember looking, and Officer Read had made his way
2    down to the area of the front of the truck and the
3    front of the garage, kind of -- so on the north --
4    the -- the area of the northeast corner of the
5    garage. That's where he was standing when I started
6    coming across to meet up with him.
7        Q.   Okay. When you and Officer Read were in
8    the front yard, where was Officer Casey?
9        A.   Honestly, I don't know. I don't know
10   where he was at.
11       Q.   Do you --
12       A.   I don't know where he was at, and I don't
13   remember what he was doing, so...
14       Q.   Separating what you may have heard after
15   the fact from what you remember that day, do you
16   remember anything from that day that Officer Casey
17   did that you observed?
18       A.   That I personally observed?
19       Q.   Yeah.
20       A.   Up to that point?
21       Q.   Yes.
22       A.   No.
23       Q.   Okay. And at any point up until the --
24   the shooting.
25       A.   No.

Page 62

1       Q.   Okay. Did you hear afterward where he
2    was?
3       A.   I had heard that he had -- that -- my
4    understanding was -- is that the wife had come out of
5    the home and had made contact with the two of them.
6    And then apparently the suspect had come out and
7    Officer Read is what I had been -- had heard had said
8    to Officer Casey, "Take the wife and take her down
9    the street. Get her -- get her out of here."
10       Q.   Do you know which direction they headed,
11   north or south?
12       A.   I understood they went south. I don't
13   know. That's just what I've heard, so...
14       Q.   So -- okay. Incidentally, do you recall
15   anybody else being out in the neighborhood?
16       A.   I don't remember anybody else.
17       Q.   Okay. Did you look to see if there were
18   people out?
19       A.   No.
20       MS. WHITE: Is that no?
21       THE WITNESS: No.
22       Q.   (BY MR. BURR) When he got to -- when the
23   suspect got to the gate, did he go kind of around the
24   corner to where you couldn't see his body?
25       A.   Correct.

Page 63

1       Q.   So as you could see in the picture, there
2    is kind of this fence and then there is the gate to
3    the left of the fence?
4       A.   Right.
5       Q.   And then -- so he was -- was he around the
6    corner kind of in that -- that stationary fence part?
7       A.   Right. So as he moves around -- in fact,
8    on here it's -- it looks like it's got a big knob on
9    the top of the gate fence post that's, like, right in
10   the middle of that fencing area.
11         And so as he started around that -- as
12   soon as he started into the gate is when I remember
13   looking at Officer Read, thinking, I'm going to
14   quickly move to his location, and then that's when I
15   remember hearing and seeing Officer Read fire.
16       Q.   Do you remember anything else that
17   happened prior to the shots being fired? Do you
18   remember anything else about the position that --
19   that the suspect was in or that Officer Read was in?
20       A.   No.
21       Q.   Okay. So was it shortly after he slipped
22   around the corner?
23       A.   It -- it was -- I would say fractions of
24   seconds, it seemed, that as he started to go through
25   the gate, I looked at Officer Read to start moving

Page 64

1    towards him, you know -- I think the hardest part is
2    to try painting a picture to help people understand
3    that everything is moving. These are all moving
4    parts. And so the whole explanation that takes 20
5    minutes to explain happens in a matter of a few
6    seconds, and it's -- and it's all moving parts.
7         And so as -- as he's moving, I'm moving,
8    Officer Read is moving, and I'm trying to think,
9    okay, I need to go from here to here so that I can
10   link up with my partner to now come up with our next
11   plan of what we're going to do.
12         The moving parts are also starting to fall
13   apart too, that -- we're -- we're just going as --
14   we're doing whatever we can, and we're having to make
15   it up as it goes along, because in some ways the
16   suspect holds all the cards. He knows everything
17   about us and we know nothing about him. And a
18   person, in general, I -- I believe knows some things
19   what they've got to do to push our buttons to make us
20   do certain things.
21         So as -- as Mr. Farrand starts through the
22   gate, I'm looking towards Officer Read as am I'm
23   starting to now move. And within moments, whether
24   that's a half a second, three-quarters of a second --
25   I mean, you can -- you can move a lot in

Page 65

1    three-quarters of a second.  You know, that if -- if
2    I wanted to reach out and hit you, how long would it
3    take me?  A fraction of a second.  It doesn't take
4    long.  But yet I know it's coming and you have no
5    idea.
6            And so as I turn to look towards
7    Officer Read, and I start moving towards him,
8    fractions of a second, whether that's a half a
9    second, three-quarters of a second, a full second, I
10   don't know, but then I hear gunfire.
11           What transpired with the suspect and his
12   movements, I don't know, because I can't look this
13   direction.  Because that's what I was literally
14   having to do, I'm having to look -- here he is, here
15   is Officer Read, and now, as I start moving this way,
16   gunfire erupts, and I continually move his direction
17   to get to his vantage point.
18       Q.   Do you know approximately how far apart
19   they were when the shooting happened?
20       A.   Eight to ten feet.  Maybe slightly more,
21   because he would have been through the gate.  So
22   maybe 12 feet away from each other.
23       Q.   You mentioned earlier that you saw --
24   when -- you saw his hand and he was tapping the --
25   the trigger area?

Page 66

1        A.   Uh-huh (affirmative).
2        Q.   Did you witness that just briefly, or was
3    he doing that continually?
4        A.   I remember looking -- when Officer Read
5    said, "Keep your finger off the trigger," I remember
6    looking down at his hand, and I remembered his hand
7    going like this.  And I looked back up at him, and I
8    remember he kind of -- he had this body language on
9    his -- on his head as if he was saying, "Yeah, what
10   are you going to do about it?"  That's what I thought
11   his body language was saying to us.
12       Q.   The dialogue that you recall -- so far
13   you've said you remember a few things Officer Read
14   said.  Can you recall any other dialogue between the
15   two that you haven't talked about yet?
16       A.   No.
17       Q.   Okay.
18       A.   Not between those two.
19       Q.   Did you ever hear anything that
20   Mr. Farrand said?
21       A.   Huh-uh (negative).
22       Q.   You could tell he was talking, but it was
23   too low for you to hear?
24       A.   Right.  And he's -- and he's facing away
25   from me, so his -- his voice is carrying the opposite

Page 67

1    direction of me.
2        Q.   Okay.
3        A.   And they weren't, like -- they weren't,
4    like, screaming at each other.  It was -- you know,
5    Officer Read was very polite, you know, just, "Hey,
6    don't -- don't make me do this; I've got a wife and
7    kids."  It's not like he was screaming at the top of
8    his lungs.  He was -- he was -- his voice was
9    elevated, which would be perfectly normal, but he
10   wasn't screaming, as such.
11       Q.   Did you ever get a view of Mr. Farrand's
12   face?
13       A.   No.
14       Q.   The entire time you could just see the
15   back of his head, or kind of at an angle the back of
16   his head?
17       A.   Yeah, I don't remember -- I -- I wouldn't
18   know what he even looks like.
19       Q.   Okay.  Do you recall what he was wearing?
20       A.   Hmm.  It's been a long time.  I know I
21   remembered some things at the night after the event.
22   I -- I don't remember.
23       Q.   Okay.  Do you recall how tall he was,
24   approximately?
25       A.   He seemed pretty average, but he seemed

Page 68

1    stockier, that I recall.  You know, five ten, but
2    maybe 200 pounds.
3        Q.   How fast was he walking towards the gate
4    when he went from the walkway towards the gate?
5        A.   I would say faster than a normal pace.
6    Not running, but not -- not a casual -- you know,
7    just a -- a good walk.
8        Q.   Did you continue to have a vantage point
9    where you could see his arm with the gun?
10       A.   He still would have been almost -- his
11   back would have been to me, yes.
12       Q.   Did you see where he was holding the gun
13   as he was walking towards the gate?
14       A.   As he was walking to the gate it was more
15   down towards his side.  As people move, they don't --
16   you know, their -- their body is going to move,
17   their arms are going to move, their upper body is
18   going to -- their head bobs.  But I don't remember
19   anything out of the ordinary from a normal movement
20   as he was moving towards the gate.
21       Q.   Okay.  Do you recall -- strike that.
22           You mentioned that after you heard shots
23   fired, your view was still focused towards
24   Officer Read at this point?
25       A.   As I moved towards him and -- I remem -- I

Page 69

1    distinctly remember there were two or three gunshots,
2    a slamming of the gate and gunshots.  And the thing
3    that's -- that, again, is hard to understand is this
4    is a moving machine, so to speak.  So when the
5    gunfire is firing, four or five rounds are fired in a
6    period of, again, fractions of seconds, especially
7    apart.  I mean, you're hundredths of a seconds apart,
8    pretty much.  But the gunfire, the slamming of the
9    gate and the gunfire and then silence, is all within
10   a second, that -- that everything is moving, you
11   know, that moving parts again.
12       Q.   When you heard the shots, what were you
13   looking at?
14       A.   What did I...
15       Q.   What were you looking at?
16       A.   I -- I looked at Off -- I was looking at
17   Officer Read.
18       Q.   Could you see his position as the shots
19   were being fired?
20       A.   He was -- he was facing almost directly
21   west, with his gun pointing west towards the opening
22   of the gate area -- or where the opening of the gate
23   is at -- located at, where the gate opens and closes.
24       Q.   You mentioned that he had been pointing
25   the gun towards Mr. Farrand during that entire time?

