# APPENDIX M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

MOLLY FARRAND, )
) Videotaped deposition of:
Plaintiff, )
) OFFICER JASON READ
vs. )
)
AMERICAN GENERAL LIFE )
INSURANCE COMPANY, ) Case No. 1:16-cv-00134-DB
)
Defendant. )

August 14, 2017 * 1:04 p.m.

Location: Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
Salt Lake City, Utah

Reporter: Dawn M. Perry, CSR
Notary Public in and for the State of Utah
Videographer: Gavin Bohne

APPEARANCES

FOR THE PLAINTIFF:
Robert B. Cummings
Attorney at Law
The Salt Lake Lawyers
10 Exchange Place
Suite 622
Salt Lake City, Utah 84111
(801) 590-7555
(801) 384-0825 (fax)
Robert@thesaltlakelawyers.com

FOR THE DEFENDANT:
Kendall J. Burr
Attorney at Law
Edison, McDowell & Hetherington, LLP
1001 Fannin Street
Suite 2700
Houston, Texas 77002-6707
(713) 337-8875
(713) 337-8851 (fax)
kendall.burr@emhllp.com

FOR THE WITNESS:
Heather White
Attorney at Law
Snow, Christensen & Martineau
10 Exchange Place
Suite 1100
Salt Lake City, Utah 84145
(801) 521-9000
(801) 363-0400 (fax)
hsw@scmlaw.com

ALSO PRESENT:
Hunter Howe

I N D E X

| OFFICER JASON READ | PAGE |
|---|---|
| Examination by Mr. Burr | 5 |
| Examination by Mr. Cummings | 60 |

* * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 5 | Photograph | 50 |

* * *

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record at 1:04 p.m. This is the videotaped deposition of Officer Jason Read in the matter of Molly Farrand versus American General Life Insurance Company in the United States District Court for the District of Utah.

This deposition is being held at Snow, Christensen and Martineau in Salt Lake City, Utah, on August 14th, 2017.

My name is Gavin Bohne, and I'm the videographer and present on behalf of Stratos Legal. The court reporter is Dawn Perry, also present on behalf of Stratos Legal.

Counsel will now state their appearances and firm affiliation for the record.

MR. BURR: Kendall Burr of Edison, McDowell and Hetherington, representing the defendant.

MR. CUMMINGS: Robert Cummings of the Salt Lake Lawyers on behalf of plaintiff Molly Farrand.

MS. WHITE: Heather White on behalf of Officer Jason Read.

THE VIDEOGRAPHER: Will the court reporter

Page 5

please swear in the witness?

OFFICER JASON READ,
called as a witness, being first sworn,
was examined and testified as follows:

EXAMINATION

BY MR. BURR:

Q. All right. My name is Kendall Burr. I'll be taking some questions from you.

What is your name, for the record?

**A. Jason Read, R-e-a-d.**

Q. And where do you live?

**A. Syracuse.**

Q. And what is your profession?

**A. Police officer.**

Q. Okay. How long have you been a police officer?

**A. Twelve years.**

Q. And are you -- did you work in the same department the entire time?

**A. Yes.**

Q. Which department is that?

**A. Centerville.**

Q. And you understand that we're here to talk about an event that took place on April 13th, 2014?

**A. Yes.**

Page 6

Q. Okay. Do you remember that incident?

**A. Vaguely, yeah.**

Q. Okay. So it was a couple years ago -- or a little over three years ago. And I just want to, you know, explain what this process is all about. We're not here to -- you know, to test your memory and make sure that you testify to every single detail. We're just here to get your best recollection of what you remember. And so if you have any questions about my questioning or how I'm phrasing things, just let me know, and I'll try to clarify so that you can make your answers clear for the record.

Is that all right?

**A. Sounds good.**

Q. Okay. So this incident involved a man by the name of Vincent Farrand. Did you know Mr. Farrand?

**A. Never met him.**

Q. Had you ever heard the name before?

**A. No.**

Q. Okay. Did you know his wife, Molly Farrand?

**A. No.**

Q. Okay. And during this incident I understand that there was a shooting and he had to -- he passed away?

Page 7

**A. Correct.**

Q. And you had to shoot him in that incident?

**A. Yes.**

Q. We'll talk about some of the details and what led up to that.

Just so you're clear on what this litigation is about I represent an insurance company called American General Life Insurance Company. Have you ever had heard of American General before?

**A. Probably at some point, maybe.**

Q. Okay. Have you ever spoken with me before?

**A. No.**

Q. Have you ever spoken with anybody in my firm before?

**A. No.**

Q. Okay. Has anybody from the insurance company spoken with you before?

**A. No.**

Q. Do you have any awareness of a lawsuit involving the city prior to this litigation?

**A. Prior to this?**

Q. Prior to this litigation, were you aware of any --

Page 8

**A. Oh, yeah, the -- yeah, I was aware the city was being sued by the family.**

Q. And do you know the outcome of that suit?

**A. I just know they settled.**

Q. Did you have any involvement in that litigation?

**A. Other than being the officer involved, no, I wasn't -- there was -- I'm sure there was a whole lot of behind-closed-doors stuff that went on, but I was basically told we were being sued and told it was settled.**

Q. You didn't have to give testimony, for example?

**A. No.**

Q. Did you have to provide any written statements or anything like that?

**A. No.**

Q. Okay. And just so --

**A. I understand. As soon as I shook my head, I understood. I get it.**

Q. Thank you.

**A. My bad.**

Q. No worries.

So have you ever been in a deposition

before like this?
**A. No.**
Q. Okay. You've testified in court before?
**A. Yes.**
Q. And that's something that you've done throughout your career, when necessary?
**A. Yes.**
Q. How many times have you testified in court, would you say?
**A. Oh, a dozen or more.**
Q. And you understand that you're under oath today, same as in court?
**A. Yes.**
Q. And so you'll do your best to provide your best recollection and honest answers?
**A. Yes.**
Q. So did you grow up in Centerville?
**A. No.**
Q. Where did you grow up?
**A. Roy.**
Q. And when did you start getting interested in police work?
**A. Twelve years ago. Well, 13 years ago, because it took me a year to go through the academy. I never had any desire to be a cop until I became a**

**cop.**
Q. Do you enjoy it?
**A. Yeah. It's...**
Q. Aspects?
**A. If I had to do it over again, I wouldn't, but it's -- it's fun. It's a job, you know.**
Q. Right. Did you go to the academy in the state of Utah?
**A. Yeah, I went to Weber State's police academy.**
Q. And then straight out of the police academy did you go to the Centerville Police Department?
**A. Yes.**
Q. You've been there ever since?
**A. Yep.**
Q. Has your job title changed during that time frame at all? Do you have a different title or --
**A. I've done a couple of different things. I've done patrol. I was a canine officer for a while. I was what we call our POP officer, our problem-oriented police officer. I did that for a while, but now I'm just back on patrol.**
Q. So patrol, would you describe generally

what that means?
**A. A little bit of everything, honestly. It's a lot of traffic. We do a lot of our own investigation, because we are just a small city. So it just entails a little -- we're a small department, so we don't have a whole bunch of specialty units, so us patrol officers handle all types of calls for service.**
Q. You were a canine officer for a while?
**A. Yes.**
Q. Do you recall what time frame?
**A. I was a canine officer for two, maybe three years, and it was around the time frame -- I was actually the canine officer on -- on the date of this occurrence.**
Q. Okay.
**A. So it was around that time frame.**
Q. Did you have your dog with you that day?
**A. Yes.**
Q. Where was the dog?
**A. He was in the truck. He is single-use. He's not dual-purpose; he is a drug dog only, so he's just used for narcotics investigations -- or was, I guess.**
Q. You said a truck. Is that what you drove

at the time?
**A. It was an Expedition, a Ford Expedition.**
Q. And so you would normally keep the dog in the truck --
**A. Yes.**
Q. -- during incidents like this?
**A. Yes.**
Q. And you also mentioned the -- the third title you said was some kind of specialty?
**A. Problem-oriented policing. So I handle most of our -- like, our narcotics investigations, our sex offenders, our fugitives, things like that.**
Q. And what time frame did you do that?
**A. It was after canine, for about two years, so -- I -- I just stopped doing that this year, March, April-ish -- April, May, something like that. Just a couple months ago.**
Q. Okay. When you were a canine officer, were you the only canine officer?
**A. Yes.**
Q. And did you normally -- what would be the difference between what you would do day to day as a canine officer versus being a regular patrol officer?
**A. Not much. Like I said, we're a small department, so it wasn't like me being a canine**

Page 13

**officer, I was a specialty unit. I still did regular patrol, normal calls for service. The only difference was if somebody would need me to do a drug sniff, like, you know, search for narcotics, things like that, they would call me and I would take my dog. But beyond that, it was just normal patrol.**

Q. Okay. How often did you have shifts during that time frame? Like, how many days per week would you work?

**A. As a regular, normal police officer I work a lot of overtime, as we all do. So I would work my four 10-hour shifts, which was what was required, and then typically I'd work one or two extra shifts a week. They were like, overtime, just, like, five hours.**

Q. So usually four 10-hour shifts and then a couple extra five-hour shifts?

**A. Right.**

Q. Do you recall the week of this incident what shifts you worked?

**A. This -- I don't -- I don't recall what shifts I was working. I do remember that this shift on this incident was an extra shift, because we -- like, again, I'm going to say this a lot, we are a small agency, so when people are on vacation or sick**

Page 14

**or take time off, oftentimes other guys will have to cover their shifts. So I was actually covering another officer's shift. So this was kind of like an overtime shift on -- on the date this happened. But what my regular shift was that time, I don't remember. We -- we change every four months.**

Q. Do you have to work nights?

**A. Yeah.**

Q. Do you recall whether you were working nights during that time frame at all?

**A. I don't -- I don't think I was working nights, because when I work nights I'm typically really tired all the time, and I don't remember being tired. In fact, I remember I was up that day. And if I was working nights, I would have been sleeping. So I had to have been working a day or a swing shift.**

Q. Do you recall what your shift was, what hours that day you were supposed to work?

**A. So the date of the occurrence I was working a 4 p.m. to 2:00 a.m., but the way our shifts work, we typically sign on duty a little bit early so we can have pass-on with the people that are about to leave, kind of get a gist of what happened during that day. So my shift was actually a 4:00 p.m. to 2:00 a.m. shift that day, but I think I signed on**

Page 15

**duty around 3:30.**

Q. Okay. Throughout your career have you dealt with other situations where anyone died during an incident where you were a part of it?

