# APPENDIX Y

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

MOLLY FARRAND,          )
                        )
        Plaintiff, )
                        )
vs.              ) No. 1:16-cv-00134-DB
                        )
AMERICAN GENERAL LIFE   )
INSURANCE COMPANY,      )
                        )
        Defendants. )
_____)

VIDEOTAPED DEPOSITION OF THOMAS PASTORE,
AN EXPERT WITNESS
PAGES 1 - 105
WEDNESDAY, APRIL 25, 2018, 9:45 A.M.
LOS ANGELES, CALIFORNIA

Reported by Serena Wong
CSR #10250, RPR, CCRR #200

## Page 2

1       IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF UTAH
3
4    MOLLY FARRAND,          )
                            )
5        Plaintiff, )
                            )
6    vs.              ) No. 1:16-cv-00134-DB
                            )
7    AMERICAN GENERAL LIFE   )
     INSURANCE COMPANY,      )
8                            )
         Defendants. )
9    _____)
10
11
12
13
14     THE VIDEOTAPED DEPOSITION OF THOMAS PASTORE,
15   an expert witness, taken at 664 S. Figueroa Street,
16   4th Floor, Los Angeles, California, on Wednesday,
17   April 25, 2018, 9:45 a.m., before Serena Wong, CSR
18   #10250, RPR, CCRR #200, Certified Shorthand
19   Reporter, in and for the State of California.
20
21
22
23
24
25

## Page 3

1    APPEARANCES:
2
3    For the Plaintiff:
4        GERAGOS & GERAGOS
         BY:  DAVID GAMMILL, ESQ.
5        664 South Figueroa Street
         4th Floor
6        Los Angeles, California  90017
         213.625.3900
7        david@geragos.com
8    For the Defendant American General Life Insurance
     Company:
9
         McDOWELL HETHERINGTON, LLP
10       BY:  KENDALL BURR, ESQ.
         1001 Fannin Street
11       Suite 2700
         Houston, Texas 77002
12       713.337.5580
         kendall.burr@mhllp.com
13
14   Also Present:
15       Travis Simmons
16
17
18
19
20
21
22
23
24
25

## Page 4

1                  INDEX
2
3    WITNESS:  Thomas Pastore
4
5    EXAMINATION                      PAGE
6    Mr. Burr                    7
7
8
9
10       INSTRUCTIONS NOT TO ANSWER
11              None.
12
13
14
15       INFORMATION REQUESTED
16              None.
17
18
19
20
21
22
23
24
25

## Page 5

INDEX TO EXHIBITS

EXHIBITS                                              MARKED

Exhibit 1  Expert Witness Disclosure        12
Exhibit 2  3/26/18 handwritten notes        53
Exhibit 3  3/26/18 handwritten notes        53
Exhibit 4  7/29/13 e-mail chain             67

## Page 7

THOMAS PASTORE, was called as a witness, and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BURR:

Q   Good morning.

A   **Good morning.**

Q   Can you state your name for the record?

A   **Certainly.  Thomas E., Edward, Pastore.**

Q   What's your profession?

A   **I am a financial advisor and business valuation and forensic consultant.**

Q   How long have you been in that field?

A   **About 30 years.**

Q   Has that been your entire career, basically, in that kind of field?

A   **Yes.  Well, I did start for three years as an auditor, CPA, but primarily 30 years from what I just described.**

Q   And part of your work as a consultant involves acting as an expert in litigation; is that true?

A   **Yes.**

## Page 6

WEDNESDAY, APRIL 25, 2018, 9:45 A.M.

LOS ANGELES, CALIFORNIA

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:45 a.m.  This is the videotaped deposition of Thomas Pastore in the matter of Molly Farrand versus American General Life Insurance taken in the United States District Court for the District of Utah, Central Division.  This deposition is being held at 644 South Figueroa Street, Los Angeles, California, 90017 on April 25th, 2018.

My Name is Travis Simmons, legal videographer.  And I'm here on behalf of Stratos Legal.  The court reporter is Serena Wong, also present on behalf of Stratos Legal.

At this time, would counsel present please state their names and whom they represent.

MR. GAMMILL:  David Gammill for Ms. Farrand, Plaintiff.

MR. BURR:  Kendall Burr for the Defendant American General.

THE VIDEOGRAPHER:  Ms. Court Reporter, please administer the oath.

////

## Page 8

Q   How many times have you been retained as an expert in litigation, approximately?

A   **Probably about 1,500 matters.**

Q   And in these 1,500 matters, is that over a 30-year time frame or some subset of that?

A   **Thirty-year time frame.**

Q   Okay.  And so when you first started out, you were already starting into your career -- when you first started your career as a consultant, you were already acting as an expert in other matters?

A   **Probably about three to four years into the start of my career is when I started giving direct expert witness testimony.**

Q   Okay.  Now, you mentioned about 1,500 matters.  Is that just the total number of matters in which you've been retained or is that -- and then some subset of that is the number of matters in which you've actually testified.

Is that fair?

A   **I think that's correct.  That's the total number of matters in which I've been retained.**

Q   About how many of those would you guess you've testified in?

A   **I've testified in trial about 70 times, and in deposition about 200 times.**

Page 9

1    Q   Okay.  Thank you.
2    And how did you first get into this field?
3  What was your reason for entering this field in the
4  first place?
5    A   Well, after graduate school -- well, I
6  first started as an auditor from undergrad, a CPA at
7  one of the big accounting firms, now the big four.
8  And then I went to graduate school, got an MBA.
9    And then when I came out here, I worked
10  for another big four firm in their valuation and
11  litigation consulting practice, and then later went
12  to a boutique valuation firm before starting mine
13  where I did valuations for many different purposes,
14  a subset of which was also forensic accounting and
15  loss profit analyses in litigation matters.
16    Q   Okay.  And you've written expert reports
17  in the past, as well?
18    A   I have.
19    Q   And have you ever in the various matters
20  in which you've testified -- have you ever had one
21  of your opinions excluded by a court that you can
22  recall?
23    A   No.
24    Q   Who retained you in this matter?
25    A   I was retained on behalf of the plaintiff

Page 10

1  by the Geragos firm.
2    Q   Had you worked with the Geragos firm
3  before?
4    A   Yes.
5    Q   How many times, approximately?
6    A   One time.
7    Q   And when you were first retained, who did
8  you speak with?
9    A   Mr. Gammill.
10    Q   Had you ever spoken with anybody else at
11  the Geragos firm beside Ms. Gammill?
12    A   Yes.
13    Q   About how many people have you spoken with
14  in total?
15    A   I would say one other person that I can
16  recall.
17    Q   Do you know who that was?
18    A   Yes.
19    Q   Who?
20    A   Mr. Ben Meiselas.
21    Q   And did you meet with either of them in
22  person at any point prior to today?
23    A   No.
24    Q   Did you meet with them by phone, I assume?
25    A   Yes.

Page 11

1    Q   Approximately how many times?
2    A   Mr. Meiselas, probably about two times.
3  Mr. Gammill, perhaps three times.
4    Q   Okay.  You also, I believe, mentioned in
5  your report that you had spoken with the plaintiff
6  Molly Farrand; is that correct?
7    A   Yes.
8    Q   How many times did you speak with her?
9    A   About three times.
10    Q   Were these communications by phone?
11    A   Yes.
12    Q   Did you ever exchange e-mails with her
13  directly?
14    A   No.
15    Q   When you spoke with her, was counsel
16  present?  Do you recall?
17    A   No.
18    Q   So all three of those calls were just
19  between you and her?
20    A   Yes.
21    Q   And we'll get into what you discussed in a
22  bit.  I'm just trying to get the lay of the land
23  here.
24    Did you ever request documents directly
25  from Ms. Farrand?  Or were all the documents that

Page 12

1  you looked at provided to you by counsel through
2  your own investigation?
3    A   I believe we were provided documents from
4  Ms. Farrand directly for a few of the documents.
5  There's other independent research we did on our
6  own, and we probably got the tax returns from the
7  Geragos firm, the Ferrands' tax returns.
8    Q   Okay.  I should mark the report first.
9    (Exhibit 1 was marked.)
10    Q   BY MR. BURR:  I'm handing you what I've
11  marked as Exhibit 1.  And this is a printout that we
12  printed of the expert report that was provided to
13  us.
14    Does this appear to be the expert report
15  that you prepared?
16    A   Yes.
17    Q   And are you aware of any reason to think
18  that any of the pages in this are not from your
19  expert report or that there are pages missing from
20  this?  I just want to make sure we're talking about
21  the same report.
22    MR. GAMMILL:  You've got 21 pages?
23    THE WITNESS:  This is my report.
24    Q   BY MR. BURR:  Okay.  Thank you.
25    Now, you have a list on the second page, a

Page 13

1  summary of data or information considered, and
2  there's a list of 12 items here.
3      Is this a list that you prepared?
4      A  Yes.
5      Q  Okay.  And did you look at any materials
6  that are not on this list that you can recall in
7  connection with preparing your opinions in this
8  report?
9      A  No.
10     Q  Have you looked subsequently at any other
11 materials after you prepared this report?
12     A  Well, I looked at the materials I got
13 here.  One of the related materials from item 11 is
14 the website VRBO.  It's kind of like an Airbnb
15 website where they bring together owners of lodges
16 and homes and people that are interested in renting
17 them.  So it gave me information on the lodging
18 industry in Vallecito.
19     Q  And when did you look at that website?
20     A  Well, I looked at it when I was doing my
21 report and also yesterday.
22     Q  Now, you understand that this case
23 involves a set of facts relating to a shooting
24 involving police; is that correct?
25     A  Yes.

Page 14

1      Q  Did you review any information or
2  documents or deposition transcripts relating to
3  those events?  Or was your focus solely on the
4  damages aspects of this case?
5      A  It was solely on the damages aspect.
6      Q  Okay.  You're aware that Ms. Farrand was
7  deposed in this case and she gave a deposition?
8      A  Yes.
9      Q  Did you read her deposition transcript?
10     A  No.
11     Q  Did you speak with anyone besides counsel
12 and Ms. Farrand about any of the issues in this
13 case?
14     A  No.
15     Q  Did you have any written e-mails or other
16 written communications with anyone other than
17 counsel for Ms. Farrand and Ms. Farrand?
18     A  No.
19     Q  Did you have a staff assist you with
20 preparing this report or was this all your own work
21 product?
22     A  I had one person assist me.
23     Q  Okay.  Who was that person?
24     A  Mr. Saad Rahman.
25     Q  Can you spell that?

