MARK J. GERAGOS (Cal. SBN #108325)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
*[Pro Hac Vice]*

JON D. WILLIAMS (#8318)
JON D. WILLIAMS, P.C.
The Boston Building
9 Exchange Place, Ste. 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
E-mail: jwilliam@lawyer.com

ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

*Attorneys for Plaintiff Molly Farrand*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MOLLY FARRAND, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN GENERAL LIFE INSURANCE CO., a Texas corporation, <br><br> Defendant. | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:16-cv-00134-DB-PMW <br><br> Judge Dee Benson <br><br> Magistrate Paul Warner |

## INTRODUCTION

Defendant American General Insurance Co. ("Defendant") has requested the Court enter judgment in its favor based upon Defendant's denial of Plaintiff Molly Farrand's ("Plaintiff" or "Mrs. Farrand") claim for death benefits related to an Accidental Death & Dismemberment Policy (the "Policy").   While Defendant provides a litany of evidence upon which it argues that the Court should find that the claim was "fairly debatable," what Defendant ignores is that most of the evidence submitted was never reviewed or considered by Defendant prior to denying the claim.   That alone should result in Defendant's Motion being denied.

Furthermore, Defendant relies extensively – if not exclusively – on the investigation by Davis County into Officer Jason Read's ("Officer Read") use of deadly force against Vincent Farrand.   Defendant again, however, failed to contact or otherwise speak with anyone involved in that investigation.   For example, if Defendant would have contacted District Attorney Troy Rawlings ("DA Rawlings"), he would have explained that his office's investigation should not be utilized by an insurance company when determining whether benefits should be provided. The focus of that investigation was exclusively upon whether Officer Read should be charged with a degree of homicide and nothing more.   Furthermore, as DA Rawlings would have explained, it was his view, based upon a full review of the entire record (well beyond Defendant's review), that his office would not have charged Vincent Farrand with any crime if Vincent Farrand would have survived the shooting.

Therefore, at a minimum, Defendant failed to engage in a fair and reasonable investigation prior to denying Mrs. Farrand's claim.   Or, at a minimum, there is a serious

2

question for the jury as to whether Defendant engaged in such a review.

Defendant also denied Mrs. Farrand's claim based upon an alcohol and suicide exemption in the policy.   Utah law is clear that any exemptions in insurance policies must be strictly construed against the insurance company.   Furthermore, each of these alleged bases for denying Mrs. Farrand's claim are legally insufficient.   There is no causation between Vincent Farrand's BAC and his death as Officer Read killed Vincent Farrand, with his death not resulting from some reckless behavior by Vincent Farrand, such as driving while intoxicated.   As to the suicide exemption, the definition of suicide is a person taking their own life.   Here, Officer Read – a third-party – killed Vincent Farrand.   Therefore, by definition, the suicide exemption should not apply.   At a minimum, these issues need to be presented to a jury.

As to the tort based upon a violation of public policy, the parties stipulated to dismiss that claim on August 4, 2017.   The parties agreed that Defendant would prepare the stipulation documents, but it appears they were never filed.   Either way Plaintiff stands by her prior agreement with Defendant.

Finally, Plaintiff is not seeking "extra-contractual damages."   Rather, Mrs. Farrand is properly seeking damages that were a result of and caused by Defendant's conduct.   At a minimum, whether the damages are the result of Defendant's conduct or otherwise recoverable, is an issue for the jury to decide.

Overall, Defendant denied Mrs. Farrand's claim without engaging in a reasonable and fair review of the facts.   Defendant did not contact anyone at Davis County regarding the investigation of Officer Read's use of deadly force against Vincent Farrand.   Defendant did

3

have the entire file from Davis County prior to denying the claim.   Defendant never visited the location where the shooting took place.   And, if Defendant would have engaged in that reasonable investigation, Defendant would have uncovered facts – including DA Rawling's position – as to Davis County's investigation's inapplicability to an insurance company's determination as to whether an insurance claim should be paid.   These are crucial facts for a jury to consider as to whether Defendant complied with its contractual and legal obligations when denying Mrs. Farrand's claim.   Therefore, the Court should deny Defendant's Motion for Summary Judgment.

## **BACKGROUND**

On April 13, 2014, Officer Read of the Centerville Police shot Mrs. Farrand's husband, Vincent Farrand, to death.   Prior to his death, Mrs. Farrand and her husband took steps to ensure that if such a horrific tragedy happened, that Mrs. Farrand would be taken care of upon her husband's untimely demise.   The concern arose when Mrs. Farrand's boss died leaving his wife with nothing.   This event had an enormous impact upon Mrs. Farrand.   Therefore, she and Vincent obtained the Policy from Defendant.

Following the shooting death of Vincent, Mrs. Farrand submitted a claim to Defendant on the Policy.   During the claims process, Mrs. Farrand did everything she could to assist Defendant in its review of the file.   Mrs. Farrand provided contact information for detectives involved in the investigation and was otherwise responsive to Defendant's requests.   Defendant, however, never requested that Mrs. Farrand stipulate to Davis County releasing its entire file to Defendant under GRAMA.   If Defendant would have asked, Mrs. Farrand would have agreed.

4

During the review of the claim file, Defendant never contacted anyone at Davis County. Defendant never spoke with any officer, including Officer Read.   Defendant never visited the location of the shooting.   Rather, Defendant retained a "gopher," Curry & Associates, to collect files.   Curry & Associates, however, provided no independent review or analysis of the claims file.   The review was relegated to Phillip L. Evans.   And Mr. Evans' review was incomplete and unreasonable.   Mr. Evans only reviewed files provided by Curry & Associates; he reviewed no video, he engaged in no interviews.

Based upon scant information and an incomplete review, Defendant denied Mrs. Farrand's claim.   Defendant provided three bases for the denial, all based upon exemptions in the insurance contract: 1) suicide; 2) alcohol; and 3) commission of an illegal act/felony. Thereafter, Mrs. Farrand, through counsel, provided additional information to Defendant to consider.   In a letter sent after the denial, Mrs. Farrand identified portions in a police dash-cam wherein an officer stated that Vincent Farrand placed the gun on the ground.   Defendant, however, did not review the video.   Defendant did not attempt to obtain the video from Davis County.   Rather, Defendant stood fast on its prior denial.

## <u>RESPONSE TO ALLEGED UNDISPUTED MATERIAL FACTS</u>

1)      American General issued an AccidentCare Direct limited benefit policy (Policy No. YMC0171575) (the "Policy") for accidental injury coverage to Vincent Farrand effective September 28, 2011.   (Appx. A, Policy at AGLIC-FARRAND 000013-26.)

**RESPONSE:** Undisputed.

2)      The Policy provided a $500,000 benefit should Mr. Farrand die as the result of an

accidental injury.   (*Id.*, Policy at AGLIC-FARRAND 000018.)

**RESPONSE:** The Policy speaks for itself and pursuant to FED. R. EVID. 106 must be considered as a whole.

3)     The Policy defines "accidental injury" as an "accidental bodily injury, which is unforeseen and suddenly sustained without the design or intent of [the] Insured Person."   (*Id.*, Policy at AGLIC-FARRAND 000016.)

