MARK J. GERAGOS (Cal. SBN #108325)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
*[Pro Hac Vice]*

ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

JON D. WILLIAMS (#8318)
JON D. WILLIAMS, P.C.
The Boston Building
9 Exchange Place, Ste. 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
E-mail: jwilliam@lawyer.com

*Attorneys for Plaintiff Molly Farrand*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MOLLY FARRAND, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>AMERICAN GENERAL LIFE INSURANCE CO., a Texas corporation,<br><br>    Defendant. | **APPENDIX PURSUANT TO DUCivR 56-1(c)(6) to PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:16-cv-00134-DB-PMW<br><br>Judge Dee Benson<br><br>Magistrate Paul Warner |

### *Molly Farrand. v. American General Life Insurance Co.*

Case No. 1:16-cv-00134-DB-PMW
Judge Dee Benson
Magistrate Paul Warner

*Plaintiff's Appendix to Opposition to Defendant's Motion for Summary Judgment*

| Ex. | Description | Source |
|-----|-------------|--------|
| 1 | Defendant's Initial Disclosures dated February 1, 2017 | N/A |
| 2 | Deposition of Phillip L. Evans | N/A |
| 3 | Deposition of Alan Curry | N/A |
| 4 | Ex. 5 from Deposition of Officer Read | N/A |
| 5 | Davis County Sheriff's Office Forensic Services Unit Notes | Bates Stamp Farrand_000397 to 411 |
| 6 | Officer Cannon Heslop Body Cam | Manually Lodged with the Court |
| 7 | Letter from Mark Geragos of Geragos & Geragos to Philip L. Evans, Jr. dated November 23, 2014 | AGLIC-FARRAND 000236 to 237 |
| 8 | Davis County Critical Incident Investigation, Investigative Summary | Farrand_000108 to 109 |
| 9 | Declaration of Troy Rawlings | N/A |

# **EXHIBIT 1**

Jason A. Richardson (Utah SBN #14543)
Email:  jason.richardson@emhllp.com
David T. McDowell* (TX SBN #00791222)
Email: david.mcdowell@emhllp.com
Kendall J. Burr* (TX SBN #24067533)
Email: kendall.burr@emhllp.com
Nicholas R. Lawson* (TX SBN #24083367)
Email: nicholas.lawson@emhllp.com
EDISON, MCDOWELL & HETHERINGTON LLP
1001 Fannin St., Suite 2700
Houston, Texas 77002
Telephone:  (713) 337-5580
Facsimile:  (713) 337-8850
*admitted pro hac vice

***ATTORNEYS FOR DEFENDANT
AMERICAN GENERAL LIFE INSURANCE COMPANY***

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| **Molly Farrand,** | § | |
| | § | |
| *Plaintiff,* | § | Case Number: 1:16-cv-00134-DB |
| | § | |
| **v.** | § | |
| | § | |
| **American General Life Insurance** | § | **AMERICAN GENERAL'S RULE** |
| **Company,** | § | **26(A)(1) INITIAL DISCLOSURES** |
| | § | |
| *Defendant.* | § | |

Defendant American General Life Insurance Company makes the following disclosures in accordance with Rule 26(a)(1) of the Federal Rules of Civil Procedure. American General reserves the right to amend or supplement the information below and to rely on documents, witnesses, and information that are later discovered, later come to light as being material, or as otherwise allowed under applicable law.  Nothing in these disclosures waives any objection to

production or introduction of any document or evidence, including any objection on the basis of

any privilege, the work product doctrine, relevance or burden.

**A. Name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

    1.  Representatives and Employees of American General Life Insurance Company
        c/o David McDowell
        EDISON, MCDOWELL & HETHERINGTON LLP
        First City Tower
        1001 Fannin Street, Suite 2700
        Houston, Texas 77002
        T: (713) 337-5580

American General Life Insurance Company is a Defendant in this case. Corporate representatives and employees of American General may have discoverable information related to the insurance policy at issue in this matter issued by American General, the claim submitted for the policy benefit, and American General's investigation and denial of the claim.

    2.  Molly Farrand
        c/o Robert B. Cummings
        10 Exchange Place, Ste. 622
        Salt Lake City, Utah 84111
        T: (801) 590-7555
        F: (801) 384-0825
        E: Robert@thesaltlakelawyers.com

Molly Farrand is a Plaintiff in this case and may have discoverable information related to the claims and defenses at issue in this matter and the allegations contained in Plaintiff's Complaint.

    3.  Representatives and Employees of Curry & Associates
        5109 82nd St., Ste. 7237
        Lubbock, TX 79424
        T: (806) 698-0400
        F: (806) 698-0430

Curry & Associates may have information related to American General's investigation of Molly Farrand's claim for benefits under the Accidental Death and Dismemberment Policy at issue in this matter and the allegations contained in Plaintiff's Complaint.

4. American General further identifies any and all other individuals named and referred to within documents that have been produced or will be produced within this litigation.

5. American General further identifies any and all other persons identified by Plaintiff in her Initial Disclosures or the documents described therein.

American General reserves the right to supplement or amend these disclosures based upon the results of further investigation and discovery, and directs Plaintiffs to the individuals named in the documents identified below who may have knowledge of relevant, discoverable information.

**B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

American General has in in its possession the following categories of documents, electronically stored information, or tangible things that it may use to support its claims and defenses:

5. American General's file on Accidental Death Policy No. YMC0171575, insuring the life of Vincent Farrand , correspondence relating to such policies, and non-privileged or protected internal notes or records regarding such policies;

Relevant, non-privileged documents are in the possession of counsel for American General at the offices of EDISON, MCDOWELL & HETHERINGTON LLP, First City Tower, 1001 Fannin Street, Suite 2700, Houston, Texas 77002.  American General will produce copies of such documents subject to the protective order entered in this matter.

American General reserves the right to supplement or amend this disclosure as necessary in accordance with the Federal Rules of Civil Procedure based upon the results of further investigation and discovery.

**C.** **A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered**.

American General is not seeking damages in this matter at this time. It does, however, reserve the right to supplement or amend this disclosure as necessary based upon the results of further investigation and discovery.

**D.** **For inspection and copying under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

None.

DATED: February 1, 2017.

Respectfully submitted,

By: _/s/ Kendall J. Burr_

    Jason A. Richardson
    Utah Bar No. 14543
    David T. McDowell*
    Kendall J. Burr*
    Nicholas R. Lawson*

EDISON, MCDOWELL & HETHERINGTON LLP
1001 Fannin St., Suite 2700
Houston, Texas 77002
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
Email: jason.richardson@emhllp.com
       david.mcdowell@emhllp.com
       kendall.burr@emhllp.com
       nick.lawson@emhllp.com
*admitted pro hac vice

**ATTORNEYS FOR DEFENDANT AMERICAN GENERAL LIFE INSURANCE COMPANY.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on February 1, 2017, on the following counsel of record by e-mail:

MARK J. GERAGOS (Cal. SBN #108325)
DAVID W. GAMMILL (Cal. SBN #258286)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
*[Pro Hac Vice applications pending]*

ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

JON D. WILLIAMS (#8318)
JON D. WILLIAMS, P.C.
The Boston Building
9 Exchange Place, Ste. 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
E-mail: jwilliam@lawyer.com

*Attorneys for Plaintiff Molly Farrand*

*/s/ Nicholas R. Lawson*
Nicholas R. Lawson

# **EXHIBIT 2**

```
1            IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF UTAH
3    MOLLY FARRAND, an        )
     individual              )
4                            )
         Plaintiff,          )
5                            )
     VS.                     ) CIVIL ACTION NO. 1:16-CV-00134-DB
6                            )
     AMERICAN GENERAL LIFE   )
7    INSURANCE CO., a Texas  )
     corporation             )
8                            )
         Defendant.          )
9    _____)
10
11        **********************************
          ORAL AND VIDEOTAPED DEPOSITION OF
12                PHILLIP L. EVANS
                 FEBRUARY 13, 2018
13        **********************************
14
15              ORAL AND VIDEOTAPED DEPOSITION OF
16   PHILLIP L. EVANS, produced as a witness at the instance
17   of the PLAINTIFF, and duly sworn, was taken in the
18   above-styled and numbered cause on the 13th day of
19   February, 2018 from 10:09 a.m. to 1:03 p.m., before
20   Taye J. Krusleski, CSR in and for the State of Texas,
21   reported at the offices of Edison, McDowell &
22   Hetherington, LLP, 1001 Fannin Street, Suite 2700,
23   Houston, Texas, pursuant to the Federal Rules of Civil
24   Procedure and the provisions stated on the record or
25   attached hereto.
```

```
1                A P P E A R A N C E S
2
     FOR THE PLAINTIFF:
3
         Mr. David Gammill
4        GERAGOS & GERAGOS, P.C.
         644 South Figueroa Street
5        Los Angeles, California  90017
         Phone:  213.625.3900
6        Fax:  213.625.1600
         david@geragos.com
7
8    FOR THE DEFENDANT:
9        Mr. Kendall J. Burr
         EDISON, McDOWELL & HETHERINGTON, LLP
10       1001 Fannin Street, Suite 2700
         Houston, Texas  77002
11       Phone:  713.337.8875
         Fax:  713.337.8851
12       kendall.burr@emhllp.com
13
     ALSO PRESENT:
14
         Mr. James Rodgers, Video Technician
15
16
17
18                * * * * * * * *
19
20
21
22
23
24
25
```

```
1                        INDEX
2                                               PAGE
3    Appearances                                  2
4    Preliminary Proceedings                      4
5    Examination by Mr. David Gammill             4
6    Changes and Signature                      135
7    Reporter's Certificate                     136
8                    * * * * * * *
9                    EXHIBIT INDEX
10
11   NUMBER          DESCRIPTION        PAGE MARKED
12   Exhibit 1  Letter from Phillip L. Evans to    70
              Molly Ferrand, dated August 18, 2014
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              PRELIMINARY PROCEEDINGS
2         THE VIDEOGRAPHER:  Tuesday, February
3    13th, 2018.  Time is approximately 10:09 a.m.
4         Will Counsel please identify themself
5    for the record?
6         MR. GAMMILL:  David Gammill for the
7    plaintiff.
8         MR. BURR:  Kendall Burr for the
9    defendant -- for the witness.
10        PHILLIP L. EVANS,
11   having been first duly sworn, testified as follows:
12             EXAMINATION
13   QUESTIONS BY MR. DAVID GAMMILL:
14   Q   Good morning, sir.
15   A   Morning.
16   Q   Have you ever been deposed before?
17   A   Yes, I have.
18   Q   Approximately how many times?
19   A   Ten or eleven times.
20   Q   How recently was the last time?
21   A   Almost two years ago.
22   Q   Would you like me to go over the general ground
23   rules, or do you feel like after ten or eleven
24   depos, you've got it down?
25   A   Why don't you go ahead and go over the ground
```

1    rules?
2  Q    Certainly.
3          Do you understand that the oath you
4      just took is the exact same oath you would take
5      in a court of law and it has the same power and
6      protections?
7  A    Okay. Uh-huh.
8  Q    I'm entitled to your best estimate. We don't
9      want you to guess, but if you can give an
10     estimate, I'm entitled to it. I'm entitled to
11     your general understandings of things.
12         You'll have an opportunity at the end
13     of this to read your deposition and make any
14     changes you'd like to make.
15  A    Okay.
16  Q    But do keep in mind that any drastic changes
17     can be commented on by either side and can be
18     used to impede your credibility; do you
19     understand that?
20  A    Sure. Uh-huh.
21  Q    We can take as many breaks and as often as you
22     like; it's entirely up to you. It's -- you
23     know, it's a marathon not a sprint. I don't
24     think we'll be here all day. But if you need a
25     break, just say so.

1          I just ask that you break -- you
2      don't take a break while a question is pending,
3      rather after you answer a question.
4  A    Sure.
5  Q    You understand all that?
6  A    Uh-huh. Yes.
7  Q    Okay. There's obviously no judge here to rule,
8      but at times, your counsel may object. Once
9      he's objected and stated his grounds, you can
10     go ahead and answer the question unless he
11     orders you not to answer. Okay?
12  A    Okay.
13  Q    And just remember that you have to make -- and
14     you're doing a good job so far -- but for the
15     court reporter's sake, we have to say "Yes" or
16     "No" and not head shakes or "Uh-huh,"
17     "Huh-uhs," 'cause she can't take that down.
18  A    Yes.
19  Q    Is -- are you on any medications that would
20     prevent you from giving your full and honest
21     testimony here today?
22  A    No.
23  Q    Is there any reason you can think of why you
24     couldn't give your full and honest testimony
25     here today?

1  A    No.
2  Q    I'd like to start by getting a bit of your
3      background. How old are you?
4  A    55.
5  Q    And how long -- you're current title, would it
6      be a insurance adjuster?
7  A    No. Actually, I am a associate underwriter
8      right now.
9  Q    Okay. Back in 2014 when this -- are you
10     familiar with the Ferrand matter that we're
11     here for the deposition for?
12  A    Yes.
13  Q    Back in -- on that day, what was your title?
14  A    Senior Claims Examiner.
15  Q    Okay. And so, let's -- whichever's easier for
16     you. We can start in 2014 and work our way
17     back, or we can kind of start with college and
18     work our way forward.
19         Which would you like to do?
20  A    Either/or. Doesn't matter.
21  Q    Okay. Let's start with college. Did you go to
22     college?
23  A    Yes.
24  Q    Where did you go?
25  A    University of Wisconsin Madison.

1  Q    Okay. And before that, had you worked?
2  A    Yeah. I worked at a nursing home in my local
3      town, yeah.
4  Q    Okay. Did you work while you were in college?
5  A    Yeah. I worked at a radio/record store.
6  Q    You never worked at the creamery there?
7  A    No, no, no.
8  Q    After college, what did you do?
9  A    After college, I joined a -- worked for
10     Domino's Pizza as a manager trainee.
11  Q    And how long did you do that for?
12  A    Maybe a year.
13  Q    Okay. And from Domino's, where did you go?
14  A    Went to a car rental agency, the manager
15     trainee program there.
16  Q    And how long were you there?
17  A    About a year-and-a-half.
18  Q    And from there, where did you go?
19  A    An insurance company in Lake Forest, Illinois,
20     Trust Mark Insurance Company.
21  Q    And what was your first role there?
22  A    POS representative.
23  Q    And what is that?
24  A    It's like customer service.
25  Q    Okay. And about how old are you then?

1 A   27.
2 Q   Okay. How long are you with them?
3 A   Almost eight years.
4 Q   Okay. And through those eight years, did you
5   advance up, or did you have the same position?
6 A   I was a supervisor for a while and -- before I
7   left, and -- you know, so.
8 Q   Was it all sort of customer service focused and
9   management focused --
10 A   And when I left, I was supervising Claims
11   Department.
12 Q   Okay. Does that include -- well, in your time
13   there, did you have to review claims and decide
14   whether they should be paid or denied?
15 A   Yes.
16 Q   Okay. And how many years were you doing that
17   type of work for them?
18 A   I'd say four or five years.
19 Q   Okay. And during that four or five years, at
20   some point, worked your way up to being the --
21   what did you call it, the man- --
22 A   Supervisor.
23 Q   Supervisor.
24      From there, where did you go?
25 A   BlueCross BlueShield.

1 Q   And what was your role there?
2 A   Supervising the Enrollment Department.
3 Q   And how many years were you with BlueCross?
4 A   About eight months.
5 Q   And where geographically was that position?
6 A   Milwaukee, Wisconsin.
7 Q   Okay. And after eight months, where did you
8   go?
9 A   Went back down to Illinois to work for an
10   insurance company called Guarantee Trust Life.
11 Q   And why did you only stay with BlueCross four
12   eight months?
13 A   Got laid off.
14 Q   Okay. So back to Illinois. What's your
15   position there?
16 A   Supervisor of the SIU Unit.
17 Q   What is an SIU Unit?
18 A   Special Investigations Unit.
19 Q   Okay. And what do they do?
20 A   Basically what I did at Trust Mark;
21   investigate, analyze, review claims.
22 Q   What would those investigations look like?
23 A   Death claims, long-term care claims, home
24   health care aide claims, things of that nature.
25 Q   Did you have a team of investigators in house,

1   or would you hire investigators outside of the
2   firm? How would that work?
3 A   For our home health care business, we had
4   about -- I think we had three vendors that we
5   used to assist us with the investigations.
6 Q   And what would those vendors do? What sort of
7   work do they do?
8 A   They would do -- they would check into hospital
9   billing, they would check and make sure that
10   the vendors were actually completing the home
11   health care that they said they were, they
12   would do some financial analysis and audits and
13   things of that nature for us.
14 Q   And how long were you with that company?
15 A   About two years and eight months.
16 Q   Always in that same role?
17 A   Yes.
18 Q   Okay. Then where did you go?
19 A   Hewitt & Associates --
20 Q   Okay.
21 A   -- in Atlanta.
22 Q   And what took you to Atlanta?
23 A   Got relatives here -- well, I'm sorry, I got
24   relatives in Houston. But better opportunity
25   with Hewitt & Associates, yeah.

1 Q   Okay. What was your first role there?
2 A   Benefits consultant.
3 Q   And what does that job include?
4 A   Basically we had a -- a number of Fortune 500
5   clients, and a lot of big clients were
6   self-insured.
7      And so, if they're self-insured, they
8   have other insurance companies administering
9   their product, so we would go out to the
10   administrate -- the administrative site for,
11   like, Aetna, BlueCross, Cigna and make sure
12   that they were paying the claims the way the
13   client wanted them paid.
14 Q   What does that mean, "the way the client wanted
15   them paid"?
16 A   My understanding is that if you're
17   self-insured, you pretty much make your own
18   rules about what's payable, what's not payable;
19   and so, they -- they need somebody to go into
20   the different insurance companies to make sure
21   that their claims are being payable according
22   to their contract with them.
23 Q   Is -- is part of that a company's position on
24   how sort of aggressive or how lenient to
25   interpret or how stringent they are? Is that

1     part of what you're doing?
2  A   No, no. Actually, we're going in on behalf of
3     the client. Let's say, for example, Bank of
4     America, self-insured, they need somebody to go
5     into Cigna to make sure Cigna's paying the
6     claims as instructed by Bank of America.
7  Q   But are there times where, say, take that
8     example just as an example of names, that you'd
9     have a Bank of America who's saying, "You know,
10    we've got Cigna, pays out too easily, too
11    often, too much" as opposed to Company B might
12    be saying, You know, our" -- "our people aren't
13    being taken care of often enough. They're
14    getting too many denials" so you're adjusting
15    sort of that needle?
16  A   Well, no, I -- I don't think it's -- I don't
17    think it gets down to that. My understanding
18    of self-insured is that for -- in this example,
19    Bank of America basically is, you know, paying
20    the claims.
21        They need to make sure that, you
22    know, all of the things that are within the
23    policy itself are being administered correctly.
24  Q   Okay. How long were you in that position?
25  A   One year.

1  Q   And stay with that -- how long were you with
2    that company?
3  A   One year.
4  Q   And then where did you go?
5  A   Came to Houston. I've got family here, and
6    came to Houston.
7  Q   And did you take a job to come to Houston, or
8    did you just --
9  A   I just came.
10  Q   Okay. What happened at -- was it Hughlett?
11  A   Hewitt.
12  Q   Hewitt.
13  A   Yeah, yeah.
14  Q   What happened there?
15  A   I've got a brother here who's got -- who had
16    some problems, and I came to -- he's got four
17    kids. I came to help him out.
18  Q   Okay. What was your first job here in Houston?
19  A   Worked a temporary job for -- I don't even know
20    the name of the company. It was a temporary
21    gig. We worked with the automobile industries,
22    the automobile dealerships here. Commercials
23    and things of that nature.
24  Q   Okay. How long were you doing that?
25  A   Maybe -- maybe a month.

1  Q   Okay. And then where did you go?
2  A   Went to a place called Synergy HR Technologies.
3  Q   And what did you do for Synergy?
4  A   Supervised a call center, healthy and welfare
5    call center.
6  Q   And did that have anything to do with
7    insurance?
8  A   Group insurance.
9  Q   Okay?
10  A   You know, mainly you have clients -- again,
11    company -- you have companies, and you take
12    care of changing the beneficiary for them; you
13    know, open enrollments. You take care of the
14    open enrollments for them, things of that
15    nature.
16  Q   How long were you doing that?
17  A   Think I did that for about a year-and-a-half.
18  Q   And then where did you go?
19  A   Came to AIG.
20  Q   And what year was that?
21  A   Came to AIG in 2003.
22  Q   Okay. And what was your first position with
23    AIG?
24  A   Senior Claims Examiner.
25  Q   Okay. And that was the -- to circle all the

1     way back, that's the same position you held in
2    2014 --
3  A   Right.
4  Q   -- during this event?
5  A   Yeah.
6  Q   Make sure I have it. Senior Claims Examiner,
7    right?
8  A   Yes, sir.
9  Q   So let's talk about Senior Claims Examiner at
10    AIG, sort of what that role encompasses. If
11    you could walk me through what sort of the job
12    description or explanation is.
13  A   Basically my job at the time was to review
14    analyze, investigate contestable life insurance
15    claims, any accidental death claims, any waiver
16    of premium claims. And at the time, that was
17    about it.
18  Q   Okay. And you did that -- when did you
19    transition from Senior Claims Examiner to your
20    current position?
21  A   About a year-and-a-half ago.
22  Q   Okay. Is that a promotion?
23  A   No, it was just a transfer.
24  Q   Okay.
25  A   Just a --

1 Q    Lateral move?
2 A    Yeah, I would consider it a lateral move --
3      lateral move, yes.  I had to apply for the
4      position.
5 Q    Okay.  Same pay?
6 A    Yeah.  Didn't have a change of pay.
7 Q    What made you apply for the position?
8 A    Just a better career move at the time.  Trying
9      to -- to do better for myself.
10 Q   And what makes that a better career move?
11 A   Well, underwriters are a little bit more --
12     seen as a little bit more profession in the
13     insurance industry than a -- than a claims
14     person.
15 Q   Okay.  As far as -- what sort of training did
16     you receive when you came on at AIG as a Senior
17     Claims Examiner?
18 A   I went to Dallas for about five weeks and
19     trained with other coworkers.
20 Q   Did your -- your process or the way you
21     approached a claim when you were examining it,
22     did that change at any time in your tenure as a
23     Senior Claims Examiner?
24 A   Not really, no.
25 Q   Okay.  So let's kind of walk through

1      generically what you're taught to -- to do as
2      far as a Senior Claims Examiner at AIG.
3 A    Okay.
4 Q    So I'm assuming file comes to your desk; is
5      that how it starts?
6 A    Yeah, uh-huh.
7 Q    Okay.  So then just kind of walk me through it.
8 A    File comes to your desk, you review everything
9      in the file.  You review all of the
10     underwriting information that's in there also
11     'cause you -- you know, you want to know
12     what's -- what's in there prior to the claim.
13         And basically then you write the
14     beneficiary saying, "We've got your claim" and
15     if you don't have all the necessary paperwork
16     yet, you write -- you know, you include in
17     there that, "We need this, we need that" and
18     you just give them a status of where we're at
19     and you wait for the additional documents to
20     come in.
21 Q   And once you have all the documents, what do
22     you do?
23 A   You start your decision process.
24 Q   And how does that work?
25 A   Well, it really depends on the claim.  If you

1      -- if you have a contestable claim -- for
2      example, contestable life insurance claim --
3      you might order medical records to review the
4      medical records, you might order employment
5      history to check out their employment history.
6          Basically you're making sure that
7      whatever's on the application is -- is what
8      they've -- actually happens in real life.
9 Q    If you order, say, medical records, do you have
10     access to a medical professional to consult
11     with?
12 A    Yes.
13 Q    And would those be nurses, doctors?  What
14     would --
15 A    A combination of both.
16 Q    Okay.  And are those people employed in-house
17     by AIG, or they're outside?
18 A    They're employed in-house by AIG.
19 Q    Okay.  Are they physically in the same location
20     as you?
21         Can you walk down the hall and talk
22     to them, or is --
23 A    Well, I mean, some -- sometimes they work from
24     home, but, yeah, I mean, they're -- they -- you
25     know, they basically have been in Houston.

1 Q    Okay.  The -- the location you work at, how
2      many employees does AIG have, roughly?
3 A    Right now?
4 Q    Yes.
5 A    Kind of hard to say because they have been
6      going through some -- some layoffs.  I -- I
7      have no idea.
8 Q    Are we talking about -- I'm not from here.  Is
9      it -- does it employ dozens, hundreds,
10     thousands?  What would be your --
11 A    I would put it in the thousands range.
12 Q    Okay.  So you've got, say, access to medical
13     professionals.
14         Do you have access to other types
15     of -- tell me about the other resources you
16     have access to that you may not -- you may not use
17     in every case but come up and you think, I need
18     to dig in a little deeper there and I need more
19     expertise so you go get somebody.
20 A    We have a Medical Department, we have an
21     Underwriting Department, Legal Department,
22     Customer Service, Marketing.  Those would
23     probably basically be all the sources that we
24     could reach out to.
25 Q    Do you have in -- investigators in-house at

1    AIG?

2  A   I -- I -- you know, at this -- at this

3    particular time, I have no idea if we have

4    them.

5  Q   We -- and, I guess, going back to that 2014,

6    did you have them?

7  A   AIG did have a unit that it -- did

8    investigations, but we weren't -- I don't think

9    we were using them at the time.

10  Q   Okay.  What was that unit called?

11  A   I forget the name of the unit.

12  Q   Okay.  Do you remember how big it was?

13  A   No.  I mean, I believe it was out of New York.

14  Q   Okay.  And what was your understanding of what

15    that unit consisted of?  They were just

16    investigators?  Were they former cops?  What --

17    I mean, what did you understand?

18  A   My understanding is that some of them had

19    former law enforcement background, maybe some

20    military background.  That's about it.  That's

21    all I know.

22  Q   Okay.  Did you have an understanding why --

23    when you say, "We weren't using them at the

24    time," what do you mean by "We weren't using

25    them at the time"?

1  A   My unit, yeah.

2  Q   Okay.  And what was your unit called?

3  A   Claims Investigative Team.

4  Q   Okay.  Did you have an understanding why the

5    Claims Investigative Team wasn't using the

6    investigators out in New York?

