IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| MOLLY FARRAND,<br><br>Plaintiff,<br>v.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:16-cv-00134<br><br>District Judge Dee V. Benson |

Before the Court is Defendant's Motion for Summary Judgment on Plaintiff's breach of contract claim, which was filed on June 22, 2018. (Dkt. No. 45.) Plaintiff filed a memorandum in opposition to Defendant's motion on July 27, 2018. (Dkt. No. 54.) Defendant filed a reply in response to Plaintiff's opposition on August 24, 2018. (Dkt. No. 55.) On December 11, 2018, the Court heard oral argument on Defendant's motion, as well as Defendant's Motion to Exclude Plaintiff's Damages Expert Thomas Pastore and Defendant's Motion to Exclude Plaintiff's Insurance Expert Bennett Bibel. (Dkt. Nos. 42-43.) At the conclusion of the hearing, the Court opted to take the matter under advisement with a written order to follow. The Court now enters the following Memorandum Decision and Order granting Defendant's Motion for Summary Judgment.

## BACKGROUND

On April 13, 2014, Vincent Farrand had an argument with his wife Molly Farrand at their Centerville, Utah home about a friend, Brett Clyde, as Mr. Clyde had purportedly made an unsolicited sexual advance toward her a few weeks earlier. (Dkt. No. 2 at 3; Dkt. No. 45 at 8.) In

response, Mr. Farrand grabbed one of his firearms and left his house. *Id.* Mrs. Farrand testified she "believed" that her husband had been drinking that day, which was later confirmed by a toxicology report. (Dkt. No. 54 at 7, 12-13.) After her husband left with the gun, Mrs. Farrand called 9-1-1 to report her concern about what her husband might do to Mr. Clyde while in that mental state. (Dkt. No. 45 at 8.) She told the 9-1-1 dispatcher, "He wants to go kill him. I'm afraid he is either going to kill himself or this other person." *Id.*

While Mrs. Farrand was on the phone with the dispatcher, she reported that Mr. Farrand came back into the house and put the gun back in the safe. (Dkt. No. 45-6 at 6-7.) Police officers arrived soon thereafter, and parked outside the house. (Dkt. No. 45 at 8.) Mrs. Farrand told her husband that the police wanted him to come outside, and at that moment she reported to the 9-1-1 dispatcher, "He does have weapons again . . . . [H]e has the .22 handgun and another gun. And I think he wants the police to shoot him . . . He's been suicidal for a long time . . . He'll pistol whip them. Suicide by cops." (Dkt. No. 45-6 at 12-13.) Around this time, Mr. Farrand also sent a text message to his son stating "Hey Logan I love you . . ." (Dkt. No. 45 at 8.) Mrs. Farrand repeated her fearful sentiment later on the same call: "He's suicidal, and I'm afraid he wants suicide by cops." (Dkt. 45-6 at 13.) Mr. Farrand had previously struggled with depression, including an alleged prior suicide attempt. (Dkt. No. 54 at 8.)

Mrs. Farrand also told the dispatcher "I have a very large dog who will protect me. Please, please, don't hurt my dog." (Dkt. No. 45-6 at 13.) She then informed the dispatcher that the police had arrived, hung up the phone, and exited the house through a side door to meet the arriving officers. (*Id.*; Dkt. No. 54 at 10.) Officer Jason Read first apprehended Mrs. Farrand, and then turned her over to Officer Preston Casey who led her away from the scene to a police car. (Dkt. No. 54 at 10.)