Page 70

1        A.   Correct.
2        Q.   Were his arms extended in the same
3    position the entire time or were they moving
4    somewhat?
5        A.   When I came around the corner, initially
6    when Officer Read had called in the radio and said
7    the suspect was out front, he had a gun -- he had
8    come out the front door and he had a gun and,
9    obviously, my -- my focus isn't on Officer Read, my
10   -- Officer Read is on my team, so to speak.  So I'm
11   not -- I'm not focused on what he is doing, as much
12   as I'm focused on kind of what our suspect is doing.
13   But at the same time, I'm having to know kind of both
14   places, because I always have to know where he's at,
15   and the only way I'm going to know is if I quickly
16   glance, move, come back.  So I don't know.
17       Q.   Okay.  Do you recall any sudden movements
18   by Officer Read prior to pulling the trigger?
19       A.   No.
20       Q.   Do you recall the expression on his face?
21       A.   No.
22       Q.   Do you recall anything that he said
23   shortly before pulling the trigger?
24       A.   No.
25       Q.   Do you recall anything that Mr. Farrand

Page 71

1    said at any point?
2        A.   Huh-uh (negative).
3        Q.   Was Officer Read in motion?  Were his feet
4    moving when he fired --
5        A.   No.
6        Q.   -- or was he standing still?
7        A.   He was standing.
8        Q.   How long had he been standing still?
9        A.   When -- I remember when I looked at
10   Officer Read, he was already motionless, other than
11   he was standing.
12       Q.   And do you recall the total number of
13   shots fired?
14       A.   And the hard part is, is I don't know --
15   I -- I remember hearing gunfire, the slamming of the
16   gate and gunfire.  And I don't know if it was four
17   shots or five shots that I heard.
18       Q.   We'll mark a document as Exhibit 3.
19            (EXHIBIT 3 WAS MARKED.)
20       Q.   Is this another angle of the walkway
21   between the garage and the front yard?
22       A.   Correct.
23       Q.   And you see the post between the gate and
24   the fence to the right?  Was that the post that he
25   kind of slipped around the corner from and that's

Page 72

1    what obstructed your view?
2        A.   Yes.
3        Q.   And the front left of this picture has
4    kind of a corner to the front corner of the garage,
5    right?
6        A.   Correct.
7        Q.   Was Officer Read, you know, basically at
8    this position, straight forward, slightly back?
9        A.   The best I remember is he was standing
10   almost right on that corner.
11       Q.   Okay.
12       A.   In fact, as I recall, when I -- it's
13   really weird when you think back at some of this,
14   unless you've gone through a similar event, but I --
15   I can almost remember the slide of his gun moving,
16   which if you were standing in a shooting range, you
17   probably wouldn't notice it, but -- and I have my own
18   personal theories, is that, you know, your brain
19   is -- is trying to comprehend so much information so
20   fast that -- I -- I believe that's why it seems like
21   time slows down, is because your brain is actually
22   working really, really quick.  This is my theory.  I
23   could be clear off in left field.
24            And so I -- I remember almost seeing
25   that -- that slide move.  And I remember that a brick

Page 73

```
 1   wall was behind the slide.  But where -- if his hands
 2   were a foot around the corner or if he was all the
 3   way around the corner, I don't know, other than his
 4   arms were extended beyond that wall of the garage.
 5       Q.   After the shots were fired, what did you
 6   do next?
 7       A.   So I had moved across and was over to
 8   where he was at.  And he had crouched down.  And I
 9   asked him, I said, "Can you see him," meaning the
10   suspect.  "Can you see him?"
11           And I remember Officer Read saying, "He
12   pointed his gun at me."  And I remember thinking,
13   "That didn't answer my question.  He can't -- he must
14   not be able to see him."
15           And so I then left where Officer Read was
16   and I took off running around the garage to go down
17   the -- the south side of the property line, to see if
18   I could then look into the backyard to see where this
19   guy had gone.
20           I -- I remember years and years ago being
21   told you -- you never go through -- or go over the
22   same place your suspect just went, because they're
23   anticipating that.
24           And so I thought if I run down the other
25   side of the yard and look in through an area where
```

Page 74

```
 1   he's not anticipating us coming, then I've got the
 2   advantage.  He doesn't know I'm there.  Again, I've
 3   got the advantage.  If I go through the gate, I'm now
 4   what training would say, I'm going through the
 5   fatal -- the fatal funnel.  Every -- I'm going to go
 6   out on a limb and say every cop in the world knows
 7   that you don't go through the fatal funnel.
 8   That's -- that's the bad spot.
 9       Q.   So you mentioned that you went to go
10   around -- did you go back to the area you were at
11   before, or were you going around the south side?
12       A.   No.  So now I'm going around the south
13   side.  I'm going around between the truck and the
14   garage.  I run across the front of their garage, the
15   suspect's garage, and down the west side, which is
16   just -- it's a ground cover area between now the two
17   homes that are to the -- the home that's south of --
18   of the suspect's home and their garage.
19       Q.   You mentioned that Officer Read was in a
20   crouched position.  Do you recall approximately how
21   quickly it was that he got into a crouched position
22   after the shots were fired?
23       A.   Almost immediately.
24       Q.   Okay.  Is that something that you're
25   taught to do, or do you get any sense for why he did
```

Page 75

```
 1   that?
 2       A.   I don't know, other than, looking back at
 3   it, I'm wondering if he was trying to look through an
 4   opening that was in the gate.
 5       Q.   Okay.
 6       A.   That's actually shown on the picture.
 7       Q.   How -- how far crouched?  Like --
 8       A.   He was -- he was down to where one knee
 9   would have either been on the ground or close to the
10   ground.  I mean, he was -- he was down low.  And that
11   can be for many reasons.  I mean, in training when
12   you're involved either in a shooting -- could be in a
13   shooting, if you get in that crouched position, one,
14   you're making your -- you, as a target, become
15   smaller, versus if he stands -- Officer Read is tall.
16   I mean, he's probably six two or -- to six four.  So
17   suddenly he's gone from being over six feet to only
18   three feet, kind of a thing.  So his target --
19   he's -- he's half the size.  Plus, now he's looking
20   through the -- you know, he's trying to get down to
21   see what he can see through the gate.
22       Q.   You mentioned he got into that position
23   immediately after the shots were fired?
24       A.   Yes.
25       Q.   How long did it take before you said, "Can
```

Page 76

```
 1   you see him," after the shots were fired?
 2       A.   It seemed pretty quick.  Because I was
 3   moving towards him, shots were fired, he dropped
 4   down.  I came in behind him on the corner of the
 5   thing, and I said, "Can you see where -- can you see
 6   him?"  Something to that effect.  "Can you see him?
 7   Can you see where he went?"  Something.
 8           And that's when he made the comment, "He
 9   pointed his gun at me."
10           And I thought, "Oh, he must not be able to
11   see him."  And so that's when I took off running to
12   see what I could see in the backyard, from a
13   different vantage point.
14       Q.   And this is all happening within a matter
15   of seconds?
16       A.   Yes, absolutely.
17       Q.   Did -- do you recall anything about his
18   voice, his intonation, when he was saying, "He
19   pointed his gun at me"?
20       A.   That Officer Read?
21       Q.   Yes.
22       A.   He -- he seemed calm, but -- how do I
23   describe his voice?  He was very matter of fact.  The
24   statement seemed just, "Hey, this is what he did."
25       Q.   Yeah.  Was there any pause before he said
```

Page 77

1    that?
2        A.   No, not that I remember.
3        Q.   When you went around the south side of the
4    garage and you came up into the backyard, what did
5    you see?
6        A.   So, on the south side of the property is a
7    wooden fence, again.  The backyards in this area are
8    fairly deep, considering -- or compared to a lot of
9    the backyards.  We'll compare it to my backyard.  It
10   seemed twice as deep as my backyard.
11       But the wooden fence is only -- on both
12   the north and the south side of the suspect's yard,
13   only went partway back.
14       As I came down the south side of the
15   property -- yeah, the south side of the property and
16   there were the vines there, I remember finding that
17   there was something that was covered in vines that
18   was making the vines hump upward.  And I recall
19   thinking that it was like a stump, like somebody had
20   cut off a tree and the vines had grown over the top
21   of it but would elevate me at least a another foot.
22   And so I stood on that so that I could poke my head
23   up over the top and look over the top of that wooden
24   fence.
25       Q.   And what did you see from that vantage

Page 78

1    point?
2        A.   As soon as I got to that point I could see
3    that the suspect was laying on his back.  His head
4    was pointing to the west and he was on his back,
5    sprawled out like this.  And I could see that he had
6    a gun in his -- at -- in his hand, and that's --
7    within just a second or less Officer Read then came
8    into the picture.  Because I'm at the back of the
9    garage, I'm looking now on the west side of this
10   garage.  The suspect is laying on a sidewalk, a patio
11   area on the south side of the home.  But to the north
12   of the garage there's, like, a patio area.
13   He's laying on his -- on his back.  The suspect had a
14   gun in his hand.  And I remember Officer Read coming
15   into view and kicking the gun to the -- to the west,
16   out of his hand.
17       Q.   Mark another photo.
18           (EXHIBIT 4 WAS MARKED.)
19       Q.   This is Exhibit 4.  Is this a view of the
20   patio you were just discussing?
21       A.   Correct.
22       Q.   At this point, are you saying that you
23   were kind of to the right back of this picture a
24   little bit?
25       A.   I would -- so, like, this red star, I

Page 79

1    would have no idea if that was in there or not.
2        Q.   Right.
3        A.   But where the red star would be almost
4    the back of the garage.  In fact, there is a man door
5    that is on the back of the garage right here.
6    Because there was a -- large dog that -- after I
7    made my way back around, a dog came from the backyard
8    someplace, and I actually grabbed hold of him.  The
9    dog was -- I remember thinking was gentle but scared,
10   like he was really nervous.  And yet I just took
11   ahold of his collar and just pulled him into the
12   garage and closed the door.  Because he was a big
13   dog.  It vaguely -- I vaguely remember thinking that
14   it was a Rottweiler.  So it was -- seemed to be a
15   big dog, and I just -- I wanted to get him out of
16   there.
17       Q.   And you mentioned that you saw the suspect
18   lying on the ground.  Which angle was his body
19   positioned when you -- when you first saw him?
20       A.   His head was towards the west, and he was
21   laying on his back.  And as I was looking from the
22   south property line across the back of the garage, I
23   maybe could only see his upper half to a third of his
24   upper torso area.  So maybe from, like, bellybutton
25   to his head, as he was laying on his back.