**A. Multiple times.**

Q. How many times?

**A. More than five, I would say. If you're including, like, fatal car accidents, things like that.**

Q. Do you recall how many of those involved a shooting?

**A. One prior to this.**

Q. Okay. And who was the shooter and who was the victim?

**A. Same person. I had an individual who I was attempting to make contact with shoot himself in the head right in front of me.**

Q. Okay. How long ago did that happen?

**A. Oh, that was -- I think I had been on for four years, maybe, so probably four years prior to this incident.**

Q. Have you had other situations where you had an encounter with someone who had a gun and you had to instruct them to drop the weapon?

**A. None that I can think of. Even the**

Page 16

**individual that shot himself in front of me, I didn't know he had a gun until he pulled it out and shot him. So, no, none that I can think of off the top of my head.**

Q. So you mentioned that you had a truck, and your dog was in the truck. You had signed on. Do you recall how soon after you signed on that you first heard anything about this incident?

**A. I actually heard about the incident before I signed on. While I was on my way into the city, I -- I, obviously, listened to dispatch, so I was kind of hearing some details about it.**

**And then immediately after I signed on -- well, not immediately, within a minute, they called me and assigned me the call.**

Q. Okay. And do you -- strike that.

What is signing on? What's the physical process?

**A. Oh, that's when you go on duty. So when I leave my house, I'm driving into the city; as soon as I hit the boundary I'll let dispatch know that I'm on duty and available for calls. Just like when I'm going home, as soon as I hit the border, I call dispatch and say, "I'm off."**

Q. Okay. Thank you.

Page 17

So you informed dispatch that you were signed on and ready to take calls?

**A. Right.**

Q. About a minute later they call you --

**A. Right.**

Q. -- and they say, "Can you arrive at this location?"

**A. Right.**

Q. Did they give you an address?

**A. Yeah. I don't remember what it was, though.**

Q. Did they provide any other information during that initial dispatch message?

**A. So on my way in I was listening to dispatch. I scan two different channels. We have Davis County dispatch, which I operate off, and then we have Bountiful dispatch, which is the city next to us. I monitor their channel just because they are the city next to us, and if anything is going on over there, it only makes sense that if it's coming my way, I would want to know about it.**

**So Bountiful's dispatching their officers to a residence in Bountiful where Mr. Farrand -- I didn't know his name at the time -- but he's on his way there with weapons or whatever to assault**

Page 18

**somebody, reference, wife, cheat, whatever the case. I don't remember exactly what was said. I do remember thinking Bountiful is about to have a bad day. So that came back to bite me later.**

Q. Yes.

**A. So as soon as I sign on, they call me and ask me to go to Molly's house to make contact with her to obtain as much information as I can about what is potentially going to happen in Bountiful. So I started heading towards her house.**

Q. So initially you went there thinking that you were going to interact with the family -- the spouse --

**A. Right.**

Q. -- of someone who is going to commit a crime elsewhere?

**A. Right.**

Q. Did you also have -- I understand that -- that some officers in your department have, like, a computer with information on it in your car?

**A. Yes.**

Q. A FATPOT?

**A. FATPOT, correct.**

Q. And is this -- did this computer program have any information coming through that you read or

Page 19

recall reading?

**A. So -- yeah. Well, I was on my way there -- now, I'm driving there, so I'm -- I'm just kind of glancing at the information, and I see a name that I recognize, a name that I'm familiar with, of an individual that I've dealt with a couple of times. I have a pretty good relationship with this individual.**

**Now, my initial thought is, "That's the guy who is on his way to Bountiful." And I don't know why I thought that or I don't remember exactly what I read, but I thought, "Oh. Well, I know him. This -- we'll be able to handle this. It's not a big deal."**

**I actually make phone contact with my sister, because my sister knows him really well. Her -- her husband is married to this guy -- or, no. Let's see. Her husband is -- his sister is married to this guy's name that I recall. So I call her because I'm, like -- I'm going to ask her, you know, "Hey, what's going on with so-and-so? Like, what's the deal? Why is he freaking out today? What's the story?" I'm trying to get some intel from her while on my way.**

**But as I'm on my way there, dispatch comes**

Page 20

**back on and says, "Suspect is back at the house in Centerville." Okay. Well, that's a problem. So I start -- I -- I basically just hang up on my sister. I'm, like, "I got to go." I hang up.**

**So as I get to the house, he's there, essentially, so...**

Q. So what is the friend's name you referred to?

**A. His name was Brett. I don't remember his last name.**

Q. Okay. How had you met him previously?

**A. I've arrested him before.**

Q. How many times?

**A. I think twice. One of them was not custodial, I actually think I gave him a citation. But I had a pretty good rapport with him.**

Q. Okay. And so when you were driving during this time frame, the entire time you were heading to the residence, right?

**A. Yes.**

Q. You didn't veer to go towards Bountiful or anything like that?

**A. No.**

Q. And so you initially thought that you were going to just meet with Molly; you didn't know who it

Page 21

was yet?

**A. Right. Right.**

Q. You initially thought you were going to meet with her and get more information about this incident that might take place in Bountiful?

**A. Yes.**

Q. Then after that dispatch interrupted your phone call with your sister. Did your sister provide any information before you hung up?

**A. She didn't have time. I mean, it was that fast.**

Q. Okay. When you got to the scene -- well, strike that.

Before you got to the scene, were you also hearing on dispatch whether anybody else was going to the scene?

**A. Yeah, there was two other officers, the officers that had been on duty all day long, that were also responding.**

Q. Okay. And what were their names?

**A. Gary Thomas and Preston Casey.**

Q. And did dispatch assign any kind of priority as to who was in charge or anything like that, or was it just whoever shows up will handle it?

**A. No, they don't typically do that.**

Page 22

**They'll -- when they assign a call to somebody -- like, let's use a keys -- like a -- or a theft call, okay? So if they call me -- I don't remember what my call sign at the time was, but my call sign right now is Victor 7. So if they said, "Victor 7 from Davis clear to copy theft," it's just kind of common knowledge that that's my call. Even if somebody else comes to assist or comes to re -- you know, help, it's still just assumed and understood that that's my call.**

Q. Okay.

**A. So there were other officers responding, but I was the one Davis -- or dispatch initially contacted, so it was my call.**

Q. Okay. And did that impact how, you know, things played out later on? Like, is there any sense of, like, who is going to take the lead on actually interacting with the suspect --

**A. No, it's --**

Q. -- or is it just circumstantial?

**A. It's -- it's not uncommon in my agency -- again, because we're a small department -- if -- if another officer gets there, say, on a theft, for example, and he starts obtaining a whole bunch of information, it's not uncommon for him to then take**

Page 23

**over the call, because he was there first; he obtained most of the information. Instead of him just passing it on to me, he'll just take the report.**

**So it's just kind of -- yeah -- I mean, it's assigned to me, it's my call, but it -- it just kind of flows however it flows.**

Q. Okay. When you arrived at the residence -- well, strike that.

First, during the car ride over, do you recall any conversations with Officer Thomas or Officer Casey?

**A. Huh-uh (affirmative).**

Q. Is this like a situation that you would plan out what you are going to do when you get there or --

**A. No. I mean, if -- if we had more information, we might have, but in this situation, I don't think there was any planning. It all evolved fairly quickly.**

Q. About how long was the car ride?

**A. Oh, a minute or two. It wasn't very long.**

Q. Okay. When you arrived at the scene, was anybody already there?

**A. Officer Thomas was already there.**

Q. Okay. And where was he parked?

Page 24

**A. He was parked not in front of the house; I would say just north of the house, just barely north.**

Q. Okay. We have some photos that might help as we refer to the locations and the house.

**A. Okay.**

Q. So I hand you what we have previously marked as Exhibit 1. Is this a photo of the house?

**A. Yes.**

Q. And is this photo taken looking east -- westward, so north is to the right --

**A. Yes.**

Q. -- and south is to the left?

And Officer Thomas, was he parked within view of this photo or was he further to the right?