Page 15

1      A  Certainly.  S-A-A-D, R-A-H-M-A-N.
2      Q  And what is this person's profession?
3      A  He's an associate, so he's a financial
4  analyst, same profession as mine.
5      Q  Okay.  Are you aware of any video or audio
6  recordings at issue in this case relating to the
7  shooting?
8      A  No.
9      Q  Are you aware of any other experts who
10 have been retained in this case?
11     A  No.
12     Q  Now, your counsel provided me some copies
13 of your file.  And let me go through those
14 intermittently throughout this deposition.  But for
15 the record, this stack of papers he gave to me, is
16 it your understanding this is a complete set of all
17 your materials you reviewed in connection with this
18 case?
19     A  Yes.
20     Q  Does it contain all of your notes, the
21 materials that you prepared in connection with this
22 case?
23     A  Yes.
24     Q  Have you -- strike that.
25     Just to understand what your opinions are,

Page 16

1  what the scope of them are, how would you
2  characterize not going into specifics of the math,
3  but how would you characterize what your opinions
4  are about in this case?
5      MR. GAMMILL:  Objection.  Form.
6      THE WITNESS:  My opinions are basically
7  economic damages focused on lost compensation to
8  Ms. Farrand or her marriage, however that's
9  considered by law, lost rental income on a property
10 that could not be purchased, and lost appreciation
11 in owned property that could not be gained in the
12 absence of Mr. Farrand.
13     Q  BY MR. BURR:  So you enumerated three
14 categories there, and we'll go through each of those
15 separately.
16     Other than those three categories, were
17 there any other aspects of potential damages or
18 injuries in this case that you looked at?
19     A  No.
20     Q  Were you asked to opine on anything other
21 than those three categories?
22     A  I was asked to come up with my opinion of
23 economic damages.  And based upon my research, I
24 came up with these three categories.
25     Q  So these three categories, that was the

Page 17

1  result of your own brainstorming about what types of
2  damages you would opine about?
3  A  Yes.
4  Q  What were you asked to opine on, then?
5  How was that pitched to you?  What were you asked to
6  do?
7  A  Well, I was contacted by Mr. Gammill, and
8  I was asked to come up with economic damages in this
9  matter based upon the death of Mr. Farrand and any
10  kind of damages, if any, that would cause.
11  Q  When was that?  When was that first
12  contact with Mr. Gammill?
13  A  It was about March 19th or 20th of this
14  year.
15  Q  And all your work has been in that time
16  frame since then?
17  A  Yes.
18  MR. GAMMILL: I'll just jump in because I
19  think something that may be getting unintentionally
20  confused is that the one other time he worked with
21  our firm was on the underlying matter.  So some of
22  those conversations he's referenced go back in time,
23  just to throw that out there.
24  Q  BY MR. BURR: Thank you.
25  So you're aware of the separate litigation

Page 18

1  involving the Farrand family?
2  A  Yes.
3  Q  What was that lawsuit?
4  A  That was a lawsuit with the City of
5  Centerville.
6  Q  Okay.  And you were retained as an expert
7  for that case?
8  A  I was retained as a consultant for that
9  matter.
10  Q  Do you know if you were ever designated as
11  an expert?
12  A  I'm not aware that I was.
13  Q  Okay.  So from your perspective, you were
14  retained as a consultant to provide advice that, to
15  your knowledge, was just provided to Ms. Farrand and
16  her counsel?
17  A  Yes.
18  Q  The analysis that you did at that time,
19  did that involve the same three categories that
20  we're discussing today in your report here?
21  A  Yes.
22  Q  Did the work that you did -- strike that.
23  The work that you did in preparing your
24  report here, is that kind of a hybrid of work you
25  did in connection with the other case and work that

Page 19

1  you followed up on in this case?
2  A  It gave me -- that prior case gave me some
3  background data, likes rates of return that I used
4  in my report.  But for this matter, I looked at all
5  the data fresh again, and then took a fresh
6  perspective when I looked at this analysis.
7  Q  In the other case, did you prepare a
8  report?
9  A  I prepared some schedule, I believe, for
10  mediation.
11  Q  Was your analysis, the math that you did
12  in this case, did it differ in any way from the math
13  that you had done previously in connection with the
14  first case?
15  A  There might have been.  I just can't
16  recall what the differences would be.
17  Q  Now, when you prepared your analysis in
18  connection with the first case, what was your
19  understanding of who the defendant was?
20  A  The City of Centerville.
21  Q  Okay.  And so you were looking at damages
22  that were caused by the allegedly wrongful death of
23  Mr. Farrand; is that right?
24  A  Yes.
25  Q  When you developed those three categories,

Page 20

1  was that based solely on your own individual
2  analysis or did you talk it through with counsel?
3  A  Well, what I do ask counsel -- I mean,
4  I've got several-decade experience doing damage
5  analyses and whatnot.  But of course I've got to get
6  direction from legal counsel, what is the standard
7  of damages of any matter.  So I just wanted to know
8  the standard of lost income that would be proper in
9  this case.
10  Q  Approximately what time frame was it when
11  you were retained in the other matter?
12  A  It was about the end of 2014.
13  Q  And since the end of 2014 and this year,
14  had you had any discussions with either the Geragos
15  firm or Mr. Farrand?
16  A  No.
17  Q  When you were retained in connection with
18  this case earlier this year, were you asked to
19  essentially do the same type of report as before, or
20  were you asked to do something different this time
21  around?
22  A  Let me see if I can answer it this way.  I
23  was told this case was in federal court.  I'm aware
24  they usually have to do a Rule 26 report.  I asked
25  about that.  And then I said, "Okay.  Then do we

Page 21

1  have a standard of damages, Counsel, to your
2  knowledge, that is different than the prior case or
3  is it generally lost income, lost depreciation?" I
4  was informed "yes."
5      Q   "Yes," meaning what? Sorry. I got
6  confused.
7      A   Certainly. In other words, I asked if the
8  standard of damages was going to be lost
9  compensation, lost income, lost depreciation. I was
10 informed "yes."
11     Q   Okay. Turning to the materials that you
12 provided, the third documents -- sorry. I'm looking
13 at this stack of materials. We don't need to mark
14 anything yet. I just want to refer to some things
15 first.
16         The third document in this stack that was
17 handed to me, and hopefully it's the same in your
18 stack, is the complaint for damages.
19     A   Yes.
20     Q   And then insurance bad faith. Did you
21 read the complaint in this case?
22     A   I did.
23     Q   And do you have an understanding of who
24 the defendant is in this case?
25     A   Yes.

Page 22

1      Q   And the plaintiff is Ms. Farrand; correct?
2      A   Correct.
3      Q   And the defendant is my client. That's
4  American General Life Insurance Company?
5      A   Yes.
6      Q   Had you ever been involved in a lawsuit
7  previously involving my client American General Life
8  Insurance Company?
9      A   Not that I can recall.
10     Q   Have you ever been involved in another
11 lawsuit involving -- or as a consultant or expert in
12 another lawsuit involving any life insurance
13 company?
14     A   Yes.
15     Q   Approximately how many times?
16     A   Probably about 100 times.
17     Q   A significant portion of the work you did
18 in the past involved life insurance matters?
19     A   Well, I think about 100 times in
20 litigation matters. And I've been retained 1,500
21 times, so I don't know if that's significant.
22     Q   Right. Understood.
23     A   But I'll give you the math.
24     Q   Yeah. So approximately 100 times you've
25 been involved in cases that involved life insurance.

Page 23

1  And were those all life insurance claims for death
2  benefits on policies or other life insurance-related
3  matters?
4      A   Other -- other insurance matters, as well.
5      Q   Okay. Of the 100 or so, how many do you
6  recall that involved a death and demand for a death
7  benefit?
8      A   It might have been ten times.
9      Q   And in your role representing clients in
10 such matters, were your clients ever the insurance
11 company or were they always individuals?
12     A   It includes times when they were the
13 insurance company.
14     Q   Were you ever involved in a case where
15 your client was the insurance company, and the
16 dispute related to a death and a request for a death
17 benefit?
18     A   I can recall two times where the insurance
19 company was involved.
20     Q   And you represented the insurance company?
21     A   I represented either the insurance company
22 or both the insurance company and the city.
23     Q   "The city" meaning -- what type of case
24 was that? You don't have to go into specifics, but
25 just to understand the type of case.

Page 24

1      A   Oh. It was a wrongful death where the
2  city and the police department were being sued.
3      Q   Out of the ten or so times -- I believe
4  you testified 10 or so times you were involved in a
5  case involving a death benefit, were those all civil
6  litigations or some involving -- strike that.
7          Were they all civil litigations?
8      A   To my knowledge, yes.
9      Q   And were they lawsuits brought against the
10 insurance company, brought by the beneficiaries to
11 the policies?
12     A   Yes.
13     Q   And in those types of situations,
14 typically what's your -- well, strike that.
15         How many times during those ten occasions
16 did you represent or work for a beneficiary seeking
17 to recover a death benefit?
18     A   About -- I don't know. Let's see.
19 Probably about half, five.
20     Q   When you come across a case like that,
21 what's your typical method in terms of determining
22 what kind of damages to analyze?
23     A   Again, it depends on the venue, the court
24 venue and whatnot. And so sometimes it's a loss of
25 business value, so for an owner or business. Other

Page 25

1 times it's lost compensation, lost depreciation in
2 an asset. General that -- those types of damages.
3    Q   Okay. Now, when you analyze potential
4 damages caused by an insurance company's decision to
5 not pay a death benefit, do you analyze how the
6 failure to pay the death benefit causes the injury?
7    A   I'm not a causation expert, so I'm purely
8 measuring the economic damages.
9    Q   Okay. So when you brainstorm categories,
10 is that brainstorming done on the assessment of
11 causation, or is that just these are categories you
12 think you can analyze and do the economic assessment
13 for?
14    A   Well, basically, I know there's an alleged
15 cause. There's an alleged, except for the trier of
16 fact to determine the liability. But, you know,
17 with the loss of something occurring, I guess I take
18 it into account that there's someone who's not here
19 anymore that was doing something that had a benefit,
20 or I have to measure whether that exists or not. So
21 mainly it's the damage calculations.
22    Q   Okay. Now, you mentioned you read the
23 complaint in this case, are you aware of the
24 different causes of action? Are you familiar with
25 that term, causes of action or claims that are

Page 26

1 asserted?
2    A   I'm familiar with causes of action.
3    Q   Do you recall seeing in the complaint
4 there are four different causes of action here?
5    A   I believe so, yes.
6    Q   When you were assessing potential damages
7 in this case, did you look at the individual causes
8 of action, or were you more just looking at the
9 overall consequences of the -- of the injuries that
10 could have fallen to Ms. Farrand?
11    A   Yes. I'm not a lawyer or an attorney, so
12 I'm looking at the overall issues.
13    Q   Now, there are some tabs throughout your
14 report -- your stack of documents there.
15       Are those tabs that you applied in your
16 review?
17    A   Yes.
18    Q   Is that you, yourself, or you and your
19 associate that worked with you?
20    A   Both me and my associate.
21    Q   Did you also take notes throughout -- for
22 example, I recall seeing in this stack some pages of
23 handwritten notes. Did you also take notes on
24 individual pages, for example, when you were
25 reviewing the complaint or other documents like

Page 27

1 that?
2    A   No, mainly not. There may have been some
3 handwritten averaging of data that are in the tab
4 things, but that's the only other notes that would
5 be in there.
6    Q   Okay. In general, is there a reason why
7 certain pages are tabbed and others are not?
8    A   Yeah, to facilitate you going through the
9 file, the tabs are data points from the sources of
10 information I list here on page 2 of my report that
11 are directly in the report, and they're highlighted
12 in yellow.
13    Q   And are these tabs that were applied in
14 preparation for the deposition today, then? Or were
15 they -- or were some of them applied during your
16 review in preparation of your report?
17    A   It's during our review in preparation of
18 the report.
19    Q   Okay. And then the highlighting was also
20 done prior to preparation of the report or in
21 connection with?
22    A   In connection with preparation of the
23 report.
24    Q   Got it.
25       Now, on page -- if you turn back to

Page 28

1 Exhibit 1, this is your expert report. On page 9,
2 Exhibit D is your summary of damages.
3    A   Yes.
4    Q   And for the record, you state, "I utilize
5 the damage period commencing on April 13, 2014, the
6 date of the death of Mr. Vince Farrand, and as
7 specified for each separate damage calculation,
8 either going through his expected retirement date of
9 age 70 or estimated natural date of death, age 80,
10 had Mr. Farrand's shooting death not occurred"; is
11 that right?
12    A   That is correct.
13    Q   And then you have this table here that
14 lists the three different categories we discussed
15 earlier; correct?
16    A   Yes.
17    Q   First question, how did you select a
18 retirement age of age 70?
19    A   Well, basically, I looked at the longevity
20 that Mr. Farrand would have based upon three
21 different actuarial tables, and then looked at what
22 he could be expected to work through as a contractor
23 and decided that 70 was a reasonable age for
24 retirement.
25    Q   Is that something you discussed with

Page 29

Ms. Farrand?