**RESPONSE:** Undisputed that the Policy contains that language.

4)     The Policy excludes coverage for any accidental injury or any loss "caused or resulting in whole or in party by," *inter alia*:

     a.   The Insured's suicide or attempt at suicide, or intentional self-inflicted injury, or any attempt at intentional self-inflicted injury while sane or insane; or

     b.   The Insured's being under the influence of an excitant, depressant, hallucinogen, narcotic, or any other drug or intoxicant including those prescribed by a physician that are misused by the Insured Person; or

     c.   The Insured's commission of or attempt to commit an assault or felony; or

     d.   The Insured's engaging in an illegal activity or occupation.

(*Id.*, Policy at AGLIC-FARRAND 000019.)

**RESPONSE:** The Policy speaks for itself.   Likewise, any exemption must be strictly construed against the insurer.   *See, e.g.*, *Fire Ins. Exchange v. Oltmans*, 2012 UT App 230, ¶ 6, 285 P.3d 802 ("Because 'an insurance policy is a classic example of an adhesion contract,' Utah courts have long held that '"insurance policies should be construed liberally in favor of the

insured and their beneficiaries so as to promote and not defeat the purposes of insurance."'"

(citation omitted)).

     5)     Molly Farrand called 9-1-1 on April 13, 2014 because her husband had taken a

firearm from his gun safe and was traveling to confront Brett Clyde, who had allegedly made an

unsolicited sexual advance towards her weeks earlier.   (Appx. B, M. Farrand dep. At 20:15-

22:5.)

     **RESPONSE:** Deny.   The deposition transcript speaks for itself.   Mrs. Farrand did not

testify that "her husband … was traveling to confront Brett Clyde[.]"   She testified that "he

might have sat in the[ car] just thinking and fuming."   (*Id.* at 21:18-20.)   She did not know

whether her husband had left.   (*Id.*)   Likewise, the cited testimony does not state that "her

husband had taken a firearm from his gun safe[.]"   Following the cited testimony, Mrs. Farrand

testified that the guns were generally "[i]n a gun safe in our bedroom closet."   (*Id.* at 22:9-10.)

     6)     Mr. Farrand had been drinking throughout the day on April 13, 2014, and arguing

with his wife about Mr. Clyde.   (*Id.*, M. Farrand dep. At 45:25-46:7.)

     **RESPONSE:** Deny.   Objection on relevance grounds.   FED. R. CIV. P. 401, 403.

Defendant did not have this evidence or information when it unlawfully denied Mrs. Farrand's

claim.   Mrs. Farrand testified that she "believe[d]" he was drinking "in the garden room where –

our living room while I was in the tub."   (*Id.* at 46:3-7.)   Furthermore, she testified that she

could not tell whether he was intoxicated or not.   (*Id.* at 46:8-21.)

     7)     On the 9-1-1 call, Mrs. Farrand told dispatch, "I'm afraid he is either going to kill

himself or this other person."   (Appx. C, 9-1-1 call at 3:12-13; Appx. D, Audio of 9-1-1 call.)

**RESPONSE:** Admit the transcript and audio contains the statement, but note that the dispatcher is the first one that mentioned "suicidal." (*Id.* at C, 3:9.) Further note that in the call, Mrs. Farrand reported that Vincent Farrand had returned to the home and place the gun "[i]n the safe." (*Id.* at 6:18 to 7:10.)

8) Mr. Farrand had a history of depression and had previously attempted suicide. (Appx. B, M. Farrand dep. At 56:13-20.)

**RESPONSE:** Objection. FED. R. EVID. 403. Mrs. Farrand testified that Vincent Farrand attempted suicide "when he was, like, 19 – 18, maybe 17, in high school, when his parents were getting divorced." (*Id.* at 56:16-20.) Furthermore, she was not present and had only acquired the information through conversations with her late husband. A vague reference to a suicide attempt years prior is highly prejudicial and the temporal disconnect substantially decreases the relevance. Objection on relevance grounds. FED. R. CIV. P. 401, 403. As discussed below, suicide is the act of taking one's own life; there was not a suicide that occurred here.

9) Mr. Farrand came back into the house and retrieved a .22 pistol. Mrs. Farrand then exclaimed on the 9-1-1 call, "He has the .22 handgun and another gun. And I think he wants the police to shoot him … He's been suicidal for a long time … Suicide by copes." (Appx. E, 9-1-1 call portion #2 at 11:16-12:3; Appx. F, Audio of 9-1-1 call portion #2.) Moments later, she reiterated, "He's suicidal, and I'm afraid he wants suicide by copes." (Appx. E, 9-1-1 call portion #2 at 12:16-17; Appx. F, Audio of call portion #2.)

**RESPONSE:** Admit that the transcript contains the statements. But note that the transcript needs to be considered in total. Mrs. Farrand made the call to 9-1-1 in a stressful

situation and was concerned about the worst that could happen.   As Mrs. Farrand testified: "She asked me – the 911 operator, when I was on the phone – if he was – I think she asked me if he was suicidal.   And in my mind I thought, you know, he's had depression, he's been suicidal in the past.   You know, even though it might not have been that day, I felt like I had to answer honestly that he had been before."   (*Id.*, at B, at 56:1-8.)

10)      At some point in this sequence, about two minutes before his death, Mr. Farrand sent a text message to his son stating, "Hey Logan I love you…"   (*Compare* Appx. N, Text Message at FARRAND_000546 *with* Appx. L, G. Thomas Dash recording.)

**RESPONSE:** Deny as to inference drawn.   Objection.   Hearsay and lack of foundation. FED. R. EVID. 801.   Defendant has not laid the proper foundation and any statements contained in the text message are otherwise hearsay.   Furthermore, the time stamps are hearsay as well. FED. R. EVID. 106.   There are five texts back and forth on Sunday, April 13, 2014.   The first is Vincent Farrand texting that he would like to speak with Logan that night.   Objection as Defendant did not have this evidence when it denied the claim.

11)      Mrs. Farrand exited the home through a side door to meet the officers who arrived on scene.   (Appx. B, M. Farrand dep. At 26:10-14.)   Officer Preston Casey led Mrs. Farrand away from the scene out of view.   (Appx. G, P. Casey dep. At 43:3-25; Appx. B, M. Farrand dep. At 35:4-36:5; Appx. H, J. & M. Layton witness statements at AGLIC-FARRAND 000096-097.)

**RESPONSE:** Objection as to witness statement.   No foundation has been provided and the statement is otherwise hearsay.   Objection as Defendant did not have this information when

9

it denied the claim.   Admit that Mrs. Farrand exited her home from the kitchen door (or side door) to meet the officers.   While Officer Casey ultimately led Mrs. Farrand away from the scene, prior to that, as Mrs. Farrand testified, Officer Read "immediately grabbed me and put my arm – my hands – behind my back.   And I said, 'No, I'm the one that called.   I'm here to tell' – you now, to explain the situation.   And he started marching me forward, towards his cop car." (*Id.* at B, at 29:19-23.)   Only after that gruff confrontation did Officer Read "pass[]" Mrs. Farrand off to Officer Casey.   (*Id.* at 31:3-4.)

12)     Mr. Farrand exited his front door with a .22 pistol in his hand.   (Appx. I, Officer J. Read Statement at AGLIC-FARRAND 119; Appx. J, G. Thomas dep. At 50:8-14.)

**RESPONSE:** Objection.   Fed. R. Evid. 106.   The testimony should be read as a whole. For example, as Officer Thomas testified, at this point, Vincent Farrand's arm "was straight down."   (*Id.* at J, at 50:17.)   Furthermore, the testimony does not substantiate the caliber of the weapon.   Objection as to Read's Statement.   Hearsay.   Fed. R. Evid. 801.