7  A   We -- we previously had not used them before.

8    They were doing other things, I guess.  So I

9    just think it never really got organized.

10  Q   Okay.

11  A   Yes.

12  Q   If you wanted someone to, say, go interview

13    somebody, who -- who would you reach out to, to

14    do that?

15  A   We had vendors that we used to do the

16    interviewing.

17  Q   Okay.  So you had a -- was it more than one or

18    just one vendor?

19  A   We had more than one.

20  Q   Okay.  So -- and when you say "vendors," you --

21    is it fair to say that these are -- these are

22    other businesses that invest -- that their --

23    their primary business is investigating

24    whatever they're asked to investigate?

25  A   Yes.

1  Q   Okay.  And you could reach out to them, and

2    they could go do whatever it is you asked them

3    to do; is that fair?

4  A   Yes.

5  Q   Was it your understanding that within these

6    investigative vendors -- how many are we

7    talking; do you recall?  Did you have half a

8    dozen?

9  A   Well, it varied throughout the years, but I'd

10    say when I left the department, we had three or

11    four that we used consistently.

12  Q   And would that have been similar to the 2014

13    time frame?

14  A   Yeah.  Yes.

15  Q   Okay.  What was your -- well, what was your

16    habit, let's say, or what was your sort of

17    personal policy about when you would engage

18    those outside resources, those investigative

19    vendors?

20  A   I don't quite understand the question.  Could

21    you repeat that?

22  Q   Fair enough.

23    And I probably forgot -- I think I

24    forgot to mention, if you don't understand a

25    question, just let me know, or if you don't

1    hear a question, let me know --

2  A   Okay.

3  Q   -- and we'll get to a place that you -- and

4    it's important that you don't answer questions

5    that you don't understand.

6    I guess what I'm trying to get at is:

7    You've got a resource which is outside vendors

8    for investigations; is that fair?

9  A   Yes.

10  Q   Okay.  Using them costs money, correct?

11  A   Yes.

12  Q   Okay.  So surely it's just not willy-nilly sort

13    of every single time, we're using

14    investigators; is that fair?

15  A   Yes.

16  Q   Okay.  You're trying to do as much as you need

17    to do without doing too much; is that fair?

18  A   Just try and get the job done.

19  Q   Okay.  So when -- when in your mind do you make

20    the decision to sort of include an outside

21    vendor as an investigator?

22    When does that happen, if you

23    don't -- I'm assuming you don't use it on every

24    single case you reviewed; is that fair?

25  A   That's fair.

1  Q   So when -- kind of your own thought process,
2     when would you -- when would you include them,
3     when would you not?
4  A   When we would need additional information that
5     the beneficiary maybe could not provide,
6     whether it be medical records, police report,
7     autopsy report, an interview or anything.
8        So anything outside of what the
9     beneficiary could provide, we would reach out
10    to our vendor.
11  Q   In your time as the Senior Claims Examiner,
12    when you're looking at these files, do you ever
13    call and speak to involved -- involved
14    individuals in the claim?
15  A   Like?
16  Q   Well, would you ever talk to, say, a witness?
17  A   Usually, no, we would not usually talk to
18    witnesses.  Usually that would be our
19    investigator.
20  Q   Okay.  If there was a separate investigation
21    done by a different agency or company, would
22    you ever talk to those investigators?
23  A   On occasion, we have.  Usually in those types
24    of situations, we like to kind of piggyback
25    with the other insurance company and have a

1     combined investigation.
2  Q   Okay.  Prior to the -- the review of the
3    Ferrand file, how many, I'll call it "similar
4    cases," would -- that involve -- well let's
5    break it down even more.
6        Had you ever been involved in
7    reviewing a claim that involved a police
8    shooting?
9  A   Yes.
10  Q   Approximately how many times?
11  A   I mean, I really don't remember how many.
12    Wasn't a lot.  But I can tell you there have
13    been -- I've had them before.
14  Q   Okay.  Are we talking -- would you say less
15    than five, less than ten, less than a hundred?
16    Is there any way to quantify it fairly?
17  A   I mean, I -- I'd say five.
18  Q   Okay.  And that's an estimate?
19  A   Uh-huh, absolutely.
20  Q   Okay.  And in what -- is that five in your time
21    at AIG or over your entire career?
22  A   I don't recall -- you know, I really don't
23    recall police shootings prior to AIG.  I -- I'm
24    just remembering what I can from AIG.
25  Q   Okay.  Have you -- on the cases you've

1     personally worked, have you ever recommended
2    that AIG pay a policy that involved a police
3    shooting?
4  A   I don't remember.  Don't recall.
5  Q   In your time at -- well, let me ask you this:
6    What -- how is a Senior Claims Examiner
7    judged -- which is a poor word.  But how are
8    they -- I'm assuming at a AIG's size, you've
9    got yearly review for probably every employee;
10    is that fair?
11  A   Yes.
12  Q   And you get some sort of probably written and
13    oral feedback on how AIG and your management
14    thinks you're doing, what you can do better, et
15    cetera?
16  A   Yes.
17  Q   And then you probably even have some type of
18    career path discussion about what your future
19    might hold and other things you need to
20    accomplish to kind of make your way up; is that
21    fair?
22  A   Not so much.
23  Q   Okay.
24  A   Just basically on your performance.
25  Q   Okay.  So what is it -- what are the metrics,

1     or what is -- what is used to -- to judge or to
2    measure the -- the Senior Claims Examiner?
3  A   It's kind of hard to say because it's changed.
4    It's changed throughout the years.  It's
5    changed a few times.  And it's really a
6    company-wide system, so whatever the company --
7    what -- whatever system the company has to
8    evaluate you is what the Claims Department was
9    using.
10  Q   Okay.  Well, is the percentage of claims
11    approved versus denied, is that included in
12    your year-end review?
13  A   No.
14  Q   Okay.  Do you -- at the end of each year, do
15    you know what percentage of claims you've
16    denied?
17  A   No.
18  Q   Is there a way to find that out?
19  A   Like, right now?
20  Q   Well, anytime you want, can you look and --
21  A   Oh, no, I can't.  No, no.
22  Q   In your own personal experience, how often do
23    you feel like you deny a claim?
24  A   I really couldn't give you that information.  I
25    mean, I don't keep count.  And I'm sure it

1    varies from year to year depending on how many
2    claims we get, so I -- it's very hard for me to
3    say.
4  Q   Is it unusual for you to deny a claim?
5  A   Well, yeah. I mean, we -- we have claims that
6    are denied, yes.
7  Q   Would you say it's -- I mean, you deny half the
8    claims that come in, 10 percent, one in a
9    hundred, once a week, every couple months?
10  A   I don't -- I don't keep track, and I don't keep
11    count, so it's very difficult for me to say
12    what percentage of claims I have denied in --
13    in the past.
14  Q   Okay. Let's take 2017.
15  A   Okay.
16  Q   Well, I guess you've -- you've changed jobs, so
17    let's not do that. Let's -- let's take 20 --
18    what was the last -- let's take the last
19    year --
20  A   Okay.
21  Q   -- you were a Senior Claims Examiner, last 12
22    months, as you -- and that was just a couple
23    years ago; is that fair?
24  A   Yeah, yeah.
25  Q   When you kind of reflect back on that 12-month

1    period, would you -- would you estimate that
2    you were rejecting one claim a month, a claim a
3    week, a claim a day?
4        I mean, what is it -- what is your
5    recollection?
6  A   I don't recall. I mean, I don't keep count. I
7    don't remember. I don't keep track. I
8    couldn't tell you right now.
9  Q   Okay. Is there a way to -- for you to find
10    out?
11  A   For me personally?
12  Q   Yeah.
13  A   No, not that I'm aware of.
14  Q   Okay. In any of your reviews, has anybody ever
15    commented on your denial rate, good or bad?
16  A   No.
17  Q   So what type of subject matters do you get
18    reviewed on?
19  A   How -- how fast you respond to mail that comes
20    in; your customer service skills; your
21    additional training you seek out, additional
22    classes, maybe; your ability to follow
23    directions or, you know, follow procedures or
24    whatever. That's about it.
25  Q   Okay. Have you ever had any informal

1    discussions with anyone at AIG above, below,
2    same level as you about denial rates?
3  A   No.
4  Q   Never discussed it?
5  A   No.
6  Q   Are you given a -- or have you ever been given
7    in your time at AIG a -- a written policy or a
8    written manual that explains to you how to go
9    about a -- a file review and determining
10    whether to deny or approve coverage?
11  A   No.
12  Q   Okay. So there is no written procedure that
13    you should do these ten steps or anything like
14    that?
15  A   No.
16  Q   Okay. So what is it -- let's -- so let's kind
17    of take -- take -- let's take the Ferrand
18    file --
19  A   Okay.
20  Q   -- and kind of narrow in on that issue. The
21    file comes to your desk, you don't know
22    anything about it. What is the -- what's the
23    question you're trying to answer?
24  A   Well, I'm not necessarily trying to answer a
25    question at that point. I think what I'm

1    trying to do is get all the necessary
2    information in to start the process of trying
3    to make a decision.
4  Q   Okay. Once you have all of the information you
5    think you need, what -- what's the questions
6    you're trying to answer?
7  A   Can we pay the claim?
8  Q   Okay. Are you looking for reasons to deny the
9    claim?
10  A   No, we're actually looking for reasons to pay
11    the claim.
12  Q   Okay. So walk me through -- well, I mean,
13    before we dive into the Ferrand file too deep,
14    what did you do to -- in preparation for today?
15  A   I met with our outside counsel yesterday, and
16    we went over some of the documents and some of
17    the case, basically.
18  Q   Okay. And I'm not entitled to the discussions
19    you had with your counsel, but did you review
20    your case file?
21  A   When?
22  Q   In preparation in the last --
23  A   I reviewed some of the documents from the case.
24  Q   Okay. When you say "documents from the case,"
25    these were documents you had seen before or not

1  seen before?
2  A    Yeah, I'd seen them before, right.
3  Q    Okay.  They came -- they were in your case
4      file; is that --
5  A    I don't have a case file.
6  Q    Okay.  What do you call -- what do you call
7      the -- when the -- the file comes to your desk
8      says "Ferrand on it," or however it works, what
9      do you guys call that?
10 A    A "file."
11 Q    A "file."
12          Okay.  "Client file"?
13 A    Sure, yeah.
14 Q    Okay.  And --
15 A    It doesn't belong to me.
16 Q    Sure.  Sure, sure, sure.
17 A    Okay.
18 Q    For -- for a time, you're sort of the custodian
19      or the keeper of that file; is that fair?
20 A    Can be, yeah.
21 Q    Okay.  And then you make your decision, and
22      then you pass it along?
23 A    Right.
24 Q    Okay.  So understanding it's -- it's AIG's
25      file, were these documents that you had caused

1      to be put in the file through your initial
2      examination?
3  A    That I had caused to be put in the file?
4  Q    Let me ask it a cleaner way:  The documents you
5      reviewed in preparation for today --
6  A    Uh-huh.
7  Q    -- were they the same documents you were
8      reviewing when you were making your decision?
9  A    Yeah.  The documents I saw were familiar, and I
10      had seen them before.
11 Q    Okay.  Sometimes I ask questions in the way it
12      feels like a trap, but it's not.
13 A    Okay.
14 Q    Okay.  So when you got the file, what was in
15      it?
16 A    I can't tell you.  I mean, I don't know.  I
17      don't remember.
18 Q    Okay.  Do you remember what you did after
19      getting the file?
20 A    No.  No, I don't recall.
21 Q    Did reviewing any of the documents you reviewed
22      yesterday, did that jog your memory on -- well,
23      do you have any memory of denying Ms. Ferrand's
24      claim?
25 A    Yes.

1          MR. BURR:  Objection to the form.
2      Object to the form.
3  Q    (By Mr. Gammill) Okay.  So what is it you
4      remember?
5  A    Well, you know, based on what I saw yesterday,
6      we -- I recall having Mr. Alan Curry --
7      contacting him and having him get some
8      information for us.
9          I recall having contact with the
10      beneficiary, you know, through written
11      correspondence.  And just some, you know, facts
12      of the case, as -- as I had discussed
13      previously.
14 Q    Okay.  Alan -- who is Alan Curry?
15 A    He's an investigator we used -- we used to use.
16 Q    Okay.  Before the Molly Ferrand case, had you
17      used Alan Curry before, you personally?
18 A    Yes.
19 Q    Approximately how many times?
20 A    I can't tell you.  I mean, we -- he was a main
21      staple of our investigative core, so we used
22      him when we needed him.
23 Q    Dozens, hundreds, thousands of times?  Any way
24      to give me a ballpark?
25 A    Me personally?

1  Q    Yeah.
2  A    It's hard to say.  I mean, I used him quite a
3      bit, but I -- again, a number, I just can't
4      give you.
5  Q    Okay.  How would you describe his use in this
6      case?
7          MR. BURR:  Object to the form; vague.
8  A    Can you maybe reask that question?
9  Q    (By Mr. Gammill) Sure.
10          You said Alan Curry is an
11      investigator, correct?
12 A    Yeah.
13 Q    Would you describe what he did as
14      investigation?
15 A    Okay.  In this case, we would have had him get
16      the police report and autopsy report.
17 Q    Okay.  He -- he recovered files for you?
18 A    Information.
19 Q    Okay.  Information.
20          And the information he recovered,
21      though, was all written reports or written
22      documents?
23 A    He may have gotten some other things in this
24      case, I'm not sure.  But, you know, in a case
25      like this, we would have had him go out and try

1    to get the police report or autopsy report
2    unless it was already given to us by the
3    beneficiary.
4  Q   Sure.
5          Is there -- why does -- why does
6    AI -- or why did you decide to employ an out --
7    outside investigator to retrieve documents as
8    opposed to just having, say, I don't know, your
9    secretary or someone else attempt to collect
10   those files?
11  A   I didn't have a secretary.
12  Q   Okay.  Fair enough.
13        But someone in-house.  Surely there's
14    some sort of administrative staff at a company
15    AIG's --
16  A   No.
17  Q   -- size?
18  A   No.
19  Q   There's nobody in-house that can collect those
20    documents?
21  A   I could try to get them, but we find it more
22    efficient to have an investigator to it.
23  Q   What makes it more efficient, in your
24    experience?
25  A   They know the ropes.  They know what to say.

1    They know -- they have contacts here and there
2    to -- to try to get things.
3        A lot of -- a lot police departments
4    or a lot of agencies can be difficult to work
5    with, time consuming, so in order to expedite
6    the matter, we have an investigator do it.
7  Q   Okay.  Why not ask Mr. Curry -- well, would you
8    agree with the idea you didn't ask Mr. Curry to
9    do any actual active investigation?
10  A   I'm going to have you define "actual
11    investigation."
12  Q   Well, interviewing witnesses.  I mean, let
13    me -- let me put it to you this way:  I'll
14    represent to you that Mr. Curry says all he did
15    was request documents and give those documents
16    to you.
17  A   Uh-huh.
18  Q   He never read them, he never reviewed them, he
19    never spoke to anyone, that he merely retrieved
20    what was asked for and provided it to you.
21        Now, does -- that, would you agree,
22    does not fall within what we would commonly
23    think of as, quote, an investigation?
24        MR. BURR:  Object to the form, vague.
25  A   Okay.  When I say "investigator," I don't mean

1    a private eye.  I mean a guy that goes out and
2    does the things that we need him to do.  And in
3    this particular case, Alan Curry did those
4    things that we asked him to do.
5  Q   (By Mr. Gammill) But do you understand -- did
6    you have an understanding that Alan Curry is an
7    investigator, that he is -- he will operate as
8    a PI if asked to do so?
9  A   I --
10        MR. BURR:  Object to form and vague.
11  A   I don't know.  I -- I don't -- I don't know.
12  Q   (By Mr. Gammill) In your interactions with  Mr.
13    Curry, did you ever ask him to actively
14    investigate, something that you would -- that
15    would fall within the realm of -- of a -- of a
16    private investigator?
17        MR. BURR:  Objection; vague.
18  A   That's hard for me to answer because I'm not
19    real familiar with what a private investigator
20    does or if any of the actions he took for us
21    would fall under being a private investigator.
22    So I -- it's hard for me to answer that.
23  Q   (By Mr. Gammill) Did you ever ask Mr. Curry to
24    interview anyone related to any claim?
25  A   Yes.

1  Q   Okay.  Did you ever ask Mr. Curry to go to any
2    location that was somehow involved in a claim,
3    meaning it was the scene of where something
4    happened or it was where something allegedly
5    took place or where something was supposed to
6    be happening, something to that effect?
7  A   Yes.
8  Q   Okay.  Did you ever ask Mr. Curry his opinion
9    on anything in your interactions with him
10    regarding a case?
11  A   I mean, I don't specifically recall, but
12    during -- I'm sure during the conversations and
13    during claims, I probably did ask him his
14    opinion.
15  Q   Okay.  Did you ever ask Mr. Curry in other
16    claims to review the documents you've asked him
17    to retrieve?
18  A   I mean, I can't specifically say that I recall
19    having that conversation with him.  You know,
20    we have him retrieve the documents, and he gets
21    them for us.  What -- you know, what he
22    actually does with them is hard for me to say.
23  Q   Well, would you ever have a conversation that
24    would -- that would go something like, "Mr.
25    Curry, go get A, B and C," he calls you back,

1     "I got A, B and C. Well, does that seem like
2     that's everything? Can you think of anything
3     else we ought to get, Mr. Curry," and he says,
4     "Well, you know, you might want to take a look
5     at D" and you're like, "Oh, yeah, that sounds
6     like a good idea. Would you go get me D,"
7     Conversations like that? Would you ever have a
8     that type of conversation with Mr. Curry?
9  A  It's hard to say. I mean, I don't recall those
10     types of conversation. I don't recall all the
11     conversation I had with him. It's possible.
12  Q   Would you ever use Mr. Curry -- would you ever
13     ask Mr. Curry's opinion on what he thought
14     happened in a claim that he was looking into
15     for you?
16        MR. BURR: Objection; vague.
17  A  I would say probably no because, you know, the
18     documents that we were going after should tell
19     us what happened, and that's -- you know,
20     that's what we got him for.
21  Q  (By Mr. Gammill) So what were the -- what were
22     the reasons you denied the Ferrand claim?
23        MR. BURR: Objection; assumes facts
24     not in evidence.
25        THE REPORTER: Say it one more time.

1        MR. BURR: Objection; assumes facts
2     not in evidence.
3  A  The events that happened on that particular day
4     did not fall within the policy language.
5  Q  (By Mr. Gammill) Okay. And what about them
6     didn't fall within the policy language?
7  A  Well, the policy does have exclusions for
8     illegal activity.
9        There are exclusions for -- and I --
10     I -- I don't have the policy with me, so I
11     can't use it word for word, but it does have
12     exclusions for accel- -- not accelerants, but
13     you know, alcohol or drugs.
14        Although it may not necessarily say
15     that, but, you know, it -- it refers to that.
16        And it's an accidental death -- has
17     an accidental death benefit also associated
18     with it. Was not part of an accidental death.
19  Q  Okay. Why do you say it wasn't an accidental
20     death?
21  A  Basically that would hinge on the application
22     language that's -- that's in the policy.
23  Q  What do you mean by that?
24  A  Well, the policy spits out what an -- what an
25     accidental death is or what's considered to be.

1     The events that happened that day did not fall
2     within that specific language.
3  Q  Okay. So what -- you said there -- what was
4     the illegal activity?
5  A  I would say brandishing a gun in front of the
6     police, not dropping the gun or not doing what
7     the police tell you to do with a gun in your
8     hand.
9        And from what -- from what the report
10     says, it says he pointed a gun at the
11     policeman. That would -- I would consider that
12     to be an illegal activity.
13  Q  And so, what is your -- what is your
14     understanding of what "brandishing a firearm in
15     Utah" means?
16        MR. BURR: Objection to the extent it
17     calls for legal conclusions.
18  A  I'm not an attorney, I don't live in Utah, but
19     I -- my opinion would be if you brandish a
20     firearm in front of any law enforcement
21     official, it's probably going to be illegal
22     in -- in mostly all the states.
23  Q  (By Mr. Gammill) Fair.
24        But what -- do you -- do you have an
25     understanding of what -- you're using the word

1     "brandishing," fair enough, not a lawyer, don't
2     live in Utah. What -- what do you define the
3     word "brandishing" as you use it as?
4  A  When I say that, in reading the report, the
5     report says that insured pointed the gun at
6     the -- one of the officers.
7  Q  Okay. So it was the -- it -- to your mind, it
8     was the pointing the gun at the officer is --
9     that's illegal, and now you're outside the
10     policy? That was at least one factor?
11  A  That's part of it.
12  Q  Okay. When you were reviewing the file, were
13     you aware that Utah is an open carry state?
14  A  No.
15  Q  Do you know what I mean by "open carry"?
16  A  Can carry it, like, on your hip or something,
17     uh-huh.
18  Q  Similar -- just like Texas, correct?
19  A  Uh-huh.
20  Q  Are -- do you understand that Texas is an open
21     carry state?
22  A  Yeah, I didn't know that.
23  Q  Okay. And when you were reviewing the file,
24     did you have an understanding that -- that it
25     was -- this took place on Mr. Ferrand's

1   property?
2 A   I believe I did, yes.
3 Q   Okay. You didn't have any of the -- well, let
4     me ask: Would you agree that you didn't have
5     any of the recordings -- audio recordings or
6     video from any of the please agencies involved
7     in this?
8 A   No.
9 Q   Okay. Why not?
10 A   I don't -- I don't recall. I mean, that's not
11    something we would probably order. I may not
12    have known they even existed, so.
13 Q   You say you've handled police shootings before,
14    correct?
15 A   Yes.
16 Q   Do you not have a general understanding that
17    police officers, especially in this day and
18    age, that there are usually recordings that
19    come along with any -- with really any police
20    case?
21        MR. BURR: Object to the form.
22 A   I mean, that really -- really depends on the
23    jurisdiction, I guess.
24 Q   (By Mr. Gammill) Well, in your review of the
25    Ferrand file, wouldn't you have expected a

1     9-1-1 call?
2 A   I don't know. I mean, I don't know the --
3     I don't -- I -- I wasn't there, don't know
4     facts. I don't know how the police got there,
5     so -- and at least, I don't recall.
6         So, I mean, if a man comes out
7     brandishing a gun, well, somehow the police are
8     there, I'm not quite sure.
9 Q   Well, I'll -- I'll represent to you that the
10    police report indicates that Molly called
11    9-1-1.
12 A   Okay.
13 Q   Reported that her husband was leaving the house
14    armed.
15 A   Okay. Yes, that's in the report.
16 Q   She then calls 9-1-1 again to report that he
17    has returned and that there is no longer an
18    emergency.
19        MR. BURR: Object to the form.
20 Q   (By Mr. Gammill) Does that jog your memory as --
21        MR. BURR: Objection;
22    mischaracterizes evidence.
23 A   I -- I know that her statement -- not her
24    statement, but I know that she had called
25    9-1-1, and I know some of that -- some of what

1     she said during that call is in the report.
2     The last part you said about not coming, I
3     don't -- I don't -- I don't recall that.
4 Q   Do you remember there being a second call to
5     9-1-1?
6 A   No, I don't.
7 Q   Assuming -- assuming I'm not crazy, and that
8     I'm right on this, that there's a second
9     call --
10 A   Okay.
11 Q   -- is that not -- you wouldn't want to hear
12    what was actually said in those 9-1-1 calls?
13 A   No.
14        MR. BURR: Object to the form.
15 Q   (By Mr. Gammill) Why not?
16 A   My responsibility is to resolve the claim.
17    We -- and how we do that is, we get documents
18    from the authorities who handle the -- the
19    investigation.
20        That would be the autopsy report and
21    the police report. That's part of the
22    investigation. That's -- my job is to base my
23    conclusions based upon the investigation by the
24    authorities.
25 Q   In a -- in a case where a police officer

1     shoots somebody -- well, let me -- let me back
2     up.
3         You said you -- you -- you get the
4     documents that the authorities gather, correct?
5 A   Okay. Yes.
6 Q   And you would -- I guess you would -- you take
7     the position that you would expect the
8     authorities to be doing their job properly and
9     to do an investigation and -- and to -- to be
10    honest in their investigation; is that fair?
11 A   That's fair.
12 Q   Okay. Is it also fair that when you have
13    what's a police shooting incident, that perhaps
14    the deference given to the statements of the
15    shooter and his partners should be given a
16    higher level of scrutiny because now they have
17    a motive to perhaps not be completely
18    forthright with what happened?
19        MR. BURR: Object to the form,
20    incomplete hypothetical, calls for speculation.
21 A   Anything like that should fall under the police
22    investigation, not a -- an insurance claim.
23        I mean, obviously, these are things
24    we can look at, but we depend on the
25    authorities to take care of that type of thing.

1  Q    (By Mr. Gammill) Okay.  I'm just asking
2       you whether -- there's a car accident, right?
3  A    Right.
4  Q    Police officer shows up.
5  A    Yes.
6  Q    Interviews Person A, interviews Person B, takes
7       down whatever physical evidence, done, right?
8  A    (Witness nods head up and down.)
9  Q    You'd expect that that officer was being honest
10      about his report, right?
11 A    Okay.
12 Q    I'm just asking you as -- as you --
13 A    Yes.
14 Q    -- as Mr. Evans.
15 A    Yes.
16 Q    And you'd expect that, you know, he doesn't
17      appear to have any sort of motive as to why he
18      wouldn't be honest, correct?
19 A    I mean, I -- you know, I -- I really don't give
20      that much thought.  I mean, we take what we get
21      from the authorities in terms of what the
22      report says.
23 Q    Now --
24 A    You -- you start getting into people's motives
25      and stuff, I -- I couldn't respond to that.