2

Mr. Farrand eventually exited through the front door of his house, holding a pistol down by his side; two neighbor witnesses testified in witness statements that they saw Mr. Farrand exit the front of his house with a gun in his hand, supporting the officers' testimonies. (Dkt. No. 45 at 9; Dkt. No. 45-9 at 2-3; Dkt. No. 54 at 10.) Farrand was then met by Officer Read. (Dkt. No. 45 at 9.) Officer Gary Thomas approached from behind to help provide cover to Officer Read, and witnessed some of the confrontation that ensued between Read and Farrand. A microphone on Officer Thomas captured their dialogue during the encounter; the dash camera on his car also caught a partial view of their confrontation. *Id.*

Immediately before Mr. Farrand appears in Officer Thomas's video footage, what appears to be a dog approaches Officer Read from the house's porch area, and then returns back toward the house immediately before Mr. Farrand appears in the footage. (Dkt. No. 45-13 at 15:38:25-38:43.) Neighbor Jacob Layton witnessed that he saw Farrand turn around and let the dog back into the house and then close the door. (Dkt. No. 45-9 at 2-3.) When Farrand then turned back, Officer Read promptly asked Farrand to drop the gun. Officer Read repeatedly pleaded with Farrand throughout the entire encounter, ordering him to "Drop the gun" a total of *at least nine times*. (*See* Dkt. No. 45-13.) According to Officers Read and Thomas, Mr. Farrand never complied with Read's orders, but instead rubbed and tapped the trigger repeatedly with the gun "just down by his side." (Dkt. No. 45-10 at 11; Dkt. No. 54 at 11.) Read accordingly gave Farrand the following order: "Don't put your finger on that trigger, man. Don't put your finger on that trigger." (Dkt. No. 54 at 11.) Read reported that in response to this order, Farrand laughed nervously and sighed. (Dkt. No. 45-10 at 11.) During the confrontation, Farrand also responded to Officer Read at least three times with the words "Do it," which Officer Read interpreted to mean that Farrand

3

was encouraging Read to shoot him. (*See id.*; Dkt. No. 45-13.) Officer Read states that he feared for his life and for Officer Thomas's during this encounter. (*See* Dkt. No. 45-10 at 11.)

Mr. Farrand then moved toward the gate positioned between the house and the detached garage, opened the gate, and began to pass through the gate opening. (*See* Dkt. No. 54 at 19; Dkt. No. 45-10 at 24.) Plaintiff contends that Farrand was walking toward the fence to put their dog Brutus in the backyard because Brutus had exited the house through the side door and "most likely entered the front yard from the side gate left open when Officer Read removed [Mrs. Farrand] from the backyard." (Dkt. No. 54 at 19.) Officer Read later confirmed that as Farrand was walking toward the backyard there was "a dog running around," and he further stated that he didn't "know if [Farrand] was putting the dog in the back yard or what he was doing . . . ." (Dkt. No. 45-10 at 11, 24.) Read also claimed, however, that at that moment he began to worry that if Farrand was able to get past the gate, he could enter the house through a side door and threaten anyone potentially still inside the house, as Read did not know whether anyone else remained in the house. (*Id.* at 11.) Read also testified that he feared losing sight of the gun, as Farrand might then be able to target him or Officer Thomas from behind the fence. (*Id.* at 24.)

About two seconds before shooting Farrand, Officer Read again shouted "Drop the gun, Vince" one last time. (Dkt. No. 45-13 at 15:39:36.) According to Read's account, Farrand then turned around and gave him a "smirk" which Read said made him feel as if Farrand was saying to him "You ready?" (Dkt. No. 45-10 at 24.) At this point in Officer Thomas's dash camera footage of the encounter, Farrand is no longer visible to the camera. (*See* Dkt. No. 45-13.) Officer Read then claims that Farrand turned into a sideways "bladed" position, and lifted his gun toward Read. (Dkt. No. 45 at 9.) Read fired five shots, some of which hit and killed Mr. Farrand. (Dkt. No. 45-13 at 15:39:38; Dkt. No. 54 at 21.)

After waiting for a period of time, Read testified that he walked toward the fence, kicked open the spring-loaded gate door to approach Farrand's body on the ground, and then promptly kicked the gun out of Farrand's hand. (Dkt. No. 45-10 at 12, 24.) Officer Thomas testified that he also witnessed Farrand's body on the ground with the gun still in his hand, and that he subsequently saw Read kick the gun out of Farrand's hand. (Dkt. No. 45-11 at 21.)