Page 80

1        Q.   And you mentioned his arms were kind of
2    sprawled out?
3        A.   I remember him -- his right arm being out
4    to his side and the gun was right there in his hand.
5        Q.   Okay.  Was he still gripping the gun?
6        A.   No.  It looked -- it appeared to me that
7    it was open, because when -- and then Officer Read
8    immediately came up and kicked it out of his hand.
9        Q.   Right.  After that, what did you do next?
10       A.   After that what?
11       Q.   After -- after you -- so after you saw him
12   kick the gun out, at that point was that when the dog
13   came and you --
14       A.   So, he -- he kicked the gun out of his
15   hand.  And I remember thinking, Officer Read has gone
16   in; I need to be there.  And so I jumped down and I
17   ran around, back the south side of the garage, across
18   the front of the garage and back through the gate.  I
19   remember that -- this is going to sound really funny,
20   but I remember something happened, but I don't
21   remember what, and I was told later that I had
22   fallen, that as I came around the front of the garage
23   I tripped and fell and I tumbled, rolled, got back
24   up.
25           And Officer Casey told me, he said, "I

Page 81

1    even asked, 'Are you okay?' And you said, 'I'm
2    fine,'" or something, and then ran into the back. I
3    don't remember any of that, other than when I got
4    home, my hands were scuffed up, my knee was scuffed
5    up, but I don't -- I still don't remember ever
6    falling, which is weird. But I'm sure I'm so focused
7    on trying to get to Officer Read, is the only thing I
8    can think of, I -- I didn't really care. It
9    didn't -- it didn't hurt. I just was going in.
10    Q.   Right. During this entire incident did
11    you fear for Officer Read's life?
12    A.   Absolutely.
13    Q.   Was it during the entire time frame or
14    were there portions where it felt like it was
15    deescalating?
16    A.   I didn't feel like -- when I came around
17    front -- I don't believe it ever deescalated, because
18    nothing really changed other than the suspect --
19    he -- he wouldn't -- he didn't comply.
20    Again, you know, most people, when the
21    cops show up, the last thing you would want to do is
22    bring a gun out of your house and confront them with
23    it.
24    We had been told by -- my dispatch had
25    said that the wife had said he had returned home and

Page 82

1    put the gun away, and yet here he's standing -- that
2    he had put the gun away in the safe, and that now
3    he's standing in his front yard holding a gun.
4    We're going, "Where did the gun from if he
5    put the gun away?"
6    And he -- and dispatch -- I remember them
7    saying that the wife had told him -- or had said, "He
8    knows that the police have been called." So he knew
9    we were there. He knows we're coming and yet chose
10    to still confront us with -- with a gun tells me that
11    something is going on. He's not -- he's not here to
12    play the game by any rules, and holds all the cards.
13    Q.   Did -- did you have any impression as to
14    why he was heading towards the gate?
15    A.   I have my own thought that he was -- my
16    thought was -- is that, okay, he's not -- he's done
17    talking to us and I'm out of here, kind of a thing.
18    Q.   But you still felt that the tension was
19    not deescalating?
20    A.  No. Absolutely not.
21    Q.   Do you recall...
22    A.   Because he -- because he wasn't -- he
23    wasn't giving up. In -- in other calls that I've had
24    where we call somebody out of a vehicle, we call
25    somebody out of a home -- I went on a call several

Page 83

1    years ago where a guy -- it had been reported that he
2    had fired a shot in his house, and when we called --
3    we called into the home, and I spoke to him on the
4    phone and I told him he needed to come out, to leave
5    the gun in the home and comply with what officers
6    told him to do on the outside, which he did. He left
7    the gun in the home, he came out, he -- you know,
8    officers gave him commands and he complied with all
9    of that.
10    And Officer Farrand -- or Mr. Frandland --
11    or whatever his name is, sorry -- he didn't comply.
12    He didn't do anything. I mean, "Keep your finger off
13    the trigger," and he -- he starts bouncing it as if
14    to antagonize or -- or make a point of, "I can do
15    whatever I want."
16    When -- when a scene deescalates is when
17    the suspect comes into compliance and goes, you know,
18    "Yeah, I've got myself in a bad situation here and I
19    need to give up," and he drops the gun over on the
20    grass and moves away from it. That's deescalating
21    it.
22    But by holding onto the gun and walking
23    away, knowing that we're there to figure out what's
24    going on and why he's wanting to kill his friend or
25    something, things aren't deescalating very fast. It

Page 84

1    sounds like things are spiraling out of control more
2    than they are deescalating.
3    Q.   From when he left the walkway to the front
4    yard -- from the front door towards the -- the
5    driveway -- from when he left that position where he
6    had been talking with Officer Read until the shots
7    were fired, about how many seconds was that?
8    A.   So where he was standing in the arc --
9    Q.   Right.
10    A.   -- and then he walks across the front yard
11    to the gate and Officer Read fires, how long
12    between --
13    Q.   Yes.
14    A.   -- the arc? Eight to ten seconds.
15    Q.   Okay. And -- okay. You mentioned that
16    his body language conveyed to you an impression that
17    he was antagonizing the situation a bit?
18    A.   Uh-huh (affirmative).
19    Q.   So you mentioned the finger tapping the
20    trigger?
21    A.   (Witness nods head.)
22    Q.   You also mentioned his head motions?
23    A.   His body seemed to just, you know -- I
24    remember him, like, doing one of these numbers. I
25    don't know what he said. I don't know if there

Page 85

1  was -- if there was dialogue to Officer Read, if he
2  said something to him, but, you know, it's just -- it
3  doesn't seem normal to me that someone would -- I
4  know I -- personally, if the cops showed up on my
5  front lawn, I'm not going to do that, because I know
6  what -- this is the outcome that it's going to lead
7  to. Things are not going to turn out very good.
8      Q.  So you mentioned his head motion and his
9  shoulders were moving a little bit as well?
10     A.  Uh-huh (affirmative).
11         MS. WHITE:  Is that a yes?
12         THE WITNESS:  Yes.  Sorry.
13         MR. BURR:  Thank you.
14         MS. WHITE:  It's okay.
15     Q.  (BY MR. BURR)  Do you recall how many
16  times Officer Read told him to put the weapon down?
17     A.  How many times what?
18     Q.  Officer Read him told him to put the
19  weapon down?
20     A.  I don't know.
21     Q.  Was it multiple times?
22     A.  I don't re -- I don't recall.
23     Q.  Okay.
24     A.  The only two things I remember in their
25  dialogue was that Officer Read had told him, "I've

Page 86

1  got a wife and kids; don't make me do this," and to
2  "Keep your finger off the trigger."  And any other
3  dialogue that he had, I -- I don't remember it.
4      Q.  Do you not remember just because of the
5  passage of time, or could you actually not hear it at
6  the time?
7      A.  That's a good question.  I -- I -- I don't
8  -- it -- it didn't compute, I guess.  If -- if he
9  told him to put the gun down, which I would find
10  highly unlikely, that he would have had to have said
11  that.  I mean, it's -- it's what our training says,
12  but I would have to speculate, because I don't know.
13     Q.  All right.
14     A.  I don't remember.  I'm sorry.
15     Q.  Did anything in Mr. Farrand's movement
16  give you the impression, as he was heading towards
17  the gate, that he was trying to leave the scene?
18     A.  Besides the fact that he was leaving, he
19  was walking out of -- walking from us and wasn't
20  going to -- you know, he -- he wasn't going to allow
21  us to take him, because he was obviously leaving.
22     Q.  Okay.
23     A.  Again, he is somewhat in control, and
24  we're almost out of control, because we're having to
25  react to everything he does, and he can do whatever.

Page 87

1  We just have to react to it.  Again, we have to abide
2  by the rules and, again, he doesn't.
3      Q.  Now, you mentioned that Officer Read
4  stated, "He pointed the gun at me."  Are those the
5  words that he used?
6      A.  Uh-huh.  Right.
7      Q.  Did you have any reason to disbelieve him?
8      A.  Absolutely not.
9      Q.  Do you believe he was telling the truth?
10     A.  I do.
11     Q.  Are there any other contextual clues as to
12  why you think he was telling the truth?
13     A.  That Officer Read and I have known each
14  other, up to that point, probably eight years, and
15  have -- and have worked together numerous times, and
16  I have found that on all of those occasions he's very
17  accurate in -- in his recollection of what he does.
18  I mean, his reports are what happened.
19     Q.  Do you think that Officer Read feared for
20  his life?
21     A.  Absolutely.
22     Q.  Did you get that impression from his body
23  movement?
24     A.  Oh, I -- I believe all of us were in
25  the -- felt the same way.  When -- when a person that

Page 88

1  is obviously not thinking rationally, is not -- he's
2  not thinking clearly because he's -- between him and
3  his wife -- and this is information that I found out
4  after the fact -- that he and his wife had this
5  argument, this fight -- we had been dispatched
6  because they had had this argument, fight, and comes
7  up with the rational decision that "I'm going to get
8  a gun and go kill this other guy" -- nobody out there
9  is going to look at it and go, "Oh, yeah, he's no
10  threat."  We all felt threatened.  Even though this
11  suspect never pointed the gun at me, and I don't
12  believe even knew I was there, I still feel
13  threatened, because if he would have shot
14  Officer Read, I'm going to be his next victim because
15  I'm going to start shooting.
16         Or if he would have made a -- a
17  reaction -- if he would have done something while
18  standing in that arc way of the sidewalk in the front
19  yard and started to raise his gun, I would have shot
20  him too, due to the fact that that threat is probably
21  going to be going towards Officer Read and I am --
22  I'm committed to protecting my fellow officers, the
23  rest of the community.  What else is he going to do?
24     Q.  Did you get the impression that -- strike
25  that.