**A. I think he was further to the right.**

Q. So to the north of -- of the house.

**A. Yeah.**

Q. And where did you park?

**A. So when I pulled up, I pulled up in front of him.**

Q. Okay. And was -- where your car was parked, was that within view of this photo?

**A. No, I -- I don't remember, but I don't think you would have seen my car in -- in this photo.**

Q. So both cars were probably in front of

the -- the north --
**A. The neighbor's house.**
Q. Just north of the neighbor's house?
**A. Yeah. That's just common practice.**
Q. Okay. When you arrived, did you exit your vehicle immediately?
**A. Yeah.**
Q. Okay. And did you -- what did you do next?
**A. So as we show up -- I think Officer Casey showed up. I don't know where, when, but I do recall the three of us were walking up towards the house at the same time. I remember as we're about halfway from the street to the front door, dispatch got back on and said something about he's -- he's in the safe getting more weapons, you know, more guns, something like that. And I remember thinking, "Shit," to be honest. I mean...**
Q. Yeah.
**A. So -- yeah. We're approaching the house at that point.**
Q. So -- and just -- since this is a civil litigation, you know, the jury may not understand all the details, and I don't either.
**A. Right.**



Q. So just to be clear, when you get information on dispatch, do you have, like, a radio that you carry with you --
**A. Yes --**
Q. -- on your person?
**A. -- just like -- or --**
Q. It's an earpiece?
**A. Yes.**
Q. Do you have it in your ear?
**A. Yeah. It would have been at the time, yeah.**
Q. And who is speaking on dispatch?
**A. Davis County dispatch, whoever the dispatcher is. I think there is 25 different dispatchers, and I couldn't tell you which one was working that day.**
Q. And just to be clear, you don't have any, you know -- you don't listen in on 911 calls, for example?
**A. No, I have no idea what the...**
Q. There is no way for them to patch that into your feed?
**A. No.**
Q. All right. So what you are getting is the information that dispatch is providing, and then



comments from other police officers on the scene?
**A. We're not really talking to each other a ton. I mean -- because we're -- we're receiving information, and I think we're all just kind of trying to formulate what to do. I mean, nobody wants to be standing in front of the house in that situation. I mean, we -- we want as much information as we can have, but we were kind of caught in a bad spot at the time we got the information.**
**So, like I said, it was real fluid. It just -- it happened really quick, it evolved quickly, so there wasn't a whole lot of plan-making or...**
Q. And you understood that there was a potentially dangerous situation; you had to act quickly, right?
**A. Absolutely.**
Q. Yeah. When you got out of your vehicle, did you beeline for the front door or did you stop at any point?
**A. So we're walking to the front door, and I can hear somebody crying, somebody who is, like, obviously upset. And I can look -- I looked over to this corner of the house behind the fence, and that's the first time I saw Molly.**
Q. So just so it's clear --



**A. So you see where the gate is?**
Q. We're taking about the gate between the garage --
**A. Yes.**
Q. -- and the house?
**A. Yeah.**
Q. Okay.
**A. She's -- she's back behind that gate, and she's obviously visibly upset and shaken. I think she was still on the phone with dispatch. So we -- we completely bypassed the front door and we go to her.**
**At some point along here I lose sight of Officer Thomas. He disappears somewhere. But me and Officer Casey go over to the -- to the fence to make contact with her.**
Q. Okay. So you mentioned that Officer Thomas arrived first, then you arrived and parked in front of him?
**A. Right.**
Q. Did Officer Casey arrive third?
**A. Yes.**
Q. Where did he park?
**A. I don't know.**
Q. Okay. And then did he arrive much later,

Page 29

or were all three of you on the scene pretty --
**A. No. I mean, all three of us -- I remember -- if I remember correctly, all three of us were approaching the house at the same time.**
Q. Okay.
**A. So wherever he came from, wherever he parked, it was within enough time frame that we were all three in the front yard together.**
Q. Okay. And -- and so the three of you were heading towards the front door, but then you veered left and went towards the gate instead because you heard her crying?
**A. Right. Yeah.**
Q. You're not sure when Officer Thomas peeled off and went elsewhere?
**A. No.**
Q. Do you know where he did -- he went?
**A. So he -- later I realized where he went, because after Vincent come out the front door, I saw Officer Thomas on the back corner, like, the north side of the house. So it was safe to assume that he went around that side.**
Q. Okay. All right. We'll get back to that in a second.
So when you got to the gate, was Molly

Page 30

inside the gate?
**A. Yes.**
Q. Was the gate closed?
**A. Yes.**
Q. Okay. Did you open it or did somebody open it?
**A. So we opened the gate and pulled her out. We -- we had to get her out of there, because based on the information that I had, I thought she was a potential victim, because it was my understanding that she kind of started this whole situation based on the information from dispatch. So, yeah, we opened the gate and we were getting her out of there.**
Q. Okay. So this was you and Officer Casey?
**A. Yes.**
Q. And did -- was she still on the phone when you were getting her out of there?
**A. So when -- when we first made contact with her, she was still on the phone, but I don't -- at some point she got off the phone; I don't remember exactly when that was. It was prior to her coming out from behind the gate, but I don't remember exactly how that happened.**
Q. How much time did you spend talking with her before you removed her from the scene, or did you

Page 31

just --
**A. A few seconds. Not very long.**
Q. Just, "You're going to come with me" type of thing?
**A. Right.**
Q. Do you recall the words that you said and that she said?
**A. No.**
Q. Okay. Did someone get -- did either you or Officer Casey take her from the scene?
**A. Right. So we pulled her out from the gate. We walk her around the other side of the garage. Like, if you are looking at the white truck here. So we walk her over to the far south side of the garage and I'm telling Officer Casey, "Get her out of here, get her out of here," you know, she's -- we've got to get her to safety.**
**At this point I'm still thinking that the individual inside the house is Brett. So I walk over to the corner of the house and I -- I don't remember my exact words, but I believe it was, "Hey, Brett, it's Officer Read."**
**And that's when Molly said, "That's not Brett, that's Vince." And I remember specifically thinking, "Well, shit, this is not good," because**

Page 32

**it's not who I thought it was.**
Q. Is that the first time you heard the name Vince?
**A. Yes. And she -- I'm pretty sure she said Vince, but she did say, "That's not Brett," and that's when I knew.**
Q. Where was she? Was she already with Officer Casey?
**A. Yeah, so Officer Casey -- I mean, she -- she didn't want to leave, but like I said, I didn't know what -- I didn't know the whole story. I'm getting bits and pieces. And I believed she was in danger.**
**So I had officer Casey -- like, I assisted him -- once I said that, realized it wasn't Brett, I walked back and we had to forcefully take Molly up to the edge of the driveway. Once we got up to the edge of the driveway I told officer Casey, I said, "Get her out of here," and I pointed down the street. And so he started walking her south along the sidewalk.**
Q. Okay. So then you go to the corner of the house and you -- and you -- well, before that is when you went to the corner of the house and you said the name Brett?
**A. Right.**

Page 33

Q. You're talking about the -- if you look at this photo, you're talking about the corner that's, like, right by the fence and the gate there?
**A. The corner of the garage.**
Q. Okay.
**A. So, like, right there.**
Q. Okay. So at the front of the white truck that's parked there?
**A. Yeah.**
Q. And then you get Molly out of the scene?
**A. Right.**
Q. Coming back to this white truck, was that truck there when you arrived?
**A. It was.**
Q. Had you heard anything about a white truck prior to arriving?
**A. I believe we were told he was driving a white truck.**
Q. Okay. But you didn't see him --
**A. No.**
Q. -- you know, come to the house or anything like that?
**A. No. No.**
Q. So it was already parked there?
**A. Right.**

Page 34

Q. When you had Officer Casey take Molly from the scene, what did you do next?
**A. So as we're up at the top of the driveway, I turn around and that's when I see him come out the front door, and he's got the gun in his hand.**
**I initially took cover behind the -- the white truck, like, back by the tailgate. And I remember a dog. I find -- there was a lot more to this, something to do with the dog, but I all remember about is there was a dog that came out the front door, and he put the dog back in the house and closed the front door, from what I remember.**
**And then he walked out along this little sidewalk, I don't know, five, ten feet from the door. And then, like an idiot, I left my cover and walked out to the front yard. So we were basically just standing across from each other.**
Q. Okay. So let's talk about each of those aspects separately. So you took cover initially behind the tailgate of the white truck?
**A. Yes.**
Q. Okay. And that's when he exited the front door?
**A. He had exited before I took cover.**
Q. Okay.