 **A I did discuss that with Ms. Farrand.**

 Q Did you discuss their plans for what he would do through his retirement age or what his career would be?

 **A Yes.**

 Q What was she saying to you about that?

 **A Well, I mean, she thought that he could progress as a professional in foreign contracting, in general contracting and whatnot. And, you know, I took that into consideration. But then I adopted, I believe, a more conservative view that he would continue on as a flooring contractor through his retirement.**

 Q Now, I understand that part of the plans, as expressed by Ms. Farrand, were to move to Vallecito and to run these cabins; correct? Is that right? Is that your understanding, as well?

 **A That that would be the purpose, and that Montecillo would be a retirement residence.**

 Q So retirement as of age 70?

 **A Well, I don't know what really they consider retirement, but it would be the home that they would move to. They would sell Centerville, I think, in 2014, and move to Montecillo.**

Page 30

 Q And was it your assumption, then -- in preparing the lost income portion of your analysis, was it your assumption that he would resume his career as a flooring contractor in Montecillo?

 **A He would continue his career.**

 Q Continue his career in Montecillo, Utah?

 **A Well, wherever he was going to work. They wanted to work in Utah and then southern Colorado, too.**

 Q Do you recall seeing at any point any initial disclosures by Ms. Farrand? It's a document that talks about her damages.

 **A No.**

 Q Do you recall discussing with anyone any allegations that she had to sell certain tools or other property?

 **A No.**

 Q Did you see any other categories of potential damages in any of the papers that you looked at that that you decided not to analyze?

 **A I can't recall. If they're in the complaint and I didn't do them, then I did exclude that.**

 Q So let's dive in. So this first category relates to Mr. Farrand's lost income. And, again,

Page 31

this was an opinion that you first started formulating in connection with the prior lawsuit against the city back in 2014, and then continued your analysis in connection with this case today; right?

 **A This was a category that I did for mediation in the prior case.**

 Q Right.

 **A And it's a category that I refined and did more work for because, in this case, we're exchanging the Rule 26 report. In the last case, it was a mediation analysis.**

 Q Did you attend that mediation?

 **A I did not.**

 Q You just prepared some information for counsel to take to the mediation?

 **A That's correct.**

 Q Now, there are -- actually, if we can go back to page 2, that list of the information that you relied upon, which of these 12 items would you say are relevant to your analysis of the lost income for Mr. Farrand?

 **A Item two, item three, four, five, six, seven, ten, and twelve.**

 Q And how would you describe the main

Page 32

components of your analysis on this issue? What were the main data points that you needed to assess the lost income for Mr. Farrand?

 **A Basically his historical income, which was in the tax returns, and then market compensation research for flooring contractors to compare with that. And then we have to get the present value of that. So I'd have to get data on rates of return to discount the future income back to a present value. And then the economic outlook to see, you know, what is reasonable to assume going forward based upon the economic conditions that were present in 2014 and projected for the next several years, and then the actuarial tables that would tell you what is the expected life for someone that is 39 years old. And then discussions with Ms. Farrand, which I think I've touched upon, which was what was the future career potential of Mr. Vincent Farrand and how long would he work.**

 Q I'll turn to a few of those points. So the life expectancy assumptions that you used, did you rely on actuarial tables relating to just the average male, age 39? Or did you do -- did you rely on a certain class of health, for example?

Page 33

1    A    It's the average male.
2    Q    So just the average American male; is that
3  right?
4    A    That's correct.
5    Q    Did you have any information or knowledge
6  about any of Mr. Farrand's personal health issues?
7    A    Well, I asked Ms. Farrand if it was
8  reasonable to assume he's in average health, and she
9  said yes.
10    Q    Now, you mentioned Ms. Farrand, and you
11  also mentioned earlier that category 12, your
12  discussions with her, was part of your analysis.
13        What other things that you discussed with
14  her were relevant to your assessment of his lost
15  income?
16    A    Well, she gave a description of what he
17  did as a flooring contractor, so those were items of
18  information that I looked at in my market
19  compensation, my independent market compensation
20  research.
21    Q    Now, the tax returns that you looked at,
22  was it your understanding that the income on those
23  tax returns came primarily or solely or partially
24  from his work as a flooring contractor?
25    A    They came partially from his work as a

Page 34

1  flooring contractor.
2    Q    And were you able to discern from those
3  tax records what portion came from his work as a
4  flooring contractor?
5    A    Yes.
6    Q    And how were you able to assess that?
7    A    Because I went to the Schedule C. That's
8  where he reported his income from flooring
9  contracting.
10    Q    And then for the years 2009 through 2013,
11  did you notice any significant deviation or, you
12  know, swings in terms of the volume of work that he
13  was doing?
14    A    Well, there's differences in the income
15  between the years.
16    Q    How significant was that differential,
17  the highest year versus the lowest year?
18    A    Well, there was some significance in one
19  year out of the four that I looked at that I can
20  recall where there was lower revenue and profits.
21  And then there was some -- one high year. And I was
22  not, based upon my experience, surprised because
23  it's construction, and there's peaks and there's
24  valleys in any year.
25    Q    Did you average the years 2009 through

Page 35

1  2013, then? Is that how you came up with your
2  baseline for your analysis?
3    A    Well, I basically looked at the high
4  point, low point. I considered averages. And then
5  I looked at my market compensation research that
6  pretty much came within or close to those -- you
7  know, pretty much the average or midpoint.
8    Q    So what did you use as your baseline,
9  then? Which data point?
10    A    $37,000 as the compensation.
11    Q    And that was -- is that a number that you
12  reached based on your assessment both of his tax
13  returns and the market data that you looked at? Or
14  was it leaning more towards one or the other of
15  those two?
16    A    It's based upon my assessment of both.
17    Q    Did you discuss with Ms. Farrand at all
18  any of the issues that Mr. Farrand had had with
19  depression?
20    A    No.
21    Q    Were you aware of any testimony by her
22  regarding his ability to work when he was depressed?
23    A    I'm aware that that issue came up. But,
24  again, I asked her if he could function and work as
25  a contractor for the rest of his career. And she

Page 36

1  said yes, she thought he could advance. I didn't
2  take that view. He could advance above flooring
3  contractor, I didn't take that view.
4    Q    What did you understand her to mean by
5  "advance"?
6    A    Well, just as a flooring contractor, he's
7  got experience doing tile, marble, working on
8  high-end single-family residential, so he could go
9  into general -- perhaps general contracting,
10  whatnot.
11    Q    And for your assessment, you stuck with
12  the flooring contractor?
13    A    I did.
14    Q    Anything else that you discussed with
15  Ms. Farrand that was pertinent to your analysis of
16  the lost income aspect of damages?
17    A    Not that I can recall.
18    Q    Now, when you calculated the gross income
19  and then the -- well, strike that.
20        Did you calculate gross income or net
21  income after subtracting various components?
22    A    It's basically the compensation someone
23  would be paid that's a wage that would be taxable.
24  So it's just like you and me, we get a gross pay,
25  and then you have deductibles out of that.

Page 37

1    Q   So the amount that you're calculating here
2  relates to the gross amount of income that he could
3  bring into the family, but does not account for
4  taxes, for example?
5    **A   That's correct.  It's my understanding**
6  **that the damage awards are taxable.**
7    Q   Did you do any analysis relating to how
8  the family's expenses might differ with him no
9  longer living?
10   **A   No, I didn't include that as an element of**
11 **damages.**
12   Q   Just for his personal consumption, food
13 and, you know, insurance, and things like that, life
14 and health insurance.
15   **A   No.**
16   Q   So your calculation is the total gross
17 income that he could expect to earn from the date of
18 his death through the date of his anticipated
19 retirement at age 70?
20   **A   Yes.**
21   Q   Now, you understand that in this case, one
22 component of the request for damages is for a death
23 benefit; is that right?
24   **A   I believe so, yes.**
25   Q   So in reviewing this aspect of damages,

Page 38

1  did you factor the death benefit or the lack of the
2  payment of the death benefit into your analysis in
3  any way?
4    **A   No.**
5    Q   Have you ever been involved in another
6  case in which an insurance company was ordered to
7  pay damages calculated based off of the lost income
8  of the deceased rather than paying the death
9  benefit?
10   **A   I can't recall if that -- well, I think**
11 **that was a component brought up in some of the**
12 **insurance cases, but I can't recall if there was an**
13 **order.**
14   Q   Did you read the life insurance contract
15 at issue in this case?
16   **A   No.**
17   Q   Do you have any understanding about how
18 that life insurance contract works?
19   **A   Just general that if there's a death,**
20 **certain circumstances, there's a payment of**
21 **proceeds.**
22   Q   Did you know what the amount of that
23 proceeds was?
24   **A   I believe it was $500,000.**
25   Q   And we talked about how that death benefit

Page 39

1  didn't factor into your analysis on this particular
2  point.
3         Did it factor into your analysis of the
4  other two categories relating to the lost rental
5  income or the depreciation of the Montecillo
6  property?
7    **A   No.**
8    Q   Now, again, you don't consider yourself a
9  causation expert.  Is that what you said?
10   **A   That is correct.**
11   Q   And so you're not offering an opinion in
12 this case regarding whether my client caused
13 Mr. Farrand's death; right?
14   **A   That is correct.**
15   Q   And you're not offering any opinions
16 relating to whether my client should be liable to
17 pay for the consequences of his death?
18   **A   That is correct.**
19   Q   And your analysis isn't specifically tied
20 to which types of damages were caused by the fact
21 that he's no longer alive versus which types of
22 damages were tied to the fact that a death benefit
23 wasn't paid?
24       MR. GAMMILL:  Objection.  Form.
25       THE WITNESS:  I don't understand that

Page 40

1  question.
2    Q   BY MR. BURR:  I'll rephrase it.
3         You're not offering any opinion that any
4  of the categories of damages that you've outlined,
5  the three categories, were caused by the fact that
6  he is no longer alive as opposed to something that
7  my client did?
8        MR. GAMMILL:  Objection.  Form.
9        THE WITNESS:  I think that's a causation
10 issue that I can't opine on.  But I think I
11 testified earlier the fact that he's not here, he's
12 no longer around, then I have to take into account
13 what is the economic impact in my opinion as a
14 damages expert.
15   Q   BY MR. BURR:  Okay.  So your assessment is
16 what the economic impact on Ms. Farrand's family
17 of the whole thing, the fact that he died and they
18 don't have a death benefit?
19   **A   That's correct.**
20   Q   And then whichever components of those are
21 attributable to my client's conduct is not for you
22 to opine on; is that right?
23   **A   Yes.**
24   Q   Just to clarify the time frames, so your
25 assessment was based on his expected continued

Page 41

1  employment as a flooring contractor from the date of
2  his death through age 70; correct?
3      A   Yes.
4      Q   And did you analyze the differences
5  between the amounts that one could earn in
6  Centerville versus Montecillo or wherever else they
7  might live?
8      A   I think our market compensation looked at
9  both Utah and Colorado.
10     Q   Did you assume a transition date moving to
11 Colorado or Utah, southern Utah?
12     A   No.  I just assumed he'd have continued
13 employment pretty much in a market wage in the mid
14 point of the data, market data.
15     Q   Was it your view of the market data that
16 flooring contracting paid roughly the same in
17 Centerville, Utah as it would in the other location,
18 Montecillo?
19     A   Well, Montecillo, and also that they would
20 -- he might be doing work in Colorado, too, have a
21 little bit of higher wages.  I took really a mid
22 point.  I didn't go to the high side of the wages,
23 which would be up to $60,000.
24     Q   And I think I'm a little confused about
25 where the Farrands intended to live in future years.