13)     During the ensuing confrontation, Officer Read pointed his handgun at Mr. Farrand, and ordered Mr. Farrand to "drop the gun" at least nine times.   (Appx. K, G. Thomas Dash at 2:6-25; Appx. L, G. Thomas Dash recording, Appx. I, Officer J. Read Statement at AGLIC-FARRAND 119.)

**RESPONSE:** Admit that the recording says what it says.   Objection as to Read's Statement.   Hearsay.   Fed. R. Evid. 801.

14)     Officer Read feared for his life during the confrontation.   (Appx. I, Officer J. Read Statement at AGLIC-FARRAND 000129.)

**RESPONSE:** Objection.   Hearsay.   Fed. R. Evid. 801.

15)   Two neighbors saw and heard the confrontation in the Farrands' front yard, and confirmed that Officer Read repeatedly told Mr. Farrand to drop the gun.   (Appx. H, J & M. Layton Witness statements at AGLIC-FARRAND 000096-97.)

**RESPONSE:** Objection.   Hearsay.   Fed. R. Evid. 801.   Furthermore, J&M Layton Witnesses were not disclosed by Defendant as possible witnesses at trial.   (*See* P's Appx., at Ex. 1.)

16)   Instead of obeying Officer Read, Mr. Farrand kept rubbing and tapping the trigger of his pistol.   (Appx. I, Officer J. Read Statement at AGLIC-FARRAND 000128; Appx. J, G. Thomas dep. At 47:6-48[:]16[;] 51:1-19.)

**RESPONSE:** Admit that Officer Thomas testified to "tapping" of the trigger.   Object to Officer Read's statement.   Hearsay.   Fed. R. Evid. 801.

17)   Officer Read commanded Mr. Farrand, "Don't put your finger on that trigger, man.   Don't put your finger on that trigger."   (Appx. K, G. Thomas Dash at 2:6-25; Appx. L, G. Thomas Dash recording.)

**RESPONSE:** Admit the recording includes that statement.

18)   In response to Officer Read's commands, Mr. Farrand sighed, smirked, and responded three times, "Do it."   (Appx. K, G. Thomas Dash at 2:6-25; Appx. L, G. Thomas Dash recording; Appx. I, Officer J. Read Statement at AGLIC-FARRAND 000131.)

**RESPONSE:** Object to Officer Read's statement.   Hearsay.   Fed. R. Evid. 801.   Admit that the recording contains the statement "Do it."

11

19)     Within seconds, Mr. Farrand approached a gate positioned between his house and the adjoining garage, stood in a "bladed" sideways position, opened the gate to his backyard with one hand and, with the other, began to lift his pistol towards Officer Read as he passed through the gate, prompting Officer Read to shoot and kill Mr. Farrand.   (Appx. I, Officer J. Read Statement at AGLIC-FARRAND 000131-133; Appx. M, J. Read Dep. At 44:7-18; Appx. K, G. Thomas Dash at 2:24-3:3; Appx. J, G. Thomas dep. At 73:11-12.)

**RESPONSE:** Disputed.   Object to Officer Read's statement.   Hearsay.   FED. R. EVID. 801.   The only person that testified as to the gun coming up was Officer Read, and he had every incentive to establish that he feared for his life, including that Vincent Farrand was preparing to shoot him.   This is the crucial point in dispute and in contention in this case.   As discussed below, there is evidence to suggest that Officer Read's testimony is, at a minimum, incorrect. For example, there were bullet holes in the fence and bullets with paint on them in Vincent Farrand's body.   Officer Read testified that Vincent Farrand "took his left hand and he pushed the gate like this, and as he kind of turned to step inside the gate he brought the gun up, and that's when I fired."   (Appx. M, at 44:14-18.)   This suggests that Vincent Farrand was not through the threshold of the fence.   But Vincent Farrand ended up fully in the backyard with bullet holes through the fence gate.   Officer Thomas' statement is simply that he "remember[ed] Officer Read saying, 'He pointed his gun at me.'"   (Appx. J, at 73:11-12.)   It adds nothing to clarify the dispute.

20)     A toxicology report later confirmed that Vincent Farrand's blood alcohol level was 0.22.   (Appx. O, Medical Examiner's Report at FARRAND_000667-673.)

12

**RESPONSE:** Admit that the toxicology report states what it states, but object that Defendant did not have this report at the time it denied the claim (citing Mrs. Farrand's production in this case rather than Defendant's claim review file).

21)     On April 28, 2014, Mrs. Farrand submitted a proof of death claimant's statement and a copy of Mr. Farrand's death certificate to American General, seeking payment of the $500,000 policy benefit.   (Appx. P, Claimant's Statement at AGLIC-FARRAND 000007-12.)

**RESPONSE:** Admit.

22)     On June 18, 2014, Curry & Associates submitted a report to American General including internet research of news articles related to Mr. Farrand's shooting, an update on the status of FOIA requests for investigative materials related to the shooting sent to Clearfield Policy (sp) Department, call notes for a discussion with Neal Geddes, Davis County Attorney regarding acquisition of the investigative file, and notice that the Utah Medical Examiner would provide a copy of Mr. Farrand's autopsy upon the receipt of a notarized authorization from next of kin.   (Appx. Q, Curry Report 1 at AGLIC-FARRAND 000027-31.)

**RESPONSE:** Admit.   But note Curry & Associates did not independent analysis of the facts or claim; it simply operated as a "gopher" for Defendant, as discussed below.

23)     On June 27, 2014, Curry & Associates submitted a second report to American General including a notarized authorization from Mrs. Farrand to obtain Mr. Farrand's autopsy report from the Utah Medical Examiner, and a copy of the Davis County Critical Incident Investigation Report.   (Appx. R, Curry Report 2 at AGLIC-FARRAND 000035-38.)   The Davis County Critical Incident Investigation Report included, among other things, (1) a summary

13

of Davis County's findings and conclusions, (2) interview transcripts of Officer Jason Read,

Officer Gary Thomas, Officer Preston Casey, Officer Mike Sheldon, (3) interview summaries of

Mrs. Farrand, Officer Jason Read, Officer Gary Thomas, Officer Preston Casey, Officer Mike

Sheldon, Brett Clyde, Courtnee Parks, John Plowman, (4) Mr. Farrand's autopsy report, (5)

summaries of data retrieved from Mr. Farrand's cellphone and laptop computer, and (6)

summaries of the crime scene investigation.   (*See id.*)

  **RESPONSE:** Admit.

  24) On July 15, 2014, Curry & Associates submitted a third report to American

General including a copy of the Utah Medical Examiner's autopsy and toxicology report for

Vincent Farrand.   (Appx. S, Curry Report 3 at AGLIC-FARRAND 0000169-184.)

  **RESPONSE:** Admit.

  25) On August 5, 2014, American General's Life Claim Review Committee

determined that the claim was not payable.   (Appx. T, Life Claim Review Form at AGLIC-

FARRAND 000232.)

  **RESPONSE:** Admit that Defendant denied the claim.   Object to Life Claim Review

Form as hearsay and lacking foundation.   Fed. R. Evid. 801.

  26) On August 18, 2014, American General sent a letter advising Mrs. Farrand of its

claims decision.   (Appx. U, Denial Letter at AGLIC-FARRAND 000242-43.)