1  Q    Okay.  Well, let's -- let's back up kind of a
2       step and say:  Was -- was this a complicated
3       claim?  For a Senior Claims Examiner, is this a
4       complicated case, or is this a simple case?
5            MR. BURR:  Objection; vague.
6  A    I don't think I would classify it as either.
7       Each case is different.  I mean, I really
8       couldn't classify it as -- as a complicated
9       case or an easy case.
10 Q    (By Mr. Gammill) Was it a hard case?
11           MR. BURR:  Objection; vague.
12 A    I don't know if I would classify it as that.
13 Q    (By Mr. Gammill) The -- the issue of the --
14      the -- you said the police report said Mr.
15      Ferrand pointed a gun at the police and that
16      that would fall under the illegal activity.
17           And that -- you took that from the
18      police report; is that fair?
19 A    Yes.
20 Q    Okay.  And you -- you took it as true?
21 A    Yes.
22 Q    Okay.  What do you do when you get conflicting
23      information in the reports that you receive?
24 A    If I can't get a clear -- if I can't resolve
25      the conflict, then I'll probably send it to our

1       Legal Department for further review.
2  Q    Okay.  Was this file ever sent to the Legal
3       Department?
4  A    Our Legal did review it, yes.
5  Q    At what point?
6  A    As far as I know right now, it was the Claims
7       Committee.
8  Q    Okay.  Can you explain that answer?
9  A    As far -- as far as I know, it was during our
10      Claims Committee.
11 Q    Okay.  You had somebody from Legal there; is
12      that what you're telling me?
13 A    I don't know if they were present, but I think
14      they were at least on the phone, so.
15 Q    Okay.  Prior to you making your personal
16      recommendation to the committee --
17 A    Uh-huh.
18 Q    -- had -- had the file, to your knowledge, gone
19      to Legal?
20 A    I don't remember.
21 Q    You have no memory of sending it to Legal?
22 A    No, I don't.
23 Q    Okay.  And what is it you're hoping that Legal
24      -- when you send a file to Legal, what --
25 A    Uh-huh.

1  Q    -- because you can't -- I mean, let me put it
2       like -- give you an example.
3            Person A says the sky is blue or
4       cloudy.
5  A    Uh-huh.
6  Q    Person A says it -- it was a cloudy day,
7       Person B says it was clearest day you could
8       ever imagine.  So now you got one person saying
9       the sky's totally clear and another
10      person saying the sky is totally cloudy.
11           And somehow that matters.  Okay?
12      It's going to influence your thought process or
13      your decision-making.  Legal is not going to be
14      able to tell you who's right and who's wrong;
15      is that fair?
16 A    No, I don't think that's fair.
17 Q    Okay.  Well -- well --
18 A    I don't know what Legal's going to be able to
19      tell me.  I mean, in a situation like that, I
20      have no idea --
21 Q    Okay.
22 A    -- what Legal's going to be able to tell me.
23 Q    What are you hoping that -- what are you hoping
24      comes back from Legal?  You've got two
25      conflicting things, you -- that you -- you

1    can't rect- -- you can't --

2  A    You look for things like guidance, suggestions,

3    things of that nature.

4  Q    Okay.  At any point since you've denied this

5    claim, have you ever listened to any of the

6    audio or watched any of the video?

7  A    No.

8  Q    Okay.  If there had been a -- a video of one of

9    the police officers on scene stating that Mr.

10    Ferrand had put the gun down and ran, would

11    that have influenced your opinion?

12  A    I'm sorry, can you repeat the question?

13  Q    Absolutely.

14    You've said that -- that the report

15    said that Mr. Ferrand pointed the gun at the

16    police officer and he shot him, right, that's

17    the --

18  A    The police officer shot him.

19  Q    Yes, the police officer shot Mr. Ferrand.

20    If there was a video where one of the

21    witness officers who's watching what happens

22    said that Mr. Ferrand put it down and ran and

23    then got shot, would you agree that that would

24    contradict, at least would -- to your mind,

25    does that contradict what you read in the

1    police report?

2    MR. BURR:  Object to the form;

3    assumes facts not in evidence and incomplete

4    hypothetical.

5  A    Well, I mean, that's not in the police report.

6    Okay?

7  Q    (By Mr. Gammill) I agree with you there.

8  A    Okay.  It does contradict what's in the police

9    report.

10  Q    Okay.  Would that contradiction have influenced

11    you, you think?

12  A    It's hard to say.  I mean, you know, it -- it

13    might have presented a different set of facts,

14    possibly.  Well, obviously, it would have.

15    But, you know, there are other facts that go

16    along with the case, so it's hard for me to say

17    whether I still would not have come up with the

18    same conclusion or not.

19    I mean, the fact is he came out of

20    the house with a weapon.  My understanding is

21    the police asked him to drop it, he did not.

22    So there -- I mean, there's a long

23    list of details that go along with this case,

24    not just that or something else, so I can't

25    really tell you that I would have made another

1    decision based on him running away.

2  Q    To your analysis, would you agree with me that

3    the fact that Mr. Ferrand was armed and pointed

4    that weapon at a police officer was the most

5    significant fact to you?

6    MR. BURR:  Objection; vague.

7  A    No.

8  Q    (By Mr. Gammill) You're telling me that in the

9    denial of this claim, Mr. Ferrand pointing the

10    gun at the officer who then shot him was not

11    the critical fact?

12    MR. BURR:  Objection; form.

13  A    I think it's all important.  I think, you know,

14    the fact that he came out with a gun in his

15    hand is the start of things right there.

16  Q    (By Mr. Gammill) Okay.  Well, let's -- let's

17    stop there.

18    Utah, his property, nothing unlawful

19    about coming out of your house with a gun in

20    your hand, fair?

21    MR. BURR:  Objection; calls for

22    speculation, assumes facts not in the evidence,

23    states a legal conclusion.

24  A    I -- you know, I'm not familiar with the Utah

25    law, so.

1  Q    (By Mr. Gammill) Fair enough.

2    So did you take any steps to become

3    familiar with the Utah law during your --

4  A    No.

5  Q    -- examination of this file?

6  A    No.  But -- but we got Legal Department who

7    does that.

8  Q    Absolutely.

9    Did you check with Legal about Utah

10    law?

11  A    No, I did not.

12  Q    Okay.  So comes out of his house, gun in his

13    hand.  What's the next thing that stands out in

14    your mind as important about your analysis?

15  A    He was asked to drop the weapon.

16  Q    Okay.  And your understanding is he didn't?

17  A    That's correct.

18  Q    But you didn't have any of the audio or video

19    recordings that go along with this incident?

20  A    No.

21  Q    Did you ever ask for them?

22  A    No, not that I recall.

23  Q    Okay.  Have you ever asked for any audio or

24    video recordings of any case involving the

25    police?

1   A    No.
2   Q    Have you ever asked for any audio or video on
3       any case, whether it's surveillances or some
4       cell phone footage that you know is out there,
5       anything like that?
6   A    The only thing I can recall is maybe asking for
7       some audio on an insured signing up for
8       insurance, you know, calling in on the 1-800
9       line, filling out some questions verbally on
10      the -- on the 1-800 line. That would be about
11      it.
12  Q    Okay. So he's asked to drop it, and he
13      doesn't, going back to Mr. Ferrand. What's the
14      next significant factor for you?
15  A    Well, I mean, there's a number of things. His
16      blood alcohol level.
17  Q    So let's talk about it. What -- what about his
18      blood alcohol level?
19  A    Well, I mean, he -- he had a significant blood
20      alcohol level, from what I understand.
21  Q    I would say that's putting it lightly. I
22      think -- and I -- he's -- he's got a -- a very
23      elevated blood alcohol level.
24  A    Okay.
25  Q    I think it's .2 something. Does that --

1   A    Rings a bell.
2   Q    Okay. And I'm assuming you probably have an
3       under -- I believe Texas is also a -- .08 is
4       the driving legal limit?
5   A    Yes.
6   Q    Okay. Would you agree with me that if one of
7       your insureds is driving down the street, ends
8       up in a single-vehicle accident off on the side
9       of the road, rolled four times, dead and they
10      take his blood and it's a .20, that's probably
11      a fairly easy case of saying, "The alcohol
12      exclusion applies. You were drunk driving,
13      we're not paying out."
14          Is that a fairly easy case for an
15      examiner to take a look at?
16          MR. BURR: Objection; vague,
17      incomplete hypothetical.
18  A    Not necessarily. It really depends on each
19      case. Each case is different.
20  Q    (By Mr. Gammill) Okay. Would you agree with me
21      that there seems to be a very high cause effect
22      correlation in the example I just gave?
23          MR. BURR: Objection; vague.
24  A    Okay. You're going to have to reword that.
25  Q    (By Mr. Gammill) Fair enough.

1       That -- I mean, the alcohol exclusion
2       is, and you can correct me if I'm wrong --
3       well, what is your understanding of the alcohol
4       exclusion that's -- that's in these contracts?
5   A    Well, I -- I think I would have to read -- I
6       don't have the exact language, but I would have
7       to see the policy language in order to explain
8       that to you.
9   Q    Okay. Would taking a look at the letter you
10      sent denying the coverage, do you think that
11      would help your --
12  A    Sure.
13  Q    -- refresh your memory?
14          MR. GAMMILL: Where did I put my
15      iPad?
16  Q    (By Mr. Gammill) Yeah, this is your letter.
17          MR. BURR: Can I see it real quick
18      first?
19          MR. GAMMILL: Yeah, absolutely.
20      (Tendering to counsel.)
21  Q    (By Mr. Gammill) That's the last disclosure you
22      guys sent.
23  A    (Witness reviewing document.)
24          Okay.
25  Q    (By Mr. Gammill) Does that refresh your memory,

1       or does that help guide you on what the alcohol
2       factor is or how that plays into this?
3   A    That's -- I'm -- I'm not -- you know, I'm not
4       understanding --
5   Q    Your -- your --
6   A    -- what you're trying to get at.
7   Q    In your letter, you're citing the alcohol
8       use --
9   A    Okay.
10  Q    -- or the factor --
11  A    Yes.
12  Q    -- that he's under the -- he has a high blood
13      alcohol, however you want to phrase it.
14  A    Right, right.
15  Q    Okay. So you've included it in your Letter of
16      Denial.
17  A    Yes.
18  Q    And so, it would stand to reason that you
19      somehow believe that influences the decision to
20      deny.
21  A    The policy does have language that would relate
22      to alcohol, yes.
23  Q    Okay. Agreed.
24          Is it your position that the
25      alcohol -- that his alcohol consumption, his

1     blood alcohol level that day, is reason enough
2     to deny coverage in and of itself?
3   A   You mean without the other factors?
4   Q   Yeah. I mean, is it -- is it part but not
5     enough on its own, or would it have been enough
6     on its own?
7         Are you telling Ms. Ferrand, here are
8     the three reasons we're denying you, and any
9     one of these is good enough and we got three,
10    or are you saying these three things kind of
11    all put together equals denial?
12  A   Well, basically it's reflected in the letter.
13    Whatever we put in the letter is the reason why
14    we denied the claim.
15        And, now, you if you want me to go
16    and try to pick out each individual fact and
17    say whether or not we would have made the same
18    decision, I can't answer that question, but I
19    can tell you what's based in the letter is the
20    reason why we denied the claim.
21  Q   Understood.
22        You wrote the letter, correct?
23  A   That is correct.
24  Q   Okay. So as the author of the letter, what --
25    what are you telling Ms. Ferrand? Are you

1     telling her that those -- those factors are
2     independently enough, or are you telling her
3     that as a whole, taking parts put together as a
4     whole, that they create a denial?
5         MR. BURR: Objection; vague.
6  A   The letter says what it says. There are --
7    there are things in the letter that says these
8    are the reasons why we denied the claim.
9    That's all I can tell you.
10       I can't tell -- I can't break it down
11    for you. I can't say if something was
12    eliminated, we would still do the same thing or
13    if something was added, we'd do the same thing.
14    The letter speaks for itself.
15  Q   (By Mr. Gammill) You -- you came to the decision
16    that this should be a denial independent before
17    it went to a committee, correct?
18  A   Not me alone, no.
19  Q   You were the initial reviewer of this file,
20    correct?
21  A   That is absolutely correct.
22  Q   You recommended denial?
23  A   I did.
24  Q   And that was at a point in the process where
25    you were the only one that had input into it,

1     correct?
2  A   I guess if you -- if you want to define
3    recommendation as input, yes.
4  Q   Okay. It wasn't, "Me and Johnny recommend
5    denial," it was, "I have reviewed the file for
6    AIG. I recommend denial"?
7  A   Yes.
8  Q   Okay. Went to a committee. You were part of
9    the committee?
10  A   That is correct.
11  Q   The committee made the decision for denial?
12  A   That is correct.
13  Q   You authored the Letter of Denial to
14    Ms. Ferrand?
15  A   That is correct.
16  Q   I'm asking you: Why did you deny coverage to
17    Ms. Ferrand? Is it three independent reasons,
18    or is it a totality of the three reasons you
19    put in your letter?
20        MR. BURR: Objection; vague.
21  A   I'm going to answer it this way again: The
22    reason we denied the claim is listed in the
23    letter right here, and that's all I can tell
24    you.
25  Q   (By Mr. Gammill) Why -- why is that all you can

1     tell me?
2  A   Because it would require a reevaluation of --
3    of the facts and -- and -- and we -- I would
4    have to go back to the Claims Committee and
5    say, "Okay, let's throw this out, let's throw
6    that out." I don't have that information.
7       This is the reason why we denied the
8    claim right here (indicating). It's all in the
9    letter. We've -- we've specifically listed the
10    reasons why we denied the claim.
11  Q   If -- let me give you a hypothetical.
12  A   Sure.
13  Q   It includes alcohol.
14  A   Okay.
15  Q   A individual is standing on his front lawn,
16    okay, blood alcohol .20. Let's say he's been
17    barbecuing all day or something, right? Just
18    hanging out getting drunk.
19       He's standing on his property talking
20    to somebody else. Suddenly a car comes flying
21    down the road, loses control, hits him, takes
22    him out, dead. He's just standing there.
23    Standing there one second (indicating), gone
24    the next.
25       Do you think the alcohol consumption,

1      his blood alcohol takes him outside of a
2      policy?
3   A    You know, I can't -- I can't give you an answer
4      to that. It's a hypothetical. There may be
5      more facts associated with it. I -- I mean, I
6      can't give you an answer to that. I just
7      can't.
8          Because more goes into making a
9      claims decision than just, you know, you
10      throwing a hypothetical situation and me making
11      a decision on the spot. I just -- I can't do
12      that.
13   Q    What else would you need to know about that
14      situation?
15   A    I don't know. I mean, I would have to sit down
16      and think about it. I don't know. Can't give
17      you -- can't give you an answer right here and
18      now.
19   Q    Is -- I mean, can you think of any other factor
20      you need to know?
21   A    Maybe -- maybe what he was doing at the time he
22      got hit. I don't -- I don't know. I mean --
23   Q    Nothing.
24   A    Okay.
25   Q    There you go, he was doing nothing.

1   A    I --
2   Q    He's just standing there on his property
3      enjoying the day, drunk, smiling and a car lost
4      control, veered off the road, clipped him and
5      killed him.
6   A    Yeah. You know, when you're reviewing claims,
7      you're -- you're reviewing a lot of facts, and
8      I -- you know, I'm not going to sit here and
9      hypothesize or try to give you a decision based
10      on something that you were just bringing up.
11      I -- I'm just not going to do that.
12   Q    So as you sit here today, you can't tell me
13      whether or not the alcohol exception was in and
14      of itself enough for denial for Ms. Ferrand's
15      claim; is that --
16   A    I can't tell -- yeah, I can't -- can't give you
17      an answer to that.
18   Q    Okay. So as you -- as you sit here today,
19      other than "Why we denied it is in the letter,"
20      you can't give any other individual or -- or
21      independent input into the reasons for why you
22      denied the claim?
23   A    It's in the letter.
24   Q    That's all you can -- you can't shed any light
25      on that letter?

1   A    The letter speaks for itself. I mean, what --
2      what kind of light do you want me to shed on
3      the letter? It speaks for itself.
4   Q    Well, I think for one, the letter does not
5      indicate whether you are specifically denying
6      for three individual grounds or you're -- you
7      feel that each factor taken in its totality
8      with one another formulates a denial.
9   A    They're -- they're all part of the denial.
10   Q    Okay.
11   A    So that's what I can tell you.
12   Q    Okay. So then what -- what is it about his
13      alcohol use? I mean, okay, would you agree
14      with this, that simply having alcohol in your
15      system does not per se mean AIG won't cover
16      your claim?
17   A    Yeah, doesn't -- the policy doesn't say you
18      can't drink alcohol.
19   Q    Right.
20   A    Okay.
21   Q    So you'd agree -- would you agree that there
22      has to be some sort of causation connection
23      to -- let's take an accidental death. The
24      reason you're dead in some way has to be
25      connected to the fact that you had been

1      drinking or using drugs and, therefore, that's
2      why we're denying your claim?
3          Would you agree with that there has
4      to be some sort of causational component to it
5      when you're doing your analysis?
6          MR. BURR: Objection; vague,
7      incomplete hypothetical.
8   A    Again, not necessarily. I mean, I've seen a
9      lot of claims, I've seen a lot of different
10      scenarios, lot of different decisions. I
11      really couldn't -- couldn't "Yea" or "Nay" on
12      that one.
13   Q    (By Mr. Gammill) Okay. You've seen a lot of
14      claims, seen a lot of scenarios. When you're
15      doing your analysis, are -- are you looking for
16      some connection -- when you know there's -- you
17      get the -- you get the tox, you know there was
18      alcohol involved.
19   A    Uh-huh.
20   Q    Are you then asking yourself the question, Is
21      this alcohol -- is this -- is his alcohol --
22      blood alcohol level or whether he was drunk, is
23      that somehow connected to what happened? Is
24      that a question you're asking yourself?
25   A    Well, you want to get all the facts.

1  Q    I understand that.
2  A    You want to get all the facts.
3  Q    But isn't that -- is that part of your
4        analysis?  Are you trying to ask yourself --
5        if -- right -- if you're going to deny a claim
6        because the person was intoxicated, is it fair
7        that that intoxication would have had something
8        to do with why they were dead and why the claim
9        was being denied?
10 A    It really -- I mean, if you're just
11       specifically talking about intoxication?
12 Q    Yes.
13 A    Just really depends on the claim.  It really
14       dependent on the facts behind the claim.  Now,
15       yes, there are times when, you know, the
16       intoxication did have a role in the person's
17       death, and there are other times when maybe it
18       doesn't -- it doesn't play as big of a -- as a
19       role.
20             So I can't really give you a specific
21       "Yes" or "No" answer to that because it depends
22       on the facts behind the claim.
23 Q    Have you ever recommended a claim be paid where
24       the person was intoxicated?
25 A    I -- I mean, I don't recall any -- anything

1        like that.  I mean, it -- it's possible, but I
2        don't recall a specific claim.
3  Q    Have you ever recommended a denial of a claim
4        solely because the individual was intoxicated?
5  A    Again, I can't give you a specific example
6        because I don't remember.
7             MR. GAMMILL:  Why don't we -- this
8        would be a good spot to take a break.  We'll
9        switch out the videotape.  Is that okay?
10            THE VIDEOGRAPHER:  11:22; we're off
11       the record.
12            (Short break.)
13            (Exhibit 1 marked.)
14            THE VIDEOGRAPHER:  It's 11:39; we're
15       back on the record, beginning Disc 2.
16 Q    (By Mr. Gammill) All right.  You understand
17       you're still under oath, correct, sir?
18 A    Yes.
19 Q    Okay.  You've got there what's been marked as
20       Exhibit 1, and you'd agree with me that's your
21       denial letter to Ms. Ferrand, correct?
22 A    Yes.
23 Q    Same document we were looking at on my iPad --
24 A    Uh-huh.
25 Q    -- before we took the break; is that fair?

1  A    Yes.
2  Q    Okay.  So is it fair to say, then, as we sit
3        here you don't know whether Mr. Ferrand's
4        alcohol blood content was in and of itself
5        enough to deny coverage?
6  A    No, I can't give you an answer to that.
7  Q    Okay.  So that would be you don't know?
8  A    Right.
9  Q    Okay.  The other -- I want to direct your
10       attention to kind of the first -- I guess it's
11       first four paragraphs of the letter.
12       Essentially the whole first page, it seems.
13 A    (Witness complies.)
14 Q    And you can review that if you need to.
15            I -- I take that you sort of -- of
16       put together that that's basically spelling out
17       suicide by cop.  Is that what you're getting at
18       there?
19            MR. BURR:  Object to the form and
20       vague.
21 A    Which paragraph are you referring to?
22 Q    (By Mr. Gammill) Kind of the -- the combination
23       of the first four, the first -- "We have now
24       concluded our review of this claim.  Please be
25       advised" all the way down to the -- four later,

1        it ends with "wanted suicide by cop."
2             That those four paragraphs are kind
3        of explaining what is in the policy.  You point
4        out some things you reviewed that sort of
5        support this idea that part of the denial is
6        based on his mental state.
7             You feel that you've got a -- you
8        know, a suicide by cop situation, and that
9        would be an exception to the -- or suicide
10       itself, I suppose, would be a -- an exception
11       to the policy.
12            MR. BURR:  Object to the form.
13 A    Well, again, you know, the suicide by cop is --
14       is part of the claim, and it's part of what
15       Mrs. Ferrand, I guess, told the police, based
16       on the information that we have.
17            And, yes, we've included this in the
18       letter as -- as part of that denial letter, and
19       is part of it, yes.  The fact -- again, the
20       fact that he's carrying a gun with him outside
21       with the police there is another aspect of the
22       case.
23 Q    (By Mr. Gammill) Well, I think you -- I think
24       you've addressed that maybe further down in the
25       letter.

1 A   Okay.

2 Q   You can -- you can disagree with me, but later
3 on Page 2 after you talk about alcohol, you
4 start talking about brandishing and pointing
5 the weapon.

6       So it seems as though -- and again,
7 you can disagree with me, would you -- but
8 would you agree that you kind of -- this letter
9 breaks out -- it says we've reviewed the
10 policy.  Let me talk to you about suicide by
11 cop; let me talk to you about alcohol; let me
12 talk to you about -- talk to you about illegal
13 activity, pointing the gun.

14 A   Uh-huh.

15 Q   Denied.

16 A   Yes.

17 Q   Okay.  And we've already talked about the
18 middle one, the alcohol, correct, before we
19 took a break?

20 A   Yes.

21 Q   Okay.  And you've told me you can't -- you
22 don't know whether or not in and of itself the
23 alcohol would have been grounds for denial.

24       The suicide by cop, as you sit here,
25 in and of itself, would the suicide have

1 been -- by cop, would that have been enough for
2 you to recommend denial?

3       MR. BURR:  Objection; vague and
4 incomplete hypothetical.

5 A   Again, I -- I can't really answer that question
6 for you.  I mean, each claim has its own life,
7 and if you change the dynamics of the claim,
8 then you possibly change other things.

9       I can't sit here and make that
10 conclusion for you without running the whole
11 thing through the process again.

12 Q   (By Mr. Gammill) Was Ms. Ferrand's -- did
13 you deny -- did you recommend denial for Ms.
14 Ferrand's claim because you believed Mr.
15 Ferrand committed suicide by cop?

16 A   Based on Mrs. Ferrand's statement that, yes,
17 he -- he came out, and he -- she said that.
18 That is part of the denial, yes.

19 Q   So you believed Mr. Ferrand committed suicide
20 by cop because of Ms. Ferrand's statement?

21 A   Well, what we did was, we put
22 Mrs. Ferrand's state -- we took Mrs. Ferrand's
23 statements and included that as part of our
24 denial letter, yes.

25 Q   Okay.  And it was -- you believe he committed

1 suicide by cop.  How do you believe he
2 committed it?

3 A   Well, coming out, again, with a gun, asking --
4 the gun -- the police asking him to drop the
5 gun.  Based on Mrs. Ferrand's statement, this
6 is what we put into -- into our denial letter.

7 Q   No, I -- I understand what's put in the denial
8 letter.

9 A   Okay.

10 Q   I'm trying to get -- did you deny Ms. Ferrand's
11 policy because you believe -- well, let me ask
12 it a cleaner way.

13       Do you believe Mr. Ferrand committed
14 suicide by cop; is that your belief?

15 A   I believe what Mrs. Ferrand said during the
16 9-1-1 call.  That's -- that's -- those were her
17 comments, that's what she said, that's what we
18 put into our report, and that's part of the
19 denial.

20 Q   But that's not my question.

21 A   Okay.

22 Q   My question is:  Do you believe Mr. Ferrand
23 committed suicide by cop?

24 A   I don't know what I believe, but I -- I -- I'm
25 only taking it in regard what the facts are.

1 Those -- the facts are, this is what
2 Mrs. Ferrand said.  The facts are that he came
3 out brandishing a gun.  The police asked him to
4 drop the gun; he did not.  He pointed the gun
5 at the policeman, and he was shot.

6       Based on Mrs. Ferrand's statement,
7 these -- you know, those were her words, and we
8 included that in our denial letter.

9 Q   When you say, "I don't know what I believe,"
10 would you deny somebody's -- would you
11 recommend denial for somebody's coverage if you
12 didn't believe it yourself?

13       MR. BURR:  Objection; incomplete
14 hypothetical.

15 Q   (By Mr. Gammill) Do you understand that
16 question?

17 A   I think I do --

18 Q   Okay.

19 A   -- yeah.

20       I mean, if there's something I'm not
21 clear on, obviously, I would try to, you know,
22 get some answers.  I mean, I would ask a
23 question or two or what have you.  If I was
24 confused, for example, I would ask some
25 questions.

1 Q   Well, let me -- if you didn't think something
2     was true but you thought you might be able to
3     say -- but that you -- that you -- let's --
4     let's say you have a reason for denial.  Okay?
5 A   Okay.
6 Q   You don't -- you don't believe that reason's
7     true.  You think you might be able to make it
8     out in some of the documents you've been given.
9     It's not what you believe.
10        Would you deny because you're not
11    doing what you believe, you're doing what you
12    think AIG can get by on, meaning that AIG can
13    deny and we're going to be able -- we'll be
14    okay with the denial, despite what you might
15    believe, or does your belief coincide with what
16    you do as far as when you recommend a denial?
17 A   Okay.  When I'm reviewing a claim, when any of
18    us are reviewing a claim, we -- we -- we go
19    with the facts.  You know, it really doesn't
20    matter what we believe necessarily.  We all
21    have our biases or what have you, but the facts
22    are hard to deny.
23        And that's basically what we go by
24    when we make a claims decision is -- are the
25    facts.