Plaintiff argues that a material issue of fact remains regarding whether Mr. Farrand placed his gun on the ground prior to being shot. (*See* Dkt. No. 54 at 18, 21.) Attempting to contradict Read's account of the confrontation, Plaintiff submits video evidence from Officer Cannon Heslop's Body Camera of Officer Casey telling Officer Heslop that Farrand had put the gun down. (*See* Dkt. No. 54 at 20.) Specifically, Officer Heslop asked Officer Casey who had shot Farrand, to which Officer Casey responded in part: "He [Mr. Farrand] came out with a gun in his hand, and then put it down and started running toward the fence, and then he turned around. And Jason [Read] followed him." (Dkt. No. 54-1, Ex. 6 at 20:00-20:32.) In further support of Plaintiff's contention, Mrs. Farrand testified in her 2017 deposition testimony that immediately before she was escorted away from the scene out of view, she saw her husband "lifting" the gun out of his waist band with his left hand before "setting" the gun down, although she clarified that she never actually witnessed the gun touch the ground. (*See* Dkt. No. 45-3 at 10; Dkt. No. 54 at 18.) Defendant responds that Officer Casey's statement is consistent with Read's assertion that Farrand brought the gun down to his side during the confrontation, but never actually obeyed orders to drop the gun to the ground. (Dkt. No. 55 at 3-4.)

Plaintiff also contends that Farrand did not turn to point a gun at Read, but was instead shot in the back. (Dkt. No. 54 at 21.) Plaintiff further argues that Read would not have been able to see Farrand lift a gun toward him because the gate was closed behind Farrand at the time he was

5

shot; Read's view of Farrand would have thus been completely obstructed by the nontransparent fence. (*Id.* at 21, 26.) In addition to the issue of whether Farrand actually lifted his gun toward Read, Plaintiff contends that another issue of fact remains as to whether Farrand was shot through the fence after the gate was fully closed behind him (*i.e.*, when he was not visible to Read) or whether he was shot while the gate was open (*i.e.*, when he remained visible to Read). Plaintiff submits that some of the bullets retrieved from Farrand's body had paint remaining on them, suggesting that they passed through the painted fence, and further that Farrand's body was found lying fully inside the backyard fence. (*See id.* at 12.) Defendant responds by pointing to the Utah Medical Examiner autopsy report which concluded that the projectiles initially struck Farrand in the back, traveled through his right chest cavity, and then "exited the chest and re-entered the right arm . . .", contending that this report is consistent with Officer Read's account of Farrand turning in a bladed position to raise his gun right before he was shot. (*See* Dkt. No. 55 at 4; Dkt. No. 45-16 at 2.)

On April 21, 2016, Mrs. Farrand submitted a claim to Defendant American General Life Insurance Company (AGLIC) based on Mr. Farrand's death seeking $500,000 in benefits under an accidental injury policy insuring her husband. (Dkt. No. 2 at 4.) Mrs. Farrand was the sole named beneficiary on that policy, which had been effective since September 28, 2011, with all monthly premiums paid up to the date of the shooting. (*Id.* at 3.) In response to Plaintiff's claim, Defendant retained third party Curry & Associates to acquire the Davis County Police Department's official investigation reports of the incident, which they claim included "numerous witness statements from the officers and other eye-witnesses, transcripts of interviews, a detailed ballistics analysis, a medical examiner's report, a toxicology report, an analysis of Mr. Farrand's computer and cell phone, and numerous other materials." (Dkt. No. 45 at 9.) On August 5, 2014

6

Defendant determined that the claim was not payable based on the policy exclusions, and on August 18, 2014 Defendant sent a denial letter to Mrs. Farrand. (*See* Dkt. No. 2 at 4.) On September 21, 2016, Plaintiff brought the present case against Defendant for breach of contract, breach of the implied covenant of good faith and fair dealing, and other tortious actions. (*Id.* at 9-10.)