Page 89

1     In your experience as a police officer,
2  have you been a part of any other situation where you
3  felt like you were going to die?
4     A.   Absolutely.
5     Q.   How many times?
6     A.   Let me have you define what you mean by
7  "going to die."
8     Q.   That it was a serious risk that you could
9  be killed.
10    A.   A couple, yes.
11    Q.   Does this incident stand out in your
12 memory partly for that reason?
13    A.   This one does.  In my earlier career I had
14 a lady that -- it was almost identical to this one,
15 other than she was suicidal -- had been at home.  Her
16 friend had been talking to her on the phone, and the
17 woman had made some comments that she was going to
18 kill herself.  So her friend had called the police.
19    We responded and knocked on the door.  And
20 I could see the lady moving on the inside of her
21 home.  And she kept telling me to go away, go away.
22 Long story short, eventually I just -- I tried the
23 doorknob, and it was open.  So I pushed the door open
24 and I said, "Just come out and talk to us.  Could you
25 just come and talk to us and tell us why you're

Page 90

1  having such a bad day?"
2     She stepped into a doorway that happened
3  to be a half bath -- at the time I didn't know -- but
4  she stepped into a doorway to where half of her body
5  disappeared, that I could just see a little bit of
6  her.  And she stepped back and she had a gun.
7     And same thing, she come out with this
8  gun; she's got it pointed at the ground.  I'm talking
9  to her.  And there's that moment of it's about to go
10 bad.  In fact, I had even called my dispatch on the
11 radio and I said, "Call my supervisor and tell him to
12 respond," because I knew I was going to shoot her.
13    And she -- she put the gun down.  And she
14 started walking towards me and I grabbed her and I
15 threw her down on the ground and, thankfully, I
16 didn't have to kill her.
17    And I remember all the thoughts that went
18 through my mind that day of, "I'm going to get
19 crucified in the news media; the attorneys are going
20 to have a heyday with this one," you know, just those
21 stupid thoughts that you have.
22    And -- so this one with Officer Read
23 brings some of those thoughts back.  I've been in a
24 couple car crashes in my career that for split
25 moments you think, "Holy cow, you know, this is going

Page 91

1  bad in a hurry," and then, thankfully, it didn't.
2     I've had other times foot chases, where
3  you are chasing somebody.  I mean, this -- this
4  career has -- is an interesting one.  And the general
5  public, as a whole, especially people who just go to
6  work and they work at McDonald's, they work at the
7  hospital, they sit behind a desk and work on
8  computers, they don't understand how fast stuff goes
9  to crap out here.  And we're just trying to do our
10 best.  We just want to go home.  I want to go home to
11 my wife, my three kids.  I'm just trying to make a
12 living like the guy at McDonald's, provide for my
13 family.  And yet I love my job.  I love working law
14 enforcement.
15    And this -- this event had a big impact on
16 me.  I kept going for another year.  And I was to the
17 point to where I knew I could retire, and I said,
18 finally, "I don't need it anymore.  People don't
19 appreciate me.  They don't -- they don't care about
20 us.  They don't understand what we're going through
21 and so I'll -- I'll go do something else, because I
22 can, thankfully."
23    Q.   Do you -- do you believe that if the
24 suspect had put the weapon down, that it would have
25 immediately deescalated the situation?

Page 92

1     A.   Absolutely.  This -- this would have had a
2  whole turn of events.  I can't even tell you how many
3  times I have thought, "I should have tried to rush
4  him and Taser him," so that we wouldn't had to have
5  killed him.
6     Because the last thing in -- in my police
7  department -- I can't answer for every cop out there,
8  but in my police department at Centerville, I do not
9  have an officer that works for Centerville Police
10 Department that would ever want to kill someone.
11 That -- there's a lot of factors I believe would have
12 changed this entire thing, and yet Officer Read,
13 Officer Casey, myself -- in my opinion, I feel like
14 everybody looks at us and we're the bad guys.
15    Q.   Do you feel that you're --
16    A.   We're -- we're at fault for this.  It's
17 our fault that he died, and yet we're trying to do
18 our best.  We go to the training classes.  We go to
19 firearm classes.  We go to how to deal with mentally
20 ill.
21    The -- the bookwork or the -- you know,
22 these -- the -- the scenarios are -- are the perfect
23 scenario.  But society doesn't understand.  It -- it
24 spins out of control in a second and then it gets
25 analyzed for years.  And all we're -- and then I feel

Page 93

1    like all we are is just told of what we did wrong,
2    and yet we didn't hold any of the cards. We're not
3    the ones that made the decision. This -- this
4    suspect made us make the decision. He held all the
5    cards, in my opinion. If he would have put that gun
6    down, we would have walked over to him, we would have
7    put him in handcuffs, would have taken him over, sat
8    him on a chair and said, "Tell us what's going on.
9    Why are you having such a bad day? What's going on
10   with you and your spouse that, in your rational
11   thinking" -- that in our thinking is nonrational --
12   "do you feel like the best course of action is for
13   you to drive over and kill your friend, for whatever
14   reason?"
15        Q.   Do you recall having -- at other times in
16   your career instructing a suspect to drop a weapon?
17        A.   Uh-huh (affirmative).
18        Q.   How many times have you done that?
19        A.   Three or four. I mean, a couple of them
20   were with knives. Some were -- you know, I had the
21   girl in my early career that had the firearm.
22        We had one where there was a suspect that
23   had -- had a gun in the car, you know, they
24   brandish -- you -- you hear about those on the -- on
25   the news where somebody brandishes a gun, we pull

Page 94

1    them over and you instruct them to get out of the
2    car, leave the weapon in the vehicle, and it's rare
3    that people just refuse to comply.
4         I mean, in -- in our rational thinking as
5    cops, we look at them and we go, "You can't do this.
6    We're the police. We're telling you to do it and you
7    are supposed to do it." Because that's how the rules
8    are. The rules say you comply. And yet in this
9    case, we would talk to him and say, "Keep your finger
10   off the trigger," and he would tap it. He's breaking
11   the rules.
12        You know, he comes out of the house --
13   and -- and I would dare say anybody in this room or
14   anybody in a jury or anybody in society that's
15   rationally thinking knows, if the police are standing
16   on my front porch or in my front yard, you don't pick
17   up the gun that your wife claimed that has been put
18   away in the -- in the safe and walk out the front
19   door and confront the police that you know are out
20   there, because it's not going to end pretty.
21        Q.   So you -- when you instruct a suspect to
22   drop a weapon, you expect them to comply because of
23   your understanding of the rules?
24        A.   Yeah. That's what we want them to do,
25   because we know if they do, that's when it starts to

Page 95

1    deescalate. That's when -- we're not -- we know that
2    we're going to get to go home tonight.
3         Q.   Are you aware of any toxicology report on
4    the suspect?
5         A.   I have not seen a toxicology report. Over
6    the years I have vaguely heard some stuff. I -- I
7    vaguely remember that he had been drinking alcohol on
8    the day of the event. And in my training I know that
9    alcohol -- that -- that -- you know, they say in
10   training, the very first thing that -- that is
11   affected is your good judgment when you consume
12   alcohol. And I don't have any idea what -- you know,
13   if he had had a little bit or a large amount, if he
14   had been using drugs or anything like that, I don't
15   know.
16        Q.   Right. I've seen a few notes in the
17   record about the concept of -- that he was
18   potentially suicidal, and someone mentioning the word
19   "suicide by cop." Did you hear any of those terms in
20   connection with this incident?
21        A.   I vaguely remember something from dispatch
22   now. You know, that's the hardest part with this,
23   is -- because this is my actual first involved
24   shooting where I've been this close. I remember
25   asking one of the sergeants on scene, I said, "Well,

Page 96

1    do I need to pull a case number? Do I need -- do you
2    want me to do the initial report on this?"
3         And he said, "You do nothing. We're going
4    to take your statement. We're going to take you down
5    and do a video statement and record it and all that,
6    and that is your report."
7         And to this day, as of right this moment,
8    I have never seen a report, I have never read a
9    report. And so it becomes very difficult that here
10   we are three, three and a half years later, to try
11   and remember some of the final -- finer details that,
12   in the big scheme of things, you're not -- you're not
13   going to remember. You can't remember them, and yet
14   you remember other little things.
15        You know, I -- I told Mrs. White that --
16        MS. WHITE: Don't talk -- I'm going to
17   instruct you not to talk about what we've discussed.
18        THE WITNESS: Okay.
19        MR. BURR: That's fine.
20        Q.   Do you have a general familiarity with the
21   penal code, various crimes and misdemeanors that are
22   in there? Do you -- is that part of your
23   responsibility, to know some of the actual crimes
24   that can be committed?
25        A.   From time to time we know -- that I know.