Page 35

**A. I had turned around after telling Officer Casey to get Molly out of there. When I turned around and started to walk back, my -- my initial -- what I wanted to do was walk back up to the garage, walk along the front of the garage. But as soon as I turn around and start walking back, that's when he came out, and so that kind of changed my...**
Q. And when he exited the front door and you first saw him, did he have a gun in his hand?
**A. Yes.**
Q. Did you instantly see it?
**A. Instantly. In fact, I believe I told dispatch right away, "He's outside and he has a gun in his hand."**
Q. And what does -- what did Vincent look like?
**A. I don't remember.**
Q. Do you remember anything about his build or his height?
**A. I wouldn't know him if I saw him today.**
Q. Do you remember anything about what he was wearing?
**A. I don't remember. I would say, you know, he was average height, average build. But, like I**

Page 36

**said, that was the first time I had ever seen him, and it was brief, and I wouldn't know him if I saw him now.**
Q. Did you get a good look at the gun?
**A. Yes.**
Q. What did it look like?
**A. So I knew right away the gun was a Ruger. And I remember it had a gold trigger on it. I mean -- yeah, there was a point where I was focused on the gun in his hand.**
Q. Did that strike you as unusual; is that why you remembered it?
**A. The gold trigger struck me as unusual. But I think I remembered it because we're taught, the entire time we're cops, that the hands will kill you and the gun will kill you, so I initially focused on the gun.**
Q. Did you see how he was holding it? How was his arm positioned?
**A. So he -- he was holding the gun down by his side. And I remember that he kept taking his finger and going in and out of the trigger guard. In fact, at one point I believe I called him on it and said, "Keep your finger off the trigger," or something like that. But he -- he just kept putting**

Page 37

**his finger in and out of the trigger guard.**
Q. Was he doing that the entire time frame that you interacted with him?
**A. I don't -- I don't remember.**
Q. But definitely for some --
**A. Yeah.**
Q. -- several times?
**A. Yeah.**
Q. So initially he came out with the gun, and then you took cover behind the tailgate and then you saw the gun prior to him putting the dog back in the house?
**A. Right.**
Q. Okay. Then he put the dog back in the house?
**A. I --**
Q. -- and closed the door?
**A. That's what I remember.**
Q. Right. And then he came back out with the gun again?
**A. Right. He never fully went back into the house.**
Q. Okay.
**A. He just, like, reached in and pulled the door, but he never actually -- his body never**

Page 38

**actually went back into the house.**
Q. Okay. Did you leave your cover position -- strike that.
Why did you leave your cover position?
**A. Good question. I mean, I've -- I've talked to several other officers who train and do force-on-force training, and they've -- they believe they understand why I did it, but I -- at the time, I don't know why I did it. I have no idea why I did it.**
Q. When you left that position, you started interacting with him, where were you standing?
**A. So I was standing on the same cement sidewalk, probably ten feet from him.**
Q. Okay. So was he about where it's curving right there on the driveway?
**A. So, you know, it's hard -- it's hard to look at this picture, because I remembered the cement walkway going from the front door to the gate, and that's obviously not the case.**
Q. Right.
**A. But he was standing on the cement as it curved probably ten feet from the door.**
Q. Okay.
**A. Right.**

Page 39

Q. And you were about ten feet from him?
**A. Right. I mean, a guess.**
Q. Right. Did you -- did you point your gun at him?
**A. Yes, I had my gun pointed at him the whole time I was talking to him.**
Q. So the entire time when you left your covered position?
**A. Uh-huh (affirmative).**
Q. Did he speak to you?
**A. So there was a whole conversation that took place, but I don't remember anything I said to him or anything that he said to me. I know there was communication back and forth, but I had things going through my head. And I think I was just, you know -- I don't know what I was saying to him and I don't know what he was saying to me, to be honest with you.**
Q. Okay. And if you don't remember your exact words, that's fine, you know, we'll -- if -- do you remember, generally, concepts that you may have discussed with him?
**A. I -- you know, "Drop the gun." I vaguely remember saying something about, you know, "I've got a family too, don't -- don't do this." I -- I -- I remember feeling like I was begging him to drop the**

Page 40

**gun.**
Q. Do you remember anything that he said?
**A. I don't.**
Q. Do you know -- was he talking?
**A. I -- I seem to recall there was conversation back and forth, but like I said, I don't remember exactly what I said. I don't remember what he said.**
Q. Okay.
**A. And I don't know that I ever will, because I just -- it's just not part of the memory that I have.**
Q. How much time did you spend interacting with him during that -- when you're ten feet apart?
**A. So it felt like three hours. How long it was, I don't know. It felt like an eternity.**
Q. Okay. During that time frame could you see anyone else?
**A. So during this time frame I saw Gary Thomas back behind the corner of the house.**
Q. Talking about the north -- northeast corner?
**A. Yes.**
Q. Okay.
**A. And then he came out from behind the**

**house, and I don't know -- like, I lost sight of him. I mean, I -- I was kind of tunnel-visioned in on -- on him and so -- I mean, Gary could have been standing five feet off to my right; I don't know if I would have saw him.**

Q. So you had a sense that he was there?

**A. I had a sense that he was there, yes. I -- I -- I knew he was there, but I -- I wasn't -- I didn't see him, I didn't focus on him, I didn't make a mental note of, "Oh, there he is," except for when he was -- so when he -- when -- when we were first initially standing across from each other, Officer Thomas was back here. And I remember that because I -- I was looking right past Vince to Officer Thomas.**

Q. At this point Officer Casey and Molly were long gone, right?

**A. To my knowledge, yeah.**

Q. Do you recall hearing Molly, you know, saying anything or --

**A. No.**

Q. -- anything like that?

**A. No.**

Q. Okay. So from -- during this time frame you're focused solely on -- on the victim -- on

the -- sorry -- the suspect. And what -- strike that.

So you're about ten feet from him and he is facing you. Do you recall his body position, whether his feet are, you know, perpendicular to you or squared against you or anything?

**A. I mean, he was just facing me, so I...**

Q. Okay. Do you recall the expression on his face?

**A. No.**

Q. Do you recall where he was looking?

**A. I mean -- so, initially he was looking at me, but there came a point where he turned his focus over to the fenced area.**

Q. Okay. So, initially you said he was looking at you. Was that while you were talking with him?

**A. Right.**

Q. And then did that take some time? You can't remember how many minutes --

**A. Yeah, I don't --**

Q. -- or seconds it was?

**A. Yeah, I don't remember what -- how long. Yeah, obviously that took some time.**

Q. Okay. And then eventually he turned his

focus towards the fence?

**A. Right.**

Q. During the time frame when you were talking, before he turned his focus to the fence, was he holding the gun the entire time?

**A. Yes.**

Q. And was his gun always facing downward?

**A. Yes.**

Q. And you mentioned that you saw his finger going in and out of the trigger?

**A. Yes.**

Q. Did he have any other body movements or gestures that you can recall?

**A. No.**

Q. Okay. When he turned his attention towards the gate, what did he do next?

**A. He started walking towards the gate.**

Q. Do you recall saying anything to him at that point?

**A. I -- I think there was still probably communication back and forth. He started to walk towards the gate. I remember closing the distance on him. I mean, I got -- I got really close to him, probably five feet at that point, because I actually thought to myself, "Just tackle him," but very**

**quickly I realized there is only one outcome if that goes bad. Like, if I tackle him and I can't tackle him, then I lose that situation very quickly. So I realized I could not tackle, I couldn't take that risk. So I -- I probably just kept giving him commands as we were walking over towards the fence.**

Q. Okay. When he was going towards the fence, was he looking at the fence or looking at you?

**A. So -- I don't remember what he was doing. I just remember he was walking towards the fence.**

Q. When he got there, what did he do?

**A. So he gets to the fence and he kind of looks over the fence. And then he turns back towards me and he -- he smiled at me. And he turned, like -- I remember he took his left hand and he pushed the gate like this, and as he kind of turned to step inside the gate he brought the gun up, and that's when I fired.**

Q. So you remember as he was going into the gate -- let me, actually, show you another exhibit that we looked at earlier. This is Exhibit 3. If you could take a look at Exhibit 3. Is that the gate that we're talking about?

**A. Yes.**

Q. Okay. And so did he kind of walk at an

angle across this dirt area to the right?
**A. Yes.**
Q. Okay. So he went from the sidewalk towards this gate area. Which way does the gate swing in?
**A. So the gate swings in so the -- the -- it hinges on the left, so the gate swings this way.**
Q. Right. And so the -- was there a latch on the right side?
**A. So I don't remember if there was a latch. I remember we had to open the gate to get Molly out. I remember him just pushing the gate, so I don't know how it operated.**
Q. Okay. So he was holding the gun in his right hand; is that right?
**A. Yes.**
Q. And up until that point his hand had always been facing downward?
**A. Uh-huh (affirmative).**
Q. And the gun had been facing downward?
**A. Yes.**
Q. And then when he got to the gate did he lift his left hand first, to push the gate with the left hand?
**A. Right, right. So -- and I don't remember**

**the exact sequence, but I remember he put his hand up and went to push the gate open as he stepped through, and brought his right hand up. And I don't -- I don't know how far it got up. I don't -- I don't remember consciously thinking, "Shoot." I remember specifically watching the casings come out of my gun and thinking to myself, "Oh, my gosh, I'm shooting." Like, I never said to myself, "Shoot." I remember seeing the casings fly out of my gun, and that's how I knew I was firing my weapon.**
MS. WHITE: May I ask for a clarification? You asked him if he saw which hand go up on the gate, and then he said, "Right, right," and so I don't know if he meant "that's correct" --
MR. BURR: Oh.
MS. WHITE: -- or it was the right, and I think you might want that.
MR. BURR: Oh, I --
THE WITNESS: I'm sorry.
Q. (BY MR. BURR) Let's clarify that.
**A. So his left hand came up to the gate. His right hand was on the gun the whole time.**
Q. So he got to the gate. His left hand lifted up to push the gate. And then his right hand lifted up underneath it, with the gun pointed --

**A. Yes.**
Q. -- more towards your direction?
**A. Yes.**
Q. Okay. You don't remember how high the gun got, but you definitely remember him lifting the gun?
**A. Right.**
Q. Okay. The smile you referenced earlier, where he looked at you and smiled, how quick was that?
**A. I don't know. I mean, it sounds crazy, but time did not exist. I mean, it...**
Q. Right. Did he say anything before or after that -- immediately before or after that?
**A. I don't remember.**
Q. Did you have any impression at the time as to why he was going into that side yard?
**A. I had my opinion, and I -- I had my thoughts on it, but I don't know that I can say I know why, because, obviously --**
Q. Well, let's take it -- first, at the time, while you're in the moment, was anything crossing your mind as to why he's going into the backyard?
**A. I thought he was looking for Molly.**
Q. Okay.
**A. Because that's the last place she was.**