Page 42

1  Can you clarify that for me?  What was your
2  understanding based on your conversations with
3  Ms. Farrand about where they plan to move to and
4  live, since we have two other properties we've been
5  talking about in Colorado and Montecillo?
6      A   Certainly.  And I do state it here, but I
7  believe after the graduation of their son in June
8  2014 that they would want to -- yeah, I say that on
9  page 10, the last full paragraph, that they intended
10 to sell the Centerville property, and they would use
11 a portion of that proceeds to purchase the rental
12 income in Vallecito.  And since they already own the
13 Montecillo property, that would be their residence.
14     Q   So it was your assumption, then, that for
15 the bulk of that remaining three decades or so until
16 his expected retirement age, that they would be
17 living in Montecillo?
18     A   Yes.
19     Q   And your assessment of the average income
20 for flooring contractors, you believe, is in the
21 right range for that location?
22     A   Yes.  And for where else he intended to
23 work, which I believe was southern Colorado also.
24     Q   Now, on those points, turning back to your
25 list of exhibits or information considered, which of

Page 43

1  these categories relates to the market data that you
2  were citing regarding flooring contracting average
3  salaries?
4      A   Item No. 7.
5      Q   Okay.  And is that data of the U.S. Bureau
6  of Labor Statistics, salary.com and payscale.com, is
7  that data nationwide, statewide, broken down by
8  county?  How do you tell what the scope is of those
9  categories?
10     A   On Exhibit 1, actually, I give a breakdown
11 of the data.  There's three data points, the Bureau
12 of Labor Statistics, salary.com, and payscale, yes.
13     Q   And just so I'm understanding correctly,
14 the Bureau of Labor Statistics data is broken down
15 by state, so it's for the entire state of Utah; is
16 that right?
17     A   That's correct.
18     Q   And the same with salary.com, that's the
19 same for the state Utah for carpet installers?
20     A   Yes.
21     Q   And the payscale.com data is national;
22 right?
23     A   That is correct.
24     Q   Now, under Bureau of Labor Statistics, it
25 has sub categories, carpet installers, floor layers,

Page 44

1  tile and marble setters.
2          Did you have any discussions with
3  Ms. Farrand about which of those categories her
4  husband had been involved in?
5      A   That's how I chose these categories,
6  actually.
7      Q   Was it your understanding that he worked
8  in all three of those areas?
9      A   Yes.
10     Q   Did you have any discussions with her
11 about how that broke down, whether the bulk of his
12 work was in laying carpet versus doing tile or
13 marble or hardwood?
14     A   She thought he was involved in all three
15 equally, pretty much, as I recall.
16     Q   Okay.  Now, turning to the bottom portion
17 of this exhibit where you have some data, summaries
18 of the data relating to his gross receipts and net
19 profit from his work in flooring, did you have any
20 conversations with Ms. Farrand about the year 2013,
21 which appears to have kind of a lower volume?
22     A   Yes.
23     Q   And what did she say about that year?
24     A   As I recall, it was -- there was ups and
25 downs in the contracting industry.  This was a year

Page 45

1    that was lower versus some years where it was very
2    high, intense work, too.
3        Q   And in your assessment of his income, can
4    you talk a little bit about gross receipts versus
5    net profit and how those factored into your overall
6    calculation?
7        A   Sure. The gross receipts are gross amount
8    of money he gets from the services he pays, and then
9    there's various expenses, car and truck, cell phone,
10   some materials that are deducted from those to get
11   the net profit.
12       Q   Do you know if he had any employees?
13       A   I think he had some contractors
14   occasionally working under him.
15       Q   And did you use the net profits amount as
16   your data point for the income assessment or the
17   gross receipts portion?
18       A   Well, I considered the net profit. But
19   the fact that you're a business person versus an
20   employee, you get to write off expenses on cars,
21   trucks, certain things that can be used also
22   personally, kind of gives you a tax shield. I took
23   that into account, but ultimately said balancing
24   that tax advantage of being a business person versus
25   the tax benefits you get, I can't ignore that.

Page 46

1            And so then I also went to the market
2    compensation data, and ultimately looking at both
3    the tax returns and the market compensation data, I
4    selected something in the average of the market
5    compensation data.
6        Q   So even though his net average profits for
7    the year 2009 through 2013 was only $25,537 per
8    year, you felt that it was appropriate to assume a
9    higher lost income value for your assessment?
10       A   I thought it was appropriate to take that
11   into consideration, but also 2013 out of five data
12   points appears to be more of an outlier; and also
13   that Mr. Farrand has a car and truck and, like,
14   other cell phone expenses that, you know, have some
15   aspects of personal use that is kind of a tax
16   advantage. And so I thought it was relevant to take
17   that into account and then assess what I consider a
18   conservative market compensation wage of $37,000,
19   basically, if he stays as an average flooring
20   contractor for the next 30 years.
21       Q   Did you do any calculations relating to
22   the value to the Farrand family of the various
23   business expenses he might have been able to deduct?
24       A   No.
25       Q   And then once you had your data points,

Page 47

1    the $37,000, I believe you said was your conclusion?
2        A   Yes.
3        Q   Once you had that data point, did you
4    assume an increase over time?
5        A   It was an increase based on expected
6    inflation.
7        Q   And what data point did you use for that
8    calculation of the inflation?
9        A   If we go back to page 2, it would be Item
10   No. 3.
11       Q   And what was the value that you assumed
12   for page 14 of your report?
13       A   Yes. Footnote 1, it's inflation rate of
14   2.3 percent.
15       Q   All right. Now, if you could turn to the
16   second opinion that you formulated, can you in your
17   own words briefly summarize what your opinion is
18   related to the second component?
19       A   The second component is the lost rental
20   income from the property that would have been
21   purchased in Vallecito, Colorado, which has seven
22   cabins. So basically what I did was project
23   expected rental income on seven cabins, but then
24   assume there might be a possibility that there will
25   always be one vacancy, so I did a second scenario of

Page 48

1    six cabins.
2            But to get this property into a state
3    where you could rent the cabins, there was going to
4    be some expenses that had to be incurred in the area
5    of about $150,000 or so. And so I took that cost
6    into account and also the fact that a portion of the
7    purchase price for this property would be debt. So
8    I deducted also the interest and principal payments.
9    And then also when I'm showing the annual net rental
10   income, at the top of each calculation, that's after
11   deducting operating expenses from the gross income.
12       Q   There was a lot in there. So I just
13   wanted to break it down, but thanks for the
14   explanation.
15           So when you spoke with Molly Farrand, did
16   you discuss any details regarding the likelihood
17   that they were going to purchase this property?
18       A   Well, yes, she basically said there was a
19   strong likelihood that they could purchase the
20   property based on the proceeds they got from
21   expected sale of the Centerville property and the
22   financing they could get in her discussions with the
23   broker involved.
24       Q   Did she tell you the price point that they
25   had been willing -- the Farrands had been willing to

Page 49

1    pay for this property?
2        A   Yes.
3        Q   What was that?
4        A   I think it was in the area of 299- to
5    350,000.
6        Q   Do you have any information regarding the
7    amount that the sellers were asking for for that
8    property?
9        A   Yes.
10       Q   What do you know about that?
11       A   Ms. Farrand told me that they were asking
12   about 350,000 initially.
13       Q   Did you discuss with her whether there
14   were any other potential buyers looking at the
15   property?
16       A   I don't recall.  I'd have to look at my
17   notes.  She believed that they would be the
18   successful buyers.
19       Q   Did you ever speak with the real estate
20   agent that was involved?
21       A   No.
22       Q   Did you ever speak with the prior owners
23   of the property?
24       A   No.
25       Q   You understand that they did wind up

Page 50

1    selling that property to a third party; is that
2    right?
3        A   I believe so.
4        Q   Did you speak with the new owners of that
5    property?
6        A   No.
7        Q   Did you see what they sold for?
8        A   I'd have to refer to my notes.  I might
9    have that in there.
10       Q   Okay.  Actually, now is a good time for a
11   break.  Would you mind doing that, just look through
12   your notes.
13       A   Sure.
14           THE VIDEOGRAPHER:  Off the record at
15   10:48.
16           (Recess taken.)
17           THE VIDEOGRAPHER:  We are back on the
18   record at 10:57.
19       Q   BY MR. BURR:  Before the break, we were
20   asking about a data point that you were going to
21   look up through your notes.
22           Did you find that?
23       A   I looked through my notes and my file.  I
24   don't have that data point.
25       Q   You mentioned that you looked on VRBO.com;

Page 51

1    is that right?
2        A   Yes.
3        Q   Did you also look on Airbnb, or just VRBO?
4        A   VRBO.
5        Q   Did you see the property in question, the
6    Vallecito property on VRBO?
7        A   I don't recall seeing that.
8        Q   Do you know if it's used as a rental
9    property today or as a VRBO type property today?
10       A   I don't know that it's on VRBO.
11       Q   Did you ever ask what the property sold
12   for to the buyers who purchased the property?
13       A   I don't have that information in my file,
14   so I can't recall if I got that purchase price.
15       Q   You don't recall whether you looked online
16   to try to find out?
17       A   That's correct.
18       Q   Did you look at other nearby properties in
19   the area?
20       A   To the extent they were on VRBO, yes.
21       Q   And that's looking at VRBO as of this
22   year, 2017?
23       A   This year, 2018.  I tried looking in the
24   Wayback Machine.  I wasn't successful in finding
25   prior VRBOs.

Page 52

1        Q   Thanks for reminding me what year it is.
2    It's 2018.
3            The communications that you had with Molly
4    Farrand, you mentioned there had been approximately
5    three phone calls with her; is that right?
6        A   Correct.
7        Q   Were those all communications for this
8    case in 2018, or were some of them referred to the
9    other case in 2014?
10       A   No, just this case.
11       Q   Did you also speak with her back in 2014
12   relating to the case against the city?
13       A   I can't recall if I did.
14       Q   When you spoke to her this year, would
15   that have been within the past month or so?
16       A   Yes.
17       Q   About when was that?
18       A   It would be in between the period of March
19   23 to March 30th when I exchanged my report.
20       Q   And you spoke with her on three separate
21   occasions where they fall on different days?
22       A   I think it was two different days.
23       Q   And was there any reason why it wasn't all
24   just one long conversation?  Was there something
25   that she needed to check on and get back to you?

Page 53

1  Did you have additional questions?
2      A  Yeah.  The first time I talked to her, she
3  started giving me some background, but then she had
4  to attend to something, so we decided I'd have a
5  subsequent conversation with her.
6      Q  Now, in your file are some handwritten
7  notes of conversations with Molly Farrand.
8          Are those the two sheets you have in front
9  of you there?
10     A  Yes.
11     Q  I'd like to mark them as exhibits, but I
12  need to be able to read them at the same time.
13         MR. GAMMILL:  Take my copies.
14         MR. BURR:  Unless you're fine with us
15  marking your originals, but I don't want to presume.
16         MR. GAMMILL:  Let's just use a copy.
17         MR. BURR:  Yeah, they're kind of at the
18  end of the stack after these.  So I will use those
19  to refer to, and then I will hand you these, which
20  will be mark as Exhibit 2 and 3.
21         (Exhibit 2 and 3 were marked.)
22     Q  BY MR. BURR:  I'm handing you what's been
23  marked as Exhibits 2 and 3.  And can you tell me if
24  those are copies of the yellow note pad pages that
25  you have in front of you?