  **RESPONSE:** Admit.

**ADDITIONAL MATERIAL FACTS**

  1) Defendant did not use any investigator to prepare a report or otherwise engage in

14

any independent investigation regarding Mrs. Farrand's claim.   (P's Appx., at Ex. 2, 38:7-41:20
(Evans Dep.).)

2)     Curry & Associates was engaged by Defendant to collect information and records.
(*Id.* at 36:10-37:11.)

3)     The individual that reviewed Mrs. Farrand's claim for Defendant, Phillip L.
Evans, did not review any Utah laws prior to recommending that the claim be denied.   (*See id.* at
55:24-55:11.   *See also id.* at 123:5-10; 132:25-133:3.)

4)     Mr. Evans was unaware at the time of reviewing Mrs. Farrand's claim that Utah is
an open-carry state.   (*Id.* at 44:12-14.)

5)     He used a colloquial definition provided by himself as to what "brandishing"
means.   (*Id.* at 41:3-42:6.)

6)     Prior to denying the claim, Mr. Evans had not reviewed any audio from dash-
cams, the 9-1-1 calls, photographs of the location, or evidence outside of what Curry &
Associates provided him.   (*Id.* at 45:3-47:13; 53:4-7; 56:18-20; 88:18-21.)

7)     Other than Mrs. Farrand, Mr. Evans does not recall speaking to any other
witnesses to the shooting incident, nor any of the officers or investigators, nor the District
Attorney.   (*Id.* at 108:2-24.)

8)     Mr. Evans viewed his role in reviewing Mrs. Farrand's claim limited to the
autopsy report and police report, "bas[ing] [his] conclusions based upon the investigation by the
authorities."   (*Id.* at 47:16-24; 48:12-25.)

9)     Mr. Evans equivocated on whether a video wherein an officer stated that Mr.

Farrand had placed the gun on the ground would have impacted his decision as to whether recommending approving or denying the claim.   (*Id.* at 53:8-55:1.)

10)   Mr. Evans was unaware of the fact that Vincent Farrand was shot in the back when Mr. Evans recommended denial of the claim.   (*Id.* at 88:2-9.   *See also id.* at 98:1-24.)

11)   Mr. Evans was unaware of the fact that Vincent Farrand had been shot through a wooden fence when Mr. Evans recommended denial of the claim.   (*Id.* at 88:10-12.   *See also id.* at 98:1-24.)

12)   In fact, when deposed, Mr. Evans did not remember a fence being involved in the shooting incident.   (*Id.* at 88:13-16.)

13)   When asked whether the alcohol exclusion would have been enough to deny the claim on its own, Mr. Evans could not give an answer.   (*Id.* at 66:12-17; 71-2-6; 87:5-10.)

14)   When asked whether the suicide exclusion would have been enough to deny the claim on its own, Mr. Evans could not give an answer.   (*Id.* at 73:2-74:11; 86:20-87:4.)

15)   When asked whether the illegal activity exclusion would have been enough to deny the claim on its own, Mr. Evans could not give an answer.   (*Id.* at 87:11-20.)

16)   Regarding the police report, Mr. Evans testified that he believed the report's conclusion was that the shooting was "justif[ied]."   (*Id.* at 78:23-79:3.   *See also id.* at 80:10-19.)

17)   Overall, Mr. Evans was unsure whether, if presented with additional facts, he would have made a different recommendation.   (*Id.* at 107:5-18.)

18)   Indeed, Mr. Evans acknowledged receiving a letter after the initial claim denial

but admitted to engaging in no additional investigation thereafter.   (*Id.* at 119:10-120:2.)

19)     Nonetheless, while avoiding the answer for much of his deposition, Mr. Evans admitted that if there was evidence suggesting that Vincent Farrand had placed the gun on the ground, that evidence "would be a big part of the story, yes."   (*Id.* at 126:9-125:4.)

20)     Alan Curry, of Curry & Associates, is not currently a private investigator; his company is simply "an information services provider."   (Cummings Decl., at Ex. ##, 8:9-17 (curry dep.).)

21)     While Alan Curry had done investigative work for Defendant in the past, Defendant never asked Curry & Associates to give an opinion on whether to pay the claim at issue or not or otherwise analyze the claim; Curry & Associates were only instructed to collect documents.   (P's Appx., at Ex. 3, 15:14-16:18; 18:4-17; 21:5-8 (Curry dep.).)

22)     While Alan Curry emailed with Mrs. Farrand regarding receiving authorization to obtain documents, he never conducted an interview or otherwise asked her any questions.   (*Id.* at 17:12-21.)

23)     Likewise, he never interviewed anyone else in regards to the shooting incident. (*Id.* at 17:22-25.)

24)     Officer Read was rattled during the entire altercation.   When he first arrived on the scene, he believed he was approaching someone he knew – Brett Clyde.   Only after arriving did he "realize oh shit it's not Bret in house[.]"   (Dckt. 45-1, Ex. I, at AGLIC-FARRAND at 000119.)   With that realization, his "mind start[ed] racing[.]"   (*Id.*)[1]   Officer Read did not take

---

[1] While Plaintiff has objected to the report, to the extent it is admissible, Plaintiff will rely upon

17

any time thereafter to pause and reacquaint himself to the actual facts of what was occurring; he continued headlong with a rattled mind.   (*See also id.*, Ex. M, at 31:23-32:6; 71:5-72:4; 72:11-17.)

25)   When he arrived at the scene, he was calling out for Brett Clyde.   (*Id.*, Ex. B, 26:16-23.)

26)   After making contact with Mrs. Farrand, he spent only "[a] few seconds" speaking with her.   (*Id.*, Ex. M, at 30:24-31:2.)

27)   Mrs. Farrand tried to explain the situation to Officer Read – that she was the one that called and mentioning Brett's name would be disastrous – but Officer Read placed her hands behind her back and marched her towards the police cars.   (*Id.*, Ex. B, at 29:13-23.)

28)   Mrs. Farrand saw Vincent Farrand exit his home with the gun in his waist band. When Officer Read asked if Vincent Farrand had a gun, Vincent said "Yes" and took the gun out of his waist band.   (*Id.* at 32:6-13.)

29)   Mrs. Farrand has also testified that she witnessed Vincent Farrand either place the gun on the ground or make a motion towards the ground within inches with the gun.   (*Id.* at 32:14-24.)

30)   In the dash-cam video from Officer Thomas' vehicle, one can see Vincent Farrand walking towards the backyard with Officer Read moving forward, gun-drawn.   The ultimate shooting is outside the view of the camera.   (*Id.*, Ex. L, at 15:39:30.)

31)   As Officer Read testified, he "left [his] cover and walked out to the front yard"

---

the statements contained therein.

18

"like an idiot[.]"   (*Id.*, Ex. M, at 34:13-17.)

32)      The video, however, conclusively shows Vincent Farrand walking to the

backyard.   (*Id.*, Ex. L, at 15:39:30.)

33)      Mrs. Farrand testified that Vince Farrand was walking to the fence in order to

place their dog, Brutus, in the backyard.   (*Id.*, Ex. B, at 85:12-86:7 (Molly dep.).)

34)      While Officer Read testified that Vincent Farrand placed the dog back in the

house (*id.*, Ex. M, at 34:9-12), Mrs. Farrand testified that Brutus would exit the house through

the side door behind the fence, that Brutus most likely entered the front yard from the side gate

left open when Officer Read removed her from the backyard, and that Vincent Farrand was

placing Brutus in the backyard when he was shot (*id.*, Ex. B, at 85:9 to 86:7).