1 Q   Well -- and fair enough.
2 A   Okay.
3 Q   But at some point, you have to make the
4     determination -- before you recommend denial or
5     you recommend pay, you have to decide, is that
6     what I think happened, right?
7         Because if the facts say he pointed
8     the gun and then ten other facts say, no, he
9     didn't, then you decide based on everything, I
10    know that he pointed the gun, therefore it's
11    not suicide by cop, therefore we're not denying
12    the claim, or you could say I believe heh --
13    the facts seem to indicate he pointed the gun,
14    so I believe he pointed the gun, and we're
15    going to deny it?
16 A   We have a -- we have a police report.  That
17    was -- as far as I -- as far as I understand
18    was investigated.  The police activity was
19    investigated, final report came out detailing
20    what happened.
21        That's what we have to go by in terms
22    of, you know, making our decision.
23 Q   What was your understanding as -- of what the
24    final report concluded?
25 A   Well, in short, that they investigated the

1     shooting and found it to be, I guess, I --
2     and -- lack of a -- for lack of a better word,
3     justifiable.
4 Q   Okay.  And that was the -- Davis County
5     conducted this full-blown investigation, and
6     that was your reading those reports and the
7     reports that they collected, right?
8 A   Yes.
9 Q   Okay.  What -- what was your understanding of
10    what Davis -- what the District Attorney in
11    Davis County was attempting to -- the question
12    they were trying to answer?  Does that make
13    sense?
14        MR. BURR:  Objection; vague.
15 A   Yeah, I -- I mean, I don't -- I don't know what
16    kind of question they were trying to answer.  I
17    just know they investigated the shooting and
18    they concluded -- you know, they made their
19    conclusion.  That's pretty much all I can tell
20    you.
21 Q   (By Mr. Gammill) Okay.  So I guess that kind of
22    answers my question.
23        So then from your point of view,
24    Davis County does an investigation to decide
25    whether it was a justifiable or non-justifiable

1     shooting?
2 A   I mean, to put it simply, yes.
3 Q   Okay.  Why did you believe that was the purpose
4     of Davis County's investigation?
5 A   Just -- again, this happened three years ago.
6     Maybe -- maybe we're going on four years now.
7     I don't recall the entire claim; I don't recall
8     the entire report.  But based on what I saw
9     yesterday, that's what I remember.
10 Q   Okay.  And an investigation of this, I guess,
11    size and done by a district attorney that found
12    it justifiable, would that have been a
13    significant factor in you concluding that it
14    was suicide by cop?
15 A   No.  I -- I mean, I would not necessarily say
16    that, no.  I mean, I -- you know, it -- it --
17    it means what means.  It was a -- the policeman
18    shot, and he should have shot.  I mean,
19    that's -- that's what it says to me.
20 Q   Okay.  Would it have changed your analysis if
21    that's not what Davis County was saying?
22        MR. BURR:  Objection; incomplete
23    hypothetical.
24 A   Depends on what they would have said.  I mean,
25    we -- you know, if they say something

1    different, we're dealing with a different set
2    of facts.
3  Q  (By Mr. Gammill) Okay. Other than Davis
4    County -- other than your understanding that
5    Davis County's report had found it to be a
6    justifiable police shooting, what else did you
7    rely upon to conclude that it was, in fact, a
8    justifiable shooting?
9          MR. BURR: Objection; assumes facts
10    not in evidence.
11  A  Okay. It's not my -- it's not my first duty
12    to -- to understand whether it was a
13    justifiable shooting or not.
14          It's my -- it's my job to gather the
15    facts, find out what happened, and then based
16    on the event and the facts in the case, make a
17    claims decision. Okay?
18  Q  (By Mr. Gammill) Would you agree that the issue
19    of justifiable shooting and suicide by cop go
20    hand in hand --
21          MR. BURR: Objection --
22  Q  (By Mr. Gammill) -- given this set of facts?
23          MR. BURR: Objection; vague.
24  A  I'm not -- I'm not sure I can -- I'm not sure
25    if I understand what you're saying, but I can't

1    agree with that, no.
2  Q  (By Mr. Gammill) Okay. Well, if you guys have
3    cited suicide by copy here -- you've cited
4    suicide by cop in your letter on behalf of AIG,
5    correct?
6  A  Yes.
7  Q  And as the facts as you understand them, if it
8    was suicide by cop, the suicide by cop was the
9    decision to point a weapon at a police officer
10    who was pointing a weapon at you and knowing
11    you would cause him to shoot you with the hopes
12    that you would die because you wanted to end
13    your life, correct? That's --
14  A  Okay.
15  Q  That's your theory on suicide by cop in this
16    matter; is that fair? That a fair --
17  A  That makes sense.
18  Q  Is that -- but is that a fair summary of what
19    your theory is by suicide by cop, that it's the
20    pointing the weapon at a -- at a police officer
21    and -- and purposefully creating -- purposely
22    making him shoot you so that you can end your
23    own life?
24  A  Again, that -- that came from Mrs. Ferrand.
25    Now, I don't know -- I can't tell you what Mr.

1    Ferrand was thinking when he left out the door,
2    but I can tell you this, that he came out with
3    a gun, police told him to drop the gun, he did
4    not do that. He went over to another section
5    of the yard, pointed the gun at the policeman.
6          Mrs. Ferrand has stated in her
7    statement that, you know, he wants to die
8    suicide by cop or what have you. Based on
9    those facts -- based on those facts, we placed
10    that in the letter, and that became part of our
11    decision.
12  Q  Suicide by cop?
13  A  That's what we put in the letter.
14  Q  And you put it in the letter because that was
15    part of the reason --
16  A  Now -- right.
17          Now, what I -- what I believe, I --
18    you know, that -- to me, that has nothing to do
19    with what the facts are. These are -- these
20    are the facts.
21  Q  Well, if you didn't believe he committed
22    suicide by cop, you wouldn't have included it
23    in your letter, correct?
24  A  Well, when you say me, are you talking about me
25    personally, or are you speaking in terms of

1    AIG?
2  Q  Well, I guess in this situation, I'm talking
3    about you personally. You wouldn't have
4    included it in that letter if you didn't
5    believe that suicide by cop was a legitimate
6    grounds for denial, correct?
7  A  Well, it's -- it's not -- you know, it's a
8    large -- it's part of a denial. I mean,
9    there -- you know, there's several pieces to
10    this.
11  Q  Right. But if you thought it was illegitimate,
12    an illegitimate reason, you would not have
13    included it in your letter?
14  A  If the reason -- if the reason had no weight, I
15    would assume we would not put it in the letter.
16  Q  Okay. But my question is more to you
17    wouldn't -- if -- if -- if somebody said, "And
18    throw suicide by cop in there" and you thought,
19    No, that -- that doesn't have anything to do
20    with this or I don't think he was committing
21    suicide by cop, I don't think that the facts,
22    as you've said, the evidence, doesn't support
23    that, you wouldn't have still included it in
24    the letter, right?
25  A  Again, that's a hypothetical question. With

1    all due respect, this is what Mrs. Ferrand told
2    us.  Okay?  You asking me whether or not I
3    think it's legitimate or not, I don't think, is
4    a -- is a -- is a -- is a fair question.
5  Q    Well, that's okay, you can not think it's a
6    fair question.  I'm still entitled to an honest
7    answer.
8         You've influenced this letter the
9    things you believe to be true that create
10    reasons for denial; is that a fair statement?
11  A    Yes.
12  Q    And the reason you believe them to be true is
13    the opinion you formed after reviewing all of
14    the facts as you gathered them?
15  A    I wouldn't say "opinion," but it's -- it's --
16    it's me gathering the facts.  I mean, my
17    opinion doesn't -- I mean, these are -- these
18    are facts.  These are not my opinion, these are
19    facts.
20  Q    You recommended denial, correct?
21  A    That is correct.
22  Q    Is that an opinion?
23  A    It's a recommendation.
24  Q    Okay.  Is it a recommendation based on an
25    opinion?

1  A    Yes.
2  Q    Okay.  And you recommended denial because
3    suicide by cop, alcohol content and violating
4    the law; is that correct?
5  A    Yes.
6  Q    You had an opinion on all three of those
7    factors, correct?
8  A    Yes.
9  Q    And your opinion was he was committing suicide
10    by cop, his blood alcohol content was high and
11    he pointed the gun at the officer?
12  A    Well, I think more specifically, this was not
13    an accident.  Okay?  You know, this was not an
14    accident.  That's the important part that I
15    want to get across to you, is that when I wrote
16    this letter, when I made my recommendation this
17    was not a accident based on how the policy
18    describes an accident.  That's where I was
19    headed.
20  Q    So in and of itself would have -- would your
21    belief -- or would your opinion of suicide by
22    cop been enough for a denial?
23         MR. BURR:  Objection; vague,
24    incomplete hypothetical.
25  A    Again, if you change the facts, I -- you know,

1    I can't -- I can't give an answer to that.
2  Q    (By Mr. Gammill) So is it fair to say the answer
3    is, "I don't know"?
4  A    I don't know.
5  Q    And same question regarding alcohol:  Based on
6    the alcohol -- your opinion of the alcohol
7    consumption, would that alone been enough for
8    the grounds for a denial?
9         MR. BURR:  Same objections.
10  A    I don't know.
11  Q    (By Mr. Gammill) And as far as the illegal
12    activity which you point out in your letter,
13    the pointing of the gun at the officer, in and
14    of itself, would -- is your opinion on that
15    fact that he pointed the gun, would be that in
16    and of itself been enough for grounds for
17    denial?
18         MR. BURR:  Objection; form, vague and
19    incomplete hypothetical.
20  A    I don't know.
21  Q    (By Mr. Gammill) And I understand that you wrote
22    a letter and that you would take the position
23    that the letter speaks for itself.
24    Understanding that, can you tell -- can you
25    explain to me why you denied Ms. Ferrand's

1    claim -- why you recommended denial of  Ms.
2    Ferrand's claim?
3  A    Based on the documentation that I saw yesterday
4    when I wrote the -- the memo, it said illegal
5    activity, criminal activity, just to
6    paraphrase.
7  Q    Were you aware at the time you were reviewing
8    this file that -- well, you were aware of
9    Davis County's investigation, I assume.  You
10    were getting the documents that they were
11    doing.
12  A    Yeah.  I mean -- yeah.
13  Q    Were you aware of any underlying litigation,
14    meaning were you aware of anyone on Ms.
15    Ferrand's behalf suing the police agency or the
16    City?
17  A    No.
18  Q    Okay.  Did you ever -- you never saw any
19    photographs of the -- where this happened,
20    right?
21  A    No, not that I recall.
22  Q    Okay.  And you've talked about the -- the
23    pointing the gun, he gets shot and killed.
24    That's kind of the suicide by cop and the
25    illegal activity.

1        What -- what was your understanding
2   of -- of what happened -- well, let me ask you
3   this: Did you -- when you -- when you made
4   your -- formed your opinion, did you realize
5   that Mr. Ferrand had been shot in the back?
6  A   Back when I was examining the claim, I don't
7   remember. I don't remember those facts. I
8   don't remember, you know, if he was shot in the
9   back or not.
10  Q   Okay. Do you remember whether or not he had
11   been shot through a wooden fence?
12  A   No, I don't.
13  Q   Okay. And you never saw a picture of how big
14   that wooden fence was?
15  A   I -- you know, as we speak today, I don't
16   remember a fence.
17  Q   Okay. Do you have any -- do you write any
18   notes as you're going through a case file?
19  A   I'm -- yeah, I'm sure I have.
20  Q   And what do you do with those notes?
21  A   They usually go into the claim file, if I write
22   notes.
23  Q   Case like this, do you remember whether you
24   wrote notes or not?
25  A   No, I -- I don't remember.

1  Q   Would it surprise you one way or another? I
2   mean, you -- I know you didn't -- didn't want
3   to agree with me whether this was a -- a
4   difficult or complicated matter. It seems me
5   it is.
6        It seems like the kind of thing that
7   somebody would be taking notes as they went
8   along because it seems like there's multiple
9   layers here.
10       Would you be surprised if you never
11   took any notes while you were examining this
12   file?
13       MR. BURR: Object to the form.
14  A   No. I mean, you know, whatever notes I might
15   put into our system, whatever e-mails I might
16   have sent. I mean, you know, if you want to
17   consider those notes.
18  Q   (By Mr. Gammill) Well, I guess let's -- let's
19   break it down. Would there -- would you be
20   e-mailing -- would you be discussing this with
21   anybody? Let's leave the e-mail aside for a
22   minute.
23       Would you -- would you -- are you
24   kind of isolated in your own world. You're
25   reviewing the thing and you're coming to your

1   own conclusions, or are you going and you're
2   talking to this guy and this guy to get their
3   input and "Have you ever seen anything like
4   this" and "What do you think about this" or
5   "What do you think about that"?
6  A   Yeah, again, I don't recall ever speaking to
7   anybody else about this, I mean. And it's
8   usually not a practice to -- you know, you
9   usually have a little bit too many files to be
10   going around discussing every file with
11   everybody. People are busy. People got to do
12   their work.
13       I've been in the business a while.
14   So I -- I really couldn't tell you what I
15   discussed with anybody in regard to this claim
16   and -- and, you know, prior to Claims
17   Committee, so.
18  Q   Is it your normal practice to do handwritten
19   notes while you're examining files?
20  A   Sometimes.
21  Q   Okay. And if you did, you would have included
22   those? You'd tear them out and put them in the
23   case file?
24  A   Should -- should have been included in the case
25   file, that's correct.

1  Q   Is there any other way to -- to make notes? Is
2   there any sort of software where you can enter
3   your thoughts to come back to later or so
4   someone else can see?
5  A   You know, no. The system we have is a -- is
6   where you want to put in factual information.
7   You really don't want to opinionate or, you
8   know, put in your beliefs that are, you know,
9   off the grid or something.
10       Basically we have a system where we
11   put in the facts. If you write your on
12   personal notes, you write your own personal
13   notes separate from that.
14  Q   Okay. So what is it -- you've -- you don't
15   think this was an accident, or you didn't --
16   when you wrote your denial letter, you didn't
17   think it was an accident?
18  A   I don't think it met the definition of an
19   accident --
20  Q   Per AIG --
21  A   -- per the policy.
22  Q   -- policy. Fair enough.
23       So tell me what your understanding of
24   what happened was.
25       MR. BURR: Object to the form, asked

1    and answered.
2  Q   (By Mr. Gammill) Kind of walk me through it.
3  A   And, again, my recollection is based upon the
4    reports.
5        Mr. Ferrand got upset, had been
6    drinking.  He has a history of mental health
7    issues.  Came out the house with a gun.  Police
8    asked to drop the gun.  He did not do that.
9        He walked on the property a little
10   bit and apparently pointed the gun at one of
11   the policeman, and the policeman shot him.
12       That's my understanding of the
13   events.
14  Q   Okay.  If he pointed the gun at the police
15   officer and that's why they shot him, how's he
16   get shot in the back through a fence?
17       MR. BURR:  Object to the form;
18   assumes facts not in evidence.
19  A  I mean, I -- I can't answer that question.
20  Q  (By Mr. Gammill) Neither can I.
21  A  I mean, I -- I -- you know, I don't know.
22  Q  So --
23  A  I mean, that, I -- I -- I don't know.
24  Q  Well, then --
25  A  I can't answer that question.

1  Q  -- how do you get to he pointed a -- the police
2    reports indicate he was shot through the back
3    and that they -- they went through a wooden
4    fence, and that wooden fence is about 5, 6 feet
5    high.
6       MR. BURR:  Object to the form;
7   assumes lots of facts that are not in evidence.
8  Q  (By Mr. Gammill) If -- if anybody had ever, you
9    know, bothered to look at a photo.
10      And so, if -- if you -- if you deny
11   it because he pointed a gun at an officer and
12   he got himself shot, okay.  But how do you
13   reconcile shot in the back through a fence?
14      MR. BURR:  Object to the form;
15   assumes facts that are not in evidence.
16  Q  (By Mr. Gammill) 'Cause you must have -- to my
17   mind, you must you -- you must -- I mean,
18   those -- you said you reviewed these reports.
19   That's in those reports.  How do you get there?
20   What did you -- what did you make of those
21   facts?
22  A  Again, my -- you know, my analysis is going to
23   be based on what the police report, what the
24   autopsy report says.  This is how we make our
25   analysis.  That's what I made my decision on.

1  Q   Well, then --
2  A   That's what we made our decision on.
3  Q   I didn't mean to interrupt you.
4       Then are you -- is it more based on
5    the police report's conclusions?  Because --
6    and let me -- I'll expand on what I mean by
7    that.
8       The police report says "pointed a gun
9    at an officer."  Police report says, you know,
10   "bullet holes in a wooden fence."  Police
11   report says "bullets with paint from the
12   fence."
13      The autopsy report indicates entry
14   wounds in the back on either side of the spine.
15   So these are all facts in the report that one
16   might have to wrestle with how they come
17   together.
18      But the conclusion that the officers
19   that were involved in the shooting, the -- that
20   you know, "I shot him because he" -- "he
21   pointed a gun at me, "that's conclusion.  And
22   if you didn't wrestle with the facts, it sounds
23   more like you're relying upon these conclusions
24   to reach your opinion on what happened.
25      Am I wrong about that, am I unfair

1    about that?
2       MR. BURR:  Object to the form;
3   assumes facts not in evidence, mischaracterizes
4   the reports which speak for themselves.
5  A   Again, we're going to -- we're going to base
6    our decision based on the autopsy reports,
7    based on the police reports.
8       Anytime you have a shooting
9    situation, whether it's by a policeman, whether
10   it's by another citizen, you know, we're going
11   to get the police report, we're going to get
12   the autopsy report, and we're -- you know,
13   we're going to make a conclusion and a decision
14   based on those reports.
15  Q  (By Mr. Gammill) Right.
16      But are you using the underlying
17   facts that the report offers, or are you using
18   the report's conclusions as your foundation?
19  A  I --
20      MR. BURR:  Object to the form and
21   vague.
22  A  I would -- I would say the whole thing.  I
23   mean, we read the reports and -- but, you know,
24   based -- in this particular situation, based on
25   the report it allowed us to make a decision on

1     the case.
2 Q   (By Mr. Gammill) And the -- the significant --
3     as I understand what you said today, the
4     significant parts of the report is that he's
5     pointing the gun at the officer and that then
6     Davis County finds it justified?
7 A   Well, that's part of the report, yes.
8 Q   Yeah.
9     Well, I'm -- I think is that not --
10    are those not the critical factors that you
11    were relying upon?
12      MR. BURR: Objection; vague.
13 Q   (By Mr. Gammill) I mean, it also says it was,
14    say, a Tuesday, but that doesn't matter, does
15    it?
16 A   Not necessarily, no. I mean --
17 Q   Right, in this -- in these facts. I'm sure
18    there's cases where the day of the week might
19    matter, but this probably isn't one of them.
20 A   But, again, you know, as a -- as a whole, the
21    police report and the autopsy report is -- you
22    know, this is -- and I -- I'm not quite sure
23    how to explain this further, but this is what
24    we use to make our decision.
25 Q   I understand that.

1     But I -- I guess what I'm -- again,
2    what I'm -- I'm asking is: If -- if the
3    autopsy report says he's shot in the back on
4    either side of the spine and if the bullets
5    have paint from the fence and the fence has
6    bullet holes and -- how -- how did you in your
7    mind reconcile what the police officer said
8    happened in his report, that I'm sure you read,
9    and what the physical evidence seemed to point
10    to?
11     Did you find a contradiction? Did
12    you wrestle with it? Or maybe you didn't see
13    any contradiction or didn't notice a
14    contradiction. I mean, I'm trying to get to
15    what -- what your analysis was.
16      MR. BURR: Objections to the form,
17    assumes facts not in evidence, mischaracterizes
18    evidence and vague.
19 A   You know, in terms of the facts that you just
20    mentioned about him being shot in the back
21    through the fence and all that stuff, I mean, I
22    really don't recall what I thought about that
23    at the time, but apparently I recommended --
24    recommended it for denial.
25     And that's what I can tell you, is I

1     recommended it for denial. Whatever was in the
2    report, I recommended it for denial. What I
3    thought about those specific facts that you
4    just mentioned, I -- I -- you know, I don't
5    recall what I said or what I thought.
6 Q   (By Mr. Gammill) What do you think about them
7    now?
8      MR. BURR: Objection; assumes facts
9    not in evidence. We're talking about facts
10    that are not in evidence.
11 A   I mean, I -- you know, I -- I trust the police
12    to do their job. They did an investigation. I
13    mean, that's -- I wasn't there, so really could
14    not paint a picture for you as to what my
15    opinion was on that. I don't know.
16 Q   (By Mr. Gammill) If a police officer illegally
17    shot somebody, do you think -- do you believe
18    they might lie about why they shot the person?
19      MR. BURR: Objection; incomplete
20    hypothetical.
21 A   Well, sure. People -- I mean, humans lie.
22    Humans have been known to lie, so it's
23    possible.
24 Q   (By Mr. Gammill) Did you -- do you -- as you sit
25    here today, do you believe that you did a

1     thorough investigation of Ms. Ferrand's claim?
2 A   Yes, I do.
3 Q   Would you agree with me that a recorded
4    statement from an officer who witnessed the
5    shooting stating that Ferrand put the gun down
6    would be a significant piece of information in
7    your analysis --
8      MR. BURR: Objection; assumes --
9 Q   (By Mr. Gammill) -- had you had it?
10      MR. BURR: Objection; assumes facts
11    not in evidence, calls for speculation.
12 A   It would be a different set of facts than we
13    have now. I could -- I mean, I -- I will tell
14    you that much, sure.
15 Q   (By Mr. Gammill) Certainly would be different,
16    would you -- I mean, you point out in your --
17    in your denial letter "pointed the gun at the
18    officer," right?
19 A   Uh-huh.
20 Q   It's a --
21 A   Yes.
22 Q   Thank you.
23     It's -- it's -- because it was a
24    significant fact for you in your analysis?
25 A   Yes.

1  Q   If there had been a fact that indicated he
2      didn't have the gun because he had put it down,
3      wouldn't that have also been a significant fact
4      at the time of you reviewing this file if you
5      had had it?
6          MR. BURR:  Objection; incomplete
7      hypothetical, assumes facts not in evidence,
8      improper foundation.
9  A   It would have been a change of -- of what we
10     had, sure.  It would have been a change.
11         We -- you know, it would have been an
12     additional piece of evidence that we would have
13     looked at.
14 Q   (By Mr. Gammill) Would it have been a
15     significant piece of evidence?
16         MR. BURR:  Same objections.
17 A   That, I can't say be- --
18 Q   (By Mr. Gammill) Well, if the -- if -- if a --
19     if a statement in a police report, that he
20     pointed the gun at an officer, is significant,
21     why is not the answer to a recording of an
22     officer saying he put it down, why is that not
23     also automatically just significant?
24         Why won't you say that that is also
25     significant?

1          MR. BURR:  Objection; vague, assumes
2      facts not in evidence.
3  A   Because what you're saying is hypothetical, so
4      I don't know -- I don't know if it would be
5      significant or not.
6          I mean, I know he -- based on the
7      report, we know he pointed the gun at an
8      officer, based on the report.  That's a
9      significant fact.
10         Whether he put the gun down or not in
11     your hypothetical story, I don't know -- I
12     don't -- I can't categorize that as significant
13     or non-significant because it really didn't
14     happen, and there's going to be another set of
15     facts behind that.
16         And for me to hypothesize as to
17     whether it's significant or not, I don't think
18     I can do that for you.
19 Q   (By Mr. Gammill) What do you mean, "it really
20     didn't happen"?
21 A   It's not in the police report.
22 Q   Okay.  Can you point to something that you
23     don't have?
24         MR. BURR:  Objection; vague.
25 A   You mean in regard to this story?

1  Q   (By Mr. Gammill) Anything.
2      I'm pointing my pen at you, right?
3  A   Right.
4  Q   I just put the pen down, right?
5  A   Okay.
6  Q   Can I point the pen at you?
7          MR. BURR:  Objection; vague.
8  A   Not right now, no.
9  Q   (By Mr. Gammill) Not right now.
10         You tell me that it was significant
11     that he pointed the gun.
12 A   Uh-huh.
13 Q   But you're unwilling to say it would have been
14     significant if some other cop said he put it
15     down?
16         MR. BURR:  Objection; incomplete
17     hypothetical, assumes facts not in evidence.
18 A   It would have been a different fact entered
19     into the case.
20         Whether the significant (sic) of it
21     or -- the significance of it or not is another
22     story.  I mean, that's -- to me, that's a
23     separate discussion.
24 Q   (By Mr. Gammill) That's the discussion --
25 A   I mean, he -- I mean, he --

1  Q   -- I'd like to have.
2  A   You know -- you know, he could have been waving
3      the gun and waving the gun, and maybe the --
4      maybe a policeman didn't see him put it down.
5      I don't know.  That's not what the police
6      report says.
7  Q   I --
8  A   So -- so whether he put the gun down or not is
9      significant, I can't give you that answer.
10         Now, it would be a different fact,
11     sure.  It would be another piece of evidence to
12     look at, but whether -- for me to categorize it
13     as significant or not is -- is another story.
14 Q   So you put in your letter that he points a gun,
15     but you're telling me that the -- that a --
16     that another police officer saying he put it
17     down is simply a different fact, but you cannot
18     comment on its significance?
19 A   Exactly.
20         MR. BURR:  Again, same objections.
21 Q   (By Mr. Gammill) Okay.  What is your -- what is
22     your understanding between the criminal justice
23     system and the civil justice system?
24 A   From a civil standpoint, it's just like maybe
25     citizen to citizen versus, you know, criminal

1    would be illegal, you know, county, state,
2    local municipalities charging you with a crime
3    or something of that matter.
4  Q    When decide -- when -- when a crime has been
5    charged against somebody --
6  A    Uh-huh.
7  Q    -- are you familiar with what standard of proof
8    the government must meet to prove that person
9    did what they say they did?
10  A    I would say beyond reasonable doubt.
11  Q    You would be correct.
12  A    Okay.
13  Q    Are you familiar with what the standard would
14    be for a civil plaintiff to prove in a civil
15    court of law that they are right?
16  A    It's less than reasonable doubt.
17  Q    Exactly.
18  A    That's all I know, yeah.
19  Q    Okay.  If you knew that what the Davis County
20    District Attorney was doing was rather than
21    deciding whether or not it was a justified
22    shooting, which is one question, right, was the
23    shooting justified, but instead answering a
24    second question, a different question, that
25    question beaning, Can I prove beyond a

1    reasonable doubt that that police officer
2    murdered Mr. Ferrand and that when they decided
3    they could not prove it beyond a reasonable
4    doubt -- not whether or not it was an okay
5    shooting, but simply the question of can I
6    prove beyond a reasonable doubt that he
7    murdered him or that he committed manslaughter
8    and that that was the question they answered
9    and that when they denied to prosecute, they
10    were not commenting on whether it was -- they
11    were not ruling justified, they were simply
12    saying, we can't prove beyond a reasonable
13    doubt, we will not be filing charges against
14    this police officer, if you had that
15    understanding about the reports and the
16    opinions of Davis County that you were reading,
17    would that have included your decision-making?
18         MR. BURR:  Object to the form;
19    incomplete hypothetical and assumes facts not
20    in evidence.
21  A    With all the facts being the same?
22  Q    (By Mr. Gammill) Uh-huh.
23  A    I would -- if we had the same set of facts
24    here, I would have -- that's what we would have
25    went on to make our decision.