## **DISCUSSION**

To prevail on its motion for summary judgment, Defendant as the moving party must show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A disputed fact is "material if it might affect the outcome of the suit under the governing law; the dispute is genuine if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party." *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"Under Utah law, insurance policies are construed using general contract principles." *Utah Power & Light Co. v. Fed. Ins. Co.*, 983 F.2d 1549, 1553 (10th Cir. 1993). The elements of breach of contract are: (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages. *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, 20 P.3d 388, 392 (2001).

"Utah courts have long held that 'insurance policies should be construed liberally in favor of the insured . . . so as to promote and not defeat the purposes of insurance.'" *Fire Ins. Exchange v. Oltmans*, 2012 UT App 230, 285 P.3d at 805 (quoting *U.S. Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993)). As a result, "ambiguous or uncertain language in an

insurance contract ... should be construed in favor of coverage." *Sandt*, 854 P.2d at 522. "In strictly construing exclusions, [Utah courts] give them effect only when they use language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Oltmans*, 285 P.3d at 805.

Defendant's AccidentCare Direct limited benefit policy (the "Policy") for accidental injury coverage defines "accidental injury" as an "accidental bodily injury, which is unforeseen and suddenly sustained without the design or intent of an Insured Person." (Dkt. No. 45-2 at 6.) To be subject to coverage, the accidental injury must cause a "covered loss" (such as accidental death) within 180 days following the accidental injury that caused such loss. (*Id.*) The Policy notes that Defendant "will pay the accidental death benefit . . . if the Insured Person dies as the result of an Accidental Injury," with an accidental death benefit amount of $500,000. (*Id.* at 5, 7.)

The Policy excludes coverage for any accidental injury or any loss "caused or resulting in whole or in part by," inter alia:

    a. **Suicide**: The insured person's suicide or attempt at suicide, or intentional self-inflicted injury, or any attempt at intentional self-inflicted injury while sane or insane; or

    b. **Intoxication**: The Insured's being under the influence of an excitant, depressant, hallucinogen, narcotic, or any other drug or intoxicant including those prescribed by a physician that are misused by the Insured Person; or

    c. **Assault or Felony**: The Insured's commission of or attempt to commit an assault or felony; or

    d. **Illegal Activity**: The Insured's engaging in an illegal activity or occupation.

(Dkt. No. 45-2 at 8.)

Plaintiff claims that Defendant breached the insurance contract by denying Plaintiff's claim for the $500,000 death benefit for Mr. Farrand's death, and is thus entitled to a jury determination of whether her damages suffered "are the result of Defendant's conduct or

otherwise recoverable." (*See* Dkt. No. 54 at 3.) In order for Plaintiff to recover under the policy, Mr. Farrand's death must have resulted from an accidental injury, and the accidental injury or loss must not fall under any of the enumerated Policy exclusions. On the other hand, for Defendant to prevail on summary judgment, it bears the burden of demonstrating as a matter of law that either 1) the injury was not accidental or 2) one of the Policy exclusions apply.[1]

I. **Accidental Injury**

The Utah Supreme Court has provided two tests (subjective and objective) for applying accidental injury insurance policies to determine whether bodily injury was non-accidental under Utah law:

> First, harm or damage is not accidental if it is the result of actual design or intended by the insured. Second, harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured. The first category presents a factual question as to what the insured intended. The second category generally presents a legal question as to what the average individual would expect to happen under the circumstances.

*N.M. on behalf of Caleb v. Daniel E.*, 2008 UT 1, ¶¶ 6–7, 175 P.3d 566, 569–70 (2008). The Court also found that an insured's injury is accidental "only where the injury suffered is completely disproportionate to the injury intended or reasonably expected . . . ." *Id.* at ¶ 12. Further, the Court explained that under this test, the insured (or the average individual) need not intend or expect the specific type of injury suffered for it to be deemed non-accidental. *Id.*

While the first (subjective) test presents a factual question that would be best left to a jury under these facts and circumstances, the Court now finds it appropriate to decide this case under the second (objective) test.