Page 97

1  **Like, statistical-wise, is that what you're asking?**
2      Q.  No, no.  I'm talking about what the crimes
3  are, you know, like -- like, this is what assault
4  means, this is what, you know, different crimes mean.
5  Do you have a general understanding of those?
6      **A.  Oh, yeah.  Yeah.**
7      Q.  I'm not asking for your legal
8  understanding of those.  I'm just asking for, as a
9  police officer, when you're referring to various
10 actions that a suspect might take, you know, which
11 ones are --
12     **A.  Oh, yeah.**
13     Q.  -- and which ones are not?
14     **A.  Like disorderly conduct or brandishing a**
15 **firearm or aggravated assault or something like that.**
16 **We have a -- a general knowledge of them.**
17         **Many times, as a police officer, you know**
18 **that a crime has occurred, but the -- subsection 3,**
19 **paragraph 4 in that -- you would have to look it up**
20 **and read it.**
21     Q.  Right.
22     **A.  You know that -- that -- there's numerous**
23 **investigations, crimes that I've been involved in**
24 **over the years that we refer to the Utah State**
25 **Criminal Code book and we have to read it and say,**

Page 98

1  **Okay, this guy committed an armed robbery, but at**
2  **what level and what are -- what's everything that we**
3  **can look at here that he committed while doing this**
4  **armed robbery, as such.  And so you have to read the**
5  **finer print to -- to make sure that you're -- that --**
6  **yeah, you just have a general knowledge.**
7      Q.  Okay.  You mentioned earlier that when he
8  refused to drop the weapon when instructed to do so,
9  that that was against the rules.
10     **A.  Uh-huh (affirmative).**
11     Q.  As a police officer, you expect someone to
12 do that, regardless of whether they are on their own
13 property or not?
14     **A.  Correct.**
15     Q.  What about just the fact that he left the
16 house with a firearm in his hand to confront police,
17 was there anything in that that you think is
18 problematic?
19     **A.  Well --**
20         MR. CUMMINGS:  Objection.  Assumes facts.
21         THE WITNESS:  I -- I didn't hear what you
22 said.
23         MR. CUMMINGS:  I said, "Objection.
24 Assumes facts."
25         MS. WHITE:  You can answer.

Page 99

1          THE WITNESS:  So if a -- if a suspect,
2  like in this case, has left his home and he
3  carries -- he is carrying a firearm, it's not illegal
4  to have a gun, but if you are using it or have -- are
5  intending to use it unlawfully, it's illegal.  If
6  you're intoxicated, under Utah State law, and in
7  possession of a firearm, it's illegal.
8          You -- you know, if he walked out of the
9  house and started waving it around the neighborhood,
10 it's illegal.  His actions serves no legitimate
11 purpose.  I mean, you could -- you could look at from
12 disorderly conduct to -- you know, he comes out of
13 the house, the police are out there.  We're looking
14 at it as suddenly he's showing aggression to us.  Is
15 it -- he's on the fine line of committing aggravated
16 assault on a police officer, potentially.  You know,
17 let's -- let's pull the book out and let's read the
18 fine print to see if it really complied -- if it
19 really applies or not.
20     Q.  So this is something -- this is a
21 situation that you felt could have --
22     **A.  Absolutely.**
23     Q.  -- constituted aggravated assault on a
24 police officer?
25     **A.  In fact, the -- I wasn't there the moment**

Page 100

1  **he walked out of his house, but I've often thought,**
2  **what kept officers from shooting him the second he**
3  **opened the door and came out with the gun.  Because**
4  **in my experience in 24 years full-time and two years**
5  **as a reserve, when a guy comes out of his house and**
6  **he's carrying a gun and he knows the police are out**
7  **there, because dispatch had told us that he knew we**
8  **had been called, and he knew we were in route to -- and**
9  **he comes out of his house with a gun, he's wanting a**
10 **gunfight.**
11         MR. BURR:  Okay.  All right.  Let's take a
12 break.
13         THE VIDEOGRAPHER:  Off the record.  The
14 time is 11:30.
15         (A break was taken from 11:30 a.m. to
16         11:35 a.m.)
17         THE VIDEOGRAPHER:  Returning on the
18 record.  The time is 11:35.
19         MR. BURR:  Thank you.  I will pass the
20 witness.
21             EXAMINATION
22 BY MR. CUMMINGS:
23     Q.  Good afternoon.  I don't have if you
24 are --
25         (Discussion off the record.)

Page 101

1    Q.   Now, I don't know if you all are like
2  judges, but do you still go by Officer Thomas or is
3  it Mr. Thomas?
4    **A.   I do not.**
5    Q.   Okay.
6    **A.   I -- you kind of lose the title when**
7  **you -- you're out of the career.  Some people**
8  **would -- well, the kids still call me Officer Thomas.**
9  **I did different assignments in my work.  I worked a**
10 **lot with kids in -- ten years ago, and so I got to**
11 **know a lot of kids.  So now when they see me and**
12 **they're in their 30s and they have kids, they still**
13 **call me Officer Thomas.**
14   Q.   I think with -- with lawyers, whenever
15 judges retire, they will always be judges to lawyers
16 so -- do you mind if I call you Officer Thomas for
17 this deposition?
18   **A.   That's fine.  Thank you.**
19   Q.   Okay.  My name is Robert Cummings.  I
20 represent Molly Farrand, the wife of Vincent Farrand,
21 the decedent here.  I just want to go over some --
22 some general rules.  Kendall laid out some initially,
23 but I just want to make sure we're operating on the
24 same playing field here.
25       There is nothing that would prevent you

Page 102

1  today from providing honest and accurate testimony,
2  correct?
3    **A.   Correct.**
4    Q.   So you are not on any drugs, alcohol or
5  any mind-altering substances?
6    **A.   No.**
7    Q.   Are you on any prescriptions or other
8  medication today?
9    **A.   No.**
10   Q.   You understand that this lawsuit doesn't
11 necessarily pertain to you or Centerville Police
12 Department directly, correct?
13   **A.   That's what I have been told, correct.**
14   Q.   Now -- and that it involves insurance,
15 right?
16   **A.   That's my understanding, yes.**
17   Q.   Before today you testified that you really
18 didn't know American General; is that right?
19   **A.   I don't recall ever -- I've never -- the**
20 **best I can remember, I've never done any business or**
21 **anything with them, so...**
22   Q.   So is it fair to say that before today you
23 hadn't spoken with anybody from American General?
24   **A.   No, I have not.**
25   Q.   Before today had you spoken with Kendall

Page 103

1  here?
2    **A.   I have not.**
3    Q.   What about a woman named Diane Wizig?
4    **A.   I don't think so.**
5    Q.   Have you heard of the law firm of Edison
6  McDowell before today?
7    **A.   Who?**
8    Q.   Edison McDowell.
9    **A.   No.**
10   Q.   So it's fair to say that you haven't
11 spoken with anybody associated with Edison McDowell
12 before today?
13   **A.   Right.**
14   Q.   Do you know of an organization called
15 Curry and Associates?
16   **A.   No.**
17   Q.   So it's fair to say that you haven't
18 spoken with anybody associated with Curry and
19 Associates, then; is that correct?
20   **A.   Correct.**
21   Q.   After the shooting that occurred here --
22 strike that.
23       There was a -- a prior lawsuit involving
24 this -- this shooting.  Do -- do you remember that
25 lawsuit?

Page 104

1    **A.   I know of it, yes.**
2    Q.   And is it your understanding that that
3  lawsuit has been resolved?
4    **A.   Correct, that's what I've been told.**
5    Q.   Okay.  After the shooting that occurred
6  here and the resolution of that prior lawsuit, what
7  was the next time that you spoke with someone about
8  this case other than your counsel?  About the
9  shooting, I should say.
10   **A.   As for somebody in a professional basis?**
11   Q.   Other than -- yeah, general conversations
12 with friends or family, anything along those lines.
13   **A.   I really haven't had any -- you know, I**
14 **had my initial interview.  I talked to Miss White,**
15 **and she had some people there that day when we**
16 **visited.**
17   Q.   Okay.  I'm just going to pause you here.
18 One ground rule that I forgot is, I may ask a
19 question and then counsel may object.  Generally, the
20 presumption is that you will -- you will still answer
21 the question unless Miss White instructs you not to
22 answer.  One of the bases upon which she'll tell you
23 not to answer is attorney-client privilege.  I have
24 no right to anything that you all discussed and,
25 frankly, I don't want to know who was there.  You

Page 105

1  know, we can get into some fun, philosophical
2  questions about the scope of the attorney-client
3  privilege. I -- I don't want any of those
4  conversations, who were there, so --
5      **A.  Yeah.**
6      Q.  -- anything with her, just completely put
7  that to the side.
8      **A.  Yeah, I -- I -- I just want -- I don't**
9  **want to hide anything.**
10     Q.  Sure.
11     **A.  I'm not hiding anything and so that's why**
12 **I say, you know, I had a conversation with her and**
13 **there were some people there. I don't remember who**
14 **those people are. I trust that she wants them there**
15 **or they wouldn't have been in the room with me.**
16     **My -- I was instructed that in -- even my**
17 **chief, if I were to sit down and shoot the breeze in**
18 **his office one day and he asked me questions about**
19 **it, I have been instructed that I need to get her on**
20 **the phone and she's a part of that conversation.**
21     **I had one other occasion where a**
22 **supervisor started to bring some things up about it,**
23 **and I ended the conversation with him.**
24     Q.  Okay. And I --
25     **A.  So...**