Q. Were you concerned for her life at that point?
**A. Absolutely.**
Q. Afterward, did you form any other opinions based on your observations that -- that -- during that incident as to why?
**A. Like, since that day?**
Q. Right, as to why he was going in that backyard.
**A. I have my opinions.**
Q. What's your opinion?
**A. I think he was going after Molly. I -- for what reason, I -- I go back and forth. Was he going to hurt her? Was he going to make sure she saw what he was about to do? I don't know, but I -- I do believe that he thought she was probably still in the backyard.**
Q. Okay. So when Officer Casey took her from the scene and started going southward, that was before Vincent came out the front door?
**A. Yeah. Yeah, she was -- by that time she probably was a house down.**
Q. Okay. So Vincent wouldn't have seen her exiting the -- the premises?
**A. If he saw her out a window, but he**

Page 49

**wouldn't have seen her from the front door.**

Q. Right. Okay. I know you mentioned you don't recall the specific words that he ever said. Do you recall anything about his tone of voice, whether he was talking loudly, softly?

**A. Not really. He wasn't loud. I don't recall thinking, oh, he's -- he's loud or out of control or anything like that. I -- I -- so I wouldn't say he was talking loud.**

Q. How many shots did you fire?

**A. I've been told how many, but at the time it was different than what I thought, what actually -- do you want to know what I did or what I thought?**

Q. What you thought.

**A. I thought I fired three to four.**

Q. Okay. And what have you been told subsequently?

**A. Five.**

Q. And when you were shooting, had he already gone past the gate?

**A. I don't remember.**

Q. Okay. Do you know if the gate was opening or closing, or anything like that?

**A. No.**

Page 50

Q. Okay. Did -- after -- after you fired your weapon, what's the next thing you remember?

**A. So after I fired my weapon, I took cover behind this brick wall right here.**

Q. Okay.

**A. And I kind of got down in, like, a kneeling stance. And you can see this hole in the gate right there. I could see him through the gate -- I could see Vincent through the gate, and he was lying on the ground. And I could see that he was kind of laying on his side -- his right side and he still had the gun in his hand. And he was kind of rolling back and forth. And he was kind of taking the gun and doing this with it. And I think I even told dispatch, you know, "He still has the gun," or "He's still" -- something to the effect that he still has the weapon.**

Q. Okay. Do you recall whether Officer Thomas ever arrived on the scene?

**A. So Officer Thomas was probably doing a whole bunch of stuff, but I don't remember what he was doing. I was focused on -- on Vince. I don't...**

Q. After you -- I'll mark this document as Exhibit 5.

(EXHIBIT 5 WAS MARKED.)

Page 51

Q. This is more a zoomed-in image of the gate. Is that the gate that -- that was at their property?

**A. Yeah.**

Q. And you mentioned being able to see Vincent through a hole. Is that the hole that's about two-thirds of the way down?

**A. Yes.**

Q. This big horizontal, rectangular hole?

**A. Yes.**

Q. And you could see him through that hole kind of --

**A. Right.**

Q. -- rocking back and forth on the ground?

**A. Right.**

Q. And at that point the gun was still in his hand?

**A. Yes.**

Q. Do you know if his finger was on the trigger?

**A. No, I don't.**

Q. Do you recall what happened next? You mentioned that you were in a crouched position by the corner.

**A. Right. So I was keeping cover back here.**

Page 52

**I watched him for -- like I said, I don't know how long. I don't know what the time was, but I -- I recall at one point he -- his body went limp and he stopped moving completely. And that's when, as fast as I could, I went through the gate, I kicked the gun out of his hand. And the gun ended up -- I don't know how many feet west of where he was laying.**

MR. BURR: Okay. Let's take a break.

MS. WHITE: You bet.

THE VIDEOGRAPHER: Off the record. The time is 1:51.

(A break was taken from 1:51 p.m. to 1:58 p.m.)

THE VIDEOGRAPHER: Returning on the record. The time is 1:58.

Q. (BY MR. BURR) So after you kicked the gun away from his hand, do you recall what else happened after that?

**A. So I remember I told Officer Thomas to stay on the gun, "Don't let anybody touch it, don't let anybody move it."**

**Prior to that, though, I think -- so the way Vincent was laying, we moved him just a little bit and there was a fairly large pool of blood, so I knew that there was nothing that we were going to be**

Page 53

**able to do for him, so immediately contacted medical, had them come respond in and start doing their thing.**

**While they did their thing, I went to my patrol vehicle. I grabbed cones and I handed cones to an officer and I said, "Put these on all the shell casings." I told another officer, you know, "Put up crime scene tape." I basically just started trying to lock down the scene so that crime scene could then come do their job.**

Q. How quickly did others arrive on the scene besides you and Officer Thomas?

**A. And Officer Casey?**

Q. Yes.

**A. Pretty quickly.**

Q. Did Officer Casey come back immediately?

**A. No, he -- I mean, he -- I mean, on scene. He was still over -- but you mean officers from other jurisdictions? They were -- they were pretty quick. I want to say as soon as I exited the gate and went outside I was met by a Bountiful officer, who is the one I think I gave the cones to, once I got them. And then there was a Davis County sheriff that had arrived. But what their time frames were, where they were at, what time they got there, I don't -- I don't really know.**

Page 54

Q. And how long did it take for medical to arrive?

**A. It was -- I feel like it was pretty quick, like, really quick.**

Q. Had he already passed away prior to that?

**A. I didn't -- I wasn't told whether or not he had passed away until much later that evening.**

Q. Later that evening did you have to give statements, interviews, anything like that?

**A. No.**

Q. When did you --

**A. No, they took me -- so my chief, who had arrived -- I don't know how much later -- he took me back to my police department. They set me in a conference room. I sat there and met with an attorney from the FOP. And then I think -- so crime scene came. They took -- did they take my whole uniform? They -- they took my -- they took some of my stuff; I don't remember exactly what. They took photographs of me. And then they sent me home.**

Q. And did -- at some point did you have to give a statement?

**A. Two days later. This happened on a Sunday. I think Tuesday or Wednesday morning I had to give a statement.**

Page 55

Q. Okay. And besides that statement, have you ever recounted -- I don't want you to tell me anything you may have told your lawyers at any point. Did you give an account of your statement to anybody else other than that interview?

**A. So it was probably six or eight months later I was allowed to talk to my -- my police department, and we had department meeting where I went through my experience. And it was -- it was after that, that -- I mean, it was -- it was a long, long time before they set me down and told me everything. I went months and months and months only knowing what I knew of the situation. And I was able to give that version to my police department, but it wasn't with -- it was without all the known details. It was just based off my knowledge at the time.**

Q. And during that time frame you understood they were doing an investigation?

**A. So the -- the criminal investigation was done. That investigation was over. And we hadn't been notified that we were being sued by the family civilly at that point. So it was kind of that in between.**

Q. Okay. And was it your understanding that this meeting with the police -- with your department

Page 56

was about the civil lawsuit or about something else?

**A. No, it was just kind of a -- a debrief of the events that happened that day. As -- as a police department, obviously we want to take every situation we're involved in when they're critical like that and use them as training issues and talk about things that happened right and the things that happened wrong.**

Q. Prior to that point had you been instructed by anyone to not speak about the incident?

**A. So I was told not to talk about it as long as the criminal investigation was going on, and then I was told not to talk -- or be careful about what I say, because we were expected -- we were expecting a lawsuit to come from the family.**

Q. All right. Did -- strike that.

You mentioned earlier that you recall him tapping the -- or sticking his finger in and out of the trigger area of the gun, right?

**A. Right.**

Q. You recall vaguely saying something about, "Don't do that," right?

**A. Right. I don't remember my exact words, but I remember calling him out on the fact that he was doing it.**

Q. Okay. Do you recall whether you told him to put the weapon down?
**A. I don't recall if I did. I mean, I want to sit here and say I'm sure I did, because that only makes sense, but like I say, I don't -- I don't remember the exact words I said and didn't say.**
Q. Okay. Do you recall hearing anything about whether he was intoxicated that day?
**A. No.**
Q. Did you observe anything in his actions that led you to believe that he may have been intoxicated?
**A. It was -- like I said, it -- it was so quickly evolving, like -- like that wasn't even on my mind. I wasn't looking for those clues. I wasn't looking for that, you know.**
Q. You were focused on the gun --
**A. Right, and --**
Q. -- and preventing injury?
**A. -- the situation at hand. I wasn't worried about whether or not he was intoxicated. That never even crossed my mind.**
Q. You mentioned earlier that when he was going towards the side yard, you were concerned for Molly's life?