Page 54

1      A  Yes.
2      Q  And these are handwritten notes from your
3  conversations with Ms. Farrand?
4      A  Yes.  As well as Exhibit 3, Mr. Saad
5  Rahman's notes in the same conversation.
6      Q  So Exhibit 2 is your handwriting from the
7  conversation where you and Mr. Saad were on the
8  phone at the same time with Ms. Farrand?
9      A  Yes.
10     Q  Does this relate to just one call or
11  several calls?
12     A  It relates to two calls on the same day.
13     Q  And then there was a third call.  Was that
14  before or after these calls?
15     A  Yeah, the first call was before this.
16     Q  The first call, did it go into some detail
17  on any of these points?
18     A  We started to, but I think Ms. Farrand had
19  to attend to something.  So I said, "Let's try to
20  have one call or a call on a subsequent call to get
21  as much data as I think I need to do my analysis."
22     Q  So on that first call, you didn't take any
23  notes?
24     A  I did not.
25     Q  And how long was that call?

Page 55

1      A  I think it was five to ten minutes.
2      Q  And you started to get into some details,
3  but not very many?
4      A  Yeah, I recall some overall details of his
5  career and then the properties in question.  And
6  then I usually listen to people at first.  But then
7  she said, "I have to attend to something."  I said,
8  "Let's set a time today or subsequent where we can
9  talk in further detail."
10     Q  And then later on, I guess it would have
11  been another day you had two phone calls that are
12  memorized in these two sets of notes?
13     A  Yes.
14     Q  And was there a reason why that was a set
15  of two calls instead of one long call?  Was that
16  also she had something to attend to?
17     A  No.
18     Q  What happened?
19     A  I had something to attend to.
20     Q  And then you resumed the call later that
21  day?
22     A  Yes.
23     Q  Just for the record, this Exhibit 2 is
24  your handwriting, and Exhibit 3 is Mr. Saad's
25  handwriting; is that right?

Page 56

1      A  Yes.  Mr. Rahman.
2      Q  Saad Rahman?
3      A  Correct.
4      Q  Okay.  Now, I apologize, but some of your
5  handwriting is difficult to read.
6      A  That's an understatement.
7      Q  Would you mind reading for the record the
8  top half of this page on Exhibit 2?
9      A  Okay.  3/26/18, Molly Farrand, her phone
10  number, Vincent Farrand background, started in high
11  school from best friend's dad, 15 years on his own,
12  1999; nearly exclusive for Allied Home Furnishing,
13  mostly all single family, mostly high flooring,
14  worked in Utah, northern Utah, Park City, Salt Lake.
15     Q  And could you just finish out the page,
16  and then I'll have some follow-ups.
17     A  Sure.
18         No contractor's license.  Don't need in
19  Utah.  Had insurance.  Was planning to work in
20  Durango, Colorado.  No license required.  2013,
21  started looking at properties in Colorado.
22     Q  Okay.  Now, you referred here to high
23  flooring, mostly high flooring.
24         Do you understand what that means?
25     A  If I can relate it back, because I

Page 57

1    translated these note into my report.  It's high-end
2    residential flooring.
3        Q    And then you refer here to an interest in
4    working in Durango, Colorado.  Was it your
5    understanding that Durango was close to either the
6    Montecillo or Vallecito properties?
7        A    Well, I understand there was an intent to
8    look into Colorado, but I think it was two hours
9    away from Centerville.  I don't know about
10   Montecillo, the distance.
11       Q    Okay.  When you did your assumptions about
12   the average income for flooring contractors, did you
13   focus on the Durango area or on Utah more broadly?
14   I believe I saw it was Utah Statewide was one of the
15   data points you used.
16       A    Utah Statewide.
17       Q    And then if you turn to the next page -- I
18   apologize for this, but could you just continue to
19   read your notes for the record?
20       A    Certainly.
21            Molly getting Colorado real estate
22   broker's license, will move to Colorado after son's
23   graduation.  Vincent did all work on residence, as
24   well as Montecillo.  Process of flooring,
25   installation, sheetrock, electrical, tiles, always

Page 58

1    working on many projects.  Molly Farrand, last eight
2    years, contract manager for software.  I think it's
3    Client Track, Inc., but then changes, Petoziak
4    Solutions, case management company sold to
5    government.  They sold software to government,
6    nonprofit agencies.  Five years worked for
7    broker/developer, residential and commercial
8    properties, Reny Homes (phonetic); JMR Development,
9    two years; residential real estate brokerage, two
10   years.  Office manager at a laser company.  Worked
11   for father's company for five years doing leases.
12   The laser company treats, hair, skin.
13       Q    And when you inquired about her
14   background, experience, was that just her giving you
15   background information that -- was that something
16   you requested that she provide you, or was she just
17   giving it to you?
18       A    I requested her information, too.
19       Q    Did her income factor into your analysis
20   at all or her career?
21       A    Well, I've measured no damages to her.
22       Q    Now, these comments here about sheetrock,
23   electrical, tile, is that -- was the point of
24   writing that there when she was talking about
25   potentially him, you know, advancing in his career

Page 59

1    and becoming more of a generalized contractor?  Or
2    was there some other reason to write these types of
3    contracting work?
4        A    I just asked her for the categories he
5    worked in and the process, and that's what she
6    provided me.
7        Q    Okay.  The next page, if you continue --
8        A    At software company 2014, $85,000 per
9    year; 2018, $105,000 per year; 2017, 4,000 in real
10   estate.
11       Q    Can I pause there?
12       A    Sure.
13       Q    These relate to her income during those
14   years?
15       A    Yes.
16       Q    Go ahead.
17       A    Properties, Centerville residence,
18   purchased 1999, $179,000.  Refinanced, $151,000.
19   Sold for $375,000, May 2017.  Also put $20,000
20   between 2014 and 2017.  The mortgage payout,
21   $236,726.  Has not yet purchased a residence as a
22   $250,000 1031 credit after Vincent's passing.  Could
23   not keep property because of maintenance.  Vincent
24   did this, pruning/trees.  $350,000 appraised in
25   2006.

Page 60

1        Q    Is the $350,000 appraised in 2006, is that
2    referring to the Centerville property?
3        A    Yes.
4        Q    So is it your understanding that the lower
5    half of this page all relates to information about
6    the Centerville property?
7        A    Yes.
8        Q    Did you do any assessment relating to the
9    Centerville property in your analysis?
10       A    No.
11       Q    Did you consider any of the family's
12   assets that they had at the time of Vincent
13   Farrand's death in connection with your assessment
14   of whether they could have purchased the Montecillo
15   property -- I'm sorry -- the Vallecito property?
16       A    Yes.
17       Q    And what did you assess in connection with
18   that?
19       A    Well, basically, based on the information
20   on my notes on this page, it appears that they would
21   be able to sell the Centerville property, pay off
22   their mortgage, and have enough to put a down
23   payment on Vallecito.
24       Q    Okay.  Did you have an understanding of
25   what down payment would be required to get the

Page 61

1    Vallecito property?
2        A    I believe it was $60,000.
3        Q    And was it your view that they would have
4    enough from the sale of the Centerville home in
5    order to fund that $60,000 down payment?
6        A    Yes.
7        Q    This refers to pruning and trees that
8    Vincent did.  Is that talking about maintenance on
9    the Centerville property, the yard?
10       A    Yes.
11       Q    This refers $250,000 1031 credit.  Just
12   for clarity, what is that referring to?
13       A    I inquired as she was going to -- she was
14   going to purchase another residence.  And she said
15   she had not yet, which, you know, there's sometimes
16   a tax incentive, because she's got up to a $250,000
17   tax credit.  But it doesn't put her in any rush to
18   purchase a residence.
19       Q    Do you know if she has purchased another
20   home to date?
21       A    No.
22       Q    Do you know one way or the other whether
23   she has alleged any damages relating to depreciated
24   value of the Centerville home?
25       A    No.

Page 62

1        Q    And that wasn't part of your analysis?
2        A    That's correct.
3        Q    I apologize to the court reporter for
4    continually mixing up Montecillo and Vallecito, but
5    hopefully we can get those clarified as we go.
6            So this next page appears to refer to the
7    Montecillo property.  Do you mind reading into the
8    record for that?
9        A    Certainly.  Montecillo bought 12 years, 70
10   acres, planned retirement house, $190,000 in 2014
11   estimated value.  Vince would have done work, at
12   least $100,000 of work.  Vallecito Lake near
13   Durango, California, two hours for Montecillo
14   property, resort with seven cabins, seasonal April
15   to October, cabins rented.  John Williams has
16   listings, other info, $299,000.  First visit, July
17   2013.  Second visit August 2013.  Wanted to buy May
18   or June 2014.  Son graduating.  Plan sell
19   Centerville residence, then moved to Montecillo and
20   buy Vallecito.
21       Q    So, basically, in this conversation, it
22   was your understanding that their plan was to live
23   in Montecillo and then own a property in Vallecito
24   about two hours away?
25       A    Yes.

Page 63

1        Q    Now, the notes here refer to 190,000 in
2    2017 estimated value.  Do you know what that is
3    based on?
4        A    Yes.  Molly, I believe, looked at listings
5    in the other area, consulted brokers.  She's a
6    broker herself.
7        Q    And this would be $190,000 for the entire
8    group of cabins that they were looking to purchase?
9        A    No.  This is the estimated value of
10   Montecillo.
11       Q    Strike that.
12           So, yeah, Montecillo property, her
13   assessment of the acreage down there, I believe it's
14   70 acres; is that right?
15       A    Yes.
16       Q    So her assessment was $190,000 in 2017 as
17   the estimated value for the Montecillo property?
18       A    No.  In 2014.
19       Q    2014.  Okay.
20           Did you do any independent investigation
21   of the value of the property?
22       A    No.  I relied on her experience as a
23   broker.  I don't think I could find in Wayback
24   Machine enough data points, so I thought that she
25   had information on hand based on her experience

Page 64

1    that's reasonable to rely on.
2        Q    Did you look at any, for example, tax
3    appraisal records relating to that property?
4        A    I did not.
5        Q    The calculation, at least $100,000 worth
6    of work, do you know what that is based on?
7        A    That's based upon her assessment of what
8    was needed to be done to keep the property in repair
9    over the next several years.
10       Q    Does she give a time frame?
11       A    She just estimated the next several years
12   that you'd have to put in some work.  But then over
13   the course of his lifetime, she thought aggregate
14   probably about $100,000.
15       Q    Did she talk to you about specific types
16   of work that needed to be done on the property?
17       A    There would be upgrades and repairs that
18   would need to be done.  That's the information I
19   have.
20       Q    Did she explain to you what improvements
21   existed on the property?
22       A    To my knowledge, it was a house and then
23   70 acres.
24       Q    Do you know what portion of the value of
25   the property is in the land versus the house?