35)      According to Officer Read, Vincent Farrand was at the fence, "he took his left

hand and pushed the gate like this, and as he kind of turned to step inside the gate he brought the

gun up, and that's when I fired."   (*Id.*, Ex. M, at 44:12-18.)

36)      The gate had at least four (4) bullet holes in it.   (P's Appx., at Ex. 5.)

37)      Officer Read shot five (5) rounds overall.   (Dcket. 45-1, Appx., Ex. M, at 49:10-

19.)

38)      There was no blood on the gate.   (*See* P's Appx., at Ex. 5.)

39)      Likewise, investigation notes reveal that there was a "paint-like substance" on at

least two rounds, which appeared to match the color of the fence.   (Dckt. 45-1, Ex. V, at 2,

AGLIC-FARRAND 000049.)

40)      The two rounds recovered from Vincent's body also had the paint-like substance

on them.   (*Id.*)

41)     Rounds recovered from the scene also had wood material clogged in their tips. (*See* P's Appx., Ex. 5, at 15, Farrand_000412.)

42)     Those bullets entered Vincent Farrand through his back.   (Dckt. 45-1, Ex. S, at 7, AGLIC-FARRAND 000174; 10, AGLIC-FARRAND 000177.)

43)     Notably, during his deposition, Officer Read could not remember whether Vincent Farrand had already passed through the gate when he shot or whether the gate was opening or closing.   (*Id.*, Ex. M, at 49:20-25.)

44)     Officer Read does remember, however, "thinking that if he gets on the other side of that fence, I'm dead, because I can't see him and he can see me."   (*Id.* at 60:1-3.)

45)     During the Davis County investigation, however, "Read stated that Vince was approximately 1 foot inside the gate and that the gate shut completely."   (*Id.*, Ex. I, at AGLIC-FARRAND 000119.)

46)     After the shooting, Officer Read retreats back to behind the white truck.   (*See id.*)

47)     Officer Cannon Heslop was wearing a body cam during the aftermath of the shooting.   (P's Appx., at Ex. 6, Heslop Body-Cam Video.)

48)     At 20:00, Officer Heslop begins to have a conversation with Officer Casey. Officer Heslop asks Casey what happened, and Casey responds that Vincent Farrand came out of the house with a gun in his hands, the he put it down, and began running to the fence.   (*Id.*)

49)     On November 23, 2014, Mrs. Farrand, through counsel, sent a letter to Defendant. (*Id.*, at Ex. 7. (AGLIC-FARRAND 000236).)

50)     As stated in the letter, Mrs. Farrand brought to Defendant's attention "Officer

Preston Casey's recorded statement [that] he witnessed Mr. Farrand **put the gun down** on the

ground before passing a fence and being shot and killed by Officer Read."   (*Id.* at 2 (emphasis in

original).)

51)     The letter also brought to Defendant's attention that Vincent Farrand "was shot in

the back on the other side of the nontransparent fence."   (*Id.*)

52)     The letter also detailed facts derived from Officer Stricker's report, which was in

Defendant's possession at the time.   As detailed in the letter:

> *Officer Stricker's report makes it clear that Mr. Farrand was shot while walking through the fence and while Officer Read's view was obstructed.   This conclusion is based on the placement of Mr. Farrand's body, which was on the other side of the nontransparent fence, and that Officer Read's shots made impact as follows: (1) the first shot fied struck no objects and passed the opening of the fence as Mr. Farrand was walking through it; (2) the second and third shots hit the fence as it closed shut, passing through the fence and missing Mr. Farrand; and (3) the fourth and fifth shots hit the fence as it was closed shut, passing through the fence and hitting Mr. Farrand directly [in] the center of his spine as his back was turned from Officer Read.*

(*Id.*)

53)     Officer Stricker was the lead investigator for the Davis County investigation.

(*Id.*, at Ex. 8, Farrand_000109.)

54)     Following receipt of the November 23, 2014 letter, Defendant engaged in no

further consideration, review, and/or analysis of Mrs. Farrand's claim.   (*Id.*, Ex. 2, 119:10-

120:2.)

55)     DA Rawlings' office was in charge of the investigation into Officer Read's use of

deadly force.   (*Id.*, Ex. 9, ¶ 10.)

56)    Defendant never contacted DA Rawlings to discuss his office's investigation. (*Id.* at ¶¶ 22-23.)

57)    If Defendant would have, Defendant would have learned that: 1) that his office's decision to not prosecute Officer Read was that the office was "not convinced a unanimous jury would find guilty using a reasonable doubt standard"; 2) that he had serious questions and issues related to the shooting; 3) that the conclusion was "solely … that Officer Read would not be charged with a degree of homicide"; 4) that the conclusion of his office "must be read narrowly with this in mind"; 5) his "office never found that Officer Read's shooting of Vincent Farrand was 'justified' from a civil perspective"; 6) that any such determination "is the quintessential determination for a jury to make"; 7) that his office "singularly decide[s] whether to pursue charges against the officer, the same decision that [they] make [in] every case"; 8) that his review of the case file makes it reasonable to assume that his office would not have filed criminal charges against Vincent Farrand; 9) that it was "his opinion that Vincent Farrand had not committed any crime over which [his] office ha[]d jurisdiction prior to being shot"; and 10) that his "office's findings should be used for no other purpose, including the denial of insurance benefits."   (*Id.* at ¶¶ 17, 18, 19, 20, 24, 25, 26, 28.)

## ARGUMENT

## I.    Summary Judgment Standard.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment

as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P.

56).   A fact in dispute is "material if it might affect the outcome of the suit under the governing

law; the dispute is 'genuine' if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   The Court must construe all facts

and reasonable inferences in the light most favorable to the nonmoving party.   *See Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell*

*Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

## II.   **There are Issues of Fact Preventing Summary Judgment on Plaintiff's Breach of Contract Claim.**

### A.   **The Entire Claims Review Process Began on a Faulty Premise.**

"Under Utah law, insurance policies are construed using general contract principles."

*Utah Power & Light Co. v. Fed. Ins. Co.*, 983 F.2d 1549, 1553 (10th Cir. 1993).   In interpreting

insurance contracts, Utah courts "consider [] their meaning to a person of ordinary intelligence

and understanding, ... in accordance with the usual and natural meaning of the words, and in the

light of existing circumstances, including the purpose of the policy."   *Lopez v. United Auto. Ins.*

*Co.*, 274 P.3d 897, 902 (Utah 2012) (internal quotation marks omitted).   "Utah courts have long

held that 'insurance policies should be construed liberally in favor of the insured ... so as to

promote and not defeat the purposes of insurance.'"   *Fire Ins. Exch.*, 285 P.3d at 805 (quoting

*U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993)). As a result, "ambiguous or

uncertain language in an insurance contract ... should be construed in favor of coverage." *Sandt*,

854 P.2d at 522.

23

An insurer therefore may include provisions barring coverage for certain losses; but even so, "provisions that limit or exclude coverage should be strictly construed against the insurer." *Oltmanns*, 285 P.3d at 805 (quoting *Sandt*, 854 P.2d at 523).   "In strictly construing exclusions, [Utah courts] give them effect only when they use 'language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided.'"   Id. (quoting Crook, 980 P.2d at 686).   Finally, "the determination of whether a claim was fairly debatable is made ***at the time the claim was denied***."   *Hoopes v. Owners Ins. Co.*, Case No. 2:15–cv–00734–PMW, 2018 WL 3320799, at *2 (D. Utah Jul. 5, 2018) (citing *Jones v. Farmers Ins. Exch.*, 286 P.3d 301, 304 (Utah 2012)).