1  Q    What would be an example of a different fact
2    that would have changed your decision?
3         MR. BURR:  Objection; calls for
4    speculation.
5  A    Well, I mean, you can change the facts; I'm not
6    sure we would change the decision, see.  And
7    this is what I'm trying to -- I guess this is
8    what I'm trying to communicate.
9         It's hard for me to anticipate or
10    tell you what decisions we would have made if
11    we changed the facts around a little bit.  I --
12    I can't answer that question.
13         I mean, we can change the scenarios,
14    we can -- we can change it to the fact that he
15    didn't have a gun in his hand when he came out.
16         I -- but I still can't tell you we
17    would -- we still would not have denied the
18    claim.  I mean, I can't -- can't tell you that.
19  Q    (By Mr. Gammill) Well, let me ask you:  If -- if
20    Davis County didn't rule it was a justified
21    shooting, would that have influenced your
22    decision-making?
23         MR. BURR:  Objection; calls for
24    speculation.
25  A    Again, difficult to say.  Difficult to say.  I

1    can't -- I can't make that call.
2  Q    (By Mr. Gammill) Would you agree with the idea
3    that if Davis County didn't rule it a justified
4    shooting -- well, let me scratch that.
5         You never spoke to any witnesses
6    other than Ms. Ferrand; is that correct?
7  A    I mean, I -- I -- I don't remember who I spoke
8    to.  And if you're referring to witnesses, if
9    you're referring to someone who was actually at
10    the scene --
11  Q    Yes, yes.
12  A    -- I mean, I don't recall speaking to anybody
13    of that nature.
14  Q    And you didn't speak to any of the
15    investigators; police officers, law
16    enforcement?
17  A    That, I don't know.  I don't remember.
18  Q    The -- you never spoke to the District Attorney
19    who declined to charge the officer with
20    criminal charges, correct?
21  A    I don't -- don't remember.  I mean, and the
22    reason I say that is 'cause I've spoken to
23    district attorneys in the past possibly, but I
24    don't remember in this case.
25  Q    In those past instances, why would you speak to

1    the District Attorney?
2  A   Returning their call, maybe.  You know, they
3      call and want some info, and you call them
4      back.
5  Q    Would you ever reach out to the District
6      Attorney for information or to ask questions?
7  A   Can't recall a case where I have.
8  Q   Do you remember in your review of this file the
9      places where it seemed to be there were
10     questions about the physical evidence and the
11     police officer's account and how those two
12     would or would not contradict one another?
13          MR. BURR:  Objection; vague.
14  A   Could you --
15          MR. BURR:  Form.
16  Q   (By Mr. Gammill) Let me ask it cleaner:  Do you
17     remember -- in your review, do you remember
18     parts of this -- of these reports where the
19     author of the report is saying that the
20     District Attorney, Troy Rawlings, has questions
21     about how any of this makes sense -- I'm
22     paraphrasing -- how this makes sense, so we
23     have to do another meeting, other another
24     presentation or I have to go do this, this and
25     this?  Do you remember that part?

1  A   No, sir, huh-uh.
2  Q    Okay.  Do you believe you have a duty to fully
3      investigate a claim?
4          MR. BURR:  Objection to the extent it
5      calls for a legal conclusion.
6  A   I believe we have a duty to get as many facts
7      as possible and then, you know, relay those
8      facts to the policy language.
9  Q   (By Mr. Gammill) Do you have a duty that where
10     there's a -- a doubt or a discrepancy that you
11     can't -- well, do you have -- do you have a
12     duty that a kind of tie goes to the
13     policyholder -- I'm sorry -- to the -- to the
14     client, to the insured, that if there's a fact
15     you can't reconcile, then the benefit of the
16     doubt goes to the -- the policy -- to -- to the
17     insured?
18  A    There's no rule of that, that I'm aware of, no.
19     Again, our responsibility is to get as much
20     information that ties into the policy language
21     and work it from there.
22  Q    Okay.  And let me ask it hopefully a cleaner
23     way:  Do you have a duty that any doubt goes in
24     favor of the insured?
25          MR. BURR:  Objection to the extent it

1      calls for a legal conclusion.
2  A   No.
3  Q   (By Mr. Gammill) Do you have a duty that any
4      ambiguity is put in favor of the insured?
5          MR. BURR:  Same objection.
6  A   No, because each case is different.
7  Q   (By Mr. Gammill) Why did this -- after you made
8      your recommendation, is it a -- what's the
9      term, "Committee Review Group"?  What's --
10  A   Claims Committee.
11  Q   Claims Committee.
12          Why did it go to the Claims
13     Committee?
14  A   Went there because that's the procedure.
15     However, you know, before it went to the Claims
16     Committee, it went to my manager, and that's
17     usually the procedure.
18          It goes to my manager first, he gives
19     the file back to me.  Either he agrees to it,
20     says, "Go ahead, send it to the Claims
21     Committee" or says, "No, we need to do
22     something else."
23  Q   Okay.
24  A    And so, in this particular situation, he agreed
25     with my recommendation, and we sent it to the

1      Claims Committee.
2  Q    Who was your manager at the time?
3  A   Ray Sawicki.
4  Q   Ray Sawicki?
5  A   Yeah, Ray Sawicki, uh-huh.
6  Q    With a Z or an S?
7  A   S.
8  Q    Okay.  And is it -- does every claim that comes
9      through AIG pass through a man -- pass through
10     a claims -- senior --
11  A   Committee?
12  Q    -- claims examiner, a manager and then a
13     committee, or is it a certain dollar amount
14     triggers that or --
15  A   Yeah.  I mean, you know, for a life insurance
16     claim or, you know, in this particular
17     situation, a accident -- accidental claim,
18     usually there's a dollar amount that triggers
19     that type of procedure.
20  Q    Do you have an understanding of what that
21     dollar amount was in April of 2014?
22  A   I believe it's 250,000 --
23  Q   Okay.  So --
24  A    -- or more.
25  Q    So everything at or above that threshold is

1  going to go through the adjuster, the manager
2  and then the committee; is that my -- do I
3  understand that correctly?
4  A   If it's a decline.
5  Q   If it's a decline.
6  A   Right.  Now if -- if it's 50,000-dollar claim
7  and myself or maybe the manager feels that we
8  still need to go to Claims Committee, it can
9  still go to Claims Committee.
10  Q   Okay.  Do you have a recollection -- so is it
11  your recollection that this went to the Claims
12  Committee because of a dollar amount or because
13  you or your manager thought that it should?
14  A   Both.
15  Q   Okay.  Why did you feel it should go to the
16  Claims Committee?
17  A   Well, it's part of the procedure for a claim of
18  this size.  And we're going to -- I had
19  recommended a decline or denial, it needs to go
20  to Claims Committee.  That's part of the
21  procedure.
22  Q   Do all denials regardless of dollar value go
23  before the committee?
24  A   No.
25  Q   Okay.  Do you have -- is there some dollar

1  value that you as -- in your role as senior
2  reviewer -- Senior Claims Examiner can just
3  sign off on when paying a claim?  Is there a
4  threshold?
5  A   For payments, it would be $500,000 for me.
6  Q   Okay.  So hypothetically speaking, if you had
7  approved this claim, it wouldn't have had to
8  had any other review because this -- this is a
9  500,000 thousand-dollar policy, it would have
10  had --
11  A   Yeah.  I mean, if I -- if I had gone ahead and
12  paid it, yeah, it wouldn't have had any other
13  review.
14  Q   Okay.  And what is it -- what is it you provide
15  your manager?
16       Do you give him the whole case file,
17  do you just tell him what your recommendation
18  is?
19  A   The whole case file.
20  Q   Okay.  And then how does the review committee
21  work?  Or just walk me through in this instance
22  your recollection of how it works.  You-all get
23  in a consistent room, or what happens?
24  A   Well, you know, you have some individuals who
25  call from home or maybe they're out of town on

1  business or maybe they live someplace else
2  altogether, but the committee members from
3  different departments -- Medical, Legal, Life
4  Insurance, Life Management, maybe Marketing,
5  Policy Service, what -- you know, whoever gets
6  invited -- and you -- you -- you know, you sit
7  down and talk about the facts of the claim and
8  you make a decision.
9  Q   Do you recall, whether physically or virtually,
10  how many people were involved in the committee
11  on the day that Ms. Ferrand's file was
12  reviewed?
13  A   I don't know the exact number.
14  Q   Is there a range that usually ...
15  A   Yeah.  I mean, it will change between maybe
16  five to eight people.
17  Q   Do you as the -- as the initial reviewer, do
18  you give -- I mean, are you -- do you take
19  point and walk everybody through why you made
20  the denial recommendation and then everybody
21  votes it up or down?  Is that kind of how it
22  goes?
23  A   Yeah.  What I'll do is basically give a --
24  summarize what -- what the facts -- what the
25  facts are, what we have, and give a reason as

1  to why we recommended that it go Claims
2  Committee.
3  Q   And is the Claims Committee vote -- does it
4  have to be unanimous, does it have to a be a
5  majority?  How -- how is that handled?
6  A   Well, everybody has input, but usually it's a
7  Claims decision.  It's a Claims decision that
8  will determine whether or not the claim is
9  payable.
10  Q   Okay.  But let's say -- let's use eight just as
11  an example.  You have eight people in the room.
12  A   Uh-huh.  Yes.
13  Q   Everybody gives their input.  And then do you
14  take, like, a vote, or -- or how is it
15  ultimately decided?
16  A   It's just a discussion.  Discussion takes
17  place.  There is no vote.  You know, you don't
18  raise your hand or anything of that nature.  A
19  discussion takes place.  You discuss different
20  aspects of the case, and from that, a Claims
21  decision is made.
22  Q   By who?
23  A   Again, the Claims decision would be from the
24  Claims Department.
25  Q   Sure.

1          But, I mean, who's -- who's got the
2      -- I mean, who's got the final say there?
3   A    That would be the Vice President of -- of
4      Claims.
5   Q    Is he in the Claims Committee --
6   A    Yes.
7   Q    -- discussion?
8   A    Yes.
9   Q    Okay.  So you make your presentation, I'll call
10     it, walk everybody through the facts as you
11     understand them?
12  A    Uh-huh.  Yes.
13  Q    You'll explain your rationale.  Everybody else
14     at the table gets to ask questions or whatever,
15     give input?
16  A    Uh-huh.  Yes.
17  Q    And then ultimately you're saying the Vice
18     President makes the decision of Yes or No, and
19     that's the end of it?
20          MR. BURR:  Objection;
21     mischaracterizes the testimony.
22  Q    (By Mr. Gammill) If I've mischaracterized
23     anything, do say so.
24  A    Yeah, yeah.  No.  No, the ultimate decision is
25     with the Claims Department.

1   Q    The Vice President?
2   A    He's the head of the Claims Department.
3   Q    I mean, well, it -- it -- it sounds like you
4      don't want to rat out to Vice President.
5          Is it -- I mean, the Claims
6      Department's not a living, breathing thing.
7      Ultimately somebody has to check the Yes or No
8      box, right, a figurative Yes or No.
9   A    Okay.  Yes, the Vice President would be the
10     one --
11  Q    Okay.
12  A    -- to finally say Yea or Nay.
13  Q    And that -- and that Vice President would have
14     been present during the committee's discussion?
15  A    Based on the form that I saw yesterday, yeah,
16     he was present.
17  Q    Okay.  Is that sometimes not the case?
18     Sometimes he relies upon just the discussion
19     that was had by the committee and what the
20     committee's suggestion is?
21  A    Sometimes maybe a manager may be in his place
22     if he can't make it.
23  Q    Okay.  And who was the Vice President then?
24  A    Woody Thatcher.
25  Q    Woody Thatcher?

1   A    Yes.
2   Q    To your recollection, did anybody raise the
3      idea of getting more information?
4   A    I don't recall that.
5   Q    After it went to the Claims Committee -- well,
6      after you sent your letter, your denial letter,
7      did you have any other involvement in this
8      matter?
9   A    Not that I recall.
10  Q    Did you ever receive any additional
11     information?
12  A    Okay.  Based on what I saw yesterday, I did
13     receive a letter from an attorney, I think.  I
14     believe.
15  Q    Okay.
16  A    Maybe.  Probably your law firm, maybe.
17          That was sent up to our Legal
18     Department for further review, but after that,
19     I had nothing to do with it.
20  Q    Okay.  The -- so you never -- after your denial
21     letter, you never reexamined your conclusions?
22  A    That's correct.
23  Q    Okay.  You never got additional info -- got
24     additional recordings, got additional video and
25     decided whether or not you stood behind your

1      initial conclusion?
2   A    No.  I don't recall doing that at all, no.
3   Q    Okay.  Is there a process that you're aware of
4      within AIG that somebody else would have done
5      that in your stead?
6   A    You know, it's possible.  You know, our Legal
7      Department could -- could possibly do
8      something, you know.
9   Q    And I -- I get -- I have the old joke,
10     anything's possible.
11          But I'm asking:  Do you -- do you
12     know of -- as an outsider, got nothing to do
13     with insurance, it seems to me that as a
14     person who examined this claim, who was part of
15     the review committee, if there was additional
16     information that ought to be considered, you
17     would be the best person to take a look at that
18     and make at least an initial decision on
19     whether or not this changes our analysis.
20          And it sounds like you didn't do
21     that, so I'm asking:  Is there a -- is there a
22     process that you're aware of where, oh, yeah,
23     that wouldn't have been me, that would have
24     been such and such a department because they're
25     the denial review refresh organization?

1  A     If additional information had been presented on
2        this case after the denial letter, I would have
3        sent it to our Legal Department.
4  Q     The additional information?
5  A     Right.
6  Q     You wouldn't have reviewed it?
7  A     No.
8  Q     And then it becomes solely -- to your
9        understanding, at least, then, solely it's the
10       Legal Department deciding whether or not the
11       new information changes your analysis?
12 A     They -- yeah, they would handle it.  They would
13       handle the new information.
14 Q     Okay.  And then when you say the "Legal
15       Department," that's not the same as outside
16       counsel; is that fair?
17 A     No, I -- I would send it to inside counsel.
18 Q     Okay.
19 A     I would send it to the company counsel.
20 Q     Okay.  What's your understanding of what the
21       purpose of the review committee is?
22 A     You know, to -- to -- to -- to -- to invite
23       different areas of thought into making a
24       decision on the claim.
25             I guess the -- the thought process

1        is, is that instead of having one person make
2        the decision, you have these different entities
3        give their -- you know, give their opinion so
4        that we can try and make a fair claim decision,
5        a better claims decision.
6  Q     Do you have an opinion as to whose benefit the
7        review committee is?  Is it to the benefit of
8        AIG, or is it to the benefit of the insured?
9  A     Definitely to the benefit -- well, it's -- I
10       think it's to the benefit of both.  I'd say
11       both.  Definitely, definitely benefit to the
12       insured as you get more eyes looking at it.
13             Again, instead of just one person
14       making the decision, you have many people
15       discussing it and, you know, bringing in
16       different angles, different opinions and so on.
17 Q     To your knowledge, were there any reserves
18       posted in relation to the Ferrand claim?
19 A     I don't know -- don't know about that.
20 Q     Would that be outside of your scope, or you --
21 A     Yes.
22 Q     -- just don't remember?
23 A     That's outside of my scope.
24 Q     And who would -- who would deal with that?
25 A     I couldn't even tell you.

1  Q     Okay.  And I'm guessing that you have the same
2        answer to the question of whether or not any
3        reserves were still held?
4  A     Oh, I have no idea.
5  Q     In your -- is it fair to say that in your
6        review of the file before making your
7        recommendation, you never reviewed any Utah
8        law?
9  A     I -- I don't recall, but I don't make a habit
10       of reviewing, you know, that type of stuff.
11 Q     Why -- why didn't you tell Mr. Curry to just go
12       get everything related to this incident?
13             MR. BURR:  Objection; incomplete
14       hypothetical.
15             THE REPORTER:  What?
16             MR. BURR:  Incomplete hypothetical.
17 A     Well, in my opinion, we did.  We told him to
18       get every -- police report and an autopsy
19       report.  These are the things that we use to
20       make decisions.
21 Q     (By Mr. Gammill) Would you agree with me that --
22       well, you've already said that the reason you
23       would use somebody like Curry to -- to retrieve
24       documents is his relationships, his --
25       sort of his experience dealing with these types

1        of agencies and his experience makes it perhaps
2        easier for him to -- to get the documents than
3        it would be for somebody that has never done it
4        before.
5             Is that kind of what you told me?
6  A     Yeah.
7  Q     Okay.  Then would you also agree with the idea
8        that perhaps that individual would also be
9        insightful as far as what other pieces of
10       evidence or documentation might exist and might
11       be useful in the review of a file?
12 A     No, I can't say that.  Because, you know, we've
13       worked with Alan for quite some time, and I
14       think he's on the same accord that we are.
15             You know, when you have a situation
16       like this, you go out and get a police report,
17       you go out and get an autopsy report.  Those
18       are pretty standard documents in a case like
19       this.  And --
20 Q     What do you define as "a case like this"?
21 A     When you have a death by -- you know, when
22       someones is killed.
23 Q     Okay.  When someone's killed.
24 A     Yeah.
25 Q     Do you think that that adds a certain wrinkle

1  or a certain different angle of analysis when
2  the person doing the killing is a police
3  officer?
4  A  Not necessarily.  I mean, it just really
5  depends on the case and the facts behind the
6  case.
7  Q  Do you still feel -- I'll represent to you
8  there's a video recording of an officer who
9  says he put it down and ran and the officer
10  shot him.
11      Knowing that that recording exists --
12  not asking you to decide whether that's true or
13  the officer who wrote the police report and
14  claimed he got a gun pointed at him, not -- not
15  asking you to decide.
16  A  Uh-huh.
17  Q  But just knowing that that exists, do you still
18  feel like it's best practice to not recover the
19  recordings and videos that surround police
20  shootings moving forward?
21      MR. BURR:  Objection; assumes facts
22  that are not in evidence, improper foundation
23  and incomplete hypothetical.
24  A  Well, I mean, I -- I'll answer the question
25  this way:  If something like that existed

1  during my examination, I would have looked to
2  have gotten an additional report, something
3  from the police in writing as to what their
4  conclusion was in regard to that investigation.
5  I would not have asked for video.
6  Q  (By Mr. Gammill) But I guess to some degree, I
7  think, my question to you:  Isn't that sort of
8  the rub?
9      When the police officer's the one
10  doing the killing, that -- that video never
11  made it into any police report.  Its existence
12  didn't make it into any police report.  That
13  statement didn't make it any in -- into any
14  police report.
15      Knowing that --
16  A  Okay.
17  Q  -- knowing that type of evidence, would you
18  agree with me that that type of evidence seems
19  to at least beg the question of what happened?
20      Are they being -- is it -- is it --
21  did it happen the way they said it happened in
22  the police reports?
23      Would you agree with that?
24      MR. BURR:  Objection; assumes facts
25  that are not in evidence, incomplete

1  hypothetical.
2  A  I mean, you know, if -- obviously, if something
3  like that happened or occurred, it would be a
4  big part of the story, yes.
5  Q  (By Mr. Gammill) Yes.  Perfect.
6      So you've now -- give you the benefit
7  of the doubt on the past.  Now, you know if
8  you're going to be able to ever get that type
9  of information, you can't rely on the police
10  officers to tell you about it.
11      You got to ask for the underlying
12  data, the recordings themselves, the audio
13  themselves, and listen to them yourself,
14  because you might find people say things that
15  the police failed to mention in their police
16  report.
17      Knowing that, moving forward, do you
18  still think it's best practice to just get the
19  police reports and just get the autopsy report
20  in a situation that involves a police shooting?
21  A  Yes.
22      MR. BURR:  Objection; incomplete
23  hypothetical, assumes facts that are not in
24  evidence.
25  A  My answer to that question is, yes, that's what

1  we're going to go after.  I'm not going to --
2  I'm not going to look for any -- any film
3  footage.
4      You know, I'm not a forensics expert.
5  I'm not trying to take fingerprints or anything
6  like that.
7      I want to get the facts behind the --
8  the event so that we can compare them to the
9  policy language.  That's my job.  That's what I
10  should be doing.  That's -- that's what my job
11  is.
12  Q  (By Mr. Gammill) The facts as presented by the
13  police reports?
14  A  The facts presented by the authorities; the
15  Medical Examiner, police report, death
16  certificate.
17  Q  And as you sit here right now, you don't know
18  where Ms. Ferrand's claim was denied for three
19  independent reasons or because of a combination
20  of the three reasons?
21      MR. BURR:  Objection; vague.
22  A  Her claim was denied based on the documentation
23  in this letter.
24  Q  (By Mr. Gammill) I understand that.
25  A  Okay.

1 Q   But as you sit here, you don't know whether it
2     was three independent grounds or a totality of
3     the three?
4          MR. BURR:  Same objection.
5 A   Whatever we have in the letter is the reason we
6     denied it.
7 Q   (By Mr. Gammill) And that's not my question.
8     I'm not asking about the letter.  I'm asking as
9     you sit here today.
10         The answer to was it three
11     independent grounds or was it a combination of
12     three things that in the totality equaled the
13     denial, the answer to that question is, "I
14     don't know"?
15         MR. BURR:  Objection; asked and
16     answered.
17 A   Yeah, I think my answer answers your question.
18     My answer is, is that what we put in the denial
19     letter is the reason why we declined or denied
20     the claim.  And I think, in my opinion, that
21     answers your question.
22 Q   (By Mr. Gammill) How does that answer my
23     question?
24 A   Because I'm telling you exactly why we denied
25     the claim.

1 Q   Would you agree with me that the letter does
2     not specify whether or not you're being denied
3     for three separate reasons or we're just
4     explaining to you a totality situation of why
5     we denied it?
6          MR. BURR:  Objection; vague,
7     confusing.
8 A   Again, I'm having a hard -- I guess I'm having
9     a hard time understanding what you're trying to
10     ask me, you know.
11 Q   (By Mr. Gammill) Let me try it again.
12 A   Okay.
13 Q   You've already -- we all already went through
14     each factor, the three factors in the letter --
15 A   Uh-huh.  Yes.
16 Q   -- and you told me as you sit here today, you
17     don't know whether or not in and of itself that
18     would have been enough.
19         I'm just asking you as a follow-up
20     question, it's -- which seems to me to
21     logically flow, but you can disagree, that as
22     you sit here today, then you can't tell me
23     whether or not the grounds for denying Ms.
24     Ferrand's coverage was based on three
25     independent reasons or a totality of the

1     reasons cited in your letter?
2          MR. BURR:  Objection; form, vague and
3     asked and answered.
4 A   What we've placed in the letter is -- is the
5     reason for our denial.
6 Q   (By Mr. Gammill) And that is what?  Articulate
7     it for me.
8 A   Well, I mean, do you want the policy language,
9     or do you want --
10 Q   I want your -- you -- ultimately, you sent this
11     letter?
12 A   Yes.
13 Q   I want -- I don't need it read.  I would just
14     like your explanation for why you denied this
15     claim.
16 A   Okay.  All right.  We didn't believe it was an
17     accident.  It's not an accident.  He had -- he
18     was intoxicated at the time this happened.  We
19     believe he was breaking the law.  The events
20     behind him breaking the law, that was another
21     reason.
22 Q   Okay.  Why didn't you think it was an accident?
23 A   Again, you have to go back to the policy
24     language, and the policy talks about an
25     accident being the, you know -- you know, like

1     the definition of an event being unforeseen.
2          Well, Mr. Ferrand came out with a
3     gun.  Police were -- told him to drop the gun.
4     He didn't do that.  He went over to another
5     part of the yard and pointed the gun at a
6     policeman.
7          Anybody, you know, who's, you know,
8     operating knows that more than likely, you're
9     probably going to get shot by the police.  So
10     this then becomes not unforeseen.  It was
11     probably foreseen that something was going to
12     happen to him.
13 Q   And why do you think he was intoxicated?
14 A   That's what the autopsy report said.
15 Q   So based on the blood alcohol content?
16 A   Right.
17 Q   Why did you feel he was -- how do you feel or
18     why do you feel -- how do you feel he was
19     breaking the law?
20 A   He was brandishing a weapon and was told by the
21     police to drop the weapon.  He did not.  And
22     then when he pointed the weapon at the
23     policeman, in my opinion and my experience,
24     that's breaking the law.
25 Q   Okay.  You'd agree with me that you cannot

1    articulate the legal definition of
2    "brandishing" in the State of Utah?
3 A    Yes, I -- I would say that.
4 Q    And you can't articulate the legal definition
5    of "brandishing" in the State of Texas?
6 A    I will agree with that; however, our Legal
7    Department can.
8 Q    Did you have a discussion with your Legal
9    Department regarding that issue?
10 A    No, I did not.
11        MR. GAMMILL:  Let's take a quick
12    five.  I -- I may be done.
13        MR. BURR:  Okay.
14        THE VIDEOGRAPHER:  12:53; we're off
15    the record.
16        (Short break.)
17        THE VIDEOGRAPHER:  It's 1:02; we're
18    back on the record.
19 Q    (By Mr. Gammill) Actually, I do have one last
20    question.  Promises, promises.  The -- the
21    material that you reviewed in preparation for
22    today, the -- the physical material --
23 A    Yes.
24 Q    -- was that paper or digital?
25 A    Paper.