---

[1] Defendant can meet this burden by "point[ing] to an absence of evidence to support the non-movant's claim." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff argues that Officer Heslop's recorded statement that Mr. Farrand "put the gun down and started running toward the fence" together with Mrs. Farrand's testimony that she saw him "setting" the gun down toward the ground creates a fact issue regarding whether Farrand dropped the gun on the ground during the encounter with Officer Read. While this is certainly a material fact, Defendant has met its burden of demonstrating that no genuine issue exists with respect to it. Officer Casey never actually stated that Farrand dropped the gun *on the ground* before running to the fence, but simply that he "put [it] down." Casey's recorded statement is thus inconclusive on this question, and yet appears consistent with his later deposition testimony that he "lost visual of the suspect when he put his gun down to his side. . . . [Farrand] had it in his hand still, but it was down to his side as he was walking toward the gate." (Dkt. No. 45-8 at 15.) While Mrs. Farrand's statement is more detailed, she admitted that she never actually witnessed the gun touch the ground. Further, her specific testimony about her husband dropping the gun toward the ground in particular was first given more than three years after the incident took place. (*See* Dkt. No. 45-3.)

By contrast, Defendant persuasively argues that Officer Thomas's dash camera recording from the incident and his accompanying audio footage tell a story that is incompatible with Mrs. Farrand's testimony. Mrs. Farrand testified that after her husband came out the front door, removed the gun from his waist band, and purportedly went to set the gun down on the ground, she "didn't really see anything" else that followed in the ensuing confrontation with Officer Read. (Dkt. No. 45-3 at 10.) However, if Mr. Farrand actually dropped the gun on the ground early on in his encounter with Officer Read, nothing that follows in Officer Thomas's audio recording makes sense. For instance, it is clear from the audio recording that Officer Read firmly tells Mr. Farrand to "put the gun down" at least nine times throughout the confrontation,

including one last order just two seconds before firing the fatal shots. He also cautions Farrand: "Don't put your finger on that trigger, man. Don't put your finger on that trigger." Why would Read repeat these warnings over and over if Farrand had already put the gun down on the ground earlier? Also evident from the recordings is Read's highly anxious tone of voice and tense body posture while pointing his gun at Farrand throughout the entire encounter. Read's words and actions only make sense if he actually could see that Farrand posed a threat to him by keeping his weapon in his hand throughout the encounter. Furthermore, if Farrand had in fact dropped his weapon earlier, it seems likely that Farrand would at least once respond to Read's order to "drop the gun" by saying something like "I already dropped it." Instead, the recording shows Farrand's defiance and aggression toward Read, including daring him to "do it" at least three times. Lastly, and equally persuasive, Officer Thomas testified that after the shooting, Farrand still held the gun in his hand as he lay on the ground, and that he then witnessed Officer Read kick it out of Farrand's hand. Defendant has met its burden of showing that these accounts cumulatively refute Plaintiff's claim that Mr. Farrand placed the gun on the ground at some point prior to the shooting. Accordingly, the Court finds that there is no genuine issue on this fact, and that no reasonable jury could find in Plaintiff's favor.

Plaintiff also argues that because Farrand had turned his back and was walking toward his backyard gate, his actions "suggest[ed] a disengagement with the police," and thus that he posed no threat to Officer Read. (*See* Dkt. No. 54 at 26-27.) Plaintiff alleges that he was simply choosing to withdraw from the deadly situation while placing his dog Brutus in the backyard, which action cannot be sufficient to warrant a deadly response. (*See id.* at 19.) Plaintiff also alleges that there is a fact issue regarding whether Farrand went entirely through the gate which then closed behind him before shots were fired, thus preventing Read from seeing Farrand raise

the gun toward him. Defendant responds that the facts instead show that "when Officer Read *started* shooting, [the gate] was still open and [Read] had a clear view of Farrand," but that because the gate was spring-loaded it swung shut after Farrand was shot. (Dkt. No. 55 at 3.)