Page 106

1      Q.  Just to -- to kind of give you the
2  10,000-foot level here on what my perspective is.
3  You mentioned that you didn't want to hide anything.
4  I kind of want to give you an understanding of -- of
5  what I'm interested in here.
6      The background on this is that there is a
7  lawsuit over an accidental death and dismemberment
8  policy that Molly had on Vincent's life. And now
9  that his life was taken, she put a claim in for that
10 policy and it was denied. And so the question is
11 whether American General -- and these are my words --
12 American General had a -- has a legal basis for
13 denying that claim or whether they should have paid
14 out the claim.
15     **A.  I understand.**
16     Q.  And so we're probing the -- the
17 circumstances of the shooting, your understanding of
18 the shooting and stuff of that nature to determine
19 whether American General acted properly as an
20 insurance company in denying that claim.
21     Is that -- does that make sense to you?
22     **A.  It does.**
23     Q.  And so there is no -- and I'll leave this
24 to Miss White, but there is no, you know, liability
25 as to you. You are what we call a percipient witness

Page 107

1  here, and your information is going to educate us on
2  determining whether American General violated any of
3  their duties to Molly Farrand. Okay.
4      So with that understanding, based upon
5  your knowledge, sitting here today, have you ever had
6  a conversation that would be relevant to this
7  lawsuit?
8      **A.  Outside of the ones I've already said?**
9      Q.  Yes. Yes.
10     **A.  No.**
11     Q.  Now, following the shooting that occurred
12 here, did you do any independent investigation to
13 determine whether Mr. Farrand was committing a crime?
14     **A.  My -- I was told that my responsibility**
15 **was a witness of the event and that I was not**
16 **involved in the investigation. I know most**
17 **investigations of this nature would entail, you know,**
18 **looking at maybe phone messages, text messaging,**
19 **mailing. They look at Internet usage and what**
20 **they've been doing there. I had -- I -- I didn't**
21 **contribute to any of that, no.**
22     Q.  Okay. And as part of that, you know, the
23 officers that are involved in that investigation, you
24 would assume that they might do some research,
25 including --

Page 108

1      **A.  Oh, yeah.**
2      Q.  -- legal research into statutes of the
3  potential crimes committed, correct?
4      **A.  Yeah.**
5      Q.  And you mentioned that even in your --
6  your job, if you're investigating, you might have to
7  go to the code books -- and when I say "code books,"
8  you know what I'm referring to, correct?
9      **A.  Correct.**
10     Q.  You might have to go to the code books and
11 look up a subsection, you know, 6_J, to determine
12 exactly what crime might have been committed,
13 correct?
14     **A.  Correct.**
15     Q.  Is it your understanding that those laws
16 are uniform across all 50 states?
17         MR. BURR:  Object to form.
18         THE WITNESS:  I -- I don't -- I don't
19 think that they are uniform on all 50 states.
20 Every -- every state would have -- there are probably
21 some laws that are similar, you know, that --
22 shoplifting, for instance, you know, it's illegal in
23 Utah, it's illegal in California and it's probably
24 similar, but I don't know what the finer details of
25 homicide or child abuse are in New York compared to

Page 109

1  Utah, or if they're identically the same or uniform
2  or not. I don't know.
3      Q.   (BY MR. CUMMINGS)  Or to take your -- the
4  two states you used, California and Utah, and
5  considering a general understanding of political
6  makeup, gun laws might be markedly different between,
7  say, California and Utah.
8      A.   Yeah.
9      Q.   Do you know if the -- the gun that
10  Officer Read kicked away from Vincent's body, whether
11  it was loaded?
12      A.   I don't know.
13      Q.   Do you know if there was a bullet in the
14  chamber?
15      A.   I don't know.
16      Q.   Now, following the shooting, there's --
17  there's an investigation under Utah law when there is
18  an officer-involved shooting.
19      A.   Yeah.
20      Q.   What's your understanding of -- of the
21  scope of that investigation?
22      A.   The question is vague, so I would have
23  to --
24      Q.   And let me -- let me rephrase that, right,
25  because whenever I said it -- "the scope" suggests

Page 110

1  that -- the scope of the investigation and who they
2  talked to, et cetera.
3           I guess the better question -- or the
4  question I'm interested in is, what's the goal or
5  target of that investigation?  What does the
6  investigation hope to achieve?
7      A.   The goal in this case, in my opinion,
8  would be to determine the wrongdoing on anyone's
9  part, whether that's the officer that pulled the
10  trigger, the officers that were also in -- there
11  involved, the wrongdoing of the suspect.  I mean,
12  they are going to look at all aspects of it -- or I
13  would hope that they look at all aspects of it.
14      Q.   Have you read one of those finalized
15  reports?
16      A.   I have not.
17      Q.   Okay.  So you wouldn't know kind of the --
18  if the district attorney or the investigative
19  attorneys start with the presumption that a homicide
20  occurred, and then analyze whether an affirmative
21  defense, such as lawful use of deadly force, applied
22  like that?
23           MS. WHITE:  Objection.  Speculation.
24           THE WITNESS:  The only -- the only thing
25  that I have knowledge of is what I have been told.  I

Page 111

1  have not had a letter sent to me where somebody said,
2  "Hey, this is what's going on," other than the -- we
3  were -- I was told that Officer Read's shooting was
4  justified by the district -- or by our county
5  attorney, that after the investigation was completed,
6  that they had determined that he was -- it was
7  justified.
8           To what other extent that they went to or
9  what their investigation was, what they looked into,
10  who they interviewed, you know, I -- I know of some
11  people that they interviewed, only because I either
12  heard it or I would assume that they were
13  interviewed, you know, because they were -- you know,
14  they -- I know they said that they had canvassed the
15  neighborhood, they talked to neighbors.  Who they
16  were, I have no idea.
17      Q.   (BY MR. CUMMINGS)  Sure.
18      A.   But I know they talked to -- to one
19  gentleman that we deal with occasionally that lives
20  on that street that had provided some bad
21  information.  And, you know, a couple of the guys
22  were pretty upset about that, or mad.  And so -- but,
23  yeah, I didn't have any involvement in it.  I was
24  instructed that I was not to be involved in it
25  because I am a witness in an officer-involved

Page 112

1  shooting.  I was not going to taint the investigation
2  process.
3      Q.   Now, you used the term "justified," saying
4  that the investigative authorities found the shooting
5  justified.  What does that word mean to you?
6      A.   It means that he had legal justification
7  to use deadly force to protect himself or others from
8  immediate harm.
9      Q.   Would it be fair to say that he reasonably
10  believed that his life or another's life was in
11  danger?
12      A.   Yes.
13      Q.   Have you ever been called by dispatch to a
14  call involving a family member?
15      A.   A call involving my family member?
16      Q.   Yes.
17      A.   Yes.
18      Q.   Can you give me the -- kind of the
19  circumstances on the call?
20      A.   At the time I didn't know, but I assumed
21  it was.  I -- we had a -- it was actually a medical
22  call.  And a call came out that an elderly male had
23  been hit in the face with a -- with a saw, and they
24  gave the address.  And I went, "Holy cow, that's my
25  brother's house, and this is going to be my dad."

Page 113

1      So I responded. I was the first one on
2 scene. And my dad had been using a -- a grinder
3 blade that -- at my brother's house they had -- he
4 had poured some cement and it had, like, little rough
5 areas that if you walk barefoot on, it -- it would
6 literally scrape your skin. And so he was grinding
7 those little rough things off.
8      Somehow the blade disintegrated, came
9 apart, caught it and flipped it up, hit him in the
10 face and split him from the center of his lip to
11 almost his ear. It took out five of his teeth, broke
12 his jaw. And when I arrived on scene, he was
13 kneeling on the ground, holding his face, and the
14 blood was literally dripping off of his arms. And,
15 long story short, took him to the hospital and after
16 about 18 months to two years, he's back to normal.
17 So pretty -- it was rough, but I had a job to do.
18    Q. Yeah, and I totally understand that. I'm
19 glad to hear that he's doing all right. Hopefully he
20 has you doing the sanding next time.
21      I -- I just want to ask about that of --
22 if I -- you will indulge me a little bit. When you
23 received that call and you realized that it was your
24 father -- or a family member -- did it seem to impact
25 you differently than a call where you don't know who

Page 114

1 the subjects are?
2    A. Yes and no, because I knew I had a job to
3 do. If I would have allowed it to impact me like
4 some, panic sets in and you react differently. And I
5 have, over the years of dealing with fairly graphic
6 things -- I mean, I've had -- I've had kids ask me
7 what's the worst thing I've ever seen, and I
8 literally turn to them and I say, "You don't want to
9 know."
10    Q. Yeah.
11    A. Because I have seen things and experienced
12 things in my career that I hope no one ever has to
13 experience.
14      And so, yeah, it -- it affects you
15 differently. I -- in fact, I'll even go one farther
16 than -- than this story.
17      One day I was walking to my office and our
18 detectives were looking at a video. And they were
19 trying to identify a suspect on a video that had
20 apparently been inadvertently given a wallet that --
21 that had been left on the counter of a -- of a store.
22 And this little boy picks up this wallet, hands it to
23 this man on the video, and the man on the video goes,
24 "Oh, okay," and sticks it in his pocket, does a
25 couple other things and then walks out the door.