**A. Right.**
Q. Were you concerned for your life during this entire time frame?
**A. Yeah. Yes, I was.**
Q. Were you concerned for anyone else's safety?
**A. I mean, I'm concerned for a whole lot of people's safety, based on the information that I have. I mean, the initial information that I have is that he's going to a house in Bountiful to, you know, cause harm to somebody.**
**Then he comes back to the house and he's clearly still upset, he -- you know, the information I have is he's getting more weapons out of the safe. So I'm concerned about the officers that are with me, I'm concerned about Molly.**
Q. Have you ever had any other incidents in your career where someone was approaching you with a weapon in their hand?
**A. Not that I can recall.**
Q. Did -- did Vincent ever take any actions during the entire time frame that you felt were kind of indicating that he was kind of retreating from the scene or trying to --
**A. No.**

Q. -- deescalate the situation?
**A. No.**
Q. Do you feel that the tension was there through the whole time?
**A. Oh, yeah, absolutely.**
Q. And when he went to the gate and he lifted his right arm, did you -- do you recall any thoughts that went through your mind at that point?
**A. No. Like I said, I -- I just remember shell casings flying out of my gun. I don't -- I don't remember having any conscious thoughts at that time. I remember thinking, "Oh, my gosh, I'm firing my gun."**
Q. Was he walking towards the gate and going into the gate quickly, a normal pace?
**A. No, he -- he had got to the gate and he had stopped. And at one point he was facing me again, and then he turned to go through the gate.**
Q. When he stopped and was facing you, is that when he smiled?
**A. So, he -- he stopped and faced towards me and -- I don't know how long the pause was, but, yeah, that's about the time that he -- he smiled at me and he turned and -- and went -- the movement. I do remember thinking that if he makes it behind that**

**gate, I'm dead. I do remember thinking that if he gets on the other side of that fence, I'm dead, because I can't see him and he can see me.**
MR. BURR: Okay. I'll pass the witness.
(Discussion off the record.)
THE VIDEOGRAPHER: Off the record. The time is 2:07.
(A break was taken from 2:07 p.m. to 2:08 p.m.)
THE VIDEOGRAPHER: Returning on the record. The time is 2:08.

EXAMINATION
BY MR. CUMMINGS:

Q. Good afternoon, Officer Read. And just for my sake, how do you spell your last name?
**A. R-e-a-d.**
Q. R-e-a-d, okay.
**A. Yes.**
Q. I've seen it spelled both -- different ways.
**A. Mine is the right way.**
Q. Yours isn't the right way, yours is the reading way. Okay. Now that we got that out of the way.
Did you review anything in preparation for

Page 61

today's deposition?
**A. No.**
Q. Have you read your interview or the reports since the day of the shooting?
**A. No.**
Q. After -- on the -- on the date in question, after you had shot Mr. Farrand, do you remember making any statements?
**A. Like, as far as on scene or --**
Q. On scene, yes.
**A. I don't remember.**
Q. All right. So let's go back -- and I guess just at the outset here, to lay some initial ground rules as we proceed, my name is Robert Cummings. I'm here on behalf of the plaintiff, Molly Farrand. I'll be asking questions. And you're under oath just as if you were taking -- providing testimony in court.
**A. Right.**
Q. If one of the attorneys objects, unless they instruct you to not answer -- or your attorney instructs you to not answer, I -- I do expect an answer, and I would appreciate an answer.
If there is anything that involves your attorney -- any conversation with your attorney or

Page 62

any other attorneys, including the fraternal brotherhood -- or fraternal brotherhood of the police --
**A. Fraternal Order of Police.**
Q. Order of Police. Thank you.
**A. You got it.**
Q. That's nonsexist. I like that one better.
I don't want to know anything with the attorneys. If we get close to that, just don't -- don't bring up that information.
Now, are you on anything today that would affect your ability to recall the events or to testify truthfully?
**A. No.**
Q. Are you on any medication today?
**A. No. I consider myself pretty healthy.**
Q. Now, going back to the outset of the call. At a certain point you recognized one of the names --
**A. Right.**
Q. -- is that correct?
Can you tell me how that came about?
**A. So, like I said before, I was -- I remember seeing the name on the dispatch call screen. And I don't remember exactly what the notes were, because I'm driving at the time, but I remember**

Page 63

**seeing the name. I recall the name.**
Q. And which name was that?
**A. Brett. I don't remember his last -- I want to say his last name is Clyde, but I don't remember exactly.**
Q. Okay. And that's -- I believe that is correct.
And do you also know Courtney Parks?
**A. So I've never met Courtney, and I didn't know that was her name at the time. I since have come to discover that's her name. But at the time I didn't know of Courtney, I didn't know -- how it came about that I knew my sister knew Brett, was I had seen a Facebook photo of the two of them together previously, prior to this date. That's how I -- I saw my sister with this guy.**
**And I'm, like, "How do you know this guy?" Like, "Why are you in the same pack with this guy who's a criminal," you know.**
**And that's when she told me, "Well, Chris" -- her husband is Courtney's brother -- however that works -- and that they're -- Brett is married to -- I assume married to Courtney. I -- I don't even know if that's correct.**
Q. I think we are going to need a dry erase

Page 64

board to figure that out.
**A. Right.**
Q. There is a connection there?
**A. There is a connection there, yes.**
Q. Okay. Now, you said you had arrested Brett on previous occasions?
**A. (Witness nods head.)**
Q. Can you -- how many times did you -- have you -- had you arrested Brett?
**A. I want to say two, but it might -- might have only been one. And maybe it was that -- maybe I dealt with him twice, two separate times on the same case.**
Q. Okay.
**A. I don't remember. It was -- it was a year or two before this.**
Q. And you mentioned a citation. Can you kind of give me the circumstances surrounding either that arrest, detention or...
**A. I don't -- I don't know if I can talk about his, because he's an adult and he has rights to privacy. So I don't know if I can discuss why he was arrested.**
Q. Okay.
**A. I don't know the answer to that, so I'd**

Page 65

**hate to do that when I can't.**

Q. Let me ask you this: Was it a violent -- did it involve any violent crime, by chance?

**A. No. No, it was not.**

Q. Okay. And you said it was about two years before this? What was the length of time?

**A. Yeah, one to two years before this incident.**

Q. And then, to the best of your knowledge, how well does your sister know Mr. Clyde?

**A. As simple as that. The relationship -- before we go -- you want to go through it all over again with the whiteboard?**

Q. No, no, no, that's --

**A. Yeah. Essentially, yeah, just that -- through -- through marriage and whatever else. She wasn't -- she wasn't friends with him, she didn't hang out with him -- it was a -- it was a family function that they were in a Facebook photo together.**

Q. Okay. So when you -- when you read on the dispatch log, you see Brett Clyde referenced but you don't remember exactly how it comes up in context, where it fits?

**A. No, I -- I don't remember the context, but I do remember thinking, Brett's my guy, Brett's the**

Page 66

**suspect, Brett's the guy I'm going to be going to make contact with or -- or is the husband of the female I'm going to make contact with.**

Q. And you were initially headed to Bountiful?

**A. No, I never went to Bountiful. Never headed to Bountiful, never went that direction. From the time I signed on and got the call, I was heading to Molly's house.**

Q. So how did the Bountiful fit into the equation, then?

**A. So I was scanning Bountiful's dispatch. We work off two different dispatches. I was scanning Bountiful's channel when they were sending officers to the house in Bountiful, because, as I now know, Vince was on his way there to do harm to Brett. And if I recall, they said, "He has a gun." He -- he had a weapon, so...**

Q. And you did give a statement in this case previously -- or not this lawsuit, but regarding this incident, correct?

**A. Yes.**

Q. And that was part of the investigation following the --

**A. Yes. Yes, part of the criminal**

Page 67

**investigation.**

Q. So after you get to the house, if I remember correctly, you saw Molly on the...

**A. South.**

Q. South side of the house, by the gate, correct?

**A. Behind the gate.**

Q. Behind the gate, right.

**A. Now, I could hear her before I saw her.**

Q. Okay. Now, describe to me -- and at that point you still believe it's Brett, Brett's involved with something?

**A. Right. I believe it's Brett inside the house.**

Q. Okay. Did you believe it was Brett that had the gun or that Brett was the target?

**A. No, I believed Brett had the gun.**

Q. Okay. Now, if Brett had the gun, you said that you believe you could have talked him down?

**A. Absolutely. I believe that, yeah.**

Q. Okay. So then tell me what -- like, the -- describe the approach to Molly on the side of the house.

**A. So, like I said, I remember hearing her. I don't remember exactly what she was saying or, you**

Page 68

**know -- I just remember hearing her, and then looking over and I could see kind of the top of her head behind the gate. I'm tall, so that works out.**

Q. Yeah.

**A. But we just went over. And she is on the phone. And it was safe to assume she was on the phone with dispatch. And we basically grab her, because we -- we got to get her out of there. Like, I'm -- we -- we go on suicidal calls all the time. We go on calls all the time where people are with their family members who are out of control, who are upset, whatever the case may be, and they are still inside the house. So the fact that Molly was cowering outside the house behind the gate, that told me things were really, really bad. Because I've been in bad situations where the family is still inside the house with the person who is the problem. So the fact that she's outside cowering, it -- it told me right away that things were bad.**

Q. Okay. Now, describe that -- that -- that immediate conversation. Did you -- like, what was your first statement and what was her response?