Page 65

1    A  I have not seen that segregated, no.
2    Q  Did you ask her that question?
3    A  I don't have it in my notes.  There are 70
4  acres there, though.  The market could look at that
5  size.  It could look at a house.  But I don't have
6  that breakout.
7    Q  Right.  So there's a reference here to
8  seven cabins in Vallecito Lake area, and that they
9  would be rented out from the April to October time
10 frame each year; is that right?
11   A  Yes.
12   Q  So is your assessment of the lost rental
13 income based on that time frame, April to October?
14   A  Ultimately, I got the listing that has the
15 time frame here, if I could refer to that.
16   Q  We'll look at that shortly.
17      Who is John Williams?
18   A  He's an attorney working for the plaintiff
19 in this case.
20   Q  And do you know what this is referring to,
21 these listings?
22   A  Well, I wanted to see what kind of
23 support, when she was talking with the broker and
24 whatnot, that they had for the seven cabins rental
25 rates, the purchase price, and whatnot.  And she

Page 66

1  said he would have the listing.  I don't know
2  ultimately if I got it from him or from her, but I
3  do have this listing now.
4    Q  And by "listing," you're referring to --
5  well, I'll mark it in a second in a second, and we
6  can confirm that.
7       It also references two visits in July and
8  August of 2013 to the property; is that right?
9    A  That's correct.
10   Q  And was it your understanding that they
11 went to the property for recreational or solely to
12 look at purchasing or for some other reason?
13   A  For purchasing.
14   Q  And do you know if they met with the
15 sellers at any point, or did they just look at the
16 property?
17   A  I don't know.  I know they were
18 communicating with the broker.  I don't know if they
19 met with the sellers.
20   Q  Do you know if they ever communicated with
21 the seller directly?
22   A  I can't recall.
23   Q  Do you know if they ever placed an offer
24 on the property?
25   A  I believe they were in negotiations, and

Page 67

1  ultimately they decided on $299,000 as the purchase
2  price.
3    Q  And that's based on your communication
4  with Molly Farrand?
5    A  That's correct.  And also this broker
6  information, Item 8 in my sources of information.
7    Q  Now, you spoke earlier -- you thought that
8  the sellers had wanted $350,000.  Is it your
9  understanding that the sellers had been willing to
10 go down to $299-?
11   A  That's my understanding.
12   Q  And that's based on what Molly has told
13 you?  Or is there documentation indicating that the
14 sellers had been willing to go down to $299,000?
15   A  It's based on what Molly had told me, and
16 it's also a price that's listed on the schedule on
17 item No. 8 in my sources of information, the broker
18 listing information.
19   Q  Okay.  Let's go ahead and mark that.
20      (Exhibit 4 was marked.)
21   Q  BY MR. BURR:  I'll hand you what I've
22 marked as Exhibit 4.  Could you just compare that
23 with what you were referring to earlier, and let me
24 know if that's the same document you were referring
25 to, the information from the broker.

Page 68

1    A  Yes.
2    Q  And these are all pages that you had in
3  your possession and you reviewed in connection with
4  your report?
5    A  Yes.
6    Q  And we'll come back to that in a minute.
7  If we could return to Exhibit 2, your handwritten
8  notes, if you could just wrap that up.
9       Did you ever speak with John Williams
10 about this case?
11   A  Yes.
12   Q  Was it about getting documents or anything
13 else?
14   A  It was about the deadline for submission
15 of our report and where to get documents and
16 information from.
17   Q  And just for clarity, this Exhibit 2 has
18 four pages of notes.  And is it your understanding
19 that these four pages comprise two separate phone
20 calls on the same day with Molly Farrand?
21   A  Yes.
22   Q  And you don't recall any other -- other
23 than the more preliminary discussion you had with
24 her prior, were there any other substantive things
25 you discussed with Molly Farrand that are not

Page 69

1  recorded here?
2      A  No.
3      Q  Can you think of any substantive details
4  from your first conversation with Molly Farrand that
5  you relied upon in your analysis that aren't
6  recorded in here in Exhibit 2?
7      A  No.
8      Q  And then Exhibit 3, these are notes from
9  Saad Rahman?
10      A  Yes.
11      Q  Relating to the same conversations;
12  correct?
13      A  Yes.
14      Q  And you recognize this handwriting as his?
15      A  Yes.
16      Q  Okay.  We can set those aside.
17          If we could turn to what we just marked as
18  Exhibit 4, the first page is a July 29, 2013 e-mail;
19  is that correct?
20      A  Yes.
21      Q  It's from marilyn@realestatevallecito.com
22  to Molly Farrand; correct?
23      A  Yes.
24      Q  And is it your understanding that this
25  e-mail was after their first visit to the property

Page 70

1  before their second visit?
2      A  Yes.
3      Q  And you never spoke with Marilyn at Real
4  Estate Vallecito, did you?
5      A  That's correct.
6      Q  If you'll turn to the next page, do you
7  see this is an exchange between Marilyn and Molly
8  Farrand on August 6?
9      A  Yes.
10      Q  Okay.  Now, do you see where it refers in
11  the first e-mail from Marilyn to Molly Farrand, it
12  says, "I am just getting the key today for the
13  property I talked to you about.  I don't think I will
14  will have it up and running for a few days.  I will
15  know more about the property tonight after I get
16  inside."
17          Based on this, is it your understanding
18  that they hadn't -- that there was not complete
19  clarity after the first visit about which property
20  that they're purchasing?  That that was still in
21  flux?
22      A  I don't know if that was the case for this
23  date.
24      Q  Okay.  And the next e-mail, her response,
25  she talks about seeking showings for the home, seven

Page 71

1  cabins and an joining listing for $99,000 and the
2  red A-frame cabin.
3          Did you talk through any of the details
4  with Ms. Farrand about the different cabins, homes,
5  a red A-frame cabin, an adjoining listing?  Do you
6  have any understanding of what those different
7  listings relate to?
8      A  I understand they were working on three
9  properties initially, but basically really decided
10  to focus on the seven cabins.
11      Q  Okay.  The third page, just for the
12  record, this is a plot map of some kind showing the
13  different properties?
14      A  Yes.
15      Q  And then on the next page, there is a
16  sheet with a breakdown of rental income and
17  expenses.
18          Do you know who prepared this sheet?
19      A  I believe it was Marilyn Lane.
20      Q  And how do you know that?
21      A  I believe in my discussions with
22  Ms. Farrand.
23      Q  Do you know how this was sent to
24  Ms. Farrand, if it was attached to an e-mail or if
25  it was handed to her?

Page 72

1      A  I don't know.  I don't recall if it was
2  attached to an e-mail.  She ultimately did receive
3  it.  It's what she was relying on to make an
4  assessment of the purchase of the property.
5      Q  Did you have this document in your hands
6  at any point when you spoke with Ms. Farrand, or
7  were your conversations with her before you actually
8  saw this?
9      A  This was shortly after my conversation
10  with her on March 26.
11      Q  Okay.  So you spoke with her and then you
12  received this document after that?
13      A  Yes.
14      Q  Now, the next page of this Exhibit 4 is an
15  e-mail from orders@realestatecollege.com to Molly
16  Farrand, and this confirms an order for exam prep
17  for Colorado.
18          Is it your understanding that she was
19  applying to take some exam for -- to become a real
20  estate broker in Colorado?
21      A  Yes.
22      Q  If you turn to the next page, this is an
23  October 7, 2013 e-mail that talks about a similar
24  issue.
25          Does this also relate to her interest in

Page 73

1  becoming a broker in the state of Colorado?
2      A   Yes.
3      Q   Finally, this last page, this is an e-mail
4  from Marilyn Lane to Molly Farrand dated November
5  18, 2013.  And it states, "Hi Molly, today I showed
6  the green cabin to another real estate agent's
7  husband.  He really liked it and plans to come back
8  with family in December."
9          Do you know what that green cabin is
10  referring to?
11      A   No, it's not specified here.
12      Q   So you don't know whether the green cabin
13  was one of the seven that they were purchasing or
14  something adjoining or nearby?
15      A   It's not indicated here.  I know there's
16  seven cabins they were looking at.  It could be one
17  of them, but I can't answer it based on this
18  sentence.
19      Q   The next sentence, the seller says, "The
20  sellers are having the entire property surveyed to
21  see if we can legalize the small lot.  One mobile
22  left today and hopefully the other one will leave
23  shortly.  We should be able to do two RV spots where
24  the mobiles were."
25          Do you recall any discussions with her

Page 74

1  about mobile homes on the property and potentially
2  needing to move them off the property?
3      A   Well, I think it was basically -- well,
4  there's cabins, rentals for mobile homes, too.  We
5  weren't going to focus on anything generating rental
6  income other than the cabins if we had purchased
7  Vallecito.
8      Q   Okay.  Next sentence says, "Sellers have
9  not decided to do any price changes as of now.  I
10  will keep you posted if they change their mind."
11          Do you know what that sentence refers
12  to?
13      A   Basically, they were talking about pricing
14  the property, and I don't think they were going to
15  move from the $299,000 price.
16      Q   But you don't know whether this price
17  change is referring to a price change from $299-
18  versus $350- versus any other number; is that
19  correct?
20      A   That's correct.
21      Q   As of this point in November -- on
22  November 18, 2013, the sellers were at a certain
23  price point that we don't know where that was, and
24  they had not been willing -- they had expressed here
25  they're not willing to change that price point; is

Page 75

1  that right?
2      A   My -- certainly that's -- the sentence
3  indicates that.  And what I explored with
4  Ms. Farrand is what was the price you think you were
5  going to be able to get for the property.  And she
6  said we could get -- we could purchase it for
7  $299,000.
8      Q   This was in November of 2013, and this is
9  the last page of this exhibit.
10          Are you aware of any other e-mails or
11  other communications after November 2013 relating to
12  this property?
13      A   No.
14      Q   And Mr. Farrand died in April 2014; is
15  that right?
16      A   Yes.
17      Q   So that's about five months later?
18      A   Yes.
19      Q   Do you know or have any information
20  regarding any discussions during that five-month
21  period about this property and the price point for
22  the property?
23      A   No.
24      Q   Continuing on to this e-mail, it says,
25  "I've had some inquiries for an assistant" -- well,

Page 76

1  first, "Have you taken your test yet?  I've had some
2  inquiries for an assistant.  I have not advertised,
3  but they have come to me.  I'm holding off in hopes
4  we can work something out.  Let me know your
5  thoughts on work here and any updates on your folks
6  and the resort."
7          Does this relate to the possibility of
8  Molly Farrand working with Marilyn Lane in that
9  location?
10      A   Yes.
11      Q   Do you know if those discussions ever
12  progressed after November 18, 2013?
13      A   No.
14      Q   Do you know if she wound up taking that
15  exam?
16          MR. GAMMILL:  Objection.  Form.
17          THE WITNESS:  I'm going to check my notes.
18  I don't recall if she did.
19          I don't know.
20      Q   BY MR. BURR:  You also comment in here,
21  "Let me know your thoughts on work here and any
22  update on your folks and the resort."
23          Do you know what that phrase "your folks"
24  refers to?
25      A   I don't know directly here.  I know

Page 77

1  there's an inquiry a few pages back from Molly's
2  parents or grandfather was --
3      Q    Are you referring on the same page where
4  she asks, "How is your grandfather doing?"
5      A    Oh, yes.
6      Q    Did you discuss at all with Molly Farrand
7  as to whether any other members of the family would
8  move along with them to Montecillo or Vallecito?
9      A    I don't recall if it was anyone other than
10  the son.
11     Q    Okay.
12     A    And Vincent, of course.
13     Q    Okay.  Do you know whether there was ever
14  an earnest money contract executed relating to this
15  property in Vallecito?
16     A    At all between any party?
17     Q    No.  Between the Farrands and anyone else.
18     A    I don't recall seeing that information.
19     Q    Now, you mentioned that you thought
20  $60,000 would be the range for a down payment for
21  the property?
22     A    Yes.
23     Q    Is that just based on a simple 20 percent
24  of a $299,000 purchase price, roughly?
25     A    It's based on the information in Exhibit 4

Page 78

1  on the fourth page.  If you go to about the middle
2  of that schedule, if you see mortgage, you see
3  mortgage $299,000 with $60,000 down.
4      Q    And you're saying that's something that
5  Marilyn Lane prepared, an assessment of a mortgage
6  with $60,000 down at 4.5 percent?
7      A    Yes.
8      Q    Now, you said that -- well, it indicates
9  here that the property were to earn $108,208.24 for
10  120 nights in net income per cabin.
11         So is that the number that you used for
12  your assessment, assuming either six or seven cabins
13  being rented during that time frame?
14     A    It is used in my assessment.  But the
15  Farrands would have to invest further money, spend
16  further money to upgrade the cabins at a cost of
17  $15- to $30,000 a piece.
18     Q    Now, in the notes in the phone call, I
19  believe, there was a time frame, a season -- the
20  main season for the properties was the April to
21  October range; is that right?  Something like that?
22     A    Yes.
23     Q    And it's estimating here 120 nights per
24  cabin for that season?
25     A    Yes.