Defendant began with a presumption in favor of denying the claim.   Defendant began with the premise that the Davis County's ***conclusions*** were correct regardless of an independent review of the evidence.   Incredibly, Defendant does not even cite the deposition of Phillip Evans, the claims adjuster that reviewed Plaintiff's claim.

Moreover, while accepting the conclusions contained in the Davis County report, Defendant never considered the purpose behind that report or the objective that Davis County was pursuing.   DA Rawlings and his office were attempting to discern whether Officer Read should be charged with some level of homicide, and whether he would have a colorable chance to proving an affirmative defense based upon self-defense or the lawful use of force.   Such a determination is materially different than what an insurance company should do.   Whereas the DA was providing presumptions in favor of Officer Read, Defendant's investigation should have provided Mrs. Farrand with presumptions in her favor.   In fact, as DA Rawlings has stated in his

24

declaration, if Defendant would have simply called him, DA Rawlings would have explained this all to Defendant, including that his office's investigation should be used for no other purpose, including denying an insurance claim.   In relying upon the Davis County investigation alone – without any additional investigation, interviews, etc. – Defendant entirely abdicated its roles and responsibilities.   Thus, the entirely flawed premise of Defendant's review should prevent summary judgment on its own.

**B.   There are Issues of Fact as to Whether Mr. Farrand's Death was the Result of an "Accidental Injury."**

Defendant first claims that this Court, as a matter of law, can determine that Mr. Farrand's death was not the result of an "accidental injury."   "[A]mbiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage."   *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993).

The policy at issue defines "accidental injury."   The definition under the policy requires: 1) "accidental bodily injury[; 2)] which is unforeseen and suddenly sustained[; 3)] without the design or intent of an insured person."   As to the first prong, and with the policy not providing a definition of "accident," Utah law states "[t]here are … two independent methods by which bodily injury … may be deemed nonaccidental.   First, harm or damage is not accidental if it is the result of actual design or intended by the insured.   Second, harm or damage is not accidental if it is the natural and probable consequences of the insured's act or should have been expected by the insured."   *N.M. on behalf of Caleb v. Daniel E.*, 2008 UT 1, ¶ 6, 175 P.3d 566 (2008).

"The second category generally presents a legal question as to what the average

25

individual would expect to happen under the circumstances." *Id.* at ¶ 7. Here, Defendant wants

the Court to determine, as a matter of law, that a citizen's interaction with police could naturally

result in the citizen being shot. Importantly, Defendant ignores that Vincent Farrand was

walking towards his backyard, thus suggesting a disengagement with the police. While Officer

Read has claimed that Vincent Farrand turned to him and raised the gun, there are serious

questions as to that assertion. For example, there were at least four (4) bullet holes through the

wooden gate, with paint-like substance on the bullets. Furthermore, while Officer Read could

not remember during his deposition whether Vincent Farrand has passed entirely through the

gate, the investigation notes state that Officer Read knew that Vincent Read had passed through

the gate and the gate was closed. If the gate was closed, then there was no way for Officer Read

to see Vincent Farrand raise a gun, let alone in the manner as described by Officer Read.

The cases relied upon by Defendant are inapposite because they involved situations

where there was no doubt that a gun was raised. *See, e.g.*, *Isoard v. Mutual Life Insurance Co.*,

22 F.2d 956 (8th Cir. 1927) (shotgun raised to shoulder). Indeed, *Hoffman* actually supports

denial of the Motion here. There, an insured was confronted by police. He exited his vehicle

with a gun and was killed by the police. The trial court found that the killing was not an

"accident." The Utah Supreme Court reversed and remanded the case due to conflicting

evidence. The trial court found that "'Hoffman failed and refused to comply with the officers'

lawful commands, and, instead, attempted to exit the vehicle from the driver's door.'" 669 P.2d

410, 418 (Utah 1983). Upon that finding, the trial "court concluded that '[t]he death of Louis

Hoffman did not result from an 'accident' as that term is defined and understood at law.'" *Id.*

(alteration in original).   The Utah Supreme Court disagreed because "the act of exiting the vehicle did not threaten the lives of the officers[.]"   *Id.*   Moreover, there was "conflicting evidence as to whether Hoffman did in fact specifically threaten the officers' lives by pointing his weapon at them."   *Id.*   For these reasons, as are equally present here, the Utah Supreme Court remanded the case to the trial court.

"The first category presents a factual question as to what the insured intended."   *Id.* at ¶ 7.   While Defendant makes much of Mr. Farrand saying "do it" during the altercation, Defendant ignores that Mr. Farrand had turned his back and was walking towards his gate. Indeed, Officer Read admits that Mr. Farrand had his back to him when he began to open the gate.   Moreover, as detailed above, there are questions of fact as to whether: 1) Mr. Farrand did, in fact, raise the gun; 2) whether Mr. Farrand was entirely through the gate; 3) whether the gate was completely closed when Officer Read fired; and 4) whether, therefore, Officer Read could have actually seen any action by Vincent Farrand, let alone him raising a gun.

### C.  The Policy Exclusions Should Not be Determined as a Matter of Law.

Likewise, there are issues of fact as to whether the exclusions upon which Defendant relied should apply here.   Again, as noted above, any exclusion should be strictly construed against Defendant.   *P.E. Ashton Co. v. Joyner*, 17 Utah 2d 162, 406 P.2d 306, 308 (1965).

At the outset, the policy requires that any excluded conduct "cause[s] or result[s] in whole or in party by" the enumerated conduct.   Therefore, there must, by the contract itself, be a causal connection between the activity enumerated in an exclusion and Vincent Farrand's death. Causation is general a question for a jury.   *Butterfield v. Okubo*, 831 P.2d 97, 106 (Utah 1992);

27

*Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292 (Utah Ct. app. 1996) ("Utah litigants do not easily dispose of the element of causation on summary judgment.").

1)   <u>Felony Exclusion:</u>   Defendant cites to Utah law regarding whether Mr. Farrand was allegedly committing a felony or not at the time of his death.   First, Defendant did no investigation whatsoever as to whether Vincent Farrand committed any felony under Utah law prior to denying the claim; Mr. Evans proceeded on simple assumptions and conjecture. Second, Defendant again relies upon Vincent Farrand allegedly raising the gun at Officer Read. Yet, as detailed above, there are serious questions of fact as to whether that ever occurred. Third, assuming a felony was committed (which has yet to be proven), Defendant has not shown that there was causation between the conduct and Vincent Farrand's death.   Importantly, Vincent Farrand was walking towards his backyard and had opened the gate to enter the backyard; that much is not in dispute.   Fourth, DA Rawlings has, at a minimum, raised an issue of whether Vincent Farrand would have ever been charged if he did not die.   Therefore, regardless of what Vincent Farrand did up to that point, there are issues of fact as to whether any danger contaminant with the commission of a violently felony had been entirely dispelled, thereby obviating any causal connection between the commission of the felony and his death.