1 Q    Okay.  Approximately -- I don't expect you to
2    remember precisely, but approximately how many
3    pages of material did you review?
4 A    Maybe about ten.
5 Q    Okay.  Was that ten -- did you select the ten
6    out of a pile, or were those ten documents that
7    were handed to you and those are what you
8    reviewed?
9 A    Ten that were handed to me.
10        MR. GAMMILL:  Okay.  Thank you.
11        MR. BURR:  I have no questions.
12    Witness will read and sign.
13        THE VIDEOGRAPHER:  1:03; we're off
14    the record.
15        (Proceedings concluded at 1:03 p.m.)
16
17
18
19
20
21
22
23
24
25

1            CHANGES AND SIGNATURE
2 WITNESS NAME:                    DATE OF DEPOSITION
3 PHILLIP L. EVANS                    02/13/18
4 PAGE     LINE      CHANGE           REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21    I, PHILLIP L. EVANS, have read the foregoing
22 deposition and hereby affix my signature that same is
23 true and correct, except as noted herein.
24        _____
25            PHILLIP L. EVANS

1            CHANGES AND SIGNATURE
2 WITNESS NAME:                    DATE OF DEPOSITION
3 PHILLIP L. EVANS                    02/13/18
4 PAGE     LINE      CHANGE           REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21    I, PHILLIP L. EVANS, have read the foregoing
22 deposition and hereby affix my signature that same is
23 true and correct, except as noted herein.
24        _____
25            PHILLIP L. EVANS

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF UTAH
 3   MOLLY FARRAND, an        )
     individual              )
 4                           )
                             )
         Plaintiff,          )
 5                           )
     VS.                     ) CIVIL ACTION NO. 1:16-CV-00134-DB
 6                           )
     AMERICAN GENERAL LIFE   )
 7   INSURANCE CO., a Texas  )
     corporation             )
 8                           )
         Defendant.          )
 9   _____)
10              REPORTER'S CERTIFICATION
11      ORAL AND VIDEOTAPED DEPOSITION OF PHILLIP L. EVANS
12              February 13th, 2018
13
14       I, TAYE J. KRUSLESKI, Certified Shorthand Reporter
15   in and for the Sate of Texas, hereby certify to the
16   following:
17       That the witness, PHILLIP L. EVANS, was duly sworn
18   by the officer and that the transcript of the oral
19   deposition is a true record of the testimony given by
20   the witness:
21       I further certify that pursuant to FRCP Rule
22   30(f)(1) that the signature of the deponent:
23       ___X___ was requested by the deponent or a party
24   before the completion of the deposition and returned
25   within 30 days from date of receipt of the transcript.
```

```
 1   If returned, the attached Changes and Signature Page
 2   contains any changes and the reasons therefor:
 3       _____ was not requested by the deponent or a
 4   party before the completion of the deposition.
 5       I further certify that I am neither attorney nor
 6   counsel for, related to, nor employed by any of the
 7   parties to the action in which this testimony was taken.
 8   Further, I am not a relative or employee of any attorney
 9   of record in this cause, nor am I financially or
10   otherwise interested in the outcome of the action.
11
12       Subscribed and sworn to on this the 22nd day
13   of February, 2018.
14
15
16
     TAYE J. KRUSLESKI, Texas CSR 4405
17       My Commission Expires 12/31/19
18
19
20
21
22
23
24
25
```

# **EXHIBIT 3**

```
1          IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF UTAH
2
3  MOLLY FARRAND,              )
                              )
4             Plaintiff,       )
                              )
5  VS.                        ) CIVIL ACTION
                              )
6  AMERICAN GENERAL LIFE      ) NO.: 1:16-cv-00134-DB
   INSURANCE CO.,             )
7                             )
              Defendant.       )
8  _____)
9       ------------------------------------
10        ORAL AND VIDEOTAPED DEPOSITION OF
11                 DONALD L. CURRY
12                JANUARY 12, 2018
13        ----------------------------
14      ORAL AND VIDEOTAPED DEPOSITION OF DONALD L. CURRY,
15  produced as a witness at the instance of the PLAINTIFF,
16  and duly sworn, was taken in the above-styled and
17  numbered cause on January 12, 2018, from 10:07 a.m. to
18  10:55 a.m., before Linda York, CSR in and for the State
19  of Texas, reported by machine shorthand, at the offices
20  of Cathy Sosebee & Associates, 901 Mac Davis Lane,
21  Lubbock, Texas, pursuant to the Federal Rules of Civil
22  Procedure.
23
24
25  No. 18-60028
```

```
1                    INDEX
                                          PAGE
2  Appearances.........................................  2
3
   DONALD L. CURRY
4
       EXAMINATION BY MR. GAMMILL....................  4
5
6
7                   EXHIBITS
                    (NONE)
8
9
```

```
1            A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     MR. DAVID GAMMILL
         Geragos & Geragos
5         644 South Figueroa Street
          Los Angeles, California 90017
6         213-625-3900
          david@geragos.com
7
   FOR THE DEFENDANT AMERICAN GENERAL LIFE INSURANCE CO.
8  AND FOR DONALD L. CURRY:
9     MR. KENDALL J. BURR
         Edison, McDowell & Hetherington, LLP
10        1001 Fannin Street
          Suite 2700
11        Houston, TX 77002-6707
          713-337-8875
12        kendall.burr@emhllp.com
13
   VIDEOGRAPHER:
14    Mr. Brad Snyder
```