Because the Court has determined that no reasonable jury could find that Farrand dropped the gun on the ground during the confrontation, the Court need not resolve the issue of whether Farrand raised the gun toward Read, or whether Farrand was fully visible to Read at the time of the shooting. Defendant has shown that Farrand obstinately refused to drop the gun and acted recklessly throughout the encounter; it cannot reasonably be said (and no reasonable jury could find) that his attempt to exit through the backyard gate while still holding the gun was disengaging with the police. The fact that he may have been accompanying his dog while exiting does not change this analysis. To the contrary, Defendant has demonstrated that Read sensibly believed that if Farrand was able to find full cover behind that fence, Read's life was in even greater jeopardy, along with Officer Thomas's and anyone else remaining in the house.[2] Therefore, Defendant has shown that the average person in Farrand's position would have anticipated being shot while attempting to flee that situation with a weapon.[3] No reasonable juror could find otherwise.

Based on Mr. Farrand's actions during the standoff with Officer Read, the average individual in Farrand's circumstances would have expected either a shooting or shoot-out to ensue. Being shot (and consequently killed) was clearly the natural and probable consequence of

---

[2] *See, e.g.*, *Hoffman v. Life Ins. Co. of N. Am.*, 669 P.2d 410, 418 (Utah 1983) (finding that where insured's conduct and use of weapon threatens death or serious bodily injury to another, insured should expect or anticipate that threatened individual will very likely respond with deadly force, and under those circumstances insured's death is not accidental).

[3] *See Murdock v. Monumental Life Ins. Co.*, 2 P.3d 963 (Utah App. 2000) (finding that insured robber fleeing from scene should have expected that his victim might respond to insured's assault and robbery with deadly force, and that the insured's death was non-accidental even though the threatened person had unintentionally struck the insured with his van while chasing him).

12

recklessly disregarding nine different warnings from a police officer to "drop the gun," especially after brazenly playing with the trigger, repeatedly responding by provoking the officer with the words "do it," and then attempting to escape into the backyard with the weapon still in hand. Farrand's injury and death were thus not "completely disproportionate" to what the average individual would have expected under these circumstances, especially given the serious risk these actions posed to his life. No reasonable person could find that Farrand's injury and death were objectively accidental or unforeseen. Thus, no genuine issue exists regarding whether Mr. Farrand's injury and death qualify as an "accident" under the Policy and the objective test; Defendant is entitled to summary judgment.

## II. Illegal Activity Exclusion

Even if Plaintiff could show genuine issues of material fact regarding whether Mr. Farrand's death resulted from an "accidental injury" under the policy, Defendant still prevails if it can satisfy one of the Policy's enumerated exclusions. The Policy "clearly and unmistakably" communicated to Plaintiff that coverage would not be provided if 1) the Insured engaged in an illegal activity, and 2) that illegal conduct resulted in the Insured's death. *See Oltmans*, 285 P.3d at 805. Because it is beyond dispute that Farrand engaged in illegal activity that resulted in his death, Defendant is also entitled to summary judgment under the "illegal activity" policy exclusion in the insurance contract.

The Utah Criminal Code clearly identifies "Interference with a peace officer" as an illegal activity. Specifically, "a person is guilty of a class B misdemeanor if the person knows, or by the exercise of reasonable care should have known, that a peace officer is seeking to effect a lawful arrest or detention of that person or another person and interferes with the arrest or detention by . . . refusing to perform any act required by lawful order (i) necessary to effect the

13

arrest or detention; and (ii) made by a peace officer involved in the arrest or detention . . . ." Utah Code § 76-8-305(1).

As already discussed, Mr. Farrand clearly refused to comply with Officer Read's repeated instructions to "drop the gun" and to not put his finger on the gun's trigger. Plaintiff does not contest that the audio recording shows that Read instructed Farrand at least nine times to drop the gun. Instead, Plaintiff claims that Farrand dropped the gun on the ground prior to moving toward the fence to enter the backyard, thereby complying with the officer's instructions. However, as described above, Defendant has shown undisputed facts that as a matter of law contradict Plaintiff's assertion on this issue. The Court also determines that with the exercise of reasonable care, Mr. Farrand should have known that Officer Read was seeking to lawfully arrest or detain him for his actions, especially after the first time he disobeyed Read's orders to "drop the gun." No reasonable juror could find otherwise. By refusing to perform the acts that Read required to effect Farrand's detention, Farrand engaged in illegal activity.