Page 115

1      And they -- you know, they are going,
2 "Wow, if we could figure out who this guy is so we
3 could contact him."
4      And I walk over and I looked at the video
5 and I'm, like, "Goll, this guy kind of looks kind of
6 vaguely familiar."
7      And as he walks out and gets in his truck,
8 and as he backs the truck out on video, I recognize
9 that it's my brother. And I'm going, "This is
10 fantastic. Now what do I do with this information?"
11    Q. Yeah.
12    A. So I walked into my chief's office. I
13 didn't go to my detectives, because I didn't know
14 what to do. I walked into my chief's office with the
15 printout of the registration of the truck and my
16 brother's driver's license, and I said, "Here is your
17 suspect."
18      And my chief goes, "How do you know this
19 guy?"
20      And I said, "It's my brother." That was
21 difficult. And to this day my brother has no idea,
22 other than, you know, law enforcement, they went,
23 they dealt with him. And I was saddened by it, but I
24 have never said a thing to him. And I still love him
25 as my brother.

Page 116

1      But my career -- I have a job to do, and I
2 won't allow my personal feelings and biases to
3 interfere with what I know is right. And that's why
4 I've said, "I won't -- I'm not here to make up a
5 story or an excuse or anything else for someone else
6 and what they did. I'm going to tell you the truth."
7 And if the truth hurts, it hurts; and if it hurts me,
8 it hurts me. But I have nothing to hide.
9    Q. Sure.
10    A. And I don't think anybody else -- any of
11 our other three officers from my department that were
12 involved in this will have anything to hide or -- or
13 would give anything other than the truth.
14    Q. And I -- we could always talk if we need
15 to mark that -- this portion of the transcript
16 confidential, because I don't want to get into any --
17 any family issues that would cause you any strife.
18      But, I guess, just at bottom, though, if a
19 call involves a close friend or family member, it can
20 have an impact on you, correct?
21    A. Correct.
22    Q. Do you know a gentleman by the name of
23 Brett Clyde?
24    A. Brett Clyde?
25    Q. Yes.

Page 117

1     A.   I don't recall that being someone I know.
2     Q.   What about a Courtney Parks?
3     A.   Who?
4     Q.   Courtney Parks.
5     A.   Cortney Parks.  I don't know that person.
6  I mean, some people -- to kind of give you some
7  background, I taught the D.A.R.E. program and I was
8  the school resource officer.  Between those two
9  assignments, I did it for probably eight years.  I
10  started in 19 -- 1999 -- the fall of 1999, and I did
11  the schools until -- I believe it was August of 2007.
12  And in that time frame I met hundreds, if not
13  thousands, of kids that I taught in my program
14  that -- obviously, kids that were 12 years old in
15  1999 are in their 30s now and have children of their
16  own that -- they may know me and I don't know them.
17  If I saw their face, I may go, "Oh, I remember this
18  kid.  He was 12 years old in my D.A.R.E. class."  But
19  to know them by name, I don't -- I don't recall those
20  people.
21     Q.   Sure.  And over a 24-year career, I'm sure
22  you've bumped into a lot of people --
23     A.   Yeah.
24     Q.   -- but just sitting here today, neither
25  name rings a bell?

Page 118

1     A.   No.
2     Q.   In general, how do you approach a call
3  involving a gun?
4     A.   Cautiously.
5     Q.   What, specifically, is your training on
6  that kind of call?
7     A.   Generally, time is more on our side.
8  That's about the only thing we have going for us, is
9  more the methodical way of dealing with it.
10     Q.   So would that be to say to -- to slow down
11  and utilize that time?  What do you mean by time is
12  on your side?
13     A.   Well, for me, that's how I like doing it;
14  slow down, let's go through this so that we're not
15  missing as much.  If you're going through it fast,
16  that's when you start missing -- it's like today,
17  some of these events happened so quickly, you can't
18  perceive it all.  It's impossible for -- for my brain
19  to perceive it all.  It probably recorded it
20  someplace in there, just like a videotape records
21  something, but it's impossible to replay it all and
22  to record it -- or to spit it back out.  So that's
23  why if you slow down and take it in slow motion, it's
24  easier to perceive it.
25     Q.   So two options.  I'll give you the two

Page 119

1  options.  And one option, which is, you know, going
2  in hot, going in quick, versus going in quiet,
3  cautious and deliberate, you would select the latter,
4  the quiet, cautious and deliberate, correct?
5         MS. WHITE:  Objection.  Incomplete
6  hypothetical.
7         Go ahead.
8         THE WITNESS:  And -- yes and no, because
9  some require you to go in hot and some of them
10  require to go in the other way.  And so it would have
11  to be a case-by-case basis.  And the way that a
12  person -- from one officer to another is going to
13  perceive it differently, so they are going to react
14  to it differently.  And some may think that, no,
15  going in on this one's hot is appropriate, and
16  another officer may go, no, slowing down and going
17  more methodical is a better option.
18     Q.   (BY MR. CUMMINGS)  Okay.  So let's take
19  this shooting, and then I'm going to draw a line in
20  time before Vincent left the house.  Can you describe
21  to me, based upon your training -- not necessarily
22  what happened, but based upon your training, how you
23  would approach that scenario based upon the facts
24  that you heard from dispatch?
25         MS. WHITE:  Objection.  Speculation.

Page 120

1  Incomplete hypothetical.
2         Go ahead.
3         MR. BURR:  Same objections.
4         THE WITNESS:  So when we got the call,
5  Officer Casey and I, we were at Chevron gas station
6  in Centerville at 800 West and Parrish Lane.  And
7  when I responded from there to the home, I didn't
8  turn on my lights, as such, but I wasn't driving the
9  speed limit either.  We were -- we were hurrying.  We
10  had a -- we had a place that we needed to get to as
11  quickly as possible, but we don't want the whole city
12  knowing we're responding.  So, yes, we're moving, but
13  we're doing it methodically.
14     Q.   (BY MR. CUMMINGS)  Okay.  So, then, when
15  you get to the property and your car is parked, based
16  upon your training, how would -- how would you
17  approach a scenario with a man potentially having a
18  gun inside and similar threats?
19         MS. WHITE:  Same objection.
20         MR. BURR:  Same objections.
21         THE WITNESS:  Yeah, and the way that --
22  the way that I approached it versus the way that I
23  observed Officer Read approach it, I think we would
24  have done it slightly different, based on my personal
25  information and based on his understanding and

Page 121

1   personal information of the situation that he knew at
2   the time.
3       Q.   (BY MR. CUMMINGS)  So when you say you
4   would have done it differently, what do you mean?
5       A.   So, after the fact, Officer -- I had -- I
6   had heard that Officer Read knew something of one of
7   the parties involved.  I don't know exactly what or
8   why or how.  So he is approaching it differently,
9   much the same way that when I responded to my dad,
10  who got his face cut, I -- I jumped out of the car,
11  grabbed my pack and I run to him and I start dealing
12  with him, and I didn't put my gloves on because it's
13  my father and I'm not worried about obtaining a
14  bloodborne pathogen disease from him, because I knew
15  where he's been.  And he's not afraid of me and he
16  wants my help.
17       Whereas, if it would have been one of you
18  in the same situation, I would have dropped down on
19  my knees and I would have grabbed my pack and ripped
20  it open and put my gloves on and dealt with it
21  differently, because you don't know where I've been,
22  and so my gloves are going to protect you against me
23  and me against you.
24       Q.   Yeah.
25       A.   And so we're -- we're doing it slightly

Page 122

1   different.  And so in this case, I feel like it's the
2   same way, is that based on the information that I
3   knew and had and my understanding, I might do it
4   different -- or I know I would do it differently than
5   what -- how Officer Read would deal with it with his
6   understanding.
7       Q.   And I know we're -- we're playing
8   hindsight here.  It's all easy to second-guess
9   yourself afterwards.
10      A.   Oh, yeah.
11      Q.   I -- I appreciate your candor there.
12          Now, you said you had the dog -- the
13  Rottweiller-esque dog, I guess, if you want to do
14  that.  You grabbed him by the collar, put him in the
15  garage.  Where was the dog at when you first
16  approached the house?
17      A.   So when I got in the backyard and we
18  were -- we had been in the backyard -- in fact,
19  medical hadn't even gotten to us yet.
20      Q.   So this is after the shooting?
21      A.   After the shooting.
22      Q.   Okay.
23      A.   I had called to get an ambulance in there
24  ASAP.  Dispatch had already, by their protocol, or
25  whatever they do, however they do it, knew some of

Page 123

1   the -- the different facts and the information that
2   they had, that they were going to have an ambulance
3   on standby.  So an ambulance was already somewhere
4   there.  I don't know where.  Was it a block away or
5   three blocks away, I don't know, but they were
6   already responding.
7       So when I called and said, "Let's get
8   medical in here," that's about the time that the dog
9   came from the backyard someplace and all of a sudden
10  ended up there.  And I just grabbed hold of him and
11  put him into the thing.  And with that thought,
12  somebody had told me that this dog is very aggressive
13  towards people that he doesn't know, and I'm, like,
14  he was compliant with me, which is unusual.
15      Q.   (Indistinguishable) so I -- I -- yeah.
16      A.   You know, usually -- usually -- even a
17  uniform -- for whatever reason, dogs don't like the
18  uniform, you know, and -- and he was compliant.  I --
19  I don't know.  I mean, I -- I had to use some
20  persuasion, but I got him in, closed the door.  And
21  then I hear that he was not really nice towards
22  people he didn't know, and I thought, I'm lucky I
23  didn't get my arm ripped off.  But I felt like it
24  needed to be done, he needed to be put away, so I did
25  it.