**A. I don't -- I don't remember what was said. I just remember thinking, "We have got to get her out of there." I would dare say most of my communication**

**at that point was taking place with Officer Casey in coordinating getting her out of there.**

Q. Okay. And how did you get her out of there?

**A. So we had to -- we had to pull her out from behind the gate. We walked over to -- up to this point she was fairly cooperative with us. We get her over to the side of the garage. She wanted to stay there. She did not want to leave back behind the garage, and I don't know why that is. But she -- she wanted to stay right there, and we weren't about to let that happen. She was way too close to - to the circumstance of what was going on.**

**So we start taking her up the driveway and she starts to physically fight with us. And Officer Casey -- you'll see him -- he's a big, strong guy. He -- as soon as -- as soon as I assisted him getting her to the top of the driveway, I told him, I'm like, "Get her out of here, get her gone," and he -- he forcefully walked her down the street.**

Q. When you say you assisted Officer Casey, describe what you mean by that.

**A. So he had -- he had one arm and I had one arm, and we were walking her up the driveway.**

Q. Was it -- so, like, your right hand is

grasping, like, a biceps, like that --

**A. So I don't remember -- I don't remember -- I want to say I was her left side. I don't -- I don't know for sure. I'm just trying to think of how I turned toward the house. I think I was on her left side, so I probably had my -- my left hand on her left wrist and my right hand on her left arm as we were walking her up the driveway.**

Q. Okay. What -- and I -- I might have already asked this, but at that point on the driveway, as you are assisting Officer Casey and forcefully removing Molly, did she make any statements or did she say anything at that point?

**A. If she did, I don't remember.**

Q. Would it generally be something that if -- you know, like a -- a witness or a victim is on a scene -- on the scene like that, would a state -- would you generally listen to a statement from them?

**A. No, not under those circumstances. My focus is on the danger. I mean, we -- we have all the time in the world to get a statement from her later on, after the fact. Right then and there I've got a real threat behind me. I've got to get her out of there and I've got to focus.**

Q. Okay. At that point in time, though, she

did say something along the lines of, like, "It's not Brett inside," correct?

**A. So I do remember her saying, "It's not Brett."**

Q. Okay. And do you remember anything else about what she said about Brett or --

**A. No, 'cause I remember thinking, "Oh, cra" -- you know, I think I actually said out loud, "Oh, shit," or something like that, because this whole time I'm thinking, Okay, it's Brett inside the house, I'm going to be able to talk to Brett. I have a rapport with Brett, like, we're going to work through this. As bad as it seems right now -- like, I was still confident that this was not going to end badly.**

**As soon as she said, "That's not Brett," or, you know -- I don't remember exact words, but essentially I realized, Okay, I'm not dealing with Brett.**

Q. Yeah.

**A. I'm dealing with somebody I have no idea who they are." And I remember thinking, Crap, okay, I got to -- I got to regroup mentally as to how I'm going to deal with the situation.**

**Unfortunately, I never really got that time to reassess, because it went straight from,**

**okay, well, I got to get her the hell out of here, and then he comes out of the house with the gun. I didn't -- there was no time to reassess what I was doing.**

Q. It evolved quickly?

**A. Very quickly.**

Q. And you didn't take a chance there to follow up with Molly and say, "So who is this? What's going on?"

**A. No. I mean -- no, I -- I didn't.**

Q. But the change -- when you realized it wasn't Brett any longer, like, that was a pretty big change to you, that was significant?

**A. Absolutely, it was. I -- I had become -- I hate to use the word "afraid," but I -- I became much more afraid at that point as to what I had just gotten myself into.**

Q. Because an unknown became an unknown variable --

**A. Yes. Yes. Exactly.**

Q. Now, you mentioned that there was a dog that came out of the house, and then Mr. Farrand put the dog back in the house and closed the door?

**A. Is what I remember.**

Q. So the dog may have been in the front yard

Page 73

or may have came out with him?

**A. Yeah. I don't -- I don't remember how -- I don't remember, like -- I want to say he -- he came out, and when he initially came out he left the front door open as he walked out, and the dog followed him out. And the dog came out to the yard and he grabbed the dog, pushed the dog back inside and closed the door. And then turned around and came back out -- or walked towards me.**

Q. You don't know if the house has, like, a back doggy door or anything along those lines, correct?

**A. I have no idea.**

Q. Did you ever see the dog again?

**A. No.**

Q. And then after -- so you find out it's not Brett. It's a significant change for you. And then at that -- around that point, Vincent comes out the door, right?

**A. Right.**

Q. And you're taking cover behind the white truck?

**A. Right.**

Q. Around the tailgate, right?

**A. Right.**

Page 74

Q. And I believe that you testified at some point you came out of that cover?

**A. Right.**

Q. And I don't remember -- I think you -- let's see here. You said, "Like an idiot." And then I think before in your -- your witness statement I think you said, "Like a retard, came out under cover."

Why -- why do you think that you were -- to use your terms, an idiot, at that point?

**A. So -- because I came out from behind cover. I mean, that just makes sense you would stay behind something that would help protect you from a bullet. I didn't do that. I -- I don't know -- you know, I -- I -- like I said, I've talked to different people who do trainings, who study this sort of thing, and they've told me why they think I did.**

Q. And what was that?

**A. So when we do -- when we do firearms training, we stand in front of a target, right? We just stand in front of a paper target face to face, and that's what we do over and over, all the time.**

**So the guys I've talked to that have done force-on-force, they said, "Well, when you obviously are in a very stressful situation, your body goes back and your mind goes back to what it knows; it goes back to muscle memory, it goes back to your training. And you trained to stand right in front of the bad guy."**

**And so that's what -- they tell me I -- I was just doing what I was trained to do. You know, we -- we don't train enough on cover and concealment. We talk about it as officers all the time, make sure you have cover and concealment, but then we go to firearms training and we stand in front of the paper target.**

Page 75

Q. Would it be fair to say -- you said that you did what you were trained to do. Would it be better to say that you did what you did during training, I guess to say, because you talk about concealment and hiding, but then when you practice, you know, shooting, you --

**A. No, we don't really train concealment and cover. We talk about it, but we don't really train it. So, yeah, I -- I did what we do in training; we stand in front of a target, you know, and that's -- that's our bad guy and that's what we do, so...**

Q. Would it be fair to say that the -- I guess the proper way to handle someone with a gun would be to remain under cover?

Page 76

MS. WHITE: Objection. Incomplete hypothetical. Speculation.

MR. BURR: Same objection. Vague.

MS. WHITE: Go ahead.

THE WITNESS: Answer it still?

MS. WHITE: Yes.

THE WITNESS: So I don't -- I think we -- will you ask it one more time?

MR. CUMMINGS: Sure.

Q. And I might have -- what would be the, I guess -- would it be proper or would the -- would your training dictate that if you have somebody with a gun, the general best approach would be to be under cover or behind something?

**A. Oh --**

MS. WHITE: Same objection.

MR. BURR: Same objection.

THE WITNESS: I wished there was a way that we could say what was proper and what wasn't. Every situation is so incredibly dynamic. We make the best out of each and every one. Like I said, I had the individual who pulls out a gun and shoots himself in front of me. If I had known that guy had a gun, I probably wouldn't have walked up to him.

Q. (BY MR. CUMMINGS) Yeah.

Page 77

**A. Same situation here. Had I it to do over again, having been through it now, I probably would have stayed behind the truck, but -- I mean, I -- I did what I did at the time, and I don't know why or what -- what made me do that. Like I said, I've had people tell me what they think, but I don't know why.**

Q. And it's easy to live life in the rearview mirror --

**A. Yes.**

Q. -- and second-guess yourself.

**A. Yes.**

Q. I get that.

**A. Yes.**

Q. Thank you for the -- for being candid, though.

Now -- so you come out from the cover and Mr. Farrand is going to the fence, and at some point he -- he turns to face you, and he smiled. Like, how -- were you shoulder to shoulder squared off, or how was his body to your body at that point?

**A. So when -- we -- we were squared off. I don't know how long the time frame was, but, like I said, he walked over, and he kind of does a peek over the fence. And he turns and he's now -- now he's faced towards me. And I don't know -- I mean, I have**

Page 78

**opinions about what was going through his mind at that time. I have to tell myself certain things. But the time frame I don't know, but he smiled at me and that's when he made his move.**

Q. And so -- you said that you have your opinions about kind of what was going through his mind. Did you draw those opinions, like, when this was all going on or --

**A. Over time. Not -- not -- not while it's going on. I mean, I'm not thinking anything while it's going on, but -- I mean, unfortunately, for the next -- rest of my life, I have it to think over and over and over again and re -- replay certain things. And so over time I -- you know, I've come to different opinions and thoughts about it.**

Q. Do you know where Officer Thomas was when Mr. Farrand squared off with you?

**A. No.**

Q. And then -- so after that he squared off and then he turns back to the fence and you said he made his move. What do you mean, "he made his move"?

**A. So that's when he -- he raises his left hand and he pushes the -- like, pushes the gate open and comes up with his right. And I feel like -- I don't -- I feel like he was kind of ducking, if that**

Page 79

**makes sense.**

Q. Like a shoulder push with the fence?

**A. No, no, he pushed the -- like, he pushed the fence to give himself access, went to step through and did this.**

Q. Okay.

**A. So he kind of -- he was -- he was -- he was bladed to me but he was, like -- like, this side of his body was showing at that point, when he came up like this.**

Q. So, like, a shoulder, like, a little bit to the back?

**A. Right.**

Q. And where were you at that point?

**A. So I'm still -- if you look at this picture right here -- Exhibit 3, I guess.**

Q. Yeah.

**A. It was -- like, I'm between -- I would say I was between the fence and the edge of the garage here. So I'm kind of in just open space right there.**

Q. Are you more towards the garage or are you more towards the dirt?

**A. I was more towards the garage at that point, from what I recall.**

Q. Could you see when Mr. Farrand was doing

Page 80

this, I guess -- I don't know if you said kind of like a tuck or a roll?