Page 79

1      Q    Did you have any information other than
2  this spreadsheet regarding the frequency with which
3  those properties had been rented out in recent
4  years, if they had been?
5      A    No.
6      Q    Do you know whether those properties had
7  been used as rental properties before for VRBO-type
8  purposes or anything like that?
9      A    I don't know the frequency that they were
10  used, no.
11     Q    Do you know if they were owned by people
12  who stayed there long-term versus people who owned
13  them to rent them out?
14     A    No.
15     Q    Did you have any information regarding how
16  frequently throughout the year such properties in
17  that area of Colorado were occupied?
18     A    Other than what Ms. Farrand told me and
19  what I have here, that's what I relied on, plus my
20  experience in working in the hospitality industry.
21  It's a pretty reasonable time frame for that section
22  of the country in general.
23     Q    So this 120 nights per year, this is an
24  estimate that was provided in this document and --
25  but it's not tied to any specific data that you're

Page 80

1  aware of relating to those specific cabins; correct?
2      A    Well, I think it's related to the area
3  that you're in, taking weather into account, taking
4  vacation period of time and whatnot.
5      Q    Now, if this property would generate
6  income, net income of $108,000 per -- is that per
7  year?
8      A    Yes.
9      Q    If it would generate that kind of revenue
10  in net income per year, wouldn't that pay off any
11  mortgage on the property pretty quickly?
12         MR. GAMMILL:  Objection.  Form.
13         THE WITNESS:  Well, if you have the money
14  in, and you wanted to pay your mortgage off and you
15  could do so, you could do it.  But, recall, there's
16  also a period to get these cabins functional as
17  rental properties.  There would be a period -- I
18  think I've estimated year and a half to two years --
19  where you would be spending up to, I think,
20  $150,000.
21     Q    BY MR. BURR:  And that would be net
22  expenses for upgrades to the properties themselves?
23     A    Yes.
24     Q    And would that -- was that assumption
25  based on work that would be contracted out?  Or was

Page 81

1  that assuming that Mr. Farrand would do a portion of
2  the work or that that was the value of the work that
3  Mr. Farrand would do?  What is that number based on?
4      **A   Mr. Farrand would do a portion of the work**
5  **and would contract out other work.**
6      Q   And would the $150,000 be the work that
7  you performed or the contracted out work or the
8  combination of the two?
9      **A   It's a combination of the two.**
10     Q   So the total of $150,000 worth of work
11  that needed to be done, Mr. Farrand could do some of
12  it or some could be contracted out?
13     **A   That's correct.**
14     Q   Have you ever seen any comparable sales
15  for cabins in that region of Colorado?
16     **A   I was not looking at comparable sales of**
17  **cabins.**
18     Q   Okay.  Now, just to make sure I'm clear on
19  what you factor into your analysis, this has rental
20  income and expenses deducted from it.
21         Are there any other expenses that you
22  factored in to your analysis on top of this?  You
23  mentioned that there may need to be further
24  renovations down the road?
25     **A   Yeah, I definitely factored those in,**

Page 82

1  **yeah.**
2      Q   And could you show me where in your report
3  you refer to that?
4      **A   If we go to page 15, and if you look at**
5  **the top right after "annual net income," there's**
6  **less renovations.**
7      Q   Yes.
8      **A   And I'd be giving you a rough estimate of**
9  **$150,000, more like $156,000 or $157,000.  And if**
10  **you look at footnote 2, that's based upon an**
11  **estimated renovation expense ranging from $15- to**
12  **$30,000 per cabin.  So I took the average of that,**
13  **which would be -- let's see -- about 22,5- times**
14  **seven, and that's $157,500 of renovations that would**
15  **occur through the end of 2015.**
16     Q   And then did you also factor into this
17  analysis any estimate for renovations that might be
18  needed in the three or so decades after this?
19     **A   No.**
20     Q   So the only renovations you factored in
21  were for the initial period from 2014 to 2015?
22     **A   Yes.**
23     Q   Did you factor property taxes into your
24  analysis at all?
25     **A   No.**

Page 83

1      Q   Did you factor in the costs of any on-site
2  employees that they might need to assist with
3  cleaning or maintenance of the properties?
4      **A   No.  Mr. Farrand would be doing that.**
5      Q   Would there be any cleaning expenses.
6  Typically when you have a VRBO, would you imagine
7  there would be cleaning expenses associated with the
8  transition period between vacationers?
9      **A   Again, between Mr. and Ms. Farrand, they**
10  **would take care of that.**
11     Q   But they would be living about two hours
12  away in Montecillo?
13     **A   That would be their residence, yes.**
14     Q   Is it your understanding that they would
15  run the properties on VRBOs in Vallecito with no
16  employees or other persons assisting them?
17     **A   That was my understanding.**
18     Q   We have been talking about -- let's change
19  the tape, and then I'll have a few more questions.
20         THE VIDEOGRAPHER:  Off the record at
21  11:49.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  We're back on the
24  record at 11:53.  This is the beginning of disc 2.
25     Q   BY MR. BURR:  Now, we talked about how you

Page 84

1  factored in a $60,000 down payment for the Vallecito
2  property that could be funded by sale of the
3  Centerville home; is that correct?
4      **A   Yes.**
5      Q   Do you know whether the Centerville home
6  was ultimately sold?
7      **A   Yes.**
8      Q   Do you know whether any portion of the
9  equity in that home was used or could have been used
10  to pay for properties in Vallecito or similar
11  properties?
12         MR. GAMMILL:  Objection.  Form.  Compound.
13         THE WITNESS:  Yes.
14     Q   BY MR. BURR:  And what do you know about
15  that issue?
16     **A   Basically in my notes on page 3,**
17  **Centerville was sold for $375,000, and there was a**
18  **mortgage payout of $236,000, giving a net equity of**
19  **about $140,000.  It was appraised in 2006 for**
20  **$350,000.**
21         **So if you look at that gross value and**
22  **about -- the mortgage balance around 2014, it looks**
23  **like they might have probably cleared about the same**
24  **amount, $140,000, probably over $100,000, at least.**
25  **And so that would be able to be used to do a down**

Page 85

1  payment of $60,000.
2      Q   In your conversations with Ms. Farrand,
3  did you ever speak with her about whether she was
4  still interested in trying to secure rental
5  properties, whether in Vallecito or elsewhere?
6      A   Well, yes.  The issue is, without her
7  husband to do the upkeep, she does not think it's
8  feasible.
9      Q   Now, you understand that in this case,
10  she's suing my client to seek a death benefit for
11  the property, plus additional damages.
12      Do you understand that?
13      MR. GAMMILL:  Objection.  Form.
14      Q  BY MR. BURR:  Death benefit relating to
15  the policy at issue?
16      A   That's my overall understanding, yes.
17      Q   And did you do any assessment as to
18  whether if the court instructs my client to pay that
19  death benefit, whether that death benefit could be
20  used to fund additional rental properties or somehow
21  mitigate the damages you reference here relating to
22  the lost rental income?
23      A   No.  I think that would call for a legal
24  analysis, which I'm not qualified to do.
25      Q   So your projections for lost rental income

Page 86

1  through the date of Mr. Farrand's death is just
2  based on what the property could earn over that
3  time.  It's not based on a legal assessment of, you
4  know, what portion of that time frame Ms. Farrand
5  might be entitled to as damages in this case?
6      A   That's correct.
7      Q   Now, there's a reference here in footnote
8  1.  Looking back in your report on page 15, footnote
9  1 to Schedule 2(a), there's a reference to period is
10  prorated -- sorry -- April 13, 2014, period is
11  prorated by 262 over 365 days.
12      What is that reference to, a prorated
13  period of 262 out of 365 days?
14      A   See, when I do my discounting to present
15  value, if a property or a business is earning income
16  throughout the year, we go to the mid point of the
17  year because, mathematically, you take that income
18  into account by going to the mid point.
19      And if you start at the beginning of the
20  year, that's easy because it would go to whatever it
21  is, 182 days.  In this case, the beginning period is
22  April, so we don't have a full 365 days divided by
23  two.  We have to prorate it in the calculation I
24  show you here.
25      Q   Got it.  So that's just for the year 2014?

Page 87

1      A   Correct.
2      Q   I was confused as to whether that related
3  somehow to the 120 days per year occupancy estimate.
4  Those are completely separate issues; right?
5      A   Yes.
6      Q   All right.  Now, if we could turn to your
7  third analysis regarding depreciation on the
8  property in Montecillo.  First, you used as your
9  initial property appraisal value $190,000; is that
10  correct?
11      A   Yes.
12      Q   And that's based on an assessment by
13  Ms. Farrand?
14      A   Yes.
15      Q   Did you look at any other sources to see
16  whether that was a reasonable estimate?
17      A   No.
18      Q   Do you know what portion of that $190,000
19  relates to the 70 acres versus referring to value of
20  the improvements upon it?
21      A   No.
22      Q   Now, have you ever seen the tax appraisal
23  records for this specific property before?
24      A   No.
25      Q   Now, you estimate a depreciation growth

Page 88

1  rate of 2.28 percent.
2      What do you base that on?
3      A   If you look to the block at the right, we
4  obtained annual median home sales price appreciation
5  or depreciation for San Juan County for the Utah
6  Association of Realtors.  And we did that for an
7  eight-year period to look at appreciation.  And so I
8  got appreciation each year and then took an average
9  of that.
10      Q   Did you do any assessment of San Juan
11  County to see whether this kind of appreciation is
12  typical for that entire county or whether there are
13  any cities or suburbs in that county that might
14  impact whether that would be a reasonable estimate
15  for this kind of property?
16      A   No.  I relied on the data here and my
17  experience in doing valuations with real estate.
18  It's pretty much mirrors inflation on an annual
19  basis.  I thought it was reasonable to use.
20      Q   Now, is that an appreciation growth rate
21  that you would think should be applied solely to the
22  land value or solely to the buildings or both?
23      A   To the entire value.
24      Q   And if there were unimproved property,
25  say, if it was just 70 acres of land with no

Page 89

```
 1   buildings upon it, would you apply the same growth
 2   rate or a different one?
 3       A   Well, I have to investigate that and do
 4   that analysis to give you an answer.
 5       Q   Have you ever valued unimproved property
 6   before?
 7       A   Yes, I have done that.  I participated
 8   in valuation of unimproved property.
 9       Q   And in those valuations, you would assume
10   at least some growth; correct?
11       A   That's correct.
12       Q   And you just don't know whether it would
13   be exactly 2.28 percent or something more or less,
14   even?
15       A   No.  I mean, you can assume some
16   appreciation.  I think you bring up a good point.
17   It's probably a very conservative factor for me to
18   use if there's going to be continued upgrades and
19   whatnot to the property by Mr. Farrand.
20       Q   Now, here you project -- let's see.  So
21   you're extrapolating this 2.28 growth rate over a
22   40-year period; right?
23       A   Pretty much, yes.
24       Q   Thirty-nine years?
25       A   Correct.
```

Page 90

```
 1       Q   And your conclusion is that the value of
 2   the property, using that appreciation growth rate
 3   over 39.2 years, would be $459,083; right?
 4       A   That's correct.
 5       Q   And that's assuming 2.28 percent
 6   appreciation on both the land and the improvements;
 7   correct?
 8       A   Correct.
 9       Q   And then you have loss of value to
10   property.  What does that number relate to?
11       A   That's basically the appreciated value of
12   the property less the $190,000.
13       Q   And why do you use the $190,000 as the
14   value to be subtracted for the appreciated value?
15       A   Well, basically, you can think of the 2.28
16   percent as the incremental increase in the value of
17   the property over and above any regular inflation on
18   the land of the building that would occur based upon
19   the upkeep that would be done by Mr. Farrand.  Okay?
20   And so because it's an incremental increase, you
21   have to measure it from a base, so I use the
22   $190,000.
23       Q   Is this assessment, assuming that if
24   Mr. Farrand is not performing upkeep on the
25   property, then the value of the property, land plus
```