2)   <u>Illegal Activity:</u>   Again, Defendant has engaged in a recitation of various Utah criminal statutes, but none of this research was done prior to denying the claim.   Defendant also ignores that Mr. Farrand was on his property, exiting his own house, and entering his own backyard in regards to several of the statutes cited – carrying a dangerous weapon while intoxicated, interference with a peace officer, and possession of a deadly weapon with criminal

intent.   Likewise, regardless of the crimes committed, there are issues of fact as to the causation involved, including the timing.   And again, DA Rawlings' testimony raises issues as to whether Vincent Farrand would have ever been charged.   While Defendant hammers upon Vincent Farrand allegedly tapping the trigger, Vincent Farrand had turned around and headed to his backyard thereafter.   Furthermore, to assert that the natural and necessary consequence of interacting with the police (a result of engaging in "illegal activity") is that the police will shoot you is an absurd argument that surely violates public policy.

       3)   <u>Intoxication:</u>   Again, there must be a causal connection between the intoxication and the accident.   By the express terms of the policy at issue here, there must be a causal connection.   But Defendant wants summary judgment on this exclusion, ostensibly arguing that Mr. Farrand's intoxicated ***status*** is alone enough to invoke the exclusion.   In *Hastie v. J.C. Penney Life Ins. Co.*, the Eleventh Circuit Court of Appeals reversed a grant of summary judgment for the insurer in an analogous context.   There, the decedent's motorcycle collided with the rear of a vehicle that had switched into his lane.   The autopsy revealed a BAC of .254. 115 F.3d 895, 896 (11th Cir. 1997).   As explained by the *Hastie* court, in quoting *Harris v. Carolina Life Ins. Co.*, 233 So.2d 833 (Fla.1970): "The interpretation urged by respondent … would even deny liability for the accidental death in an automobile collision of a person being transported in an ambulance simply on the ground that the victim of the accident was under sedation at that time."   *Id.* at 897.   As the *Hastie* and *Harris* courts concluded:   "Language in contracts, drawn by reasonable men, should not be given an unreasonable construction."   *Id.* Therefore, Defendant has filed to carry its burden as to the intoxication exclusion.

4)    <u>Suicide Exclusion:</u>    There is a "presumption against suicide based on the nearly universal human characteristics of love of life and fear of death."   *Evans v. Provident Life & Acc. Ins. Co.*, 249 Kan. 248, 253 (1991) (citing 29 Am.Jur.2d, Evidence § 217).   As Am.Jur.2d explains it:

> *The presumption against suicide is a rule of law which permits, and according to some courts requires, the conclusion, in the event of an unexplained death by violent injury, that the death was not suicidal, until credible evidence of self-destruction is offered. It is a strong presumption which should not be displaced by slight contrary proof, and can be overcome by circumstantial evidence only if it is of such quality and weight as to negative every reasonable inference of death by accident.*

*Id.* at 254 (quoting 29 Am.Jur.2d, Evidence § 217).   In other words, "'the presumption against suicide is so strong that unless the evidence negatives every reasonable inference of death by accident, a finding of death by accident will be justified.'"   *Id.* (quoting 31A C.J.S., Evidence § 135, p. 286).   *See also Price v. Amer. Nat. Ins. Co.*, 113 S.W.3d 424, 428 (Tex. Ct. App. 2003) ("There is a legal presumption against suicide, which, once rebutted, does not have weight as evidence.").   "The presumption places the burden of producing conclusive evidence showing suicide on the insurance company."   *Price*, 113 S.W.3d at 428 (citing *Smith v. Tenn. Life Ins. Co.*, 618 S.W.2d 829, 833 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ)).   *Price* is instructive here as that case involved a determination by local authorities that the gunshot wound was self-inflicted.   In denying the insurance company's motion for summary judgment, the Texas Court of Appeals found that the insurance company had not conclusively proven that the death was the result of suicide.   *Id.*

The same result should be reached here.   The exclusion states that no benefits will be

paid as a result of "the Insured Person's suicide or attempt at suicide, or intentional self-inflicted injury or sickness, or any attempt at intentional self-inflicted injury or sickness while sane or insane[.]"   Vincent Farrand did not self-inflict any injury; he did not pull the trigger. Therefore, the question is whether his actions constitute "suicide."   The policy does not define "suicide."   "[I]n case of ambiguity, uncertainty, or doubt, the terms of an insurance contract will be construed strictly against the insurer and in favor of the insured, and ... the insured is entitled to the broadest protection that he could reasonably believe the commonly understood meaning of its terms afforded him."   *P.E. Ashton Co.*, 406 P.2d at 308.   Therefore, the term must be interpreted against Defendant.

"Suicide" means the taking of one's own life.   *See, e.g.*, *Joyce v. Center of Brief Counseling, Inc.*, 30 Va. Cit. 415, 1993 WL 946074, at *2 (Va. Cir. Ct. May 19, 1993) (unpublished) (suicide is "the taking of one's own life" or "deliberate self-destruction"); Webster's Third New International Dictionary Unabridged 2286 (1981) ("suicide" means "the act or an instance of taking ***one's own life voluntarily and intentionally***." (emphasis added)). "[T]he commonly understood definition of suicide simply does not encompass actions taken by another."   *Fister ex rel. Estate of Fister v. Allstate Life Ins. Co.*, 366, Md. 201, 214, 783 A.2d 194 (Md. Ct. App. 2001).   As the Maryland Court of Appeals explained in rejecting "suicide by cop":

> [W]hen one incites a police officer to use deadly violence, we are either presented with justifiable homicide, if the officer's use of deadly force is found to be reasonable, or simple homicide, if the officer's use of deadly force is unreasonable. But, under neither circumstance are we presented with suicide, for the death occurred at the hands of another.

31

*Id.*  As Vincent Farrand was shot by someone else, the suicide exclusion simply does not apply.

### III.   There are Issues of Fact as to the Breach of the Implied Covenant Claim.

In Utah, in order to establish a first-party claim in the insurance context for breach of the covenant of good faith and fair dealing, a plaintiff must establish that the insurer failed to "diligently investigate the facts to enable it to determine whether [the] claim is valid," failed to "fairly evaluate the claim," or failed to "act promptly and reasonably in rejecting or settling the claim."  *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 533 (Utah 2002) (quotations and citations omitted) (emphasis added); *see also Lieber v. ITT Hartford Ins. Ctr., Inc.*, 15 P.3d 1030, 1037 (Utah 2000); *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337, 344 (Utah 1997); *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985).   These duties account for the fact that "the overriding requirement imposed by the implied covenant is that insurers act reasonably, as an objective matter, in dealing with their insureds."   *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996).

The Utah Supreme Court has repeatedly held that insurance companies have "implied duties to diligently investigate claims, evaluate claims fairly, and act reasonably and promptly in settling or denying claims."  *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 12, 286 P.3d 301. Only when "reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care, should the court grant judgment as a matter of law."   *Id.*   At the summary judgment stage, the "fairly debatable" standard must be strictly applied.   *Jones*, 286 P.3d at 304.   The question on summary judgment, therefore, is "whether the insurer's conduct measured up to the required standard of care."   *Wheeler v. Allstate Ins. Co.*, 687 Fex. App'x

757, 773 (10th Cir. May 4, 2017) (citing *Jones*, 286 P.3d at 305).

Importantly, "the determination of whether a claim was fairly debatable is made **at the time the claim was denied**."   *Hoopes v. Owners Ins. Co.*, Case No. 2:15–cv–00734–PMW, 2018 WL 3320799, at *2 (D. Utah Jul. 5, 2018) (citing *Jones v. Farmers Ins. Exch.*, 286 P.3d 301, 304 (Utah 2012)).   Overall, "the issue of [an insurance company's] compliance with its duty of good faith is a question of fact best left for the jury."   *Wheeler v. Allstate Ins. Co.*, 687 Fex. App'x 757, 773 (10th Cir. May 4, 2017).