```
1        THE VIDEOGRAPHER:  Today is January 12th,
2  2018.  This is the videotaped deposition of Donald Curry
3  in the case of Farrand versus American General Life
4  Insurance Company.
5        Counsel please state their appearances for
6  the record.
7        MR. GAMMILL:  David Gammill on behalf of
8  plaintiff.
9        MR. BURR:  Kendall Burr on behalf of
10 defendant and the witness.
11       THE VIDEOGRAPHER:  The time is 10:07.
12 We're now on the record.
13       Would the court reporter please swear in
14 the witness?
15            DONALD L. CURRY,
16 having been first duly sworn, testified as follows:
17            EXAMINATION
18 BY MR. GAMMILL:
19 Q.  Good morning, sir.
20 A.  Good morning.
21 Q.  Have you ever been deposed before?
22 A.  Yes.
23 Q.  Approximately how many times?
24 A.  20.
25 Q.  How long has it been since your last
```

1 deposition?

2    A. I would say two years.

3    Q. I'll go over a couple quick admonishments with

4 you about being deposed, but I will make it brief since

5 it sounds like this is not your first go round.

6    A. Okay.

7    Q. The oath you took is just like the oath you

8 take in the court of law with a judge present; you

9 understand that, correct?

10    A. I do.

11    Q. Have the same consequences if you break that

12 oath as you would if you broke it in court --

13    A. Yes.

14    Q. -- you understand that? I'm entitled to your

15 best estimates and your general understanding.

16 Obviously we don't want you to guess, but you understand

17 you can make an estimate; correct?

18    A. Correct.

19    Q. At the end of all this at some point you will

20 get a copy of your deposition. You will have an

21 opportunity to make changes if something appears wrong

22 to you. However, you should understand that if you make

23 a drastic change, a yes to a no, something to that

24 effect, it could be commented by either side and affect

25 your credibility; do you understand that?

1    A. Yes.

2    Q. I want to make clear that I understand,

3 Mr. Burr who is the attorney here for the defendant, is

4 he representing you, is he your attorney here today?

5    A. Yes.

6    Q. And when did that attorney/client relationship

7 begin?

8    A. I can't remember the date, but it was when I

9 was served with the subpoena.

10    Q. Okay. Prior to being served with the subpoena

11 for this matter, Mr. Burr or his firm was not your

12 attorney; is that correct?

13    A. That's correct.

14    Q. What have you done to prepare here today?

15    A. I forwarded all of my documents in regard to

16 this file to Mr. Burr and then I met with him yesterday

17 for about an hour and a half.

18    Q. Have you reviewed, other than the documents you

19 provided Mr. Burr, and I will represent to you that he

20 has provided those to us, did you review any other

21 material?

22    A. No -- yes, I did.

23    Q. What was that?

24    A. Mr. Burr brought a file with him to our meeting

25 yesterday, and I read that document.

1    Q. And what was that document?

2    A. It was a file of all the documents in this

3 case.

4    Q. Was this stuff in addition to what you had in

5 your case file?

6    A. Some.

7    Q. Okay. Was it all written reports or were there

8 recordings and video?

9    A. Written.

10    Q. And these reports, did they appear to have been

11 generated by --

12       MR. GAMMILL: I apologize, Mr. Burr, the

13 name of your firm again?

14       MR. BURR: Edison, McDowell & Hetherington.

15    Q. (BY MR. GAMMILL) Did they appear to be

16 generated by Mr. Burr's firm or did they appear to be

17 generated by some other?

18    A. I believe they were American General files.

19    Q. Were these files you had ever seen before?

20    A. Some of them.

21    Q. Did you bring those files with you here today?

22    A. I did not.

23    Q. So other than providing Mr. Burr with your case

24 file and then reviewing the files he provided to you

25 that appeared to be American General's files, did you

1 review any other material in preparation for today?

2    A. No.

3    Q. So approximately -- how old are you?

4    A. I am 55.

5    Q. And what is it you do?

6    A. In this particular case?

7    Q. I guess general -- let me back up and just say

8 I had a difficult time -- I couldn't find a website and

9 I couldn't find a lot about you about who you are, what

10 you are. So I guess as a general question, what is it

11 you do?

12    A. I own and operate Curry & Associates. It's an

13 information services provider and we provide information

14 to insurance companies and other companies.

15    Q. Are you an attorney?

16    A. No.

17    Q. Do you have any attorneys on staff?

18    A. No.

19    Q. How many people work at Curry & Associates?

20    A. Just one, me.

21    Q. You. Okay. You are Curry & Associates?

22    A. Yes, exactly. No associates. I do have a lady

23 that part-time that works, does clerical work for me.

24    Q. And so if I saw a reference to in some of your

25 files as far -- and I forget her name. What is her

1 name?
2     A. Judy Abels.
3     Q. And how long has she been with you?
4     A. 2005.
5     Q. Other than her, is there anybody else that
6 part-time or off and on again works for you?
7     A. I have a lady that does some translation work
8 for me.
9     Q. And how long has -- how long have you been
10 doing Curry & Associates?
11     A. 2001.
12     Q. Would you call yourself an investigator?
13     A. I am -- I was a private investigator. I'm not
14 currently.
15     Q. Okay. So if -- you said Curry & Associates is
16 an information --
17     A. Services provider.
18     Q. Information services provider. Is that
19 different than being an investigation firm?
20     A. It just depends on, you know, my assignment at
21 the time.
22     Q. And before Curry & Associates, what did you do?
23     A. I worked for a company called International
24 Claims Specialist.
25     Q. When did you leave there?

1     A. When I started my company, 2001.
2     Q. Okay. And how long were you with that company
3 before leaving in '01?
4     A. Eight years.
5     Q. So that takes us to roughly 19 --
6     A. 93.
7     Q. -- 93. What did you do before?
8     A. Equifax. Similar company.
9     Q. And what did you do for Equifax?
10     A. Claims investigations.
11     Q. And how long were you with Equifax?
12     A. '86, seven years, six, seven years.
13     Q. And before Equifax, what did you do?
14     A. I worked for a department store.
15     Q. Which one?
16     A. Anthony's.
17     Q. Are they still around?
18     A. I don't think so.
19     Q. What did you do for the department store?
20     A. Assistant manager.
21     Q. Did you do any loss prevention or anything like
22 that?
23     A. Tackled shoplifters.
24     Q. Fair. Back --
25     A. I don't know if that qualifies.

1     Q. I think so. That counts. I count that. Back
2 in the '80s you tackle people.
3     A. Yeah.
4     Q. And before -- how long did you work at that
5 department store?
6     A. Six years.
7     Q. And then before that?
8     A. High school.
9     Q. Okay.
10     A. Farming.
11     Q. You grew up on a farm?
12     A. Correct.
13     Q. Here in Texas?
14     A. 30 miles from here.
15     Q. Did you have any post high school education?
16     A. One semester of college and one half semester
17 of college.
18     Q. Why did you leave Equifax?
19     A. I had a better opportunity with ICS.
20     Q. And why did you leave ICS?
21     A. I was let go, laid off.
22     Q. Were you the only one that was let go at that
23 time or was there a mass exodus?
24     A. It wasn't a mass, my boss was also laid off.
25 They consolidated our office.

1     Q. Okay. Prior to going out on your own and
2 forming Curry & Associates, had you ever been deposed?
3     A. Yes.
4     Q. Approximately how many times?
5     A. Three, four.
6     Q. So roughly --
7     A. Maybe more than that. I did a lot of workers'
8 compensation work, so I actually testified in those
9 cases, so I don't know if that...
10     Q. Testified in court with a judge or a jury?
11     A. Right. Well, not a judge but a workers' comp
12 board.
13     Q. If you -- roughly what -- you said you have
14 been deposed roughly about 20 times and I'm not pinning
15 you to that number exactly. Of those 20, what percent
16 of those would you say have been since you went out on
17 your own as Curry & Associates?
18     A. Percentage?
19     Q. Yeah. Three-fourths? Half?
20     A. Probably three fourths. Maybe less than that.
21 Maybe closer to half.
22     Q. When was the first time that you were hired --
23 and I'm going to use the term American General as a
24 company.
25     A. Okay.

1    Q.  I'll admit that I don't know how many different
2  iterations or other companies they have bought or
3  different names or subsidies they go by.  So when I use
4  American General, I'm talking about anything under that
5  umbrella that you understand to be connected to American
6  General; is that fair?
7    A.  I understand that.
8    Q.  So what was the first time that you did any
9  work for American General, not in this case, but ever?
10    A.  I know that we did work for them at ICS so '93.
11  And I'm pretty sure we did work for them with Equifax,
12  but I can't be certain of that.
13    Q.  After leaving and going out as Curry &
14  Associates, when was the first time you were hired by
15  American General?
16    A.  Immediately.
17    Q.  Okay.  Have you consistently done work for
18  American General since going out on your own in '01?
19    A.  Up until 2016.  I haven't worked for them since
20  then.
21    Q.  Okay.
22    A.  The first part of 2016.
23    Q.  From 2001 to the first part of 2016, what
24  percent of your book of business would they have
25  represented?

1    A.  Significant.  Probably 80 percent.
2    Q.  Okay.
3    A.  At one -- at the peak.
4    Q.  Okay.  What would have been the -- if that's,
5  if 80 percent is the peak, what's the valley?
6    A.  A third.
7    Q.  Okay.
8    A.  Maybe less.  Initially it wasn't very much.
9  Probably 2008, 2010 was the peak.  That would be
10  80 percent.  And then it dropped off to where it was I
11  don't work any of their business currently.
12    Q.  I'm sorry?
13    A.  I don't work any of their business currently.
14    Q.  So since 2010 to 2016, there was a steady
15  decline?
16    A.  Correct.
17    Q.  Back in -- you were hired in on this case
18  approximately June of 2014?
19    A.  That's correct.
20    Q.  And what percent of your book of business would
21  American General have accounted for back then?
22    A.  Maybe half or less.
23    Q.  And then what happened in -- you said the
24  beginning or end of 2016?
25    A.  The beginning.

1    Q.  What happened that you no longer do any
2  business for them?
3    A.  They went with a single vendor to do all of
4  their services that I provided.  And it wasn't me.
5    Q.  The type of work you did for American General
6  in our present case with Ms. Farrand and Vincent, is
7  that generally the type of work Curry & Associates does?
8    A.  Currently it's the majority of the work I do.
9    Q.  And I'm going to give you my sort of laymen's
10  interpretation of what it is, and you tell me if you
11  take issue with any of it or you disagree with it.
12  Okay?
13    A.  That's fine.
14    Q.  Essentially an insurance company will ask you
15  to weigh in on whether or not they should pay out a
16  policy or not?
17    A.  Never.
18    Q.  Never?  Okay.  What is it that -- let's be
19  specific to our case.  What is it that American General
20  asked you to do?
21    A.  They contacted me and asked me to get a police
22  report and a medical examiner's report.
23    Q.  Did they ask you to do any analysis?
24    A.  No.
25    Q.  Did they ask you to render any opinion?

1    A.  No.
2    Q.  Did anyone at American General ever ask you
3  your opinion on the police report and the medical report
4  that you recovered?
5    A.  No.
6    Q.  Did anyone at American General ever ask you
7  your opinion on whether or not this claim should be
8  paid?
9    A.  No.
10    Q.  Did anyone ever, leave aside at American
11  General, anyone in the universe ever ask you whether or
12  not this claim should be paid?
13    A.  No.
14    Q.  Did anyone ever ask you -- anyone in the
15  universe ever ask you for an opinion on whether or not
16  the shooting that took place in the report you recovered
17  was a justified shooting?
18    A.  No.
19    Q.  Did you ever see the Farrands insurance policy
20  that was at question?
21    A.  No.
22    Q.  Have you --
23    A.  The policy, right?
24    Q.  Yes.
25    A.  Okay.  No.

1    Q. Has American -- other than -- other than
2  obtaining the report and obtaining the medical
3  examiner's report, did you do anything else?
4    A. I think I reviewed an article about the
5  shooting and provided that in my report.
6    Q. Did anyone ever --
7    A. And I also contacted Ms. Farrand to get an
8  authorization.
9    Q. Did anyone ever ask you your opinion of the
10  article that you had gotten off the Internet?
11    A. No.
12    Q. Did you ever speak to Ms. Farrand -- well, you
13  did speak to her; correct?
14    A. I don't think I spoke to her.  I think I
15  e-mailed her.
16    Q. Okay.  So in those emails, other than obtaining
17  her authorization, you did not ask her any other
18  questions; correct?
19    A. No.
20    Q. You never conducted an interview?
21    A. No.
22    Q. You never interviewed anyone that had anything
23  to do with anything related to the shooting that took
24  place in Utah?
25    A. I did not.

1    Q. And you never interviewed anyone as it had to
2  do with whether or not the claim should be paid or not?
3    A. I did not.
4    Q. Other than finding the Internet article,
5  obtaining the police reports, obtaining the medical
6  examiner's report -- since I'm off camera, people are
7  going to think I just passed out.  All right.  Other
8  than finding the Internet article, obtaining the police
9  report, obtaining the medical examiner's report and
10  getting Molly Farrand's authorization, did you do
11  anything else in relation to this?
12    A. No.
13    Q. Did you conduct any investigation?
14    A. No.
15    Q. Is it fair to say you did not investigate the
16  shooting at all?
17    A. That would be fair.
18    Q. What would you describe -- well, let me ask you
19  this.  What would -- you describe to me what the service
20  you provided to American General in this instance.
21    A. I retrieved records from two sources and
22  provided those to American General.
23    Q. So record retrieval?
24    A. Correct.
25    Q. Is that fair?

1    A. Fair.
2    Q. Nothing else?
3    A. Well, other than the contact with Ms. Farrand.
4    Q. But --
5    A. And the Internet article.
6    Q. But, again, that was just -- the contact with
7  Ms. Farrand was in furtherance of record retrieval;
8  correct?
9    A. Correct.
10    Q. And the Internet article, I suppose, is a
11  record --
12    A. Correct.
13    Q. -- one might say.  In your experience with
14  dealing with American General, is that the usual or
15  unusual as far as the task you're assigned?
16    A. In a task of this nature, it would be usual.
17    Q. What do you mean by a task of this nature?
18    A. This is an accidental death claim, and I didn't
19  work a whole lot of accidental death claims for American
20  General.  I do for a lot of other clients.  But most of
21  the cases I worked for them were contestable death
22  claims.
23    Q. The other cases you work for other customers in
24  the accidental death, what do they have you do?
25    A. The same thing.

1    Q. They never ask you to do an investigation?
2    A. It would just depend.  Some of them would have
3  me get medical records, but again, that would be record
4  retrieval, but not investigate the actual event.
5    Q. In the past, have you ever done any
6  investigation for American General?
7    A. I'm not sure what you mean by that.
8    Q. Well, we've identified that in this instance it
9  was record retrieval.
10    A. Correct.
11    Q. And you're a former investigator?
12    A. Uh-huh.
13    Q. Correct?
14    A. Correct.
15    Q. Would you agree with me that record retrieval
16  is perhaps a small portion of what an investigator would
17  do, right, the investigator --
18    A. Correct.
19    Q. -- would need the records to conduct an
20  investigation; right?
21    A. Correct.
22    Q. But that would be a very small sliver of what,
23  quote, investigation means?
24        MR. BURR:  Object to form.
25    A. Correct.

1   MR. BURR: Object to form.

2  Q. (BY MR. GAMMILL) So I mean --

3  A. I would say that I have done investigative work

4 for American General in the past.

5  Q. Okay. And I guess what do you mean by

6 investigation?

7  A. Interviewing witnesses, interviewing claimants,

8 beneficiaries, interviewing medical examiners, doctors.

9  Q. Going to the scene?

10  A. What do you mean the scene?

11  Q. If an alleged incident took place at a

12 location, would you go to the location as part of your

13 investigation?

14  A. I have never done a scene investigation for

15 them -- or any other client.

16  Q. Have you ever done any investigations, not

17 record retrieval, but investigations into police

18 shootings?

19  A. No.

20  Q. Have you ever been to the Salt Lake City area?

21  A. I don't think so.

22  Q. Have you ever been to Utah?

23  A. I think I did go to Utah once. It was -- I

24 can't remember the name of the town, but it was right

25 across the Colorado border.

1  Q. Have you ever done any research on Utah, the

2 state of Utah's insurance laws?

3  A. No, I haven't. Excuse me.

4  Q. Have you ever done any research on the Utah

5 criminal statutes?

6  A. No.

7  Q. Is it fair to say that you have no opinion as

8 to whether or not American General should have paid out

9 the insurance claim or not?

10  A. It -- I have no opinion, yeah.

11  Q. Would it be fair to say that you believe you're

12 not qualified to render such an opinion?

13  A. That's correct.

14  Q. I didn't see any written analysis of anything

15 in the file that was provided to me. Is that fair to

16 say because it doesn't exist?

17  A. It does not exist.

18    MR. BURR: Just for the record, clarify,

19 you mean written analysis by him?

20    MR. GAMMILL: Correct.

21  Q. (BY MR. GAMMILL) And I didn't see any opinions

22 from you in any of those documents and that's because

23 the written opinions, they don't exist?

24  A. That's correct.

25  Q. You never listened to any recordings in this

1 matter?

2  A. I did not.

3  Q. You never watched any video?

4  A. I did not.

5  Q. Never looked at any photos?

6  A. I think there may have been one. I'm not sure

7 if there was one or not on the article, the newspaper

8 article.

9  Q. Beyond what might have been on the newspaper,

10 the Internet article --

11  A. Internet article.

12  Q. -- you didn't look at any additional photos?

13  A. No.

14  Q. The reports you obtained, the police reports,

15 and the -- all the reports you obtained, did you read

16 them?

17  A. No, I did not.

18  Q. I am looking at an invoice dated July 15, 2014,

19 I think you provided as part of your case file. The

20 total just shy of $500. Does that sound correct that

21 that's what American General paid you in this matter?

22  A. That sounds correct.

23  Q. In addition to this invoice that's $497.27, did

24 you receive any other payments from American General

25 related to this matter?

1  A. No.

2  Q. It has a breakout where it says phone, slash,

3 fax quantity 79, rate 40 cents, total 31.60. I assume

4 those are 79 minutes or pages?

5  A. Minutes -- either/or.

6  Q. Either/or. In this matter, do you recall which

7 they were?

8  A. No, I do not.

9  Q. 79 minutes would be an hour and 19 minutes;

10 right?

11  A. Probably.

12  Q. Who would you speak to at American General for

13 -- I assume -- well, let me back up. Are these phone

14 calls to American General?

15  A. No.

16  Q. Okay. These are in efforts to retrieve files?

17  A. Correct.

18  Q. None of these minutes reflect a conversation

19 with anyone at American General; is that correct?

20  A. I believe I did have one phone conversation

21 with Phil Evans on this case.

22  Q. And do you have any idea approximately when in

23 time regarding your assignment that would have been,

24 beginning, middle, end?

25  A. I don't. I think he called me to get a status

1 on the case.

2    Q. And status on the case, he would have wanted to
3 know how getting the records was coming along and what
4 was outstanding and when did you get it?

5    A. Correct.

6    Q. Never asked you any opinions?

7    A. No. But that wouldn't be reflected in that
8 79 minutes because I believe he called me.

9    Q. In this matter, you are not American General's
10 investigator; correct?

11    A. Correct.

12    Q. You sent -- in an effort to obtain records, you
13 sent letters to the Clearfield Police Report -- or
14 Police Department; do you recall that?

15    A. Yes.

16    Q. And you asked for specifically investigative
17 report, would you agree with that, or would you like to
18 see your letter?

19    A. I would like to see it if that's possible.

20    Q. I'll represent that that is Bates stamped as
21 Page 450 of the production by Mr. Curry, the --
22 Mr. Burr's firm. It's a photo, if you would like the
23 whole thing.

24    A. This is fine. Yes. Complete copy of the
25 investigative report.

1    Q. Is there a reason that you narrowed your
2 request to investigative report instead of entire case
3 file?

4    A. No.

5    Q. Is there a reason you didn't ask for any
6 recordings, video, audio, photographs?

7    A. I was asked to get the police report.

8    Q. So the reason you asked for just the report
9 because that was what you were instructed to do?

10    A. Correct.

11    MR. GAMMILL: I think we're about done. I
12 would like to take a break and make a phone call. You
13 mind if we go off the record?

14    MR. BURR: Okay.

15    THE VIDEOGRAPHER: Going off the record at
16 10:38.

17    (Break taken from 10:38 a.m. to 10:52 a.m.)

18    THE VIDEOGRAPHER: Going back on the record
19 at 10:52.

20    Q. (BY MR. GAMMILL) Did anyone ever tell you --
21 from American General, why they were requesting these
22 files?

23    MR. BURR: Object to form.

24    A. It was -- they told me it was an accidental
25 death claim.

1    Q. (BY MR. GAMMILL) That's it?

2    A. But they didn't specify anything beyond that.

3    Q. Has anybody ever -- have you ever seen a copy
4 of the complaint in this lawsuit that you're being
5 deposed for?

6    A. No.

7    Q. Has anyone ever discussed the complaint with
8 you?

9    A. Mr. Burr told me that there was a civil suit,
10 but he didn't specify anything.

11    Q. When did he tell you there was a civil suit?

12    A. Yesterday.

13    Q. Yesterday?

14    MR. BURR: Caution the witness not to
15 discuss more details about -- any details about what we
16 discussed.

17    THE WITNESS: Okay.

18    MR. BURR: Thank you.

19    Q. (BY MR. GAMMILL) Going to before you received a
20 subpoena for this deposition, okay, so prior in time to
21 that.

22    A. Okay.

23    Q. Is it fair to say you had no knowledge that
24 there was litigation surrounding the Vincent Farrand
25 death?

1    A. I had no knowledge.

2    Q. Are you aware of anyone associated with
3 American General or with American General that conducted
4 an investigation regarding the reports you retrieved?

5    A. No.

6    Q. Since we have been speaking for we'll call it
7 an hour, is there any answer that your memory has been
8 jogged that would like to change?

9    A. No.

10    Q. If you later discover that you have not
11 provided your entire file to Mr. Burr, would you be
12 willing to reach out to him and make sure he has any
13 additional documents?

14    A. Yes.

15    MR. GAMMILL: That's all I have.

16    Mr. Burr, any questions?

17    MR. BURR: None from me.

18    MR. GAMMILL: You can go back to bed, get
19 well.

20    THE WITNESS: I wish I could.

21    THE VIDEOGRAPHER: Going off the record,
22 end of tape number one at 10:55.

23    (Signature of the witness required.)

24

25

CHANGES AND SIGNATURE

DEPOSITION OF: DONALD L. CURRY

CASE: FARRAND V. AMERICAN GENERAL LIFE INSURANCE

DATE: JANUARY 12, 2018


PAGE LINE      CHANGE            REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, DONALD L. CURRY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.


_____
        DONALD L. CURRY


THE STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared DONALD L. CURRY, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.


_____
        NOTARY PUBLIC IN AND FOR
        THE STATE OF _____
        COMMISSION EXPIRES: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF UTAH

MOLLY FARRAND,                    )
                                 )
                                 )
                                 )
        Plaintiff,     ) CIVIL ACTION
                                 )
                                 ) NO.: 1:16-cv-00134-DB
VS.                              )
                                 )
                                 )
AMERICAN GENERAL LIFE            )
INSURANCE CO.,                   )
                                 )
        Defendant.    )
_____)


_____
        REPORTER'S CERTIFICATION
        DEPOSITION OF DONALD L. CURRY
        JANUARY 12, 2018
_____

    I, Linda York, RPR and Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

    That the witness, DONALD L. CURRY, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

    That the deposition transcript was submitted on _____, 2018 to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2018;

    That the amount of time used by each party at the deposition is as follows:
MR. DAVID GAMMILL.....00 HOURS:34 MINUTES
MR. KENDALL J. BURR.....00 HOURS:00 MINUTES

    That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:
FOR THE PLAINTIFF:
    MR. DAVID GAMMILL
    Geragos & Geragos
    644 South Figueroa Street
    Los Angeles, California 90017
    213-625-3900
    david@geragos.com

FOR THE DEFENDANT AMERICAN GENERAL LIFE INSURANCE CO. AND FOR DONALD L. CURRY:
    MR. KENDALL J. BURR
    Edison, McDowell & Hetherington, LLP
    1001 Fannin Street
    Suite 2700
    Houston, TX 77002-6707
    713-337-8875
    kendall.burr@emhllp.com

1
2      I further certify that I am neither counsel for,
3  related to, nor employed by any of the parties or
4  attorneys in the action in which this proceeding was
5  taken, and further that I am not financially or
6  otherwise interested in the outcome of the action.
7
8
9      Certified to by me this 17th day of January, 2018.
10
11
12
13
14
15
        _____
        Linda York, RPR, CSR
16      Texas CSR No. 4899
17
18
19
20
21
22
23
24
25

# **EXHIBIT 4**





EXHIBIT 5
WIT: Read
DATE: 8-14-17
CitiCourt, LLC

# **EXHIBIT 5**

# DAVIS COUNTY SHERIFF'S OFFICE FORENSIC SERVICES UNIT

## TABLE OF CONTENTS

Section 1 ................................................. Detective Nicholls Report

Section 2 ................................................. Sergeant Bardall Report

Section 3 ................................................. Detective Christensen Report

Section 4 ................................................. Detective Marley Report

Section 5 ................................................. Firearms Examiner Report

Section 6 ................................................. Evidence Receipt (Submitted Sgt. Killian on 04/21/14)

Section 7 ................................................. Evidence Marker/ Evidence item list

Section 8 ................................................. Evidence Receipt #E1400223 (Items Officer Read at CPD)

Section 9 ................................................. Evidence Receipt #E1400224 (Items from interior of residence)

Section 10 ................................................. Evidence Receipt #E1400225 (Items from exterior of residence)

Section 11 ................................................. Evidence Receipt #E1400257 (Items received from ME Office)

Section 12 ................................................. Medical Examiner Evidence Release Sheet

Section 13 ................................................. Evidence Release Forms

Section 14 ... ........................................... Evidence Item List from 550 South (Marley)

Section 15 ................................................. Evidence Item List from Centerville PD (Marley)

Section 16 ................................................. Field Sketch and Measurements (Bardall)

Section 17 ................................................. Field Sketch and Measurements (04/15/14 Marley)

Section 18 ................................................. Complete Scene Diagrams and Measurements (Marley)

**CASE SYNOPSIS:**

On 04-13-14 at approximately 1634 hours the Davis County Sheriff's Office Forensic Services Unit was called to respond to an Officer Involved Shooting detail at 550 South 300 East Centerville, Utah. According to DCSO Dispatch logs a woman (Molly Farrand) called Bountiful Dispatch and was quickly transferred to DCSO Dispatch at 1538 hours on 04-13-14 and reported that she and her husband (Vince Farrand) had been fighting because a mutual friend of the couple had come onto her. She also reported that her husband had left the residence in his white pickup truck and was possibly on his way to the home of the mutual friend with a gun and he was suicidal. At 1531 hours the woman reported that her husband (Vince Farrand) was back inside the house. She then reported that he put the gun back into the safe. When he found out that police were responding he allegedly picked up two other guns and the woman stated she thought he wanted suicide by cop.

According to Davis County Attorney Detective Craig Webb multiple officers responded to 550 South 300 East in Centerville. The situation escalated when Mr. Farrand would not put down his gun and shots were fired at Mr. Farrand. Medical Personnel arrived and treated Mr. Farrand. Mr. Farrand was pronounced dead and was still in the ambulance upon my arrival. Detective Webb also informed me that preliminary investigation indicated that Officer Read had fired and that the decedent (Vincent Farrand) had not fired.

**WARRANT:**

A search warrant (No. 1265855) was obtained by Detective Sgt. Troy Killian of Bountiful Police Department. I reviewed and photographed the warrant at approximately 1933 hours on 4-13-14. The warrant included the following: premises known as 550 South 300 East, Centerville, Utah 84014, person of Vincent John Farrand, White Chevrolet Silverado Crew Cab license plate ███ and Silver Acura LT ███

**ASSIGNMENTS:**

I made the following assignments prior to documentation of the scene:

Detective Nicholls (Reporting CSI):
Overseeing Scene Processing, Identifying Evidence, and Photographic Documentation of exterior portion of the residence.

Farrand_000398

Sergeant Bardall:
Identifying Evidence, Obtaining Measurements and Scene Sketch of Exterior Scene, Construction of Searching Grid and Trajectory Analysis on gate.

Detective Christensen:
Identifying Evidence, Scene Processing of Interior of Residence, and Trajectory Analysis on gate.

Detective Marley:
Video Documentation, Identifying Evidence, Collection of Evidence on Exterior of Residence, Trajectory Analysis on gate and Transportation of Evidence from Scene to Crime Laboratory at DCSO.

**SUBJECT(S):**

Vincent John Farrand ███████████ (Deceased)

Molly Marie Farrand ███████████ (911 Caller/ Wife of Deceased)

Logan Farrand (Son of Decedent and Molly Farrand)

Centerville Officer Jason Read (Responding Officer)

Centerville Officer Gary Thomas (Responding Officer)

Centerville Officer C. Heslop (Responding Officer)


**SATELLITE SCENES:**

**Centerville Police Department**

Detective Marley was tasked with documenting and collecting evidence from Centerville Officer Jason Read at the Centerville Police Department. For further details please refer to the supplemental report written by Detective Marley.


**Ambulance parked on the street in front of 550 S. 300 E. Centerville**

Upon my arrival to the scene I was informed that the ambulance was locked and secured. The keys to the ambulance were given to Detective Marley. After retrieving the keys from Detective Marley I began documentation of Ambulance 83 at 2334 hours on 04-13-2014 under the observation of Medical Examiner Representative Kenny Payne. The ambulance was locked and secured upon documentation. The ambulance was marked as South Davis Metro Fire Ambulance 83.

Farrand_000399

The subject was strapped to a stretcher in the patient compartment of the ambulance in the supine position. The subject had been strapped with spider straps to a backboard and placed on a gurney. An IO device with an attached IV bag was documented on the bottom portion of the subject's legs. A folded blanket was lying on top of the subject's left leg. A bag valve mask was lying between the knees of the subject. There was a wrap and some dressing around the bicep area on the right arm. The wrap was blood stained. Multiple blood stains were documented on the decedent. Electrodes were attached to either side of the chest near the collar bone and either side of the abdomen near the naval. Fast patches were visible above the right breast and on the lower portion of the left rib cage. A disposable laryngoscope was resting on top of the spider straps and the subject had been intubated and a tube was put into place. Bilateral nasopharyngeal airways were in place and the back of the head was resting on a cervical immobilization collar. Blood stained items and blood stained medical debris were lying on the floor of the patient compartment of the ambulance.

As the corpse of the subject was rolled onto the left side by Medical Examiner Personnel, I documented lividity on the posterior portion of the subject's body. Dark red blood spilled out of several wounds on the upper-middle back portion of the subject. The ovular void shapes within the lividity on the shoulder and buttock area of the subject were consistent with the voids in the backboard that was secured to the subject.

After the corpse had been removed I documented the backboard, gurney and patient compartment of the ambulance. All of the aforementioned areas contained blood accumulation and blood saturation stains. Documentation of the ambulance and body concluded at 1212 hours on 04-14-2014.

According to DCSO Deputy Rael the ambulance had been staged in a nearby parking lot awaiting helicopter transport. Ambulance personnel continued performing lifesaving procedures on Mr. Farrand up to the time medical control advised EMS to discontinue their efforts. South Davis Metro Fire Personnel then returned to the street in front of 550 South 300 East Centerville where the ambulance was locked and secured.

Farrand_000400

**DCSO CRIME LAB:**

During the week of 04-13-14 to 04-19-14 Officer Heslop of Farmington PD and Officers Thomas and Casey from Centerville PD reported to the DCSO Crime Lab to be photo documented. Sgt. Bardall photographed and documented the officers at the request of The Protocol Team. For details please refer to the supplemental report written by Sgt. Bardall.

**SCENE OBSERVATIONS:**

Prior to documentation of the scene Davis County Investigator Craig Webb and Bountiful Detective Sgt. Killian entered the scene. The two investigators walked from the driveway to the front door of the residence. Sgt. Killian took video on his cell phone as the two walked. They exited the scene and Mr. Webb reentered the scene with Logan Farrand (the son of the deceased). Logan retrieved a dog from the north side of the garage and all three of them exited the scene.

This report will address the documentation of the scene on the exterior portion of the residence. The interior of the residence was assigned to Detective Christensen please see his supplemental report for details. The exterior of the residence was in good repair. The numbers on the mailbox in the southeast corner of the yard were 550. Two vehicles were parked in the driveway. The driveway was a two car driveway with an RV pad extension. The vehicle on the north side of the driveway was a white double cab Chevrolet Silverado 2500 Truck License Plate Number ███████ The vehicle on the south side of the driveway was a silver Acura TL Sedan License Plate Number ███████ Both vehicles were facing west towards the double garage.

All vehicles doors were unlocked upon documentation. I conducted a cursory search of both vehicles. No probative evidence was documented or collected from either vehicle. I photo documented the interior and exterior of each vehicle. There was also a trailer parked on the RV pad of the driveway near the sidewalk. There were four tires on the trailer. Some large pieces of metal were also documented on the trailer.

At the request of The Protocol Team I documented a Centerville K-9 vehicle parked near the scene. The vehicle was parked on the west side of 300 East very close to the curb just north of the driveway of residence number 540. The vehicle had a Centerville Police logo and K-9 markings. IT was labeled 11-17

Farrand_000401

License Plate Number ████████ The vehicle was a four door Ford Expedition Flex Fuel Hybrid. The vehicle was facing south.

The backyard of the residence at 550 S. 300 E. was fenced in. A brick double garage was separate and located south of the residence at the end of the driveway. A dark brown wooden gate was located just off of the north side of the double garage. A "No Trespassing" sign was bolted to the exterior of the gate. There was a cement from the driveway to the gate door. There was a viewing slat near the bottom of the gate. There was a black metal handle on the right hand side of the exterior of the gate. From the bottom of the gate to the cement there was a gap.

A silver colored Taser cartridge door was documented near the southwest corner of the driveway of the residence. The cartridge door and associated plastic pieces were marked with "Evidence Placard #1."

Prior to my arrival four orange traffic cones had been placed in front of the residence. The cones were located near the exterior portion of the wooden gate. The Protocol Team informed me that the cones were protecting evidence items. The cone nearest the road was on the cement near the northwest corner of the driveway and near the southwest corner of the front yard. Half of the base of the cone was on the driveway and the other half was on the lawn. When the cone was removed an expended casing was revealed. The casing was marked with "Evidence Placard #2." Another expended casing was located and marked north of "Evidence Placard #2" on the front lawn between the flower patch and the ivy at the front of the residence. The casing had not been previously marked with an orange cone. The second expended casing was marked with "Evidence Placard #3." The next two orange cones were just several feet west of the previous cone. The base of the first cone was placed on the cement at the northwest edge of the driveway and next to the patch of dirt in front of the ivy. When the cone was removed a third expended shell casing was revealed. The third expended shell casing was marked with "Evidence Placard #4." Northwest of "Evidence Placard #4" was a third orange cone. When the cone was removed a fourth expended shell casing was revealed. The fourth casing was marked with "Evidence Placard #5." West of "Evidence Placard #5" was a fourth orange cone. The cone was located at the base of the wooden gate near the center. When the cone was removed a metallic object was revealed. The metallic object was marked with "Evidence Placard #6."

Farrand_000402

Upon detailed examination of the east facing side of the gate between the garage and the residence four circular defects consistent with bullet strikes were documented. All four defects were located on the upper right hand quadrant of the gate in between the "NO TRESSPASSING" sign and the latch side of the gate. Two of the defects were at the same level as the sign and two of the defects were higher than the sign. The defect closest to the sign was labeled with "Evidence Sticker #7". The edge of the sign next to the defect was chipped and broken. The other defect near the same height as "Evidence Sticker #7" was in between the sign and the latch side of the gate. It was labeled "Evidence Sticker #8."

The top defect nearest the sign was marked with "Evidence Sticker #9." The top defect above "Evidence Sticker #9" and further from the sign was labeled "Evidence Sticker #10." The defects marked by Stickers #7 and #8 had acute entry angles while #9 and #10 were more consistent with ninety degree entrance angles. The letter "F" was written on the stickers on the east facing or front side of the gate. The letter "B" was written on the west facing or back side of the gate. For further details on the angles of the defects please refer to the supplemental report written by Sgt. Bardall.

The following measurements were taken from the concrete at the base of the exterior portion of the gate:

*Concrete to bottom of gate = 3 inches*

*Concrete to top of gate = 5 feet 4 inches*

*Concrete to center of defect #7 = 4 feet 1 inch*

*Concrete to center of defect #8 = 4 feet 1 inch*

*Concrete to center of defect #9 = 4 feet 8 inches*

*Concrete to center of defect #10 = 4 feet 10 inches*

Farrand_000403