To qualify for the Policy's exclusion, the accidental injury or loss must have also been caused or have resulted in whole or in part by "the Insured's engaging in an illegal activity or occupation." It is apparent from the undisputed facts that Farrand's noncompliance with Read's orders was likely the direct cause of Farrand's death. At a minimum, however, Defendant has clearly shown that Farrand's death at least "resulted in part" by his illegal interference with a peace officer, thereby satisfying the Policy exclusion language. Plaintiff has failed to present evidence of a genuine fact issue on this particular exclusion. Thus, even construing the contract language liberally in favor of Plaintiff, Farrand's actions cannot avoid the "illegal activity" Policy exclusion.

In summary, because Vince Farrand illegally interfered with a peace officer in violation of Utah Code § 76-8-305, and this conduct clearly resulted (at least in part) in his death, Plaintiff's recovery is excluded under the policy. No reasonable jury could find otherwise. Defendant is thus entitled to summary judgment on Plaintiff's breach of contract claim. Accordingly, the Court need not address the more difficult questions of whether Farrand's loss was caused by or resulted from suicide, assault/felony, or intoxication for Defendant to satisfy those exclusions.

### III. Implied Covenant of Good Faith and Fair Dealing

Under Utah law, an insurer does not violate the implied covenant of good faith and fair dealing as long as it "acts reasonably in denying a claim," which is an objective test. *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 27, 56 P.3d 524, 533 (2002); *see also Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996). "The denial of a claim is reasonable if the insured's claim is fairly debatable. Under Utah law, if an insurer denies an insured's claim that is fairly debatable, then the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so." *Id.* at 68; *see also Eldredge v. State Farm Mut. Auto. Ins. Co.*, No. 2:12CV900 DAK, 2014 WL 1875663, at *6-7 (D. Utah May 9, 2014) (evidence supporting denial of insurance coverage, even if opposed by expert opinion, renders the decision "fairly debatable."). "[T]he determination of whether a claim was fairly debatable is made at the time the claim was denied." *Hoopes v. Owners Ins. Co.*, Case No. 2:15–cv–00734–PMW, 2018 WL 3320799, at *2 (D. Utah Jul. 5, 2018).

The materials that Defendant reviewed (as acquired by Curry & Associates) before making its claims decision were both comprehensive and voluminous. They obtained the Davis County Police Department's official investigation reports of the incident, which included

15

"numerous witness statements from the officers and other eye-witnesses, transcripts of interviews, a detailed ballistics analysis, a medical examiner's report, a toxicology report, an analysis of Mr. Farrand's computer and cell phone, and numerous other materials." (Dkt. No. 45 at 9.) Based on its review of hundreds of pages of collected materials, Defendant reasonably determined at the time that Farrand's injury was not accidental, that policy exclusions applied, and thus that it had sufficient information to deny Plaintiff's claim. Furthermore, as Defendant persuasively argues, "Plaintiff . . . fails to show that the evidence American General reviewed in 2014 conclusively *foreclosed* all defenses to coverage." (Dkt. No. 55 at 6.)

Because at a minimum there was clearly a fair debate as to whether coverage applied under these facts, Plaintiff cannot show that the evidence was so one-sided that denying coverage was unreasonable at the time of denial. Defendant has thus met its burden of demonstrating that it did not act in bad faith in denying coverage. Defendant is therefore also entitled to summary judgment on Plaintiff's claim alleging breach of the duty of good faith and fair dealing.

## IV. Motions to Exclude Experts

Defendant's Motion to Exclude Plaintiff's Damages Expert Thomas Pastore and Motion to Exclude Plaintiff's Insurance Expert Bennett Bibel (Dkt. Nos. 42 and 43) are moot as there are no issues to present to a jury regarding consequential damages or the implied covenant of good faith and fair dealing.

# **ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Complaint is dismissed with prejudice.

Dated this 22nd day of January, 2019.

                                        BY THE COURT:

                                        Dee Benson
                                        United States District Judge