Page 124

1       Q.   Sure.
2       A.   But that was the first time I saw the dog,
3   is after the shooting, after, you know, we --
4       Q.   My next question -- so the first time you
5   saw the dog was in the backyard, after the shooting?
6       A.   Uh-huh (affirmative).
7       MS. WHITE:  Is that yes?
8       THE WITNESS:  Yes.
9       MR. CUMMINGS:  Thank you.
10      THE WITNESS:  Sorry.
11      Q.   (BY MR. CUMMINGS)  Now, does
12  Centerville -- or does Centerville use body cams, in
13  general?
14      A.   In the past, before this event, they
15  were -- it was kind of more left up to discretion.
16  There wasn't quite as much hype on it as it is today.
17  I did not routinely carry a body cam.  The -- some of
18  the cameras that were out there in the beginning were
19  very frustrating to use.  You would turn it on, and
20  then you would go back to go re-review it and there
21  was nothing there.  It didn't turn on, you thought it
22  was on.  They weren't as reliable.  To try uploading
23  them was very frustrating to officers.  And so we
24  just -- some of the guys just said, "This is stupid,
25  you know, I'm wasting all this time working with a

Page 125

1    tool that's inadequate," and -- so I didn't -- I
2    never really used it but once in a blue moon.
3         Q.   Got you.
4              Do you know if any of the officers had
5    body cams during this incident?
6         A.   I don't know.
7         Q.   Prior to the shooting --
8         A.   Can I -- can I go back to that --
9         Q.   Sure.
10        A.   -- for just a split second?
11        Q.   Yeah.
12        A.   Now, I know my -- my in-car video was on,
13   and I made a specific, you know, educated choice to
14   do what I did with my camera.  I remember turning it
15   on, I remember turning my camera towards the front of
16   the house, which I testified to earlier.  That's the
17   only thing I know that I use -- that's the only thing
18   I used.
19        Q.   Sure.
20        A.   There were a couple of still pictures
21   taken during -- after the shooting that I had
22   hollered at one of the officers, and Officer Read
23   brought me a camera, still-picture camera, that I
24   started -- that I shot some pictures of, and
25   detectives took that.

Page 126

1         Q.   Okay.
2         A.   But other than that recording -- those two
3    types of records, that's the only thing I know of or
4    dealt with.
5         Q.   Okay.  Going back to the -- prior to the
6    shooting, I believe you testified that there was only
7    two real statements that you heard Officer Read make
8    to Vincent, and you really didn't hear anything
9    Vincent said.  Is that correct?
10        A.   Uh-huh (affirmative).
11        Q.   And you testified that Officer Casey
12   removed Molly from the premises, I think, going
13   south, if I remember correctly.  Is that correct?
14        A.   That's what I -- that's what I had been
15   told.  I don't -- I was in the back -- in the
16   neighbor's backyard in the first part of the event,
17   and what I had learned within a few days after -- I
18   don't remember exactly when I had learned it -- but
19   that Officer Casey had moved her -- had been
20   instructed to take her and move her down, because
21   Vincent -- is that his name? -- I think that's what
22   you referred to him as --
23        Q.   Yes.
24        A.   -- had come out and there was some type of
25   dialog or something going on.  Anyhow, a man with a

Page 127

1    gun.  We want to limit as much as we can -- I mean,
2    he's obviously mad at her.  You know, is he -- for
3    all we know, he's -- he's going to try to hurt her;
4    that's why he's come back out.  She is out there
5    talking to the police and now is he coming out to
6    hurt her?  Is he coming out to hurt us?  We don't
7    know what his thinking is.  So Officer Casey was
8    instructed to take her and go down the road.
9         Q.   When you say "was instructed," who did the
10   instructing?
11        A.   I -- I -- I had understood that -- that
12   Officer Read --
13        Q.   Okay.
14        A.   -- had instructed Officer Casey to take
15   him and -- and go with her, but I didn't --
16        Q.   Go ahead.
17        A.   -- see that part.  I didn't hear that
18   part.  That's all just after the fact.
19        Q.   Did you hear any conversation between
20   Molly and Officer Read and Officer Casey at that
21   time?  Molly is Molly Farrand.
22        A.   No, because I never had any communication
23   with her, other than I vaguely remember maybe 20
24   minutes or so after I had walked down to where
25   Officer Casey was, and he was talking to Molly in or

Page 128

1    by his car or something, or by a car.  At this point
2    there was police cars everywhere.  And they were down
3    by a car, but they were south of the residence.  And
4    they would have been -- and they were on the east
5    side of the road, in a car.  I don't know whose
6    car -- whose police car, what unit it was; no idea.
7         Q.   Okay.
8         A.   Anything about that.
9         Q.   And I'm assuming because you only heard
10   Officer Read make those two statements, you didn't
11   hear anything Officer Read stated upon his initial
12   approach to the house about, "Brett, are you in
13   there," or anything along those lines?
14        A.   Because, again, when he -- when he started
15   to come across the front of the yard and
16   Officer Casey had kind of joined up with him -- we'll
17   call it in the northeast corner of the property -- I
18   then moved towards the back.  And at that point, as I
19   moved towards the back and up to that point, I saw
20   nobody in -- in the front yard that we were going to
21   make contact with.  And that's why I went around the
22   back, is to see, "Okay, is this guy going in the
23   front and out the back?"  You know, we don't -- I
24   don't know.  So I thought, "Well, I'll get eyes on
25   the back and see what happens."

## Page 129

1    Q.  Sure.

2    **A.  Kind of normal to surround the place, you**

3  **know.**

4    Q.  Yeah.  No, that makes sense.

5      In your career, have you had to use force

6  or, you know, grab somebody by the hands that's a

7  potential victim or a percipient witness, to kind of

8  remove them from a premises?

9    **A.  People that are outraged, yes.  And maybe**

10  **"outraged" isn't the right word, but we'll -- we'll**

11  **say that.  Somebody who is upset, emotionally**

12  **attached to the situation, and they are interfering**

13  **with making things run smoothly.  There are times**

14  **when, yes, I have had to hold people back, remove**

15  **people from the situation, because in most cases it**

16  **helps slow things down, makes things calm down.**

17    Q.  For those type of individuals, what type

18  or intensity of force do you use with your hands?

19    MS. WHITE:  Objection.  Incomplete

20  hypothetical.  Speculation.

21    Go ahead.

22    THE WITNESS:  It -- it would be that which

23  would have to be reasonable.

24    Q.  (BY MR. CUMMINGS) Okay.

25    **A.  And "reasonable" might be simply just**

## Page 130

1  **taking them by the elbow and walking with them.  And**

2  **other time it might be you'd have to put them in a**

3  **rear wrist lock and drag them fighting and kicking,**

4  **because -- it just all depends on how they are**

5  **reacting.**

6    Q.  How long did you see -- and you might not

7  have seen Molly outside, but how long did you get to

8  witness Molly interacting with Officer Read and

9  Casey on the front lawn, or did you not witness them

10  at all?

11    **A.  Up -- until I saw her in the car 20**

12  **minutes after the incident, I -- I never -- I never**

13  **saw her --**

14    Q.  Okay.

15    **A.  -- at that point.**

16    MR. CUMMINGS:  Okay.  That's it for me.

17    MS. WHITE:  I don't have any questions.

18  We'll read and sign.  If you get it to me, I'll get

19  it to Mr. Thomas.

20    THE VIDEOGRAPHER:  Off the record.  The

21  time is 12:13.

22    (Deposition concluded at 12:13 p.m.)

23

24

25

## Page 131

1        REPORTER'S CERTIFICATE

2  STATE OF UTAH      )

                ) ss.

3  COUNTY OF SALT LAKE   )

4

    I, Dawn M. Perry, Certified Shorthand

5  Reporter and Notary Public in and for the State of

  Utah, do hereby certify:

6

    That prior to being examined, the witness,

7  OFFICER GARY THOMAS, was by me duly sworn to tell the

  truth, the whole truth, and nothing but the truth;

8

    That said deposition was taken down by me

9  in stenotype on August 14, 2017, at the place therein

  named, and was thereafter transcribed and that a true

10  and correct transcription of said testimony is set

  forth in the preceding pages.

11

    I further certify that, in accordance with

12  Rule 30(e), a request having been made to review the

  transcript, a reading copy was sent to Heather White,

13  Attorney at Law, for the witness to read and sign

  under penalty of perjury and then return to me for

14  filing with Kendall J. Burr, Attorney at Law.

15    I further certify that I am not kin or

  otherwise associated with any of the parties to said

16  cause of action and that I am not interested in the

  outcome thereof.

17

    WITNESS MY HAND this 24th day of August,

18  2017.

19

20

21

22        Dawn M. Perry, CSR

23

24

25

## Page 132

1  Case: MOLLY FARRAND vs. AMERICAN GENERAL LIFE

  INSURANCE COMPANY

2  Case No.: 1:16-cv-00134-DB

  Reporter: Dawn M. Perry, CSR

3  Date taken:  August 14, 2017

4        WITNESS CERTIFICATE

5    I, OFFICER GARY THOMAS, HEREBY DECLARE:

    That I am the witness in the foregoing

6  transcript; that I have read the transcript and know

  the contents thereof; that with these corrections I

7  have noted this transcript truly and accurately

  reflects my testimony.

8

9  PAGE-LINE    CHANGE/CORRECTION    REASON

10  _____  _____  _____

11  _____  _____  _____

12  _____  _____  _____

13  _____  _____  _____

14  _____  _____  _____

15  _____  No corrections were made.

16

    I, OFFICER GARY THOMAS, HEREBY DECLARE

17  UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE

  UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF

18  UTAH THAT THE FOREGOING IS TRUE AND CORRECT.

19

    OFFICER GARY THOMAS

20

    Date: _____

21

22

23

24

25