**A. Like a duck.**

Q. Like a duck. When he was doing that duck, could you see his -- the front of his torso?

**A. No, I don't -- and I don't remember if I could or not. I -- I -- maybe I could. I don't remember.**

Q. And then you said you saw him bringing the gun up. Can you --

**A. Right.**

Q. I would just kind of like to see if --

**A. So he's -- so he's pushing the door and he's got the gun down here, and he comes up like that.**

Q. So under his left arm, the gun --

**A. Right.**

Q. The gun is here?

**A. Right.**

Q. Okay. And then at that point, you don't remember why, you just --

**A. Right.**

Q. -- your body clicked in training --

**A. Yeah.**

Q. -- and (indistinguishable)?

Page 81

Okay. Now, prior to -- and then -- strike that.

After Mr. Farrand is shot, tell me what you do.

**A. So I take cover back here behind this brick, and I duck -- I get down, like, in a kneeling stance. So I'm back here. And from that vantage point I can see through that hole in the gate and I could see him. And I just sat there and I watched him. And he was kind of rolling -- not rolling, but he was just moving back and forth a little bit. He had the gun in his hand and he was kind of just doing this with the gun when he rolled. And I don't know how long that went on for, but I do remember as soon as I kind of saw him just kind of go limp, that's when I busted through the gate.**

**And, like I said, I don't -- I don't know how the gate was latched, I don't remember, but I was able to get through the gate fairly quickly, and I immediately just kicked the gun out of his hand.**

Q. Officer Thomas used the term "fatal funnel." Do you know what that means?

**A. So -- I do know what that means.**

Q. Okay. Can you describe that to me?

**A. So the fatal funnel is we -- we consider**

Page 82

**it, like, doorways or entryways. There's -- there's points where -- are much more dangerous for us in law enforcement, like a doorway. Like a bad guy, he knows we're not coming through the wall, right? He knows we're coming through that door. So for that brief period, until we can get through that entry point, we're in that called the fatal funnel, because that's where the bad guy knows we're coming. He knows we're going to be there. As long as we're outside that, he doesn't know where we're at. Once we're inside of that, we can reassess and maybe find somewhere else to be, but for that second, for that time period, he knows where we're at, you know, we're coming that way.**

Q. Did that cross your mind at all when you went through the fence?

**A. No.**

Q. Now, before -- and I guess at that point you went through the fence and you kicked the gun away --

**A. Right.**

Q. -- immediately. And then what did you do after that?

**A. Well, I -- I remember when I kicked the gun, it was heavy, and that caused me some distress.**

Page 83

**Because whether you want to or not, you tell yourself, "It's not as bad as it seems." You just do. And I remember when I kicked the gun and it was heavy, I remember thinking, aww, it was loaded, you know, this -- this was real, like this -- so that caused me distress.**

**But that's about the time I start seeing Officer Thomas again, and I tell him -- or we -- we pull Vince -- he was kind up on his side. We pull him flat. Like I said, there was a fairly large pool of blood, so I know there's nothing we can do. We get medical to respond. We tell them, you know, "Scene secure; get back here."**

**And I told Officer Thomas, "Don't let anybody touch that gun. You stand right there next to that gun."**

**The reason I do all that is I have been involved with other officers who have been in officer-involved shootings. This was my officer-involved shooting, and I did not want anybody to screw it up. So that's why -- it's not -- it's not normal for the officer involved to start making assignments and telling everybody what to do, but I didn't want anybody to screw it up. I wanted the evidence to tell the story of what happened. So**

Page 84

**that's why I immediately passed out cones and said, "Put this on every" -- I mean, I did, I walked around for -- I don't know how long, but I was giving out assignments, telling people, "Go get witness statements; put up crime scene tape," you know, "Put cones on every piece of evidence you see. Don't let anybody touch that gun." You know, I -- I wanted the evidence to tell the story.**

Q. You pulled the trigger and it's going to be your liberty on line when the review happens?

**A. Yep.**

Q. You want to make sure it was all --

**A. Yeah.**

Q. It was all there. Okay. That makes sense.

You said that you saw Vincent's body. You rolled it over onto his back. How did you find his body?

**A. So when I went through the gate and kicked the gun, he was -- I want to say -- so there is a back door right there. I want to say there was, like, stairs. And he was kind of -- his back was up against the stairs, and so I had to pull him away from the stairs to lay him flat. That's -- he was up on his side, but only because he was propped up by a**

Page 85

**cement stair. If that makes sense.**

Q. Yeah.

**A. So I pulled him away from that flat.**

Q. I think Officer Thomas referred to it as a people door -- or a man door to the garage. Was it --

**A. No, no, this is to the house. It was to the house.**

Q. Okay.

**A. But, yeah.**

Q. So you go through the gate to the right-hand side.

**A. Right.**

Q. I don't know if any of the pictures show the stairs.

**A. Yeah, you can't see the stairs on any of these pictures.**

Q. Number five.

**A. And, like I said, I -- I don't -- yeah.**

Q. Exhibit 4 right there?

**A. Right. I don't have that one.**

MS. WHITE: Right here.

Q. (BY MR. CUMMINGS) When you -- when you shot him, he was still in the -- was he in the gate entranceway or was he through the gate?

Page 86

**A. I don't remember. I mean, I -- I don't -- he was -- he -- I remember he pushed the gate open and, you know, like I said, I don't remember consciously thinking, "Pull the trigger," I don't -- so I couldn't tell you. I remember watching the rounds go out of my gun and going back to get behind the brick wall. So where he was -- I don't remember watching him fall or disappear, any of that. I just remember when I got back, I could see him through that.**

Q. Is it a possibility that Vincent may have been trying to put his dog in the backyard at that moment?

MR. BURR: Objection. Speculation.

THE WITNESS: I have no idea. Like I said, I don't remember seeing the dog again.

Q. (BY MR. CUMMINGS) But based upon your recollection -- based upon your recollection, you don't -- you can't necessarily say that he wasn't putting the dog in the backyard?

MS. WHITE: Objection. Calls for speculation.

MR. BURR: Objection.

THE WITNESS: I don't remember seeing the dog again.

Page 87

Q. (BY MR. CUMMINGS) Okay. And I believe that you testified -- and I don't want to get this wrong, but there was no way that Vincent was retreating or deescalating the situation. But it's fair to say that he was going through the fence; is that correct?

**A. Correct.**

Q. And what's behind the Farrand's household, do you know?

**A. No idea.**

Q. On the other side of that fence line, you don't know what's back there?

**A. No. I would assume another house or a backyard to somebody else or...**

Q. I believe it's a school. That's why I was asking if you knew there was a school back there.

**A. Oh, there is a school over there. I didn't -- I didn't know their house backed up to the school.**

Q. Now, you testified today that you heard a statement that he was going back into the safe to get more guns; is that correct?

**A. Right.**

Q. And when you -- in your initial interview, however, do you remember testifying that dispatch

Page 88

said that he put the gun back into the safe and you sort of sighed and said, "Good, even better"? Does that ring a bell?

**A. I don't remember that.**

MR. CUMMINGS: I think that's it for me.

MR. BURR: Nothing further here too.

MS. WHITE: I don't have any questions. We'll read and sign. If you'll get me the transcript, I'll get it to Officer Read.

THE VIDEOGRAPHER: Off the record. The time is 2:37.

(Deposition concluded at 2:37 p.m.)

* * *

Page 89

REPORTER'S CERTIFICATE

STATE OF UTAH )
) ss.
COUNTY OF SALT LAKE )

I, Dawn M. Perry, Certified Shorthand Reporter and Notary Public in and for the State of Utah, do hereby certify:

That prior to being examined, the witness, OFFICER JASON READ, was by me duly sworn to tell the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in stenotype on August 14, 2017, at the place therein named, and was thereafter transcribed and that a true and correct transcription of said testimony is set forth in the preceding pages.

I further certify that, in accordance with Rule 30(e), a request having been made to review the transcript, a reading copy was sent to Heather White, Attorney at Law, for the witness to read and sign under penalty of perjury and then return to me for filing with Kendall J. Burr, Attorney at Law.

I further certify that I am not kin or otherwise associated with any of the parties to said cause of action and that I am not interested in the outcome thereof.

WITNESS MY HAND this 24th day of August, 2017.

Dawn M. Perry, CSR

Page 90

Case: MOLLY FARRAND vs. AMERICAN GENERAL LIFE INSURANCE COMPANY
Case No.: 1:16-cv-00134-DB
Reporter: Dawn M. Perry, CSR
Date taken: August 14, 2017

WITNESS CERTIFICATE

I, OFFICER JASON READ, HEREBY DECLARE:

That I am the witness in the foregoing transcript; that I have read the transcript and know the contents thereof; that with these corrections I have noted this transcript truly and accurately reflects my testimony.

| PAGE-LINE | CHANGE/CORRECTION | REASON |
| --- | --- | --- |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |
| _________ | ____________________________ | _________ |

_________ No corrections were made.

I, OFFICER JASON READ, HEREBY DECLARE UNDER THE PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE FOREGOING IS TRUE AND CORRECT.

OFFICER JASON READ

Date: ___________________