Page 91

```
 1   improvements, will remain flat $190,000 over the
 2   next 40 year or 39 years?
 3       A   No.  It's assuming the incremental value.
 4   So, in other words, you could say, look, if both
 5   land and the building are going to grow, let's say,
 6   two percent not doing any improvements, then that
 7   190- would grow at that.  But if there were, then it
 8   would grow at, let's say, 4.28 percent.  So, really,
 9   I was just eliminating that incremental increase
10   analysis by just doing it this way.
11       Q   So let me understand this.  So 39 years
12   from now would be the year -- or this is 39 years
13   from 2014; is that right?
14       A   Right.
15       Q   So it would be the year 2053; is that
16   correct?
17       A   Yes.  Because what we can do is we can
18   look at -- it would be the year 2055.  If you look
19   at Schedule 2(b), that's the 39 years going out to
20   the date of death, natural date of death.
21       Q   All right.  So in the year 2055, your
22   projection is that assuming normal growth rates and
23   consistent maintenance and upkeep, it would grow at
24   2.28 percent?
25       A   I'm assuming the incremental increase of
```

Page 92

```
 1   upgrades would grow at 2.28 percent above any normal
 2   increase in real estate value.
 3       Q   So the 2.28 percent, that's a data point
 4   that relates to the average appreciation of property
 5   generally; right?
 6       A   Yes.
 7       Q   It doesn't necessarily relate to the
 8   margin between how much a property would appreciate
 9   if kept up versus not kept up?
10       A   That's correct.
11       Q   Are you suggesting here that if the
12   property were properly maintained, that its value
13   should be approximately $459,000 in the year 2055?
14       A   Well, I'm estimating that from the base of
15   $190- would be the incremental increase in its value
16   from upgrading.
17       Q   Why do you believe that 2.28 percent is a
18   valid proxy for an estimate of the margin between
19   how much property would appreciate incrementally if
20   kept up versus not kept up?
21       A   Well, because, basically, when you're
22   looking at appreciation rights in properties, they
23   incorporate keeping the properties in a living
24   normal condition that's upgraded.
25       Q   But you do recognize that 70 acres would
```

Page 93

1   appreciate at some rate; correct?
2       A   That's correct.
3       Q   And you didn't analyze how much it would
4   appreciate to over -- by the year 2055?
5       A   No.  That wasn't part of the analysis that
6   I felt was relevant.
7       Q   Do you know what property improvements or
8   maintenance was needed on the -- you know, just high
9   level on the Montecillo property?
10      A   Well, it would be maintaining the house,
11  doing periodic upgrades.  It would be landscaping on
12  the 70 acres.  I think there was some work on a
13  fence.
14      Q   Is it your view that the value of that
15  work over a 40-year period would be approximately
16  $269,000 worth of value?
17      A   Well, that's the gross value.  That's not
18  my opinion of the damage.  You'd have to do a
19  present value back, and my opinion is that's
20  $17,000.
21      Q   But this is your assessment of the value
22  added of continued improvements over time to the
23  property over that period, this $269,000?
24      A   That's correct, over a 40-year period.
25      Q   Did you factor in to your analysis the

Page 94

1   cost that might be required to hire third persons to
2   maintain the properties?
3       A   No.  I basically took into account it
4   would be Mr. Farrand's efforts.
5       Q   Did you look into how much it might cost
6   Molly Farrand to hire assistants over time to
7   maintain the property if, for example, my client had
8   paid a death benefit, and she had paid to hire
9   people to maintain the property, do you know how
10  much that would cost?
11      A   No.
12      Q   Have you ever been involved in a case
13  involving an accidental death property before -- an
14  accidental death policy before?
15      A   I can't recall if those insurance
16  companies covered accidental death, insurance cases
17  that I talked about earlier.  I'm sorry.
18      Q   And I believe I asked this question before
19  about opinion 2, but I'll ask this opinion about
20  opinion 3.  Your projections about the depreciation
21  of this property over the next 39 years or over a
22  39-year period, that's not your opinion regarding
23  how much my client should pay in damages; right?
24  That's your assessment of the math; is that correct?
25      A   That's my assessment of economic damages.

Page 95

1       Q   And you're not offering any opinion on
2   what portion of that time frame is damages that
3   should be attributed to my client's conduct?
4       A   No.  That calls for a legal conclusion or
5   a trier of fact or jury conclusion.
6       Q   Okay.  Let's go off the record.
7       THE VIDEOGRAPHER:  Off the record at
8   12:12.
9       (Recess taken.)
10      THE VIDEOGRAPHER:  We are back on the
11  record 12:17.
12      Q   BY MR. BURR:  Turning back to Exhibit 4,
13  this is the set of e-mails and documents.
14      Do you know how this was compiled or who
15  compiled it in this format?
16      A   I believe it was compiled by John
17  Williams.
18      Q   Okay.  And just for the record, this is a
19  collection of various documents, some of which are
20  e-mails, one of which is a spreadsheet that we
21  discussed; correct?
22      A   Yes.
23      Q   Do you know if any of these pages had been
24  affiliated with each other or one attached to an
25  e-mail or anything like that prior to this?

Page 96

1       A   No.
2       Q   Again, you didn't have this spreadsheet
3   with you when you spoke with Ms. Farrand; correct?
4   I believe it's the fourth page of that exhibit.
5       A   That's correct.
6       Q   Yeah, fourth page.
7       Did you discuss a spreadsheet with her at
8   all?
9       A   Yes.
10      Q   And she told you there would be a
11  spreadsheet that you could look at?
12      A   Yes.  She said that it would be part of
13  broker's documents that John Williams had.
14      Q   One last thing.  I won't mark it.  But in
15  your stack of papers near the end that you brought
16  with you from your file, there's a collection of
17  various listings.
18      Are these listings taken from the
19  VRBO website and other websites?
20      A   The VRBO website.
21      Q   These all come from the VRBO website?
22      A   Yes.
23      Q   Are these filtered in any specific way?
24  How did you run your search for these properties?
25      A   As narrowly as we could to do cabins in

Page 97

Vallecito.

Q  And so the goal of this stack of papers is to see what other cabins in Vallecito go for on VRBO.com?

A  Yes.  For rentals.

Q  And did you analyze price per square foot of these properties?

A  No, I did not.  I've got the information that I got from VRBO.

Q  Okay.  And your assessment, based on reviewing this, was that it was fair to rely on the spreadsheet as to the rental income to request for each property?

A  It's a data point that I looked at that it appears that the spreadsheet is reasonable in its estimates.

Q  Okay.  So you didn't actually modify your assessment of the average rental value for each cabin based on this analysis?  This was more to confirm that the spreadsheet was accurate?

A  Yes, overall.

Q  Okay.  Did you talk with Molly Farrand at all about the condition of the cabins themselves?  What they're like?

A  Yes.

Page 98

Q  And what did she say about them?

A  They needed work, needed construction work, which we previously discussed. I estimated it at, I think, $22,500 per cabin.

Q  And that work would be to put it in a condition that she could rent it out for; correct?

A  That's correct.

Q  And was it your understanding that these properties would have any particular amenities?  How many rooms per cabin?  Whether they had kitchens or anything like that?

A  Well I understand to make it rentable, it would be comparable to any kind of lodging you want to stay in during a vacation, so bathrooms, cooking area.

Q  Did you know one way or the other whether these specific properties had cooking areas or other features?

A  Well, I think part of the modifications were to do that.

Q  Okay.

A  Or improve the existing infrastructure.

Q  Do you know the approximate square footage of each cabin?  Did you ever have that information?

A  I did not.

Page 99

Q  And do you have any information to be able to tell whether the cabins, as improved as the Farrands were hoping to accomplish, would be at the mid point or on the low end or high end of these various properties that you looked at from VRBO.com?

A  It appears to be the mid to low point.

Q  And was it your understanding that the specific property that the Farrands were hoping to purchase was the seven cabins and nothing beyond that?

A  Well, there's an extra unit as indicated on the spreadsheet for a main house office.

Q  Okay.  Would that be for just -- do you have any understanding as to whether that was included in the $299,000 price that was contemplated?

A  Yes.

Q  So it would include the seven cabins, that office/ -- was it, kind of, a residential/office area?

A  Main house office, yes.

Q  And was it your understanding that the Farrands would actually occupy that or live there or rent it out for any reason or anything like that?

Page 100

A  It wasn't part of a rental, but they could live there.

Q  So they could stay there when they came to the site because they would live in Montecillo; right?

A  That would be their residence, yes.  But they could live in Vallecito.

Q  Okay.  Got it.

Are you aware of any efforts by Molly Farrand to mitigate any of the damages discussed in your report?

A  Well, I asked about, you know, mitigation as an offset, and she ended up selling Centerville about three years after she planned, but she doesn't know anything else she can do to mitigate damages.

Q  Do you know the reasons for the delay in selling the home?

A  Well, basically, her husband passed away. Let me see my notes for something else.

Well, I say in my notes, too, after Vincent passing, could not keep the property because of maintenance, which Vince did.

MR. BURR:  Okay.  All right.  I think that's it.  Thank you.

THE WITNESS:  Thank you.

## Page 101

1         THE VIDEOGRAPHER:  Off the record at
2 12:25.  This is the end of disc 2.
3        (Proceedings adjourned at 12:25 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 103

1
2       DECLARATION UNDER PENALTY OF PERJURY
3
4
5      I do hereby certify under penalty of perjury
6 that I have reviewed the foregoing transcript of my
7 deposition; that I have made such corrections as
8 appear noted herein in ink; that my testimony
9 contained herein, as corrected, is true and correct.
10
11     DATED _____
12 in _____, California.
13
14
15
16
17         _____
18          Thomas Pastore
19
20
21
22
23
24
25

## Page 102

1       ERRATA SHEET
2
3  PAGE   LINE      CORRECTION
4  ____  ____   _____
5  ____  ____   _____
6  ____  ____   _____
7  ____  ____   _____
8  ____  ____   _____
9  ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20  ____  ____   _____
21  ____  ____   _____
22  ____  ____   _____
23  ____  ____   _____
24  ____  ____   _____
25  ____  ____   _____
26

## Page 104

1    STATE OF CALIFORNIA  )
              ) ss
2    COUNTY OF LOS ANGELES)
3
4     I, Serena Wong, CSR NO. 10250, Certified
5 Shorthand Reporter, hereby certify that:
6     I am authorized to administer oaths or
7 affirmations.  (Cal. Code of Civ. P. Sec. 2093(b)
8 and Fed. R. Civ. P 28(a)).
9     The foregoing proceedings were taken before me
10 at the time and place therein set forth, at which
11 time the witness was duly sworn by me.  (Cal. Code
12 Civ. Proc. 2025.330(a), 2025.540(a), and Fed. R.
13 Civ. P. 30(f)(1)).
14     The foregoing pages contain a full, true and
15 accurate record of all proceedings and testimony
16 (Cal. Code Civ. Proc. 2025.540(a) and Fed. R. Civ.
17 P. 30(f)(1)).
18     I am not a relative or employee of the parties,
19 nor financially interested in the action.  (Cal.
20 Code Civ. Proc. 2025.320(a)).
21     Before completion of the proceedings, review of
22 the transcript [  ] was [ x ] was not requested.  If
23 requested, any changes made by the witness (and
24 provided to the reporter) during the period allowed
25 are appended hereto.  (Fed. R. Civ. P. 30(e)).

Page 105

1          I declare under penalty of perjury under the

2     laws of California that the foregoing is true and

3     correct.

4

5          Dated 5/18/18.

6

7

8

9

10

11          _____

              Serena Wong, CSR No. 10250

12

13

14

15

16

17

18

19

20

21

22

23

24

25