Defendant essentially argues that if there are factual disputes as to Plaintiff's breach of contract claim, that necessarily means that whether there was coverage is "fairly debatable." This position was directly refuted in *Jones v. Farmers Ins. Exch.*

Under Utah law, an insurance company has the duty and obligation to "conduct[] a reasonable and complete investigation" prior to refusing to settle claims.   UTAH ADMIN. CODE R590-192-12.   Whether Defendant's investigation here was reasonable is far from conclusive. While Defendant claims that the materials reviewed in 2014 "were quite robust," the facts are the exact opposite.   The claims adjuster, Mr. Evans, only reviewed files obtained by Curry & Associates.   Notably, Curry & Associates engaged in no independent analysis or investigation itself.   *See Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct. App. 1987) (hiring independent investigator can show abidance with duty of good faith).   Mr. Evans did not speak to any officer himself.   He did not speak to DA Rawlings.   He did not speak to Mrs. Farrand. He did not watch any of the dash-cam videos.   He did not listen to any of the 9-1-1 audio.

Rather, as Mr. Evans explained in his deposition, he relied upon the conclusions drawn

by Davis County's investigation as to whether Officer Read should be charged with a degree of

homicide.   When asked repeatedly whether if certain facts were changed or added (including

facts that actually did occur), Mr. Evans, at best, equivocated.   Moreover, as to what Mr. Evans

actually reviewed, there are serious questions of his thoroughness.   For example, Mr. Evans

could not remember there being a fence involved.   Mr. Evans did not know that the bullets

traveled through the fence.   Mr. Evans did not know that there was paint on the bullets found in

Vincent Farrand's body.   And these facts were in the material reviewed by Mr. Evans in 2014.

Furthermore, the other materials would have been available to Mr. Evans if he would have

simply asked Mrs. Farrand to sign an authorization for release of records, which Mrs. Farrand

ultimately did without hesitation over two years later.

Moreover, even when provided with additional information, Defendant failed to conduct

any additional investigation.   When informed by Mrs. Farrand that she had reached a six-figure

settlement with Centerville Police, Defendant did nothing.   When informed that there was video

with an officer stating that Vincent Farrand had, in fact, placed the gun on the ground, Defendant

did nothing.   Defendant opted to simply rest upon Davis County's conclusions, which ultimately

became Defendant's conclusions.

The simple fact is that if Mr. Evans would have read the materials provided to him by

Curry & Associates, he would have found: 1) there was a fence involved; 2) there were several

bullet holes in the gate; 3) Vincent Farrand was shot in the back; and 4) Vincent Farrand's body

was found entirely on the other side of the fence with the gate closed; and 5) Officer Read

admitted (at the time) that Vincent Farrand was through the gate and the gate was closed.   While

Davis County chose to not file criminal charges against Vincent Farrand, the facts above raise serious issues as to whether the claim should have been paid or not.   Therefore, reasonable minds could differ as to whether Mr. Evans – and therefore Defendant – engaged in a reasonable investigation.

If Defendant's theory is correct, then there would never be any coverage in a police-involved use of deadly force case where the officer was not charged.   No matter the egregiousness or any consideration of the prosecutor using his or her vast independent discretion as to whether charge someone, every insurance company could simply rubber stamp an AD&D claim as denied.   That cannot be the law.   It is incumbent upon insurance companies to engage in a reasonable investigation.   Overall, "reasonable minds c[an] differ as to whether the defendant's conduct measures up to the standard required for insurance claim investigations." *Jones*, 2012 UT 52, at ¶ 1.   Therefore, summary judgment is inappropriate on Plaintiff's breach of the covenant of good faith and fair dealing claim.

## IV.   Plaintiff's Damages Must be Submitted to the Jury.

Defendant wants to limit its exposure in this case to the face value of the policy.   If Defendant would have paid the face value back in 2014, that would have been more than acceptable.   But at this point, because Defendant failed to comply with its duties to engage in a reasonable investigation, Mrs. Farrand has every right to pursue consequential damages at trail. Moreover, even if only the breach of contract claim is presented to the jury, Mrs. Farrand may also pursue consequential damages.   "[C]onsequential damages for breach of contract may reach beyond the bare contract terms," meaning that "[a]lthough the policy limits define the amount for

which the insurer may be held responsible in performing the contract, they do not define the amount for which it may be liable upon a breach."   *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985).   Thus, Mrs. Farrand "may recover both general and consequential damages, which could conceivably exceed the amount of h[er] policy limit."   *Black v. Allstate Ins. Co.*, 2004, UT 66, ¶ 28, 100 P.3d 1163.

**V.   The Parties Stipulated to Dismissal of Plaintiff's Fourth Cause of Action and Plaintiff Stipulates to the Dismissal of the IIED Claim.**

Mrs. Farrand previously stipulated to the dismissal of her Fourth Cause of Action. While the parties agreed via email to dismiss the claim, the papers were not prepared and submitted to the Court.   Therefore, Mrs. Farrand stipulates to the dismissal of that claim. Furthermore, while Mrs. Farrand believed that there may be evidence uncovered to establish the necessary reckless disregard element for an IIED claim, Mrs. Farrand stipulates to the dismissal of that claim as well.

**CONCLUSION**

The shooting death of Vincent Farrand was horrific in many regards, and especially devastating for Molly Farrand.   She and her husband obtained an insurance policy from Defendant to cover Mrs. Farrand just in case something devastating like this happened.   The proverbial insult to injury occurred when Defendant denied the claim.   Come to find out, Defendant simply decided that if Davis County was not going to criminally prosecute the officer that shot Mrs. Farrand, then Defendant did not need to pay the insurance claim either.

Defendant's decision then was wrong, and is still wrong.   Nonetheless, Defendant has asked this Court to dismiss Mrs. Farrand's claims as a matter of law.   In doing so, Defendant

ignores that: 1) the death of Vincent Farrand was an accident, or there are serious questions of fact that a jury needs to resolve; 2) the exclusions cited do not apply for lack of causation or otherwise are wholly inapplicable; and 3) simply relying upon a criminal investigation as to whether an officer should be charged with homicide does not meet an insurance company's obligation to investigate a claim.   Overall, whether Defendant acted reasonable under the circumstances or whether reasonable minds could differ as to whether the claim should or should not have been paid should be decided by the fact finder.   Therefore, Mrs. Farrand respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED this 27th day of July, 2018.

THE SALT LAKE LAWYERS

 /s/ Robert B. Cummings
Robert B. Cummings

JON D. WILLIAMS, P.C.

Jon D. Williams

GERAGOS & GERAGOS, APC

Mark Geragos
David Gammill
*Attorneys for Plaintiff Molly Farrand*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, I caused to be filed the foregoing document, which

caused to be served via the Court's ECF system the same upon the following:

Jason A. Richardson
David T. McDowell
Kendall J. Burr
Diane Wizig
EDISON, MCDOWELL & HETHERINGTON LLP
2002 Fannin St., Ste. 2700
Houston, TX   77002

THE SALT LAKE LAWYERS

 /s/ Robert B. Cummings
Robert B. Cummings
*Attorneys for Plaintiff*