From the east the gate was hinged left and opening inward. The interior portion of the gate (west facing side) was also documented. Trajectory rods were ran from the defects on the east facing side to the west facing side of the gate to determine whether the defects penetrated or perforated the gate. For defects which perforated the gate the same Evidence Sticker # was given to the corresponding defect on the opposite side of the gate. The defects marked as evidence sticker numbers 7, 9 and 10 were determined to be perforating defects. The defect marked as "Evidence Sticker #8" was determined to be a penetrating defect.

The following measurements were taken during the autopsy. At my request Dr. Leis placed a measuring tape along the length of the decedent's posterior to measure the height of the two holes near the center of the decedent's upper back area. The measurements are approximations converted from centimeters to inches:

*Heel of decedent to center of penetrating injury "1" = 4 feet 11 inches*

*Heel of decedent to center of penetrating injury "2" = 4 feet 10 inches*

For a description of the impact angles on the east facing side of the gate please refer to Sgt. Bardall's supplemental report.

For a description of the impact angles in the decedent please refer to the Medical Examiner's report and the photographs taken at the Utah State Office of the Medical Examiner (ME Office Photos).

On the opposite side (west facing side) of the gate there was a concrete patio area that ran along the south side of the residence. There was a raised portion of concrete (step) next to the door on the south facing side of the residence. Just west of the raised portion of concrete there was a large wood pile stacked neatly against the side of the house under a south facing window. East of the raised concrete was a patch of dirt containing plants. The fence between the backyard and front yard of the residence bordered the patch of dirt on the east side.

Farrand_000404

A pair of sandals were documented on the concrete near the southeast corner of the dirt patch. One sandal was right side up facing south and the other was upside down and facing southwest. The pair of sandals was marked with "Evidence Placard #11." The following measurements were taken from the sandals:

*Tread of sandal to foot bed = 11/16 inch*

A pair of jeans were lying partially on the southwest corner of the raised portion of concrete next to the side door and partially on the nearby concrete of the patio near the side door. The jeans contained some red stains and had been cut near the inseam on both legs. There was a belt looped through the guides at the top of the jeans. Upon further examination of the jeans a wallet was documented in the right back pocket and various rifle cartridges were documented in the left front pocket. The jeans were marked with "Evidence Placard #12." Just west of the jeans in front of the raised concrete step a stained dark colored t-shirt was documented on top of a large red stain. The dark red stained was marked with "Evidence Placard # 13" and the stained t-shirt was marked with "Evidence Placard #14." Two partial footwear impressions just west of the stain were marked with Evidence Placard #15." The impressions were red. The impressions shared similar class characteristics with a "Danner" make of boot. Danner is a brand commonly worn by first responders. All of the red stains mentioned were consistent with blood.

A fitted baseball cap was lying on the concrete near the center of the base of the wood pile just south of the pile. The brim of the cap was positioned toward the northwest. A red stain was easily visible on the brim of the cap. The cap was marked with "Evidence Placard #16." West of "Evidence Placard #16" a fifth and final orange traffic cone was documented. The cone was on the concrete near the western end of the base of the wood pile. When the cone was removed a black pistol was revealed. The barrel of the pistol was pointed northwest towards the end of the wood pile and the handle portion of the pistol was pointing in the southwest direction.

The front door of the residence faced east. From the front door there was a concrete sidewalk that looped south and connected to the driveway. Above the door knob and next to the door panel there was a red stain consistent with blood. The stain was documented and marked with "Evidence Sticker

Page 8 of 18

Farrand_000405

"#24." Evidence markers #17-23 were used on the interior of the residence. For a description of evidence markers #17-23 please see Detective Christensen's supplemental report.

## SCENE OBSERVATIONS & ACTIVITIES 04/14/2014:

On 04/14/2014 I returned to the scene at 550 South 300 East Centerville. I was accompanied by Sgt. Bardall and Detectives Christensen and Marley. Sgt. Bardall informed me that he had gained a verbal consent from Molly Farrand to search the outside of the residence near the gate for a possible fifth casing. The Protocol Team informed me that five shots were heard on the dash board camera of one the initial officers at the scene.

Documentation of the search area began at 1045 hours. I assisted Sgt. Bardall in construction of the grid system. We determined that a fifth casing may have been located in the front yard of the residence due to the fact that the other four casings had been located in the area.

Sgt. Bardall pounded several stakes into the ground on opposite ends of the front yard. The stakes were placed in a line approximately two feet apart from one another. Six stakes were placed at the east end and six stakes were placed on the west end of the southwest corner of the front lawn area. We ran orange string around the stakes so that five designated search zones were visible. A sixth zone was added on the south end in order to search a corner of the lawn between the search lanes and the driveway.

The zones were labeled in ascending order from south to north. Evidence Marker cones one through six were used to represent each separate zone or lane. During the search a casing was discovered near the tip of lane one which was against the edge of the pavement on the driveway just east of the area where "Evidence Placard #2" had been placed. The new casing was marked with "Evidence Placard # 25." The casing was sealed upon collection and booked into the DCSO Crime Lab.

The exterior of the residence was also searched for bullet fragments. No bullet fragments were documented. A neighborhood west of the residence was also searched for potential bullet defects and fragments. No fragments or defects were documented in the neighborhood.

Farrand_000406

**AUTOPSY:**

On 04/14/2014 at 0803 hours the autopsy of Vincent John Farrand was conducted by Doctor Leis at the Utah State Office of the Medical Examiner. I attended the autopsy along with several members of the Protocol Team. I brought a Black T-Shirt (Evidence Marker #14) collected from the scene at 550 South 300 East Centerville to the autopsy. While on scene on 04/13/2014 Medical Examiner Representative Kenny Payne requested that I bring the T-Shirt to the autopsy. I gave the sealed item to Doctor Leis for documentation. Doctor Leis documented the item and then released the item back into my custody. I collected and sealed the item and transported it to the DCSO Crime Lab. The height of the holes in the upper back of the decedent were measured per my request please refer to measurements given in the SCENE OBSERVATIONS section of this report.

Various items from the Office of the Medical Examiner, along with release sheets, were released to me at the autopsy and then transported to the DCSO Crime Lab. Please refer to the items listed in connection with case D14-02354 for a detailed list of the items from the Medical Examiner's Office.

**ACTIONS TAKEN:**

Scene Video

CSI Detective Marley was assigned to video document the interior and exterior portions of the main scene at 550 S 300 E Centerville. Exterior and interior video documentation were performed by Detective Marley after reviewing the warrant.

Video documentation of the interior and exterior were performed prior to CSI Scene Processing. For a more detailed description please refer to Detective Marley's supplemental report.

Scene Photography

*Exterior of 550 S 300 E Centerville*

Reporting CSI Detective took on the assignment of photo documentation of the exterior portion of the residence. Documentation included general photography of: the surrounding area, the front and south side exterior, separate two car garage, driveway and front yard of residence. Documentation also included detailed photographs of: the vehicles parked in the driveway, evidence items east of the gate,

and evidence items west of the gate.(Note Camera's internal clock was set at one hour back from true time.)

### Interior of Residence at 550 S 300 E Centerville

Detective Christensen was assigned to photo document the interior of the residence. Documentation included general photographs of the interior of the residence and detailed photographs of the evidence items contained therein. For a more detailed description please refer to Detective Christensen's supplemental report.

### Ambulance Parked in Street in front of Residence

Reporting CSI Detective took on the assignment of photo documentation of the ambulance and the decedent inside the ambulance. For a more detailed description please refer to the SCENE OBSERVATIONS portion of this report.

### Officer Read Documentation at Centerville PD

CSI Detective Marley was assigned the task of photo documenting Officer Read. Detective Marley was also assigned to identify, collect and submit evidence obtained from Officer Read. The Protocol Team informed me that Officer read had fired at the subject. For further details of the actions at Centerville Police Department please refer to Detective Marley's supplemental report.

### Documentation of Other Responding Officers at DCSO Crime Lab

Sgt. Bardall was assigned the task of photo documenting the other responding officers. He was also tasked with identification and collection of potential evidence from the officers. It is important to note that documentation of the other responding officers took place several days after the incident. For a more detailed description please refer to Sgt. Bardall's supplemental report.

Farrand_000408

## Scene Diagram

Sgt. Bardall was assigned with obtaining scene measurements and completing a scene sketch of the evidence items on the exterior of 550 S 300 E. Sgt. Bardall took measurements on the exterior of the residence and produced a sketch. Using the information from the sketch a complete diagram was later completed by Detective Marley. For further details please refer to Sgt. Bardall's supplemental report and the aforementioned sketch and diagram.

## Identification, Collection and Submission of Evidence from 550 S 300 E Centerville

All four CSI Detectives were assigned to assist in identifying evidence. Detective Marley was assigned the task of collecting and submitting all evidence. He was assisted by Detective Christensen.

During the processing of the scene at 550 South 300 East Centerville twenty five evidence placards/ stickers were used and eighteen evidence items were collected. Below is an account of the marked items that were collected:

- The evidence items marked by the following placards were collected from the exterior of the residence: Placards # 1 -6, 11, 12, 14, 16, 17 and 25 (accidently used for a second time to mark casing on lawn on 04/14/2014.)
- Placards # 7-10 marked the defects in the gate, but the gate was not collected per Protocol Team decision.
- Placards # 13 and 15 marked blood stains on the back patio that were photographed, but not collected.
- Placard #24 marked a stain on the door. The stain was swabbed, but not collected.
- The evidence items marked by the following placards were collected from the interior of the residence: Placards # 18-20, 22 and 23.
- Placard #21 marked scope covers that were photographed, but not collected.
- Placard #25 (First use in upstairs master bedroom on 04/13/2014) marked a duffel bag packed with clothes that was documented, but not collected.

The following evidence items were separated from original items collected from the scene:
- Four rifle cartridges from the Black rifle from kitchen counter (Placard #18).

Farrand_000409

- 10 .662 rounds of rifle ammunition from blue jeans on porch (Placard #12).
- One bi-fold wallet from the blue jeans on the porch (Placard #12).
    1. $10 in US currency from bi-fold wallet.
    2. UT DL from bi-fold wallet.
    3. Home Depot and Chase credit cards from bi-fold wallet.
    4. 4 miscellaneous papers from bi-fold wallet.

CSI Detective Marley collected ten items at Centerville Police Department. He also photo documented the ten items and did a post scene analysis on the items. For details please refer to Detective Marley's supplemental report.

After the autopsy at the State Medical Examiner's Office Dr. Leis transferred seven items into my custody and the aforementioned black shirt that I had taken to the autopsy. For details please refer to the Office of the Medical Examiner Evidence Release Sheet and the report from the Medical Examiner Case # 14-0737.

Trajectory and Measurements of Defects in Gate
CSI Detective Marley and Reporting CSI were assigned the task of measuring the gate and the defects in the gate. For a detailed description please refer to the SCENE OBSERVATIONS section of this report and Detective Marley's supplemental report.

CSI Detectives Bardall and Christensen were assigned the task of documenting the trajectory of the defects. Trajectory rods were used and angular measurements were recorded. For a detailed description please refer to the supplemental reports written by Sgt. Bardall and Detective Christensen.

Examination and Documentation of Rifle on Kitchen Counter
CSI Detective Christensen was assigned the task of examining/ inspecting the rifle on the kitchen counter. He was also assigned to document the evidence item. For details please refer to Detective Christensen's supplemental report.

Farrand_000410

Sgt. Bardall was assigned the task of making a search grid. Reporting CSI Detective assumed the task of photo documenting the search grid, exterior of residence and additional evidence. CSI Detectives Bardall, Christensen and Marley were assigned the task of searching for a possible fifth expended casing.

## Post Scene Lab Analysis and Documentation

Reporting CSI Detective assumed the task of photo documenting some of the collected evidence items in the laboratory. Reporting CSI also assumed the task of examination and analysis of the collected items and photographs in the laboratory. For a detailed explanation please refer to the LAB ANALYSIS section of this report.

**LAB ANALYSIS:**

Evidence Placard # 22 was entered as E1400224 #5. The White Samsung Galaxy S3 was photographed along with the open faced black plastic case attached to the back of the phone. The phone appeared to be in working condition.

Evidence Placard item #1 was entered under E1400225 as item #1. The square gray object was photographed. The object was consistent with a Taser Blast Door from a twenty one foot Taser Cartridge. Additional plastic pieces may have been part of the blast door.

Evidence Placard item #2 was entered under E1400225 as item #2. One expended Federal .40 Caliber Smith and Wesson shell casing was photographed. According to CSI Detective Christensen the mark on the primer of the casing is consistent with a Glock firing pin impingement mark.

Evidence Placard item #3 was entered under E1400225 as item #3. One expended Federal .40 caliber Smith and Wesson shell casing was photographed. According to CSI Detective Christensen the mark on the primer of the casing was consistent with a Glock firing pin impingement mark.

Evidence Placard item #4 was entered under E1400225 as item #4. One expended Federal .40 caliber Smith and Wesson shell casing was photographed. According to CSI Detective Christensen the mark on the primer of the casing was consistent with a Glock firing pin impingement mark.

Farrand_000411

Evidence Placard item #5 was entered under E1400225 as item #5. One expended Federal .40 caliber Smith and Wesson shell casing was photographed. According to CSI Detective Christensen the mark on the primer of the casing was consistent with a Glock firing pin impingement mark. Dirt was documented on the outside of the casing.

Evidence Placard item #6 was entered under E1400225 as item #6. One metallic object with ballistic markings was photographed. The tip of the projectile appeared to be clogged with wood material. According to Detective Christensen the appearance of the projectile was consistent with an expended round that had been plugged with wood at the tip. Detective Christensen explained that experiments have been done using hollow point type ammunition. In the experiments the hollow point ammunition was shot through wood. When the hollow point rounds passed through the wood they would plug up with wood causing them to act as full metal jacket rounds.

Evidence Stickers #7-10 were not collected due to the fact that the gate was not collected.

Evidence Placard item #11 was entered under E1400225 as item #7. Two brown "Teva" flip flop sandals. Signs of wear were documented on the foot bed and sole portions. The height of the foot bed was measured at 11/16 of an inch.

Evidence Placard item #12 was entered under E1400225 as item #8. One pair of light blue size 36x34 "Levis" straight leg jeans were photographed. Both pant legs had been cut near the inseam. Red stains consistent with blood were present in the following areas: back right pocket, crotch area on right hand side, inner portion of left leg, belt loops on the back portion and inside the jeans on the waist area. A black belt was looped through the belt loops of the jeans. The belt appeared to have been cut near the buckle which was fastened. Red stains consistent with blood were documented on the backside of the belt buckle.

A wallet was documented in the right back pocket. It was entered under E1400225 as item #14. The wallet was a dark colored bi-fold style men's wallet. Signs of wear were documented on the interior and exterior of the wallet.

Farrand_000412

The following items were documented inside the wallet: 1 chase bank receipt, 2 Altius insurance cards, 1 Colorado Fishing License, 1 Utah Driver License, 1 Ten Dollar Bill, 4 One Dollar Bills, 1 Chase Bank Visa Debit Card and 1 Home Depot Credit Card. The ten dollar bill was entered under E1400225 as item #15. The UT Driver License that bore the name of the decedent was entered under E1400225 as item #16. The Home Depot and Chase cards bearing the name of the decedent were entered under E1400225 as item #17. The Fishing License, Insurance cards and receipt were entered under E1400225 as item #18.

Ten rifle cartridges were documented in the left front pocket of the blue jeans. They were entered under E1400225 item #13. The head stamp on the cartridges read "nny 6.5 x 55."

Evidence Placard item #25(Exterior) was entered under E1400225 as item #12. One expended Federal .40 caliber Smith and Wesson shell casing was photographed. According to CSI Detective Christensen the mark on the primer of the casing was consistent with a Glock firing pin impingement mark.

Evidence Placard item #16 was entered under E1400225 as item #10. One "DC" brand "flex fit" baseball cap was photographed. There was a red saturation stain documented on the brim of the cap. The red stain was consistent with blood. There was also a red saturation stain consistent with blood on the right side of the exterior portion. The cap was a size L-XL. The color on the exterior of the cap appeared faded.

Evidence Placard item #18 was entered under E1400224 as item #2. One black Bolt Action Rifle with scope was photographed. The serial number on the bolt of the rifle was 214631. The scope mounted on the rifle was a "Leupold" scope. The numbers 631 were etched into the bolt and the metal portion of the rifle near the trigger guard. A sling was attached to the rifle. Upon documentation the bolt of the rifle was in the backward or fully open position. The four rounds from the rifle were also photographed.

Evidence Placard item #19 was entered under E1400224 as item #3. One green "Case-Card" box was photographed along with the contents of the box. The box had a black handle on the top. Inside the box there were one hundred circular guide holes. There were forty four expended rifle casings inserted into some of the circular guide holes. There were twenty six rifle cartridges inserted into the circular guides.

Farrand_000413

1 cartridge was resting horizontally on top of other cartridges. There were thirty empty guide holes. On the inside lid of the box caliber and bullet information had been handwritten on a sticker.

Evidence Placard item #20 was entered as E1400224 #4. One black "Browning" .22 caliber pistol box was photographed. The box contained a red lock and a smaller box containing Winchester .22 caliber ammunition. The box was labeled "Winchester" Wildcat 22 long rifle 40 grain lead rounds. One of the casings was lodged in the top portion of the box. The head stamp on the cartridge was X super. All of the other cartridges bore a similar head stamp. Thirty nine rounds were documented in the aforementioned box.

#### Photo Log

The photographs taken by Reporting CSI Detective were organized into various folders for convenience. The following is an explanation of the various folders and the pictures that they contain. Please refer to the supplemental reports for a description of any folders not described below:

The folder labeled **Ambulance** contains photo documentation of the South Davis Metro Fire Ambulance and the corpse of John Vincent Farrand. The ambulance was parked on the street in front of 550 South 300 East Centerville. The photo documentation began at 2334 hours on 04/13/2014 and was completed at 0013 hours on 04/14/2014 **(IMG_0255 – 0302)**.

The folder labeled **Exterior Gate** contains photo documentation of the exterior gate between the garage and home at 550 South 300 East in Centerville. The photographs contain documentation of the defects on both sides of the gate, evidence stickers placed near the defects, trajectory rods ran through the defects, the rulers used to document the height of the gate and the positioning of the defects. The photo documentation occurred between 1908 hours on 04/13/14 and 0104 hours on 04/14/14 **(IMG_0055, 57, 58, 92, 93, 144-180, 208-221, 313, and 314)**.

The folder labeled **Exterior of Residence** contains photo documentation of the exterior portion of the residence located at 550 South 300 East in Centerville. The folder contains documentation of the evidence items on the exterior with and without evidence markers. The evidence items on the gate are in the Exterior Gate folder. The folder also contains the following; overall documentation of residence,

Farrand_000414

garage, search warrant, immediate surrounding area, vehicles parked in the driveway, photographs taken from on top of the command center, photographs during daylight and after dark etc. The photo documentation occurred between 1908 hours on 04/13/14 and 0104 hours on 04/14/14 **(IMG_001-54, 56, 59-91, 94-143, 181-207, 222-254, and 303-316)**.

The folder labeled **Exterior on April 15**. The folder contains photo documentation of the search grid we constructed to search for a possible fifth expended shell casing. Photo documentation of a row of houses west of the residence was also performed while searching the area for possible firearm projectile and defects. The photo documentation began at 1047 hours on 04/15/2014 and concluded at approximately 1230 hours on 04/15/2014 **(IMG_0317-356)**.

The folder labeled **ME Office Photos** contains documentation conducted by the Doctor Leis at the autopsy of John Vincent Farrand. The folder contains two x-ray photographs and photographs of the the decedent during the autopsy **(IMG 201400737 01-289, xray1 and xray2)**.

The folder labeled **Lab Evidence Photos** contains photographs taken at the DCSO Crime Lab during post scene evidence examination. The folder includes photo documentation of all evidence items collected from the exterior of the residence at 550 South 300 East Centerville. It also contains documentation of the following items from the interior of the residence: rifle on kitchen counter, cell phone in sun room, green ammunition box from bed in upstairs master bedroom and a black box from the upstairs master bedroom. Documentation began on 04/15/14 at 1452 hours and was completed at 1651 hours on 04/15/14 **(IMG_0357-493)**.

CSI Detective C. Nicholls

END OF REPORT

Farrand_000415

# **EXHIBIT 6**

**<u>EXHIBIT 6</u>**

**Office Heslop's Body Car**

***Manually Filed with the Court***

# **EXHIBIT 7**

# GERAGOS & GERAGOS

A PROFESSIONAL CORPORATION
LAWYERS
644 SOUTH FIGUEROA STREET
LOS ANGELES, CALIFORNIA 90017-3411
TELEPHONE (213) 625-3900
FACSIMILE (213) 625-1600

November 23, 2014

*Via Mail*
Philip L. Evans Jr.
American General Insurance
P.O. Box 2808
Amarillo, TX 79105

| | |
|---|---|
| **Re:** | **Demand for Life Insurance Benefits** |
| **Insured:** | **Vincent Farrand** |
| **Policy No.:** | **YMC0171575** |
| **DOL:** | **April 13, 2014** |

Dear Mr. Evans:

Geragos & Geragos, APC, has been retained by the heirs of Vincent Farrand in connection with the illegal excessive force used to kill Mr. Farrand by Centerville City Police Department on April 13, 2014. Our office also represents Molly Farrand in connection with the wrongful denial of death benefits owed to her by American General Life Insurance Company under Mr. Farrand's life insurance policy.

We are in receipt of your misguided coverage letter of August 18, 2014, denying Ms. Farrand's benefits owed under the policy. Your denial of benefits letter states that you conducted a review of the facts surrounding the incident and are denying benefits on the basis that Mr. Farrand's death was, apparently, caused by his own design and intent to have a "suicide by cop" and, therefore, outside the scope of the policy. Your review of this matter is anything but thorough and in fact may be actionable itself.

As the insurer, you have the obligation to conduct a good faith and thorough investigation before making any determination denying benefits without proper cause. It is our understanding that your office is in possession of the same documents, pictures, and videos that were obtained by our office. If that is true, you have failed in your obligation to thoroughly investigate this matter. The evidence is abundantly clear that Mr. Farrand did not commit any so called "suicide by cop." Your determination flies in the face of the facts, as is your denial of Mr. Farrand's benefits.

**AGLIC-FARRAND 000236**

GERAGOS & GERAGOS
A PROFESSIONAL CORPORATION
LAWYERS

The most glaring example of your incomplete and inadequate review is your failure to address Officer Preston Casey's recorded statement. According to Officer Casey, he witnessed Mr. Farrand **put the gun down** on the ground before passing a fence and being shot and killed by Officer Read. This statement in and of itself makes clear that Mr. Farrand did not draw or attempt to draw his weapon upon any officers since it was not in his possession, but on the ground. Also, a review of other facts surrounding the incident makes clear that Mr. Farrand was shot in the back by Officer Read.

According to your denial letter, your determination to deny the claim seems to be made solely on the questionable statements of Officer Read who, at the very best, committed a fatal mistake by shooting Mr. Farrand or, at the very worst, committed an intentional and criminal act by shooting Mr. Farrand in the back. Officer Read's statement that he feared for his life as Mr. Farrand was drawing his weapon is a bold faced lie since Mr. Farrand had dropped the gun on the ground and was shot in the back on the other side of the nontransparent fence.

Moreover, Officer Stricker's report makes it clear that Mr. Farrand was shot while walking through the fence and while Officer Read's view was obstructed. This conclusion is based on the placement of Mr. Farrand's body, which was on the other side of the nontransparent fence, and that Officer Read's shots made impact as follows: (1) the first shot fired struck no objects and passed the opening of the fence as Mr. Farrand was walking through it; (2) the second and third shots hit the fence as it was closed shut, passing through the fence and missing Mr. Farrand; and (3) the fourth and fifth shots hit the fence as it was closed shut, passing through the fence and hitting Mr. Farrand directly the center of his spine as his back was turned from Officer Read.

In light of the foregoing facts, we demand immediate payment of $500,000.00 as required under the policy. If payment is not received by this office within seven (7) days, we are authorized to take any and all legal actions to preserve our client's rights and hold American General accountable.

Very truly yours,

Mark J. Geragos
GERAGOS & GERAGOS

# **EXHIBIT 8**

# DAVIS COUNTY ATTORNEY'S OFFICE



## BUREAU OF INVESTIGATION

# DAVIS COUNTY CRITICAL INCIDENT INVESTIGATION

## INVESTIGATIVE SUMMARY

### OFFICER INVOLVED SHOOTING

Officer Jason Read     Centerville Police Department   9 years

**LOCATION OF OCCURANCE:** 550 SOUTH 300 EAST, CENTERVILLE, UTAH 84014.

**DATE OF OCCURANCE:** Sunday, April 13, 2014.

**TIME OF OCCURANCE:** Initial call received at 1528 hrs. Shots fired at 1539 hrs.

**WEATHER:** From NOAA.COM. April 13, 2014, at 1528 hrs. Partly Cloudy with a temperature at **53.0 F**.

**SUSPECT:**          VINCENT JOHN FARRAND

**ADDRESS:**

**AGENCY CASE NUMBERS:**

Bountiful Police Department Case #2014-001253
Centerville Police Department (Related I.A. Case #2014-000475)
Clearfield Police Department Case #14-04241
Davis County Sheriff's Office & Crime Lab Case #D14-02354
Farmington Police Department Case #2014-000516
Layton Police Department Case #14-05553
North Salt Lake Police Department Case #2014-000906
South Davis Metro Fire Department Case #14-0001662
Utah Attorney General's Office Case #2014-0317
Utah Highway Patrol Case #14-4241
Utah State Office of the Medical Examiner Case #2014-0737
Woods Cross Police Department Case #2014-000364

1

Farrand_000108

**OFFICERS ASSIGNED TO THE INTIAL CALL:**



| | |
|---|---|
| Officer Jason Read | Centerville Police Department |
| Officer Gary Thomas | Centerville Police Department |
| Officer Preston Casey | Centerville Police Department |
| Officer Mike Sheldon | Bountiful Police Department |

**OTHER ASSISTING OFFICERS:**

| Officer Name | Agency | PT=Protocol Team |
|---|---|---|
| Mathew Combs | Bountiful Police Department | |
| Dave Edwards | Bountiful Police Department PT | |
| Carl Hadley | Bountiful Police Department PT | |
| Troy Killian | Bountiful Police Department PT | |
| Brett Schoffield | Bountiful Police Department | |
| Alan Akerson | Centerville Police Department | |
| Jake Alexander | Centerville Police Department | |
| Jason Dingman | Centerville Police Department | |
| Zane Robison | Centerville Police Department | |
| Von Steenblik | Centerville Police Department | |
| Neil Worsley | Centerville Police Department | |
| Scott Manookin | Clearfield Police Department | |
| Devin Rogers | Clearfield Police Department PT | |
| Carey Stricker | Clearfield Police Department (Lead Investigator) | |
| Cannon Heslop | Farmington Police Department | |
| Eric Johnsen | Farmington Police Department PT | |
| Dave Bardall | Davis County Sheriff's Office | |
| Bret Chritensen | Davis County Sheriff's Office | |
| Jammie Cox | Davis County Sheriff's Office | |
| Brian Marley | Davis County Sheriff's Office | |
| Chad Nicholls | Davis County Sheriff's Office | |
| Don Rael | Davis County Sheriff's Office | |
| Brandon Roundy | Davis County Sheriff's Office | |
| Jay Berger | Davis Co. Attorney's Office PT | |
| Julie Curtis | Davis Co. Attorney's Office PT | |
| John Herndon | Davis Co. Attorney's Office (Operations Section Chief) | |
| Craig Webb | Davis Co. Attorney's Office PT | |
| Blake Noble | Layton Police Department PT | |
| John Ottesen | Layton Police Department PT | |
| Eric Smith | Layton Police Department PT | |
| Ashley Fox | North Salt Lake Police Department PT | |
| Rob Gywnn | North Salt Lake Police Department PT | |
| Craig Gibson | Utah Attorney General's Office | |
| Aaron Jones | Utah Attorney General's Office | |

2

Farrand_000109

# **EXHIBIT 9**

MARK J. GERAGOS (Cal. SBN #108325)
GERAGOS & GERAGOS
644 S Figueroa St
Los Angeles, California 90017
T: (213) 625-3900
F: (213) 625-1600
E: geragos@geragos.com
*[Pro Hac Vice]*

ROBERT B. CUMMINGS (#13186)
THE SALT LAKE LAWYERS
10 Exchange Place, Ste. 622
Salt Lake City, Utah 84111
T: (801) 590-7555
F: (801) 384-0825
E: Robert@thesaltlakelawyers.com

JON D. WILLIAMS (#8318)
JON D. WILLIAMS, P.C.
The Boston Building
9 Exchange Place, Ste. 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
E-mail: jwilliam@lawyer.com

*Attorneys for Plaintiff Molly Farrand*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MOLLY FARRAND, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN GENERAL LIFE INSURANCE CO., a Texas corporation,<br><br>Defendant. | **DECLARATION OF TROY RAWLINGS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:16-cv-00134-DB-PMW<br><br>Judge Dee Benson<br><br>Magistrate Paul Warner |

I, Troy Rawlings, hereby depose and state as follows:

1)      I make this declaration based upon first-hand knowledge, unless otherwise noted, and could testify to the matters asserted herein if called to do so.

2)      I am an attorney licensed in the state of Utah and can practice before all the courts of this state.

3)      I received my Juris Doctor degree in 1994 from the University of Alabama.

4)      From 1994 to 2000, I was in private practice specializing in criminal defense and

family law.

5) I joined the Davis County Attorney's Office as a prosecutor in January of 2000.

6) Prior to my election in 2007 to be the Davis County/District Attorney, I was the Section Chief of the Special Prosecution Unit in the Davis County Attorney's Office assigned to the most serious cases pending in the office.

7) As both a prosecutor and defense attorney, I have handled thousands of cases, including hundreds of jury and bench trials, including murder, sex offenses, white collar fraud, violent crimes against children and women, along with all other types of felonies and misdemeanors.

8) I have received numerous awards during my career, including honored multiple times as one of Utah's Legal Elites and Top Internet Crimes Against Children task force office in the state of Utah.

9) It is my understanding that the Defendant in this lawsuit, American General Life Insurance Company, denied benefits under an Accidental Death & Dismemberment policy for Plaintiff, Molly Farrand, based in large part on my office's investigation of the use of deadly force investigation into the shooting death of Vincent Farrand by Officer Jason Read of the Centerville Police Department.

10) I have been asked by Plaintiff's counsel to provide this declaration to provide my thoughts and insights into using my office's investigation into the use of deadly force by Officer Read as a basis for denying insurance benefits.

11) I am familiar with the facts surrounding the investigation into the shooting death of Vincent Farrand.

12) In reviewing this declaration, I reviewed my files related to that investigation.

13) During the investigation, I had serious concerns regarding the use of deadly force against Vincent Farrand.

14) When investigating an officer's use of deadly force, the general protocol is to ascertain if the prosecutor could prove some level of homicide. From that perspective (screening as a possible criminal case), the investigation then analyzes and reviews the facts to determine whether the officer would have a colorable chance at proving the affirmative defense of lawful use of deadly force pursuant to UTAH CODE ANN. § 76-2-404, along with justification as a defense, UTAH CODE ANN. § 76-2-401, and force in defense of person, UTAH CODE ANN. § 76-2-402. The critical determination is whether or not there is a reasonable probability of convicting the

officer of a homicide. That means is there enough evidence a unanimous jury will find guilt and convict beyond a reasonable doubt.

15)     My office reviews police officers' use of deadly force pursuant to the D.A.'s Office's authority as a public prosecutor as set forth in the Utah Constitution, Article VIII, Section 16 and Utah Code Ann. § 17-18a-203, among other legal authority.

16)     Pursuant to procedures established for the review of an officer's use of deadly force, my office was assigned the responsibility of reviewing Officer Read's use of deadly force.

*17)*     While my office ultimately decided to not file charges against Officer Read, that decision needs to be considered with several caveats. *The simple yet accurate explanation is that we were not convinced a unanimous jury would find guilt using a reasonable doubt standard.*

18)     As for the concerns: First, I had serious questions and issues to grapple with from a crime paradigm concerning Officer Read's use of deadly force – including the circumstances that led to the officer being in a position where he discharging his weapon to begin with.  While I had certain reservations, my office ultimately decided to not file charges based upon certain conclusions reached by the Medical Examiner ("ME") in charge of conducting the autopsy of Vincent Farrand.  Specifically, the ME reached the conclusion that based upon the trajectory of bullets vis-à-vis location in Vincent Farrand's body, it was the ME's conclusion that Mr. Farrand's arm was being lifted towards Officer Read.

19)     Second, the conclusion that my office reached was solely the conclusion that Officer Read would not be charged with a degree of homicide.  There was no other outcome reached by my office, and any such conclusion must be read narrowly with this in mind.

20)     Third, my office never found that Officer Read's shooting of Vincent Farrand was "justified" from a civil perspective.  While other prosecutors' offices in Utah may use this parlance in a broader context / meaning, my position as to the review of officer involved shootings is that such a review is simply to determine whether homicide charges will be filed.  Whether an officer's use of force is "justified" statutorily is the quintessential determination for a jury to make; my office does not usurp that important decision from a fact-finder. We simply apply it in the context of defenses to a potential criminal charge.  We singularly decide whether to pursue charges against the officer, the same decision that we make any every case that my office files (or does not file).

21)     After my office decided to not pursue charges against Officer Read, I met with

Molly Farrand and her counsel, Jon Williams. During that conversation, I told them that I would reconsider my office's determination to not file charges if any additional evidence came forward that could or would challenge the ME's conclusion to the degree we could satisfy a beyond a reasonable doubt standard.

22)     To date, I am unaware of anyone at American General Life Insurance Co. contacting me to discuss my office's investigation of Officer Read's use of deadly force against Vincent Farrand.

23)     To date, I have never had the opportunity to discuss my concerns, or our decision in the vacuum of a criminal case context, of the shooting of Vincent Farrand with any representative of American General Life Insurance Co.

24)     Based upon my review of the case file, including all dash-cam and body-cam footage, had Mr. Farrand survived the shooting, it is reasonable to assume my office would not have filed criminal charges against Vincent Farrand.

25)     Based upon my review of the case file, including all dash-cam and body-cam footage, it was my opinion that Vincent Farrand had not committed any crime over which our office has jurisdiction prior to being shot.

26)     At no point have I ever intended that my office's determination as to whether to file charges against an officer for the deadly use of force to be used for any purpose whatsoever other than in criminal context.

27)     Such a determination is simply my office's determination as to whether we believe that we could prevail at trial before a jury, including overcoming any of the defenses listed above.

28)     If American General Life Insurance Co. would have contacted me, I would have explained all of this to them, including that my office's findings should be used for no other purpose, including the denial of insurance benefits. We did not, at any point, think about this or consider the ramifications of this at all as that is not our role and would be improper.

Pursuant to 28 U.S. § 1746, I declare under the penalty of perjury under the laws of the United States of American that the foregoing is true and correct to the best of my knowledge.

Dated this 27th day of July, 2018

_____
Troy Rawlings

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, I caused to be filed the foregoing document, which caused to be served via the Court's ECF system the same upon the following:

Jason A. Richardson
David T. McDowell
Kendall J. Burr
Diane Wizig
EDISON, MCDOWELL & HETHERINGTON LLP
2002 Fannin St., Ste. 2700
Houston, TX  77002

THE SALT LAKE LAWYERS

/s/ Robert B. Cummings
Robert B. Cummings
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2018, I caused to be filed the foregoing document, which

caused to be served via the Court's ECF system the same upon the following:

Jason A. Richardson
David T. McDowell
Kendall J. Burr
Diane Wizig
EDISON, MCDOWELL & HETHERINGTON LLP
2002 Fannin St., Ste. 2700
Houston, TX 77002

THE SALT LAKE LAWYERS

 /s/ Robert B. Cummings
Robert B. Cummings
*Attorneys for Plaintiff*